**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | | |
|---|---|---|
| LEILA GREEN LITTLE, JEANNE PURYEAR, KATHY KENNEDY, REBECCA JONES, RICHARD DAY, CYNTHIA WARING, AND DIANE MOSTER, | § § § § § § | Civil Action No. 1:22-cv-00424-RP |
| Plaintiffs, | § § | |
| v. | § § | |
| LLANO COUNTY, RON CUNNINGHAM, in his official capacity as Llano County Judge, JERRY DON MOSS, in his official capacity as Llano County Commissioner, PETER JONES, in his official capacity as Llano County Commissioner, MIKE SANDOVAL, in his official capacity as Llano County Commissioner, LINDA RASCHKE, in her official capacity as Llano County Commissioner, AMBER MILUM, in her official capacity as Llano County Library System Director, BONNIE WALLACE, in her official capacity as Llano County Library Board Member, ROCHELLE WELLS, in her official capacity as Llano County Library Board Member, RHONDA SCHNEIDER, in her official capacity as Llano County Library Board Member, and GAY BASKIN, in her official capacity as Llano County Library Board Member, | § § § § § § § § § § § § § § § § § § § § § | |
| Defendants. | § § § | |

**PLAINTIFFS' RULE 65 MOTION FOR PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS

INTRODUCTION ............................................................................................................. 1

FACTUAL BACKGROUND ............................................................................................. 2

    I.      The Llano County Library System ...................................................................... 2

    II.    The County's Selection Criteria for Books ......................................................... 4

    III.   Defendants' Censorship and Viewpoint Discrimination Campaign ..................... 5

        A.     Defendants Target Children's Books ............................................................ 5

        B.     Defendants Remove Books Based on Representative Krause's List ............... 6

        C.     Defendants Permanently Terminate Access to OverDrive ............................. 7

        D.     Defendants Pack the Library Board and Close Meetings to the Public ........... 8

ARGUMENT ..................................................................................................................... 9

    I.      Plaintiffs Have Demonstrated a Substantial Likelihood of Success on the Merits
        of Their First Amendment Claim ........................................................................ 9

        A.     Defendants Engaged in Viewpoint Discrimination, a Per Se Violation of
            Plaintiffs' First Amendment Rights ............................................................ 11

        B.     Defendants' Censorship Is Also an Impermissible Content-Based Restriction
            in Violation of Plaintiffs' First Amendment Rights .................................... 14

           1.     Defendants' censorship activities are content based ............................... 15

           2.     Defendants cannot establish a compelling government interest for
               imposing content-based restrictions ....................................................... 15

3.      Defendants have not used the least restrictive means to achieve their
         purportedly compelling interest .................................................................17

II.     There Is a Substantial Threat of Irreparable Harm If the Preliminary Injunction Is
         Not Granted .................................................................................................19

III.    The Balance of Equities Favors Plaintiffs............................................................20

CONCLUSION.................................................................................................................20

# TABLE OF AUTHORITIES

**Cases**                                                                **Page(s)**

*Ashcroft v. Free Speech Coal.,*
   535 U.S. 234 (2002) ...........................................................................................16
*Board of Education v. Pico,*
   457 U.S. 853 (1982) ............................................................................... 10, 13, 19
*Christian Legal Society v. Walker,*
   453 F.3d 853 (7th Cir. 2006) ...............................................................................21
*Cornelius v. NAACP Legal Defense & Educ. Fund, Inc.,*
   473 U.S. 788 (1985) .............................................................................................14
*Fed. Election Comm'n v. Mass. Citizens for Life, Inc.,*
   479 U.S. 238 (1986) ...............................................................................................1
*Fulton v. City of Philadelphia, Pennsylvania,*
   141 S. Ct. 1868 (2021) .........................................................................................15
*Iancu v. Brunetti,*
   139 S. Ct. 2294 (2019) ............................................................................ 2, 10, 14
*Int'l Soc. for Krishna Consciousness, Inc. v. Lee,*
   505 U.S. 672 (1992) .............................................................................................15
*Kreimer v. Bureau of Police,*
   958 F.2d 1242 (3d Cir. 1992) ....................................................................... 10, 14
*Lamont v. Postmaster General,*
   381 U.S. 301 (1965) ..................................................................................... 10, 17
*Longoria v. Paxton,*
   2022 WL 447573 (W.D. Tex. Feb. 11, 2022) ................................................. 10, 11
*Matal v. Tam,*
   137 S. Ct. 1744 (2017) .........................................................................................11
*Miller v. California,*
   413 U.S. 15 (1973) ...............................................................................................16
*Opulent Life Church v. City of Holly Springs, Miss.,*
   697 F.3d 279 (5th Cir. 2012) ......................................................................9, 19, 20
*Perry Educ. Ass'n,*
   *v. Perry Loc. Educators' Ass'n,* 460 U.S. 37 (1983) ...........................................14
*Planned Parenthood of Gulf Coast, Inc. v. Gee,*
   862 F.3d 445 (5th Cir. 2017) ...............................................................................20
*Reed v. Town of Gilbert,*
   576 U.S. 155 (2015) .............................................................................................15
*Reno v. American Civil Liberties Union,*
   521 U.S. 844 (1997) ............................................................................... 10, 15, 17
*Robinson v. Hunt County, Texas,*
   921 F.3d 440 (5th Cir. 2019) ......................................................................... 11, 12
*Rosenberger v. Rector & Visitors of Univ. of Va.,*
   515 U.S. 819 (1995) .............................................................................................11
*Sund v. City of Wichita Falls, Tex.,*
   121 F. Supp. 2d 530 (N.D. Tex. 2000) ........................................................ 10, 14, 15, 17

*Texans for Free Enter. v. Texas Ethics Comm'n*,
    732 F.3d 535 (5th Cir. 2013) ........................................................................ 2, 19, 21
*United States v. Playboy Ent. Grp., Inc*.,
    529 U.S. 803 (2000) ................................................................................................18

## **Statutes**

Tex. Loc. Gov't Code § 323.005 ................................................................................3
Tex. Loc. Gov't Code § 323.006 ................................................................................3

## INTRODUCTION

Plaintiffs respectfully seek a preliminary injunction to stop Defendants' systematic efforts to ban books from Llano County public libraries.[1] Book banning offends basic First Amendment principles and strikes at the core of our democracy. Each moment that Plaintiffs are denied their right to access the banned books, they suffer immediate and irreparable harm. Indeed, "freedom of thought and speech 'is the matrix, the indispensable condition, of nearly every other form of freedom.'" *Fed. Election Comm'n v. Mass. Citizens for Life, Inc.*, 479 U.S. 238, 264 (1986).

