FILED
JULY 29
2022 JUL 19  PM 3: 33

CLERK, US DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY _____
DEPUTY

# IN THE UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
### AUSTIN DIVISION

| | | |
|---|---|---|
| Leila Green Little, *et al.*, | § | |
| | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | Civil Action No. 1:22-cv-00424-RP |
| | § | |
| Llano County, *et al.*, | § | |
| | § | |
| Defendants. | § | |
| | § | |

## PLAINTIFFS' REPLY IN SUPPORT OF THEIR
## MOTION FOR PRELIMINARY INJUNCTION

**INTRODUCTION**

In opposition to the abundant evidence that Defendants removed books from Llano County libraries based on viewpoint discrimination, Defendants now assert that the books about critical race theory, gender, and sexuality that appeared on their list of "pornographic filth" were "weeded" pursuant to standard procedure. This story is a pretext, contradicted by Defendants' sworn testimony, their contemporaneous notes and correspondence, and common sense. In any event, Defendants' pretext also reflects viewpoint discrimination: Defendants admit that they targeted books on their disfavored list for weeding based on complaints about the books' content. Further, by their own admissions, Defendants did not follow their own "standard procedures": they removed books that met none of their weeding criteria, further evidencing discriminatory intent. Because Defendants' conduct is based on viewpoint discrimination, there is no viable justification for it, nor do Defendants offer one.

In the face of incontrovertible evidence of their viewpoint-based discrimination, Defendants press two unavailing arguments. First, Defendants claim that they were free to discriminate against books they do not like because libraries should be allowed to choose what books to stock. This argument is foreclosed by *Campbell v. St. Tammany Parish Sch. Bd.*, 64 F.3d 184 (5th Cir. 1995), which held that the government cannot remove books from libraries simply because it disagrees with them. Second, Defendants claim that Plaintiffs can find the banned books elsewhere. This is, at best, an unavailing voluntary cessation argument. Unless a defendant can prove that there is absolutely no possibility of recurrence, having broken the law once, they cannot be trusted to follow the law absent judicial relief. That is especially true here, where Defendants are making shifting and inconsistent claims and hiding evidence of their misconduct. Defendants' behavior underscores the necessity of the injunction Plaintiffs seek.

1

**ARGUMENT**

**I.     PLAINTIFFS HAVE MADE A CLEAR SHOWING THAT DEFENDANTS HAVE ENGAGED IN VIEWPOINT DISCRIMINATION**

Because they understand that the First Amendment prohibits viewpoint discrimination, Defendants' first claim is that they did not engage in it. Their story, however, is contradicted by their own testimony and documents, and would not excuse their conduct even if believed.

**A.     Defendants Offer Contradictory and Pretextual Bases for Removing Books from the Library System Shelves**

The following facts are undisputed: (1) In sworn interrogatory responses and testimony, Defendants admitted to removing *In the Night Kitchen*, *It's Perfectly Normal*, and the "butt" and "fart" books from shelves because of "inappropriate content" (Decl. of Sarah Salomon ("Salomon Decl.") Exs. 1, 2 at 42:5-20, 43:2-12, 129:3-8, 17-23, & 3 at 46:10-47:4); (2) In early November 2021, a pro-censorship group combed through the library catalog to determine which Krause list books were available, because they believed those titles contained inappropriate content related to sexuality, gender identity, and racial equality (Decl. of Amy Senia in Supp. of Pls.' Mot. for Prelim. Inj. ("Senia Decl."), ECF No. 22-10, Exs. 8, 22, 23; Salomon Decl. Ex. 4 at 31:13-32:16, 40:21-41:4); (3) On November 10, 2021, Defendant Wallace sent a list of the fifty-nine Krause list books available in the Library System to Defendant Cunningham and others, labeling those books "pornographic filth" (Senia Decl. Ex. 7; Decl. of Amber Milum ("Milum Decl."), ECF No. 49-1, ¶ 12); (4) The same day, Defendant Cunningham forwarded the list to Defendant Milum and ordered her to "pull[ ] immediately" "any and all books that depict any type of sexual activity or questionable nudity" (Senia Decl. Ex. 7); (5) A few days later, at least seven Krause list books had been pulled (Senia Decl. Exs. 6, 9, 23); and (6) Defendant

Milum had hidden *How to Be an Antiracist* behind the front desk. (Salomon Decl. Ex. 2 at 74:13-75:18.)