Plaintiffs are residents of Llano County and visitors, users, card-carrying members, and ardent supporters of Llano County's public libraries. Starting in August 2021, Defendants— public officials who control which books are available in the County's public libraries—have perpetuated a systematic campaign to eradicate books containing ideas or messages that they disagree with from the County's library collection. In so doing, Defendants have transformed the County's public libraries from contemplative spaces where residents can explore the marketplace of ideas to battlegrounds in Defendants' political and ideological war. More troubling still, Defendants have taken steps to cloak their censorship activities in secrecy and insulate it from all forms of community review and scrutiny.

Plaintiffs are likely to prevail on the merits of their First Amendment claim. Defendants' book banning is driven by their antipathy to the ideas in the banned books. Publicly, Defendants have claimed that their purge is aimed at removing "pornographic" materials from library shelves. But the evidence shows that this is mere pretext. For example, one of the books they banned is a historical nonfiction book entitled, *They Called Themselves the K.K.K: The Birth of an American Terrorist Group*. Defendants banned it because they disagreed with the political

---

[1] Hereinafter, the "Library System."

1

views of the author, not because it is smut. Indeed, none of the books Defendants have targeted is obscene or pornographic in any fashion. To the contrary, many of the banned books have received prestigious literary awards and national acclaim. The true motivation behind Defendants' censorship is the subject matter and viewpoint of these books, many of which address contemporary issues related to sexuality, sex education, gender identity, and racial equality. Because Defendants' suppression of information was driven by their subjective views and opinions, their conduct constitutes impermissible viewpoint discrimination—a *per se* violation of the First Amendment. *Iancu v. Brunetti*, 139 S. Ct. 2294, 2299 (2019).

Plaintiffs will suffer irreparable harm absent relief from this Court. The "loss of First Amendment freedoms for even minimal periods of time constitutes irreparable injury justifying the grant of a preliminary injunction." *Texans for Free Enter. v. Texas Ethics Comm'n*, 732 F.3d 535, 539 (5th Cir. 2013). This injury far outweighs any harm to Defendants, who have no legitimate interest in perpetuating a censorship campaign in violation of the Constitution. Rectifying a violation of the First Amendment is always in the public interest. *Id.*

Accordingly, Plaintiffs seek a preliminary injunction to prevent further harm to their First Amendment rights and to reinstate access to public library books they hold dear.

## FACTUAL BACKGROUND

### I. The Llano County Library System

The County's public libraries are the cultural centers of the community, providing an open and accessible space for residents of different ages, income levels, backgrounds, and political beliefs to gather in the common pursuit of knowledge and the exploration of ideas. The County Library System has three physical locations: the Llano Library Branch (the main branch), the Kingsland Library Branch, and the Lakeshore Library Branch. (Declaration of Leila Green Little ("Little Decl.") ¶ 5.) Prior to the events giving rise to this lawsuit, the Library System also

provided library cardholders with a digital catalog called "OverDrive," which gave library patrons access to a curated collection of over 17,000 digital ebooks and audiobook titles. (*Id.* ¶ 4.) This service was widely used in the community, particularly by elderly patrons, patrons with disabilities, and those patrons otherwise unable to visit a physical library. (Declaration of Amy Senia ("Senia Decl."), Exs. 1, 25; Declaration of Cynthia Waring ("Waring Decl.") ¶ 4.)

Plaintiffs are card-carrying members of the Library System, which Plaintiffs use to access library books on a variety of topics, including fiction and nonfiction books, and books written for children, young adults, and adults. (Little Decl. ¶ 2; Declaration of Jeanne Puryear ("Puryear Decl.") ¶ 2; Declaration of Kathy Kennedy ¶ 2; Declaration of Rebecca Jones ¶ 2; Declaration of Richard Day ¶ 2; Waring Decl. ¶ 2; and Declaration of Diane Moster ¶ 2.)[2] Although Plaintiffs differ in their ages, professions, and religious and political beliefs, they are united in their love for reading public library books.

The Library System is under the general supervision of the County Commissioners Court, the County's governing body. *See* Tex. Loc. Gov't Code § 323.006. Defendant Ron Cunningham serves as County Judge, the head of the County Commissioners Court, and Defendants Jerry Don Moss, Peter Jones, Mike Sandoval, and Linda Raschke serve as County Commissioners. (Little Decl. ¶ 6.) Defendant Amber Milum is the Library System Director (*id.*), and is required to "develop and manage the library" and "determine which books and library equipment will be purchased." *See* Tex. Loc. Gov't Code § 323.005. In January 2022, Defendants Bonnie Wallace, Rochelle Wells, Gay Baskin, and Rhonda Schneider were appointed by the Commissioners Court to sit on the County's Library Board (the "New Library Board"). (Little Decl. ¶ 6.)

---

[2] Hereafter, "Plaintiffs' Decls."