Now, Defendants claim that—although they rounded the banned books up for review due to complaints about their content—they removed the books according to standard weeding procedures. (Milum Decl. ¶¶ 6-8, 12-15; Decl. of Jerry Don Moss ("Moss Decl."), ECF No. 49-3, ¶ 11.) As a threshold matter, Defendants cannot make this argument because they deliberately obstructed discovery into these issues. (Salomon Decl. ¶¶ 9-12.) For example, they refused to produce a list of books which remain in the Library System despite not having been checked out for more than three years, a list that could be used to test whether Defendants followed their own weeding policy. (Salomon Decl. Ex. 2 at 31:21-32:1.) They have also refused to produce the list of books removed from library shelves since March 2022. (Salomon Decl. Ex. 2 at 33:19-34:6.)[1]

Moreover, Defendants' story does not stand up to scrutiny. Their declarations contradict their sworn testimony and should be disregarded. *See Doe ex rel. Doe v. Dallas Indep. Sch. Dist.*, 220 F.3d 380, 386 (5th Cir. 2000) (A party "may not manufacture a genuine issue of material fact by submitting an affidavit that impeaches prior testimony without explanation"). For example, Defendant Milum claims she "was never instructed or pressured to weed or otherwise permanently remove any books from the Llano County libraries." (Milum Decl. ¶ 16.) She wrote in a contemporaneous note, however, that Defendant Moss "told me that I should take [the butt books] out of the system" (Salomon Decl. Ex. 5), and testified that Defendant Cunningham

---

[1] Defendants' tactics were plainly intended to prevent full discovery into their conduct. For example, they removed all the attachments from the emails they produced and converted the emails to pdf format, stripping all metadata to prevent effectively examining them about what they received, when, and from whom. (Salomon Decl. ¶¶ 9-12.)

directed her to remove books from library shelves because people found them offensive.
(Salomon Decl. Ex. 2 at 43:2-12.)

Although Defendant Milum testified that a book should not be weeded based on a single

factor (Salomon Decl. Ex. 2 at 24:5-10), she could not identify more than one factor justifying

the weeding of *any* book that was removed. (Milum Decl. ¶¶ 6-12.) [2] Indeed, all but one[3] were

"weeded" despite not meeting any criteria:

- Defendant Milum claims the "butt books" were weeded because "they were not being circulated sufficiently," *but admits that they could not circulate because patrons who disapproved of the books "began to check [them] out repeatedly."* (Milum Decl. ¶ 6.)

- Defendant Milum, who purchased the "fart" books because she believed they had "value" for children, claims she preemptively weeded them because "they would not circulate sufficiently," *but acknowledges that she deleted them from the system before they could ever circulate, in response to Defendant Cunningham's direct request.* (Salomon Decl. Exs. 2 at 55:2-8, & 5; Milum Decl. ¶ 7.)

- Defendant Milum asserts that in *In the Night Kitchen* was weeded because it "had been checked out only a little over once per year since . . . 1999"—which would not satisfy the criteria for weeding it in any event—*but admits that In the Night Kitchen was still in regular circulation and being checked out by patrons.* (Milum Decl. ¶ 8; Salomon Decl. Ex. 2 at 130:21-131:1.)

- *Spinning, Gabi, a Girl in Pieces, Shine,* and *Caste* have all been checked out multiple times in the past three years—indeed, *Shine* was most recently checked out in July 2021, months before it was removed from shelves. (Senia Decl. Ex. 6.)