## II. The County's Selection Criteria for Books

The County's Library System has well-defined policies for the selection of books, which the Commissioners Court adopted in August 2006 ("Materials Policy"). (Senia Decl., Ex. 2.) Before any book is placed on Library System shelves, it is assessed and vetted by a trained librarian in accordance with the Materials Policy and other professional standards established by the American Library Association ("ALA"). (*Id.*) The County's Materials Policy states its goals as "maintain[ing] a well-balanced and broad collection of materials for information, reference, research, and enjoyment" and "support[ing] the democratic process by providing materials for the education and enlightenment of the community." (*Id.* at 18). The Materials Policy also incorporates the ALA's *Library Bill of Rights*, which prohibits the exclusion of any books from a library collection "because of race or nationality or the political or religious views of the writer." (*Id.*; *see also* Declaration of Kenton L. Oliver ("Oliver Decl."), Ex. 2, *Library Bill of Rights*.)

The Materials Policy sets forth a clear standard with respect to books containing sexual content: "Materials with an emphasis on sex, or containing profane language should not be automatically rejected." (Senia Decl., Ex. 2 at 18.) Instead, "[s]election should be made on the basis of whether the media presents life in its true proportions, whether characters and situations are realistically presented, and whether the media has literary value." (*Id.*) Consistent with this provision, obscene materials cannot be selected for the Library System collection. (*Id.*)

The Materials Policy also explains that patrons' preferences and viewpoints cannot dictate what books are included in the collection: "While a person may reject materials for himself or herself and for his or her children, he or she shall not exercise censorship to restrict access to the materials by others." (*Id.* at 19.) "Responsibility for the reading of children rests with their parents or legal guardians. Selection should not be inhibited by the possibility that media may inadvertently come into possession of children." (*Id.* at 18.)

4

### III. Defendants' Censorship and Viewpoint Discrimination Campaign

For fifteen years, the County's trained librarians applied the Materials Policy without incident, creating a robust collection of books presenting a panoply of viewpoints and ideas. In 2021, however, Defendants commenced a coordinated campaign to remove and restrict access to books in the Library System's physical and digital collections based on Defendants' wholly subjective views of the propriety of those books.[3] Defendants targeted books with content that conflicted with their personal political and religious beliefs, in violation of both the County's Materials Policy, professional standards promulgated by the ALA, and the First Amendment.

### A. Defendants Target Children's Books

Defendants' unconstitutional conduct started in the children's section. Prior to their appointment to the New Library Board, Defendants Rochelle Wells, Rhonda Schneider, Gay Baskin, and Bonnie Wallace were part of a community group pushing for the removal of children's books that they subjectively deemed "inappropriate." (Little Decl. ¶ 7; Senia Decl., Exs. 3-5.) In the fall of 2021, Defendants Amber Milum, Jerry Don Moss, and Ron Cunningham acceded to that group's demands and removed several children's picture books from library shelves. (Senia Decl., Exs. 3-6.)

Among the removed books included were Maurice Sendak's *In the Night Kitchen* and *It's Perfectly Normal: Changing Bodies, Growing Up, Sex, and Sexual Health.* (*Id.*, Exs. 3, 6.) *In the Night Kitchen* follows a boy's dream journey through a baker's kitchen, and has received numerous awards, including the 1971 Caldecott Honor Book. (Oliver Decl. ¶ 28.) *It's Perfectly Normal* is an award-winning sex education book with color illustrations of the human body, designed for parents and children ages ten and older. (*Id.* ¶ 29.)

---

[3] All print and digital books targeted, restricted, or removed by Defendants, including removed books currently unknown to Plaintiffs, will be referred to collectively as the "Banned Books."

**B.  Defendants Remove Books Based on Representative Krause's List**

Emboldened by their success in the children's section, Defendants embarked on a censorship campaign of much broader scope, using a list of purportedly inappropriate books compiled by Texas State Representative Matt Krause as their blueprint. On October 25, 2021, Representative Krause sent a letter to the Texas Education Agency and various school district superintendents asking them to identify whether any of the 850 books on his attached 16-page list (the "Krause List") appeared on the shelves of Texas school libraries. (Senia Decl., Exs. 22, 23.) The Krause List includes famous and award-winning books such as *Between the World and Me* and *We Were Eight Years in Power* by Ta-Nehisi Coates, and *The New Jim Crow* by Michelle Alexander, as well as other fiction and nonfiction titles related to sexuality and sex education, gender identity, and racial equality. (*Id.*, Ex. 23.) Three days later, Defendant Milum removed *Critical Race Theory*, which appears on the Krause List, from library shelves and hid it behind the front desk in the Kingsland Branch. (*Id.*, Ex. 10.)

On November 10, 2021, Defendant Wallace sent Defendant Cunningham an email entitled "Pornographic Filth at the Llano Public Libraries," attaching a list of all the books on the Krause List that were then available in the Library System and referring to them as "atrocious." (Senia Decl., Ex. 7 at 2-3.) Defendant Wallace demanded that the children's books on the list "be RELOCATED to the ADULT section" because it was "the only way that I can think of to prohibit future censorship of books I do agree with, mainly the Bible, if more radicals come to town and want to use the fact that we censored these books against us." (*Id.* at 2.) She ended her email with a request to get "all the pastors involved in this" to "organize a weekly prayer vigil for this specific issue," exclaiming "[m]ay God protect our children from this FILTH." (*Id.* at 3.) Defendant Cunningham acted quickly, forwarding Defendant Wallace's list to Defendant Milum, who then compiled an excel spreadsheet entitled "Bonnie Wallace book list 2021.11.12" and

ordered librarians to remove those books from shelves. (*Id.*, Exs. 7, 9; (Declaration of Suzette Baker ("Baker Decl.") ¶¶ 3-5.) Cunningham also ordered Milum to "immediately" remove "any and all books that depict any type of sexual activity or questionable nudity." (Senia Decl., Ex. 7.) In private emails, Defendants referred to the Krause List not as the list of "pornographic" or "obscene" books, but as the "16-page list of CRT and LGBTQ book[s]." (*Id.*, Ex. 8.)