- *Caste* had been checked out three times in the eleven months before it was removed. (*Id.*) Although Defendant Milum now speculates that *Caste* was weeded due to damage, she testified there was "no record" of any damage. (Milum Decl. ¶ 14; Salomon Decl. Ex. 2 at 92:7-11.)

- Contrary to Defendant Milum's assertion, *It's Perfectly Normal*, a non-fiction book, was not eligible for weeding because it had been checked out in the past five years. (Baker

---

[2] Although Defendant Milum now claims a book must be checked out multiple times per month to avoid weeding, she previously testified that a book is weeded if it is not checked out "within three years." (Salomon Decl. Ex. 2 at 31:21-32:1.) Former Kingsland head librarian Suzette Baker has confirmed that the rule for fiction books is three years, and for non-fiction books it is five years. (Decl. of Suzette Baker ("Baker Decl.") ¶ 6.)

[3] Only one banned book—*Freakboy*—arguably met a weeding factor. (Senia Decl. Ex. 6.)

Decl. ¶ 11.) Defendants have admitted that *It's Perfectly Normal* was removed due to inappropriate content. (*See* Moss Decl. ¶ 3; Senia Decl. Ex. 3.)

- Even though *They Called Themselves the K.K.K.* had low circulation, it is the only book in the Library System considering the history of the K.K.K, and thus ineligible for weeding. (Baker Decl. ¶ 14.)

A rule must be "uniformly enforced" to "rebut" the inference that it is "pretextual," and the "infrequent circulation" criteria has been anything but. *Campbell v. St. Tammany Par. Sch. Bd.*, 231 F.3d 937, 941 (5th Cir. 2000). Defendant Milum openly admits that there are books on the shelves that have not been checked out in over three years without being weeded. As described above, Defendants refuse to produce that list. (Salomon Decl. Ex. 2 at 81:10-13, 84:12-85:17.) Moreover, rounding up books because of their viewpoint is not "standard weeding procedure." (Salomon Decl. Ex. 2 at 67:15-17; Baker Decl. ¶ 7.) Even under Defendants' pretextual explanation, they violated the First Amendment by targeting certain books due to complaints regarding their content, and thereafter manufacturing a reason to pull them. "[O]nce [Defendants'] justification has been eliminated, discrimination [is] the most likely alternative explanation." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147-48 (2000).

**B.     Switching Electronic Providers in Response to this Lawsuit Does Not Extenuate Defendants' Viewpoint Discrimination**

Defendants do not deny that from Fall 2021 to May 9, 2022, the County had no access to a digital catalog, and that Defendants took this overbroad step to prevent access to a single book: *Gender Queer.* (Senia Decl. Exs. 11, 14; Decl. of Ron Cunningham ("Cunningham Decl."), ECF No. 49-2, ¶¶ 7, 10.) Rather, Defendants complain that Plaintiffs are "pretend[ing]" the library's new online service, Bibliotheca, does not exist. (Opp'n, ECF No. 49, at 5.) But Bibliotheca only went live on May 9, 2022—weeks after Plaintiffs filed this suit. (Cunningham Decl. ¶ 10; Compl., ECF No. 1.) This is textbook voluntary cessation: Defendants cannot "evade sanction by

predictable protestations of repentance and reform after a lawsuit is filed." *Ctr. for Biological Diversity, Inc. v. BP Am. Prod. Co.*, 704 F.3d 413, 425 (5th Cir. 2013) (citation omitted).

Having a new online provider does not eliminate the need for an injunction because it leaves Defendants free to resume their wrongful conduct. *Meza v. Livingston*, 607 F.3d 392, 399 *decision clarified on denial of reh'g*, 2010 WL 6511727 (5th Cir. Oct. 19, 2010). Moreover, Defendants are up to their old tricks. The Library Board has sought to exercise direct power over removal decisions in at least the following ways: (1) instructing Defendant Milum to remove "all of the young adult and junior books" from the initial book purchase list Defendants received from Bibliotheca, due to a "concern about . . . inappropriate content" (Salomon Decl. Exs. 4 at 114:4-10, 126:12-15, 6 & 7)[4]; and (2) after Defendant Milum placed the initial Bibliotheca purchase order, demanding that she remove additional books that weren't "right for [Llano County's] demographics." (Salomon Decl. Exs. 2 at 105:21-25 & 4 at 124:20-125:13.) If the Library Board has been thwarted in these censorship efforts, it is only because "once the lawsuit hit" it was placed "on hiatus." (Salomon Decl. Ex. 4 at 68:3-12.) Absent court intervention, Defendants will "revert to the offending conduct." *Ctr. for Biological Diversity*, 704 F.3d at 425.