Defendants then removed at least six books on the Bonnie Wallace Spreadsheet from library shelves on November 12, 2021—the exact same date that Defendant Milum wrote in the title of her revised excel spreadsheet, *i.e.*, "Bonnie Wallace book list ***2021.11.12***." (Senia Decl., Exs. 6, 9 (emphasis added).) The Krause List books that Defendants removed included: (1) *Caste: The Origins of Our Discontent* by Isabel Wilkerson; (2) *They Called Themselves the K.K.K: The Birth of an American Terrorist Group* by Susan Campbell Bartoletti; (3) *Spinning* by Tillie Walden; (4) *Being Jazz: My Life as a (Transgender) Teen* by Jazz Jennings; (5) *Shine* by Lauren Myracle; and (6) *Freakboy* by Kristin Elizabeth Clark. (Senia Decl., Exs. 6, 9, 23.) A few days later, Defendants removed at least one more book on the Bonnie Wallace Spreadsheet from library shelves, *Gabi, a Girl in Pieces* by Isabel Quintero. (Senia Decl., Exs, 6, 9, 23.)

Then, in December 2021, Defendants closed the libraries to the public for three days to conduct a private review of the "appropriateness" of books in the teen and children's sections. (Senia Decl., Ex. 11.) This purge was likewise guided by the Krause List. (Puryear Decl., Ex. 1.)

## C. Defendants Permanently Terminate Access to OverDrive

Defendants' literary witch hunt did not stop with the County's print collection. In or around November 2021, Defendants discovered that two books on the Krause List, *Lawn Boy* by Jonathan Evison and *Gender Queer: A Memoir* by Maia Kobabe, were accessible to Llano County library patrons on OverDrive, a digital platform that gave County library patrons access to over 17,000 digital ebooks and audiobook titles. (Senia Decl., Exs. 7, 8.) Defendants

attempted to remove those two books from the digital collection, but soon realized that OverDrive has no mechanism to remove or restrict access to individual book titles. (*Id.*, Ex. 1; Puryear Decl., Ex. 1.)

Defendant Milum proposed implementing parental control options on OverDrive to restrict children's access to mature content—controls which would have filtered out the two books at issue. (Senia Decl., Exs. 12, 13; Declaration of Jim Monastra ¶ 6.) Nonetheless, on December 13, 2021, the Commissioners voted to suspend all access to OverDrive, including for adult patrons, because they did not believe the content filters were "enough" to protect children from the book *Gender Queer*. (Senia Decl., Exs. 11, 14.) Defendants never reinstated OverDrive, and to this day, Plaintiffs are unable to access it. (*See* Plaintiffs Decls.; Senia Decl., Ex. 25.)

### D. Defendants Pack the Library Board and Close Meetings to the Public

Defendants next moved to consolidate their power and insulate their censorship activities from public scrutiny. In or about January 2022, the Commissioners Court voted to dissolve the existing library board and to create a new one, which it renamed the "Library *Advisory* Board." (Little Decl. ¶ 8.) The newly created board included some appointees who did not even have library cards, and several people who had advocated for removing books based on the Krause List, including Defendants Bonnie Wallace, Rochelle Wells, and Rhonda Schneider (the "New Library Board."). (Little Decl. ¶¶ 6, 9; Senia Decl., Exs. 3, 5, 8, 11, 25.)

The New Library Board is "advisory" in name only; in reality, it has taken a series of actions in furtherance of Defendants' censorship scheme without seeking public approval from the Commissioner's Court. For example, without approval from the Commissioners Court, the New Library Board instructed librarians that all new books must be presented to and approved by the New Library Board before purchasing them. (Senia Decl., Exs. 15-17.) At the Board's

direction, no new library books have been purchased for the County for more than half a year. (Little Decl. ¶ 10; Baker Decl. ¶ 14; Senia Decl., Ex. 21.)

Defendants also took steps to cloak their viewpoint discrimination in secrecy once they learned that the public was monitoring the New Library Board's decisions. (Senia Decl., Exs. 3, 17.) For decades, County library board meetings have been open to the public. (Puryear Decl. ¶ 5). In February 2022, however, Defendants banned staff librarians from attending New Library Board meetings, which took place in public library meeting rooms. (Baker Decl. ¶ 9, Ex. 1.) A month later, they banned the public from attending meetings entirely. (Senia Decl., Ex. 24.)

For librarian Suzette Baker, the cost of standing up to Defendants' censorship campaign was even more grave. After refusing to remove books on the Bonnie Wallace Spreadsheet from library shelves and continuing to attend New Library Board meetings, Ms. Baker was fired by Defendant Milum for "insubordination." (Baker Decl. ¶ 13, Ex. 2.)

## ARGUMENT

In considering a motion for preliminary injunction, courts must determine whether the moving party has shown: "(1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable harm if the injunction is not granted; (3) that the threatened injury outweighs any harm that the injunction might cause to the defendant; and (4) that the injunction will not disserve the public interest." *Opulent Life Church v. City of Holly Springs, Miss.*, 697 F.3d 279, 288 (5th Cir. 2012). Plaintiffs, who have suffered grave and ongoing violations of their First Amendment rights, have amply satisfied each of these requirements.