## II.   DEFENDANTS CANNOT JUSTIFY THEIR VIEWPOINT DISCRIMINATION

### A.   The Discretion Afforded Librarians in Catalog Selection Decisions Does Not Extend to Viewpoint-Based Censorship

Defendants assert that their motivation in banning books "does not even matter." (Opp'n at 12.) This argument may be slightly less Orwellian than the claim Defendants have elsewhere advanced that their censorship is government speech (Mot. to Dismiss, ECF No. 42), but it is no more correct. As set forth in greater detail in Plaintiffs' Opposition to the Motion to Dismiss

---

[4] This restriction is particularly perplexing, given that minors can't even access Bibliotheca and so are not at risk of seeing "inappropriate content" there. (Cunningham Decl. ¶ 10.)

(ECF No. 50), the Fifth Circuit has held that under the First Amendment, government officials "are prohibited from . . . remov[ing] books from . . . library shelves 'simply because they dislike the ideas contained in those books.'" *Campbell*, 64 F.3d at 188 (quoting *Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*, 457 U.S. 853, 857 (1982)); (*see also* Salomon Decl. Ex. 3 at 34:20-35:16 (agreeing no book should "excluded because of race or nationality or the political or religious views of the writer").)

Citing the plurality opinion in *United States v. Am. Libr. Ass'n Inc.*, 539 U.S. 194 (2003), Defendants nevertheless claim they can censor books because libraries "have broad discretion to decide what material to provide" as part of "making collection decisions." (Opp'n at 11.) But this case does not concern collection decisions, it concerns *removal* decisions plainly subject to First Amendment scrutiny.[5] Indeed, even if this case were about "discretion" in book selection, Defendants would not be permitted to discriminate based on "viewpoint." *See Arkansas Educ. Television Comm'n v. Forbes*, 523 U.S: 666, 118 S. Ct. 1633 (1998).

### B.     Defendants Purported Alternative Means of Accessing the Books Do Not Excuse Their Viewpoint Discrimination

Defendants' main argument is that there is no issue here because Plaintiffs can access the banned books through other sources. (Opp'n at 1-5.) Defendants did not begin offering these "alternative sources" until after this lawsuit was filed. It would be an exaggeration to describe Defendants' new solutions as voluntary cessation; but, needless to say, they do not obviate the need for a preliminary injunction. *Ctr. for Biological Diversity*, 704 F.3d at 425. Moreover,

---

[5] The other cases cited by Defendants—*Chiras v. Miller*, 432 F.3d 606 (5th Cir. 2005) and *Egli v. Chester Cnty. Libr. Sys.*, 394 F. Supp. 3d 497 (E.D. Pa. 2019)—concern initial selection decisions by a school board for its curriculum and by a library for its collection, respectively. As such, they are inapposite. And *Gay Guardian Newspaper v. Ohoopee Reg'l Libr. Sys.*, 235 F. Supp. 2d 1362 (S.D. Ga. 2002), concerns the free literature table in the lobby outside a library, an entirely different forum than that at issue here.

because Defendants have refused to comply with discovery, they cannot claim they have only

censored these eleven books and "fix" the problem by providing those books alone.