### I.   Plaintiffs Have Demonstrated a Substantial Likelihood of Success on the Merits of Their First Amendment Claim

Defendants have systematically eroded Plaintiffs' rights to receive information in their public libraries, where First Amendment protections should be at their apex. The First

Amendment "indisputably protect[s] the right to receive information—*a fundamental right that is enjoyed by both adults and children*." *Sund v. City of Wichita Falls, Tex.*, 121 F. Supp. 2d 530, 547 (N.D. Tex. 2000) (Buchmeyer, J.) (emphasis in original) (citing *Reno v. American Civil Liberties Union*, 521 U.S. 844 (1997)); *Board of Education v. Pico*, 457 U.S. 853, 867-68 (1982) (plurality opinion) ("[T]he right to receive ideas is a necessary predicate to the recipient's meaningful exercise of his own rights of speech, press, and political freedom," and "students too are beneficiaries of this principle.") (internal citation omitted). Indeed, "the right to receive ideas follows ineluctably from the sender's First Amendment right to send them," otherwise "[i]t would be a barren marketplace of ideas that had only sellers and no buyers." *Pico*, 457 U.S. at 867 (citing *Lamont v. Postmaster General*, 381 U.S. 301, 308 (1965) (Brennan, J., concurring)).

"The right to receive information is vigorously enforced in the context of a public library, 'the quintessential locus of the receipt of information.'" *Sund*, 121 F. Supp. 2d at 547 (quoting *Kreimer v. Bureau of Police,* 958 F.2d 1242, 1255 (3d Cir. 1992)). In *Pico*, a public school library case the Supreme Court held that government officials may not remove books from school libraries "simply because they dislike the ideas contained in those books." 457 U.S. at 872. These principles have even greater force when applied to public libraries," where the "greater discretion afforded school boards" is not implicated. *Sund*, 121 F. Supp. 2d at 548.

Here, Defendants' ideologically driven viewpoint discrimination is a *per se* violation of Plaintiffs' First Amendment rights, and the Court need not conduct any further analysis. *See Longoria v. Paxton*, 2022 WL 447573, at *17 (W.D. Tex. Feb. 11, 2022) (preliminarily enjoining state statute prohibiting election officials from soliciting applications to vote by mail) (citing *Iancu*, 139 S. Ct. at 2301). But even if the Defendants' censorship had not been so firmly rooted

in viewpoint discrimination, Defendants' content-based suppression of access to books in public libraries—which are limited public forums—likewise violates the First Amendment.

**A.      Defendants Engaged in Viewpoint Discrimination, a Per Se Violation of Plaintiffs' First Amendment Rights**

Defendants' unilateral decision to ban certain books because they contain messages with which Defendants do not agree constitutes viewpoint discrimination at its apex. "It is axiomatic that the government may not regulate speech based on its substantive content or the message it conveys." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 828-29 (1995). "Official censorship based on a state actor's subjective judgment that the content of protected speech is offensive or inappropriate is viewpoint discrimination." *Robinson v. Hunt County, Texas*, 921 F.3d 440, 447 (5th Cir. 2019) (citing *Matal v. Tam*, 137 S. Ct. 1744, 1763 (2017)). Because Defendants' censorship measures were driven by their subjective belief that the content of the Banned Books is "offensive or inappropriate," that is a *per se* violation of the First Amendment, and the Court need not determine either the type of forum or whether such measures are narrowly tailored to compelling governmental interests. *See Rosenberger*, 515 U.S. at 828; *Longoria,* 2022 WL 447573, at *17.

Plaintiffs have presented ample evidence that Defendants' book censorship was motivated by their subjective viewpoints. When, in August 2021, Defendants removed several children's picture books about bodily functions and depicting nudity from the County's library collection, they did so in response to pressure from certain community members who deemed those books "disgusting" and "inappropriate." (*See* Senia Decl., Exs. 3, 4; Little Decl. ¶ 7.)

Further, when Defendants expanded their book banning campaign by adopting the censorship priorities of the Krause List as their own, their correspondence made clear that they were motivated by a desire to prohibit community access to books with viewpoints regarding

11

sexuality, sex education, gender identity, and racial equality that differed from their own. (*See*, *e.g.*, Senia Decl., Ex. 10 (three days after Krause list issued, Milum hides "Critical race theory book" behind front desk to limit access); *id.*, Ex. 8 (Wells describes Krause List as "16-page list of CRT and LGBTQ book[s]"); *id.*, Exs. 6, 9 (Wallace list of "pornographic filth" Krause List books removed on same exact day as date in title of Milum's spreadsheet); Baker Decl. ¶¶ 4-5, 10-12 (Milum orders Baker to remove all Krause List books, remove Krause List book display, and replace book banning sign with "Classics" sign); Puryear Decl., Ex. 1 (Wells discusses closing down library to remove books on Krause List with "pornographic content" and thanks Defendant Moss for refusing to meet with concerned citizen who referred to Defendants' actions as "censorship").)[4] Indeed, as Defendant Wallace stated before being appointed to the New Library Board, the Krause List books were "atrocious" and "FILTH." (Senia Decl., Ex. 7 at 4). Defendant Cunningham then ratified Defendant Wallace's viewpoint by forwarding her email to Defendant Milum and ordering Milum to immediately remove "all books that depict any type of sexual activity or questionable nudity." (*Id.*) Defendants next removed additional books beyond the Krause List books because they found the sexual content offensive or inappropriate. (Baker Decl. ¶ 6 (referring to other non-Krause List books that she believes were removed because of their explicit content, such as *Under the Moon: A Catwoman Tale* by Lauren Myracle).) Defendants' conduct is textbook viewpoint discrimination. *See Robinson*, 921 F.3d at 447.