More fundamentally, First Amendment violations "cannot be justified by the fact that

there may be other . . . circumstances for . . . expression. The symbolic effect of removing the

[book] . . . is more significant than the resulting limitation of access to the story." *Pratt v. Indep.*

*Sch. Dist. No. 831, Forest Lake, Minn.*, 670 F.2d 771, 779 (8th Cir. 1982) (citations omitted); *see*

*also Minarcini v. Strongsville City Sch. Dist.*, 541 F.2d 577, 582 (6th Cir. 1976) (The First

Amendment violation is "[not] minimized by the availability of the disputed book" elsewhere.)

As Plaintiffs have explained, the effect of Defendants' misconduct goes far beyond the

removal of these eleven books. Defendants have transformed the public libraries from "place[s]

dedicated to quiet, to knowledge, and to beauty," *Pico*, 457 U.S. at 868, to partisan battlegrounds

where disagreement is suppressed. (Decl. of Rebecca Jones ("Jones Decl.") ¶ 5; Decl. of Leila

Green Little ("Little Decl.") ¶ 12; Decl. of Jeanne Puryear ("Puryear Decl.") ¶ 6.) This chilling

effect has only worsened since Defendants have begun providing pretextual explanations for

their censorship. (Decl. of Kathy Kennedy ("Kennedy Decl.") ¶ 6; Decl. of Diane Moster

("Moster Decl.") ¶ 6; Decl. of Cynthia Waring ("Waring Decl.") ¶ 8.) Defendants have refused

to provide discovery on the full scope of their activities, but it is now clear that they will go to

extreme lengths to conceal it. (Decl. of Richard Day ("Day Decl.") ¶ 8; Little Decl. ¶¶ 8-9.)

To borrow Defendants' phrase, "matters get worse" as we move from law to facts. The

Supreme Court has given "the most exacting scrutiny to regulations that suppress, disadvantage,

or impose differential burdens upon speech because of its content." *Turner Broadcasting, Inc. v.*

*F.C.C.*, 512 U.S. 622, 641, 114 S. Ct. 2445, 129 L. Ed. 2d 497 (1994). Each of Defendants'

purported solutions does exactly that. First, Defendants rely on an anonymous donor who

provided copies of certain banned books on July 21, 2022, eight months after they were pulled. (Supp. Decl. of Amber Milum ("Milum Supp. Decl."), ECF No. 53.) Defendants cannot mitigate their First Amendment violation by creating a secret lending library where, if people somehow discover it exists, they may be able to access certain of the banned books. Moreover, those nine books are just the tip of the iceberg. Will this donor be a replenishing fount for all banned books, whose titles Defendants refuse to reveal? And, as part of the library's nebulous "in-house checkout" system, these books will not even be put on shelves, just somehow "made available" for Plaintiffs. (Milum Supp. Decl. ¶ 10.) Prior to its mention in Defendants' Opposition, Plaintiffs had never even heard of in-house checkout, nor had any of the librarians they asked about it. (Little Decl. ¶ 5; Waring Decl. ¶ 6; Day Decl. ¶ 6; Moster Decl. ¶ 5; Jones Decl. ¶ 7; Kennedy Decl. ¶ 5; Puryear Decl. ¶ 5.)

Defendants next claim that Plaintiffs can access the banned books via Inter Library loans, and that patrons are regularly informed of this option. (Milum Decl. ¶ 10.) None of the Plaintiffs were informed of this solution when they sought to check out the banned books. (Little Decl. ¶ 3; Waring Decl. ¶ 3; Day Decl. ¶ 3; Moster Decl. ¶ 3; Jones Decl. ¶ 3; Kennedy Decl. ¶ 3; Puryear Decl. ¶ 3.) Nor is it a real solution—a patron must wait weeks prior to the book arriving and must pay for postage. (Milum Decl. ¶ 10.) Finally, Defendants claim that certain banned books are available on Bibliotheca. (Opp'n at 3-4.) But Plaintiffs should not be forced, due to Defendants' misconduct, to use e-readers where they would prefer to read a book in hardcopy. (Day Decl. ¶ 4; Puryear Decl. ¶ 4; Moster Decl. ¶ 4.) Crucially, Defendants' solutions only work if "a patron knows *in advance* that she wants th[e] eleven specific titles" that were banned. *Sund v. City of Wichita Falls, Tex.*, 121 F. Supp. 2d 530, 550 (N.D. Tex. 2000). It does nothing to

assuage their legitimate suspicion that, as they "browse," still more books are missing from the shelves due to censorship. *Id.*