By the time Defendants suspended access to OverDrive, they had abandoned all pretense that their activities were anything other than viewpoint based. Even after acknowledging that

---

[4] As discussed in section I.B.2. below, none of the books Defendants removed comes close to meeting the legal definition of "obscenity," the purported motivation for Defendants' censorship. The attached Declaration of Kenton Oliver includes a detailed overview of each of the Banned Books known to Plaintiffs, which includes plot summaries, awards, reviews, and accolades.

terminating access to OverDrive's digital catalog of more than 17,000 books would "be a disservice to most of our patrons" (Senia Decl., Ex. 1), Defendants did so anyway—all to prevent access to two Krause List books. (*Id.*, Ex. 14 (Milum asks OverDrive to suspend  service because parental controls were not "enough" to prevent access to *Gender Queer*); *id.*, Ex. 8 (Wells relates Moss ordered Milum "to get rid of <u>Lawn Boy</u> and <u>Gender Queer</u> (physical and ebook)"); *id.*, Ex. 19 (librarian tells concerned patron OverDrive termination was "not because of money" but "because of books available, critical race theory"); Puryear Decl., Ex. 1 (Wells states their goal is "substituting OverDrive with a system that support[s] our library only, so we choose the books. … If that is not an option then no ebooks until it can be remedied.") Defendants then installed Bonnie Wallace, Rochelle Wells, Gay Baskin, and Rhonda Schneider—the very community members who had been most vocally pushing for censorship of the library's collection—on the New Library Board, confirming which views they wanted to empower.

Tellingly, Defendants have not censored all materials containing nudity or graphic sex scenes from library shelves. A quick review of the County's current catalog reveals that books containing graphic sexual activity, erotic content, and even sexual violence —which are not on the Krause List and do not discuss issues of gender identity or race—remain in circulation, including books such as *A Game of Thrones*, *The Canterbury Tales*, *Lady Chatterley's Lover*, and books in the *Outlander* series. (Little Decl. ¶ 11.) That Defendants' actions are inconsistent with their pretext merely provides further evidence of their true viewpoint-based motivations. Similarly, the fact that Defendants' actions violated their own internal procedures codified in the County's Materials Policy is powerful evidence of Defendants' improper motives. (Oliver Decl. ¶¶ 37; 44); *Pico*, 457 U.S. at 874-75. This ends the inquiry: when a restriction on protected First Amendment activity "is viewpoint-based, it is unconstitutional." *Iancu*, 139 S. Ct. at 2299.

**B.  Defendants' Censorship Is Also an Impermissible Content-Based Restriction in Violation of Plaintiffs' First Amendment Rights**

Even if the Defendants' actions were not so blatantly based in viewpoint discrimination, their conduct is nonetheless unconstitutional. First Amendment claims not involving viewpoint discrimination are analyzed in three steps. First, the court must "decide whether [the activity at issue] is speech protected by the First Amendment." *Cornelius v. NAACP Legal Defense & Educ. Fund, Inc.*, 473 U.S. 788, 797 (1985). Second, if the activity "is protected speech, [the court] must identify the nature of the forum, because the extent to which the Government may limit access [typically] depends on whether the forum is public or nonpublic." *Id.* And, third, the court must assess whether the government's justifications for restricting speech in the relevant forum survive the requisite degree of scrutiny. *Id.* Because the Library System is a limited public forum, Defendants' censorship is lawful only if they can demonstrate that their censorship is necessary to achieve a compelling government interest with no less restrictive alternatives for achieving that interest. *Id.* Defendants cannot do so here.

The County's Library System, "like all other public libraries, is a limited public forum for purposes of First Amendment analysis." *Sund*, 121 F. Supp. 2d at 548 (citing *Kreimer*, 958 F.2d at 1261). A limited public forum is created when the government has voluntarily "opened for use by the public . . . a place for expressive activity." *Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n*, 460 U.S. 37, 45 (1983). Once the County voluntarily opened the Library System for Llano County residents to use, it became "bound by the same standards as apply in a traditional public forum." *Perry*, 460 U.S. at 46. As such, Defendants "cannot limit access to library materials solely on the basis of the content of those materials, unless [Defendants] can demonstrate that the restriction is necessary to achieve a compelling government interest and there are no less restrictive alternatives for achieving that interest." *Sund*, 121 F. Supp. 2d at 548; *see also Int'l*

14

*Soc. for Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672, 678 (1992) (Regulations of speech in a limited public forum are "subject to the highest scrutiny.").

### 1.      Defendants' censorship activities are content based

Defendants cannot seriously contend that their decisions to restrict access to certain books are content neutral. "Government regulation of speech is content based if [it] applies to particular speech because of the topic discussed or the idea or message expressed." *Reed v. Town of Gilbert,* 576 U.S. 155, 163 (2015) (holding that town ordinance regulating outdoor signage was an unconstitutional content-based restriction because it defined categories of signs based on their message and subjected each category of sign to different restrictions) (citations omitted). As explained above, Defendants' campaign to restrict access to books with messages they dislike or disagree with has been anything but subtle. "In advancing their overall 'moral' agenda, [Defendants] have made no pretenses about their objectives." *Sund*, 121 F. Supp. 2d at 549 n.19.

### 2.      Defendants cannot establish a compelling government interest for imposing content-based restrictions

Defendants cannot establish that their censorship serves a compelling interest—that is, an "interest[ ] of the highest order." *Fulton v. City of Philadelphia, Pennsylvania*, 141 S. Ct. 1868, 1881 (2021). Defendants have claimed that their censorship activities are necessary to protect the County's children from "pornography." But the Banned Books are nowhere close to pornographic. (Oliver Decl. ¶¶ 24-35, 41-43.) In any event, to claim a compelling interest in banning allegedly "pornographic" books, Defendants must establish that those books are obscene. *See Reno v. American Civil Liberties Union,* 521 U.S. 844, 874 (1997) ("In evaluating the free speech rights of adults, we have made it perfectly clear that '[s]exual expression which is indecent but not obscene is protected by the First Amendment.'"); *Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 240 (2002) (stating general rule that "pornography can be banned only if

obscene"). The test for obscenity is articulated in *Miller v. California*: Defendants must prove that the Banned Books meet all of the following requirements: they (1) "appeal[ ] to the prurient interest"; (2) "[are] patently offensive in light of community standards"; and (3) "lack[ ] serious literary, artistic, political, or scientific value." 413 U.S. 15, 24 (1973); *see also* 535 U.S. at 251.