### III.   PLAINTIFFS HAVE MADE A CLEAR SHOWING OF IRREPARABLE HARM AND THE BALANCE OF THE EQUITIES

Defendants claim Plaintiffs have not been irreparably harmed because they can check out the banned books via alternative means and have access to Bibliotheca.[6] (Opp'n at 14.) As explained above, this is pure misdirection: Plaintiffs have described the chilling effects of Defendants activities in detail. (Kennedy Decl. ¶ 6; Moster Decl. ¶ 6; Waring Decl. ¶ 8; Little Decl. ¶¶ 8-9.) The "loss of First Amendment freedoms for even minimal periods of time constitutes irreparable injury." *Texans for Free Enter. v. Texas Ethics Comm'n*, 732 F.3d 535, 539 (5th Cir. 2013). And far from presenting "powerful evidence of harm to its interests," *Opulent Life Church v. City of Holly Springs, Miss.*, 697 F.3d 279, 297 (5th Cir. 2012), Defendants have presented no evidence at all, forfeiting this factor. Finally, Defendants have no "interest in administering [a regulation] in a way that violates federal law." *Planned Parenthood of Gulf Coast, Inc. v. Gee*, 862 F.3d 445, 471 (5th Cir. 2017). But "injunctions protecting First Amendment freedoms are always in the public interest." *Texans for Free Enter.*, 732 F.3d at 539.

### CONCLUSION

In the face of unmistakable evidence of viewpoint discrimination, Defendants have withheld evidence and offered a pretextual explanation that still incorporates viewpoint discrimination. Plaintiffs respectfully ask the Court to grant the preliminary injunction.

---

[6] Defendants also claim that the preliminary injunction Plaintiffs seek is overbroad because it prevents them from weeding to make room for new purchases. (Opp'n at 14.) But the Library System has not acquired *a single new book* since October 2021. (Little Decl. ¶ 7; Puryear Decl. ¶ 6.)

Dated: July 29, 2022

Respectfully submitted,

Ellen V. Leonida (CA Bar No. 184194)
Matthew Borden (CA Bar No. 214323
J. Noah Hagey (CA Bar No. 262331)
Sarah Salomon (CA Bar No. 308770)
Pratik Ghosh (NY Bar No. 5754940)
**BraunHagey & Borden LLP**
351 California Street, 10th Floor
San Francisco, CA 94104
Tel & Fax:  415-599-0210
leonida@braunhagey.com
borden@braunhagey.com
hagey@braunhagey.com
salomon@braunhagey.com
ghosh@braunhagey.com


Ryan A. Botkin (TX Bar No. 00793366)
Katherine P. Chiarello (TX Bar No. 24006994)
María Amelia Calaf (TX Bar No. 24081915)
Kayna Stavast Levy (TX Bar No. 24079388)
**Wittliff | Cutter PLLC**
1209 Nueces Street
Austin, Texas 78701
Tel: 512-960-4730
Fax: 512-960-4869
ryan@wittliffcutter.com
katherine@wittliffcutter.com
mac@wittliffcutter.com
kayna@wittliffcutter.com

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on July 29, 2022, a true and correct copy of the foregoing document was served via personal messenger service to the following:

**Dwain K. Rogers**
Llano County Attorney
**Matthew L. Rienstra**
First Assistant County Attorney
801 Ford Street, Room 111
Llano, Texas 78643
drogers@co.llano.tx.us
matt.rienstra@co.llano.tx.us

**Jonathan F. Mitchell**
Mitchell Law PLLC
111 Congress Avenue, Suite 400
Austin, Texas 78701
jonathan@mitchell.law

Ellen V. Leonida