Defendants cannot satisfy any prong of the *Miller* test, much less all three. According to Nashville Public Library Director Kenton L. Oliver, an expert in the field of library sciences with decades of experience working in public libraries, the Banned Books cannot be obscene because they have serious "literary, artistic, political, or scientific value." (Oliver Decl. ¶ 24.) Mr. Oliver also points to four facts indicating the Banned Books are not obscene: they (1) "are available in public library collections all over the country, [including in his] own collection in the Nashville Public Library"; (2) "are screened for obscenity by librarians across the country before they are added to such collections"; (3) "were screened, or should have been screened for obscenity by Llano County before they were shelved"; and (4) "have received numerous professional reviews and awards," which would not have been granted to obscene materials. (*Id.*)

To offer a few examples, *Caste*, which was written by Pulitzer Prize winning journalist Isabel Wilkerson, explores race and caste systems in India and Nazi Germany, and their hidden existence in the social order formed in the United States. It is a *New York Times* Bestseller and has won numerous awards, including the National Book Award, the *Los Angeles Times* Book Prize. (*Id.* ¶ 25.) It was named the #1 Nonfiction Book of the Year by *Time* magazine, and one of the best books of the year by a multitude of reviewers including *Bloomberg*, the *Christian Science Monitor*, the *New York Times*, *Fortune* magazine, and the *Smithsonian* magazine. (*Id.*)

Similarly, in *They Called Themselves the K.K.K: The Birth of an American Terrorist Group*, author Susan Campbell Bartoletti recounts how the K.K.K. was formed during the era of

Reconstruction and focuses her narrative on the impact on the K.K.K.'s victims. (*Id.* ¶ 26.) It was named an ALA Notable Book, the 2010 Kirkus Best Books for Teens, the 2011 Notable Books for a Global Society and the 2010 School Library Journal Best Children's Book of the year. (*Id.*)

*Spinning* by Tillie Walden is a memoir in which the author recounts her childhood in the world of competitive skating, her struggles with coming out as a lesbian, and her experiences being bullied. (*Id.* ¶ 27.) It has won several awards, including the Chicago Public Library Best Book of 2017, the 2018 YALSA Great Graphic Novel, the 2017 *Booklist* Youth Editor's Choice, and the Eisner Award. (*Id.*) In sum, Defendants have no legitimate argument that the Banned Books fall outside of the First Amendment's wide-sweeping protections because they are obscene. (*See id.* ¶¶ 24-35, 41-43.)

> **3.    Defendants have not used the least restrictive means to achieve their purportedly compelling interest**

Even if Defendants could articulate a compelling interest in banning these critically acclaimed books, they have not adopted the least restrictive means of achieving it. *Reno*, 521 U.S. at 879 ("The breadth of this content-based restriction of speech imposes an especially heavy burden on the Government to explain why a less restrictive provision would not be as effective."). "Where First Amendment rights are concerned, those seeking to restrict access to information should be forced to take affirmative steps to shield themselves from unwanted materials; the onus should not be on the general public to overcome barriers to their access to fully-protected information." *Sund*, 121 F. Supp. 2d at 551 (citing *Lamont,* 381 U.S. at 307).

Even if Defendants had a compelling interest in protecting children from accessing the Banned Books, there is a less restrictive alternative to the path they have taken: following the process already set forth in the Materials Policy. Under the Materials Policy, patrons are tasked with selecting books appropriate for their own tastes and beliefs, both for themselves and for

their children. (Senia Decl., Ex. 2. (A "patron's choice of library materials for personal use will be an individual matter," and that "[w]hile a person may reject materials for himself or herself and for his or her children, he or she shall not exercise censorship to restrict access to the materials by others.").) This rule is consistent with ALA professional standards, which also places the responsibility for protecting children from mature content exactly where it belongs—with their parents. (Oliver Decl. ¶ 18 ("librarians 'should maintain that only parents and guardians have the right and the responsibility to determine their children's—and only their children's—access to library resources'").) Defendants cannot articulate why the County's existing procedures pursuant to the Materials Policy are insufficient to protect children from accessing age-inappropriate library books. *See United States v. Playboy Ent. Grp., Inc*., 529 U.S. 803, 805 (2000) ("A court should not assume a plausible, less restrictive alternative would be ineffective; and a court should not presume parents, given full information, will fail to act.").

Indeed, nowhere is the overbreadth of Defendants' censorship more apparent than their discontinuance of OverDrive, the County's digital collection, which provided an essential service to residents, particularly elderly patrons and those with physical disabilities who lack easy access the Library System's physical locations. (*See* Senia Decl. Exs. 1, 25 (letter to editor: "What this boycott will actually do is harm adults, especially the disabled or isolated ones, and it is a cruel disservice to the people living in Llano County. . . . This decision shrinks our worlds and our lives, and makes many of us less—even smaller than we are now.").) Although OverDrive's parental controls offered a reasonable means to restrict children from accessing mature content, Defendants opted instead to prevent all County residents from accessing the 17,000+ titles available on OverDrive, solely because of two Krause List books that offended their personal politics and sensibilities. This is quintessential overreach, dressed up as parental concern.

## II.  There Is a Substantial Threat of Irreparable Harm If the Preliminary Injunction Is Not Granted

Defendants' viewpoint discrimination has caused, and will continue to cause, irreparable injury. The "loss of First Amendment freedoms for even minimal periods of time constitutes irreparable injury justifying the grant of a preliminary injunction." *Texans for Free Enter.*, 732 F.3d at 539; Indeed, "[w]hen an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary." *Opulent Life Church*, 697 F.3d at 295. Plaintiffs' ability to exercise their First Amendment rights to receive information have been severely impacted by Defendants' actions. Prior to August 2021, Plaintiffs had enjoyed use of their public libraries as "place[s] dedicated to quiet, to knowledge, and to beauty." *Pico*, 457 U.S. at 868. Since then, Defendants have unilaterally imposed their own views and beliefs on the Library System, dictating what Plaintiffs and other community members can and cannot read—and by extension—think. (*See* Plaintiffs' Decls.; Oliver Decl.)

Defendants' actions have had a profoundly negative impact on Plaintiffs. (*See, e.g.*, Waring Decl. ¶¶ 5, 7 ("OverDrive was of particular importance to me because I suffer from visual impairments that make reading regular-sized print books very difficult . . . . [the County] took away more than 17,000 books from me and others in one fell swoop. And to this day, they are still gone."); Puryear Decl. ¶ 7 ("I feel cheated and taken advantage of that I pay County taxes that are supposed to support our public libraries, when all they have done is destroy them."); Jones Decl. ¶ 5 ("I go to the library in fear that yet-to-be-discovered books will disappear from the shelves. I fear that important books will not be chosen in the first place to avoid public disapproval. I fear that simple minded zealots will reject the most interesting books because they are threatened by any idea that might challenge their fragile worldview.") And Plaintiffs legitimately fear that the worst censorship is yet to come, now that the New Library

Board has been installed and has taken steps to insulate their future activities from public review. (*See, e.g.,* Little Decl. ¶ 12 ("I fear that the government officials in my hometown will use their power to ensure that books they disagree with will never make it to my public library in the first place.").) This invidious and persistent violation of Plaintiffs' First Amendment rights unquestionably establishes irreparable harm.

### III. The Balance of Equities Favors Plaintiffs

The remaining preliminary injunction factors favor plaintiffs: the threatened injury to Plaintiffs outweighs any harm that an injunction might cause Defendants, and the injunction serves the public interest. *Opulent Life Church*, 697 F.3d at 297.

Once a plaintiff has established irreparable harm, the defendant must "present powerful evidence of harm to its interests" to prevent the plaintiff from showing the threatened injury outweighs any harm the defendant would suffer as a result of the injunction. *Id.* Defendants cannot do so here. As explained above, a preliminary injunction would not prevent patrons from selecting materials for their children that they deem appropriate and avoiding books they find objectionable, as the Materials Policy and ALA standards contemplate. The County, however, "can never have a legitimate interest in administering [a regulation] in a way that violates federal law." *Planned Parenthood of Gulf Coast, Inc. v. Gee*, 862 F.3d 445, 471 (5th Cir. 2017).

Finally, granting a preliminary injunction will serve the public interest: "injunctions protecting First Amendment freedoms are always in the public interest." *Texans for Free Enter.*, 732 F.3d at 539 (quoting *Christian Legal Society v. Walker*, 453 F.3d 853, 859 (7th Cir. 2006)).

## <u>CONCLUSION</u>

For the foregoing reasons, Plaintiffs respectfully request an order preliminarily enjoining Defendants' censorship.

Dated: May 9, 2022                    Respectfully Submitted,

**BRAUNHAGEY & BORDEN LLP**
/s/ *Ellen Leonida*
Ellen V. Leonida (CA Bar No. 184194)*
Matthew Borden (CA Bar No. 214323)*
J. Noah Hagey (CA Bar No. 262331)*
Sarah Salomon (CA Bar No. 308770)*
Pratik Ghosh (NY Registration No. 5754940)*
Amy Senia (CA Bar No. 329134)*
**BraunHagey & Borden LLP**
351 California Street, 10th Floor
San Francisco, CA 94104
Tel & Fax:  415-599-0210
leonida@braunhagey.com
borden@braunhagey.com
hagey@braunhagey.com
salomon@braunhagey.com
ghosh@braunhagey.com
senia@braunhagey.com

**WITTLIFF | CUTTER PLLC**
/s/ *Ryan Botkin*
Ryan A. Botkin (TX Bar No. 00793366)
Katherine P. Chiarello (TX Bar No. 24006994)
María Amelia Calaf (TX Bar No. 24081915)
**Wittliff | Cutter PLLC**
1209 Nueces Street
Austin, Texas 78701
Tel: 512-960-4730
Fax: 512-960-4869
ryan@wittliffcutter.com
katherine@wittliffcutter.com
mac@wittliffcutter.com

*Attorneys for Plaintiffs*
*\*Motion for pro hac vice pending*

## CERTIFICATE OF SERVICE

I hereby certify that on this ninth day of May, 2022, a true and correct copy of the foregoing document was served on all counsel of record who have appeared in this case using the Court's CM/ECF system as a Filing User, and in addition, was served upon all Defendants by placing the same in the United States Mail, postage prepaid, to:

> Llano County, c/o County Judge Ron Cunningham
> 801 Ford Street, Room 101
> Llano, Texas 78643
>
> Llano County Judge Ron Cunningham
> 801 Ford Street, Room 101
> Llano, Texas 78643
>
> Jerry Don Moss, Llano County Commissioner
> 2001 N. St. Hwy 16 Suite B
> Llano, Texas 78643
>
> Peter Jones, Llano County Commissioner
> 508 Sombrero
> Horseshoe Bay, Texas 78657
>
> Mike Sandoval, Llano County Commissioner
> 8347 RR 1431
> Buchanan Dam, Texas 78609
>
> Linda Raschke, Llano County Commissioner
> 8347 West Ranch Road 1431
> Buchanan Dam, Texas 78609
>
> Amber Milum, Llano County Library System Director
> 102 E. Haynie St.
> Llano, Texas 78643
>
> Rochelle Wells, Llano County Library Board Member
> 1406 Ash Street
> Llano, Texas 78643-2810

Rhonda Schneider, Llano County Library Board Member
5606 County Road 104
Llano, Texas 78643

Gay Baskin, Llano County Library Board Member
1100 Escolar Drive
Buchanan Dam, Texas 78609


/s/ *Ellen Leonida*
Ellen V. Leonida