# EXHIBIT B
# Part 3

```
1              IN THE UNITED STATES DISTRICT COURT
                  WESTERN DISTRICT OF TEXAS
2                       AUSTIN DIVISION
3    Leila Green Little, et      §
     al.,                        §
4                                §       Civil Action No.
         Plaintiffs,             §       1:22-cv-00424-RP
5                                §
     v.                          §
6                                §
     Llano County, et al.,       §
7                                §
         Defendants.             §
8    _____
9         REMOTE ORAL AND VIDEOTAPED DEPOSITION OF
10                      JERRY DON MOSS
11                      June 28, 2022

          _____

12
13           REMOTE ORAL AND VIDEOTAPED DEPOSITION OF
14   JERRY DON MOSS, located in the Law Library, Llano
15   County Courthouse, 801 Ford Street Llano, Texas,
16   produced as a witness at the instance of the
17   Plaintiffs, and duly sworn, taken in the above-styled
18   and numbered cause on June 28, 2022, from 1:31 p.m. to
19   4:18 p.m., before Joseph D. Hendrick, Certified
20   Shorthand Reporter in and for the State of Texas,
21   reported by machine shorthand, pursuant to Notice and
22   the Federal Rules of Civil Procedure and any provisions
23   stated on the record or attached hereto.
24
25   Job No. 5299892

                                              Page 1
```

```
 1                A P P E A R A N C E S
               (All Appearing Remotely Via Zoom)
 2
      FOR THE PLAINTIFFS:
 3         Ellen V. Leonida
           Sarah Salomon
 4         Pratik Ghosh
           BRAUNHAGEY & BORDEN LLP
 5         351 California Street, 10th Floor
           San Francisco, CA 94104
 6         (415) 599-0210
           leonida@braunhagey.com
 7         salomon@braunhagey.com
           ghosh@braunhagey.com
 8
      FOR THE DEFENDANTS:
 9         Dwain K. Rogers
           LLANO COUNTY ATTORNEY
10         801 Ford Street
           Llano, TX 78643
11         (325) 247-7733
           drogers@co.llano.tx.us
12
           Jonathan F. Mitchell
13         MITCHELL LAW PLLC
           111 Congress Avenue, Suite 400
14         Austin, TX 78701
           (512) 686-3940
15         jonathan@mitchell.law
16    ALSO PRESENT:
           Landon A. Wade
17         Office of the Attorney General of Texas
           209 W. 14th St.
18         Austin, TX 78701-1614
19         Norm Harris, Videographer
20
21
22
23
24
25
```

Page 2

```
 1                         INDEX
 2     Appearances  .................................  2
 3   JERRY DON MOSS
 4         EXAMINATION BY MS. LEONIDA ...............  6
 5     Signature and Changes  .......................101
 6     Reporter's Certification  ....................103
 7                        EXHIBITS
 8     NO.            DESCRIPTION                    PAGE(S)
 9       EXHIBIT 15   Llano County Library System    12
                      Policies
10

11       EXHIBIT 16   Llano County Library search    36
                      page, If You Give a Pig the
12                    White House

13       EXHIBIT 17   MILUM 4 RFP - 00617-0619        45
                      November 17, 2021, email from
14                    Amber Milum to Jeanne Puryear;
                      Subject: Re: Update on library
15                    books

16       EXHIBIT 18   COUNTY 3 RFP - 00163-0165       58
                      November 12, 2021, email from
17                    Amber Milum to Ron Cunningham;
                      Subject: RE: FW: Pornographic
18                    Filth at the Llano Public
                      Libraries
19       EXHIBIT 19   MOSS 1 RFP - 0007-0009          63
                      June 22, 2022, email from Matt
20                    Reinstra to Tiffany Hallmark;
                      Subject: FW: Request for
21                    Reconsideration of a Library
                      Resource form
22

23       EXHIBIT 20   WALLACE 5 RFP - 00118-0120      69
                      February 8, 2022, email from
24                    Bonnie Wallace to Dwain Rogers
                      and others; Subject: Harmful
25                    Content Review
```

Page 3

1     EXHIBIT 21    Spreadsheet: List of books          66
                    prepared by Bonnie Wallace
2
      EXHIBIT 22    ***Exhibit 22 was skipped in        --
3                   sequence - Exhibit 22 was not
                    marked or used***
4
      EXHIBIT 23    WALLACE 5 RFP - 00121-0122          79
5                   Table: Harmful Content
                    Analysis form
6
      EXHIBIT 24    MOSS 3 RFP - 00035-0036             94
7                   June 22, 2022, email from Matt
                    Reinstra to Tiffany Hallmark;
8                   Subject: FW: Overdrive
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

                                            Page  4

```
 1                         - - -

 2                 P R O C E E D I N G S

 3               (June 28, 2022 - 1:31 p.m.)

 4                         - - -

 5               THE VIDEOGRAPHER:  We are going on the

 6      record at 1:31 p.m.

 7               My name is Norm Harris representing

 8      Veritext.

 9               The date today is June the 28th, 2022.

10               This deposition is being conducted remotely

11      using virtual technology and is being taken by counsel

12      for the plaintiff.

13               The caption of the case is Leila Green

14      Little, et al., versus Llano County, et al.

15               This case is filed in the United States

16      District Court, Western District of Texas, Austin

17      Division, Case Number 1:22-cv-00424-RP.

18               The name of the witness is Jerry Don Moss.

19               Attorneys, please state your appearance as

20      well as your location.

21               MS. LEONIDA:  This is Ellen Leonida for

22      plaintiffs, and I am in San Francisco, California.

23               MR. ROGERS:  Dwain Rogers, Llano County

24      Attorney for the County and Commissioner Moss, and I am

25      in Llano, Texas.
```

Page 5

```
 1                  MR. MITCHELL:  Jonathan Mitchell, counsel
 2     for the County and Commissioner Moss, from Mitchell
 3     Law, PLLC.  I am in Austin, Texas.
 4                  THE VIDEOGRAPHER:  Okay.  Our court
 5     reporter will swear in the witness.
 6                  THE REPORTER:  Would you raise your right
 7     hand, please.
 8                  THE WITNESS:  (Complied)
 9                  THE REPORTER:  Do you swear or affirm that
10     the testimony you are about to give in this case will
11     be the truth, the whole truth, and nothing but the
12     truth, so help you God?
13                  THE WITNESS:  I do.
14                       JERRY DON MOSS
15         having been duly sworn, testified as follows:
16                       EXAMINATION
17     BY MS. LEONIDA:
18         Q.    Good afternoon, Mr. Moss.
19         A.    Good afternoon.  How are you?
20         Q.    I'm well.  How are you?
21         A.    Good.
22         Q.    Have you ever been deposed before?
23         A.    No, ma'am.
24         Q.    Have you ever had to testify about
25     anything?
```

Page 6

1      A.      No, ma'am.

2      Q.      Okay.  Then I'm just going to go over the

3  rules a little bit so that we are on the same page

4  about how these proceedings are going to go.

5      A.      Okay.

6      Q.      So, the first thing is that there is a

7  court reporter who is taking down everything that we

8  say.  That means, first, that we have to answer in

9  words instead of shrugging or making faces like we

10  sometimes do in life; so just make sure you say yes or

11  no instead of shaking your head.

12      A.      Yes, ma'am.

13      Q.      And the other thing is that we can't really

14  talk over each other because then the reporter doesn't

15  know what to write down.  So I'll do my best not to

16  interrupt you, and I trust that you will do the same.

17      A.      Yes, ma'am.

18      Q.      You are represented by an attorney here,

19  Mr. Rogers, so he is going to be objecting sometimes.

20  If he objects, you still have to answer the question

21  unless he tells you not to.  Does that make sense?

22      A.      Yes, ma'am.

23      Q.      Some of the questions that I ask you, you

24  are not going to know the answers to and that's totally

25  fine.  Just make sure that you don't -- that you don't

Page 7

1    guess or say something just because you think I want to

2    hear it.  Okay?

3          A.     Yes, ma'am.

4          Q.     You can make an estimate if I ask for an

5    estimate, but don't say something that you don't know

6    is true.

7          A.     Don't worry.

8          Q.     We can take breaks during the course of

9    this deposition.  So, if you need some water, or

10   something else comes up, just let me know.  The only

11   thing is we are not going to take a break while a

12   question is pending; so, if I ask a question, you can

13   answer and then take a break.  I'm just going to ask

14   you not to take a break between question and answer.

15   Okay?

16         A.     Yes, ma'am.

17         Q.     And finally, is there any reason that you

18   can't give your best testimony today, any, like,

19   illness, or anything on your mind?

20         A.     No, ma'am.

21         Q.     Okay.  You are in the law library; is that

22   right?

23         A.     Yes, ma'am.

24         Q.     Is there anybody in there with you?

25         A.     No, ma'am.

Page 8

1      Q.      Do you have a phone or an email, any kind

2   of messaging app that you have access to right now?

3      A.      I have a phone.

4      Q.      Would you mind turning it off until the

5   deposition is over?

6      A.      Yes, ma'am.  But -- but if I have an issue,

7   the secretary -- the judge's secretary will have to

8   come in here and help me, so then I will contact her.

9      Q.      Okay.  That's fine.

10      A.      The -- she also told me that you may be

11   giving some -- showing some exhibits?

12      Q.      Yes.

13      A.      I'm not -- if that doesn't work on my

14   computer, I can just cut my phone back on and look at

15   them I guess if that's okay.

16      Q.      That's fine.  Just let me know if that

17   happens.  I'm going to try to be showing them on this

18   screen, so they should pop up on the screen in front of

19   you.

20      A.      Okay.  Yes, ma'am.

21      Q.      So, Mr. Moss, can you tell me what you did

22   to get ready for this deposition today?

23      A.      I didn't sleep very much.  But I talked to

24   our County Attorney, with Dwain Rogers a little bit,

25   and another attorney --

Veritext Legal Solutions
866 299-5127

1            MR. ROGERS:  Before we go any further on

2    that, I will object to any content of the conversations

3    as attorney-client privilege.  But go ahead,

4    Commissioner.

5        A.    That's it.

6    BY MS. LEONIDA:

7        Q.    Okay.  So we're not -- and I don't want you

8    to say what you talked to your attorneys about because

9    that's privileged, but did you talk to anybody else,

10    without telling me the content of those conversations.

11        A.    What did you say?

12        Q.    Did you talk to -- I'm not asking you to

13    tell me what you talked to your attorney about, but,

14    other than Mr. Rogers, is there anybody else that you

15    talked to to get ready for today?

16        A.    A preacher.

17        Q.    Okay.  I won't ask you what you talked to

18    him about either.

19            You are a commissioner on the Llano County

20    Commissioners Court; is that right?

21        A.    Yes, ma'am.

22        Q.    How long have you been a commissioner?

23        A.    I guess 15 years.  Not "I guess."  It is 15

24    years.

25        Q.    What does the Commissioners Court do?

1   A.    Depends on what time of year.  Sometimes we

2   deal with budgets.  We work with all our department

3   heads or elected officials on any issues they may have

4   or budget items they may need or equipment they may

5   need, operating supplies.  Me specific, I have half of

6   the county in my precinct, so we have a lot of county

7   roads that my crew oversees and I work with them on

8   them roads, on the road issues.

9   Q.    The Commissioners Court also supervises the

10  library; is that right?

11  A.    That's -- no.  No, ma'am, that's not

12  correct.

13  Q.    What's the relationship between the

14  Commissioners Court and the library?

15  A.    The -- I said while ago the library -- we

16  work with department heads and elected officials, so

17  any issues that may come before the -- a department or

18  any other elected official office, they come to

19  Commissioners Court.

20  Q.    Commissioners Court also selects the head

21  librarian; isn't that right?

22  A.    Yes, ma'am.  That -- wrong.  That -- sorry.

23  That's not correct.  The Library Director.

24  Q.    Okay.  Who is the Library Director right

25  now?

Page 11

```
 1         A.      Amber Milum.
 2         Q.      And the Commissioners Court hired or
 3   selected Ms. Milum to be the Library Director?
 4         A.      Yes, ma'am.
 5         Q.      I am going to show you what is going to be
 6   marked as Exhibit 15.  Do you recognize the document
 7   that's on the screen in front of you?
 8         A.      It said it's a Library System Policies, but
 9   I don't look at that on a daily basis.  I'm not sure.
10         Q.      Okay.  I am going to scroll through this
11   and see if you recognize it and then I am going to ask
12   you some questions about it.
13         A.      You're sure scrolling awful fast.
14         Q.      I can slow down.  So, you know, let me --
15   let me ask you about it this way:
16                 You, earlier this year, you sent a copy of
17   the Llano County Library System Policies to Rochelle
18   Wells, right?
19         A.      I don't know if I did or not.  I don't
20   remember that.
21         Q.      Okay.  You are aware that the Llano County
22   Library System has policies in place, right?
23         A.      Yes, ma'am.  Yes, ma'am.
24         Q.      Do you know when those policies were
25   adopted?
```

1      A.      I don't know when they've been updated.

2   They may have been adopted in 2006.

3      Q.      Okay.  So if you can turn your attention to

4   the screen again, I am going to scroll a little more

5   slowly.  So, this is the table of contents.  I'm on

6   page 2 of the document here.  This Llano County Library

7   System Constitution and By-Laws, does that look

8   familiar to you?

9      A.      Again, I don't look at this daily.  That

10   looks like our policy, library policy.

11      Q.      Okay.  And over here, page 5 of this

12   exhibit, do you recognize those signatures, or do you

13   recognize the names under the signatures?

14      A.      I do.

15      Q.      Are those Llano County Commissioners?

16      A.      Not anymore.

17      Q.      Were those Llano County -- Llano County

18   Commissioners in 2006?

19      A.      I believe so.

20      Q.      Page 5 of this exhibit is the Llano County

21   Commissioners adopting the -- this Library Policy that

22   we've been looking at; is that right?

23      A.      I don't know.  I don't see page 5.

24      Q.      I'm talking about page 5 up here

25   (indicating) of the entire document.  But we can --

Veritext Legal Solutions
866 299-5127

1          A.      Okay.

2          Q.      Let's go back to the -- I want you to be

3     sure about this.  So --

4          A.      I understand.

5          Q.      So, so here we have Llano County Library

6     System Constitution and By-Laws, right?

7          A.      That's what it says.

8          Q.      Okay.  And then after that is another page

9     that continues with the Constitution and By-Laws,

10    right?

11         A.      It looks to be, yes.

12         Q.      And then the page after that is the

13    signature page that we have been talking about where

14    the Commissioners Court adopts the Constitution and

15    By-Laws, right?

16         A.      Yes.

17         Q.      So, among the policies that Llano County

18    has are policies about what can be displayed in a

19    library, right?

20         A.      Can you speak up?

21         Q.      Sure.  Among the policies that Llano County

22    has are policies about what can be displayed in a

23    library; is that right?

24         A.      I -- I don't know.  Will you repeat that,

25    please?

Veritext Legal Solutions
866 299-5127

1        Q.      Sure.  Llano County has policies about what

2   can be displayed in a library; is that correct?

3        A.      That's what that says, I believe.  It talks

4   about the displays in the library.

5        Q.      Okay.  Do you have any reason to believe

6   that this document you are looking at is not actually

7   what it purports to be, the Llano County Library System

8   policy about displays and exhibits?

9        A.      No.

10       Q.      So, Llano County Library System also has a

11  policy about selecting materials to be included in the

12  library, correct?

13       A.      And that's the paper you are talking about

14  on page 23?

15       Q.      I'm asking you, do you have any reason to

16  believe that this document at page 23 where it says

17  Materials Selection Policy and on the bottom there it

18  says August 14, 2006, isn't this the Llano County

19  Library System's Materials Selection Policy?

20       A.      It says it is.

21       Q.      Do you have any reason to think that it's

22  not?

23       A.      No.

24       Q.      Now, on page 25 of this document - which is

25  Exhibit 15 - is Llano County Library System's Meeting

Page 15

1    Room Policy that says, "Approved 10.10.17 Llano County

2    Commissioners Court," do you see that?

3          A.     Yes, I do.

4          Q.     You were a member of the Commissioners

5    Court in 2017, right?

6          A.     Yes, ma'am.

7          Q.     So you were one of the Commissioners that

8    adopted this meeting room policy, right?

9          A.     Yes, ma'am.

10         Q.     And this is the currently active meeting

11   room policy for the Llano County Library, correct?

12         A.     As far as I know.

13         Q.     Among the county librarian's duties are

14   selecting books for the library, right?

15         A.     I think so, yes.

16         Q.     And, I'm sorry, I called Ms. Milum the head

17   librarian and you called her something else.   What?

18         A.     She's the Library Director.

19         Q.     Library Director.   Okay.   So, when the --

20   when the Library Director -- let me go back.

21                The Library Director's job is to select

22   books for the libraries, right?

23         A.     Yes.

24         Q.     And part of what the Constitution and

25   By-Laws say is that the Library Director does that

                                              Page 16

1    subject to general rules adopted by the Commissioners

2    Court, correct?

3        A.    Would you repeat that?

4        Q.    Sure.  Part of what the Llano County

5    Library Constitution and By-Laws say is that the County

6    Librarian, when that person chooses books, they do it

7    subject to the general rules adopted by the

8    Commissioners Court?

9        A.    I don't know that we have a constitution

10   for the library, but the --

11       Q.    Okay, well the -- sorry.  You finish.

12       A.    No, go ahead.

13       Q.    No.  It was -- it was my rule not to

14   interrupt, and I interrupted you, for which I'm sorry.

15   So just go ahead and finish your thought.

16       A.    The -- I believe the -- the by-laws say

17   that, yes, ma'am.

18       Q.    Okay.  The by-laws also say that the County

19   Librarian, when that person selects books, should do it

20   according to accepted rules of library management,

21   right?

22       A.    I don't know word for word what those --

23   what the by-laws say without reading.  We have a lot of

24   policies in the county.

25       Q.    Okay.

Page 17

1        A.      As far as I know, that is correct.

2        Q.      The Commissioners don't pick books for the

3    library, do they?

4        A.      No, ma'am.

5        Q.      Have you ever gone to the library and told

6    any librarian what books to select for the library

7    collection?

8        A.      Repeat that, please?

9        Q.      Have you ever gone -- have you ever told

10   the librarian what books to put in the library

11   collection?

12       A.      No, ma'am.

13       Q.      When you have Commissioners Court meetings,

14   do you make lists of books that you think the library

15   should buy?

16       A.      No.

17       Q.      When you have Commissioners Court meetings,

18   is there ever a time that the citizens of Llano come to

19   you and say, "We want you to buy this list of books and

20   make sure it's in the library," has that ever happened?

21       A.      Repeat that, please?

22       Q.      Has a citizen of Llano ever come to a

23   Commissioners Court meeting and asked you to buy

24   certain books for the library?

25       A.      "Ever" is a long time, but -- I don't --

Page 18

```
 1          Q.     Only in your -- go ahead.

 2          A.     I don't think so.

 3          Q.     Okay.  In your time as a Commissioner, do

 4    you remember any Commissioner ever telling the

 5    Librarian to buy certain books for the library?

 6          A.     No.

 7          Q.     Would it be fair to say that's because the

 8    county commissioner trusts the librarian to make

 9    decisions about what books to stock based on what the

10    by-laws say?

11                 MR. ROGERS:  Object to the extent that it

12    calls for speculation on the mind of other

13    commissioners.  But go ahead and answer it.

14          A.     Would you repeat?

15    BY MS. LEONIDA:

16          Q.     Sure.  Would it be fair to say that the

17    commissioners don't tell the librarian what books to

18    buy because the commissioners trust the librarian to

19    select books based on the parameters of the by-laws?

20          A.     The commissioners do not.  I -- I don't

21    know what the other commissioners think.  I do not tell

22    the librarian what books to buy.

23          Q.     Okay.  The Commissioners Court also selects

24    the library board; is that right?

25          A.     We have a Library Advisory Board.
```

Veritext Legal Solutions
866 299-5127

1      Q.      Do you have any other kind of library

2  board?

3      A.      The -- the -- not appointed by the county.

4      Q.      Okay.  How long has the Library Advisory

5  Board existed?

6      A.      Longer than me, I think.

7      Q.      Was it always called the Library Advisory

8  Board?

9      A.      I think so.

10      Q.      How are people appointed to that board?

11      A.      By the Commissioners Court.

12      Q.      What are the criteria that the

13  Commissioners Court evaluates before appointing

14  somebody to the Library Advisory Board?

15      A.      I -- I don't think there is a criteria.

16      Q.      So, how do you personally pick somebody for

17  that board?

18      A.      As with -- as with any board, it would be

19  interest, people that have interest in that thing.

20  Some people have interest -- interest in libraries and

21  some don't.

22      Q.      Is anybody with interest allowed to serve

23  on the Library Advisory Board, or is there a limited

24  number of seats?

25      A.      There is a limited number.

Page 20

1     Q.       So how do you decide between people if
2  there are more people that want to be on the board than
3  there are seats?
4     A.       I don't know about the others,
5  commissioners; I appointed the -- pretty much the first
6  four, with the exception of one.
7     Q.       The first four?
8     A.       The first four volunteers.
9     Q.       Okay.  And what was the one exception?
10     A.       A lady that was on there before, then her
11  term had expired.
12     Q.       What was her name?
13     A.       Jeanne Puryear.
14     Q.       What does the Library Advisory Board do?
15     A.       They're supposed to oversee policies and
16  update policies throughout the library, for the library
17  system.
18     Q.       Are they also supposed to advise the
19  Commissioners Court?
20     A.       Yes, ma'am, on policies and things.
21     Q.       So the Library Advisory Board advises the
22  Commissioners Court about the library, right?
23     A.       Yes.
24     Q.       And the Commissioners Court makes decisions
25  about hiring the head librarian, correct?

Page 21

1      A.      Yes, it's the Library Director.

2      Q.      Library Director.  I'm sorry.  The

3  Commissioners Court also has the authority to fire the

4  Library Director, right?

5      A.      I guess so.

6      Q.      And the Commissioners Court sometimes tells

7  the Library Director what to do; isn't that right?

8      A.      That's a -- that's kind of a tricky

9  question, a tough question.  Yes and no.  When she

10  needs help, when she needs something on it, that goes

11  on the Commissioners Court agenda.

12      Q.      And is that the only time that the

13  commissioners tell the Library Director what to do,

14  when she asks for help?

15      A.      Once again, you keep saying commissioners.

16  I don't know what the other commissioners do on a daily

17  basis, but that's what I -- that's the only time I

18  would.

19      Q.      Let me take you back to August of 2021.  Do

20  you remember being involved in a -- in a conversation

21  about books that people were calling the "butt books"?

22      A.      In August of '21?  I -- I don't know dates.

23      Q.      Okay.  Do you remember the --

24      A.      I don't remember the -- I don't remember

25  the dates.  I'm sorry.

Page 22

1      Q.      That's fine.   Do you remember ever talking

2   to Ms. Milum about books that people were calling "butt

3   books"?

4      A.      Yes, ma'am.

5      Q.      Why did you start talking to her about

6   those books?

7      A.      Well, as a commissioner, you get lots of

8   calls and complaints about things, roads, everything,

9   budget, taxes, everything, and -- and I had gotten some

10  complaints from constituents about certain books, butt

11  books.

12     Q.      What were those complaints?

13     A.      That they were inappropriate for children's

14  section of the library.

15     Q.      What do you mean by inappropriate?

16     A.      I didn't make the complaint, so there --

17  I'm -- I'm -- I guess I'm guessing there.   There is --

18  their -- their meaning for inappropriate is that they

19  were showing nude pictures, animated nude pictures, and

20  I guess that's it.

21     Q.      Which constituents complained to you about

22  these books?

23     A.      There was probably more than I can

24  remember.   There was -- remember, I get complaints

25  about everything.   I think Rochelle Wells may have been

Page 23

1    one.   Maybe Eva Carter may have been one.   I -- I don't

2    know -- I -- I'm kind of guessing on -- on other people

3    that have made those complaints or, you know, those

4    inquiries or whatever you want to call it.

5         Q.    Okay.  We don't want you to guess.  At some

6    point after receiving the complaints, you went down to

7    the library and actually got the butt books or at least

8    one of the butt books from Ms. Milum, right?

9         A.    I didn't get it, no, ma'am.  She -- she

10   showed it to me.

11        Q.    Okay.  So, you -- so, you looked at it?

12        A.    I looked at some of it.

13        Q.    You didn't ask her to take it with you so

14   you could read it?

15        A.    No, ma'am.

16        Q.    So if Ms. Milum said that, she'd be lying?

17             MR. ROGERS:  Objection, form.

18        A.    I don't know.  If she said that I took the

19   butt book with me home or anything out of the library,

20   then I -- I don't like to call someone a liar.  I did

21   not take a butt book with me.

22   BY MS. LEONIDA:

23        Q.    Okay.

24        A.    I don't think that's their actual name, but

25   that's what they're called.

1    Q.    At some point after Ms. Milum showed you

2  the butt book, is it true that you came back and told

3  her that she should take them out of the library

4  system, that she should pick her battles, and that you

5  were going to tell everyone this was over?

6    A.    Repeat that, please?

7    Q.    Of course.  At some point after you looked

8  at the butt books, is it true that you talked to

9  Ms. Milum again and you told her that she should take

10  the butt books out of the system, that this -- that she

11  should pick her battles, and that you were going to go

12  tell everyone that this is over?

13    A.    I don't know about all that.  I did not

14  look at the butt books.  I looked at a piece of one of

15  them that was never on the -- in the system, it was

16  never on the shelf.  I -- I don't remember saying

17  anything about anything being over.  I -- I don't know

18  what -- what would be over.

19    Q.    Okay, well, let's take it piece by piece.

20  Did you ever say to Ms. Milum that you had been getting

21  calls about the books, the book that Rochelle had

22  checked out, and that she should take the butt books

23  out of the system, did you ever say that to her?

24    A.    I don't know what books Rochelle has

25  checked out or not, no.

Page 25

```
 1          Q.      Okay.  Did you ever tell Ms. Milum to take
 2     the butt books out of the system?
 3          A.      No.
 4          Q.      So --
 5          A.      That --
 6          Q.      -- if Ms. Milum said you said that, that's
 7     not true?
 8          A.      I did say to take the -- keep them out of
 9     the children's section.  There's a difference.
10          Q.      So you did tell Ms. Milum to take the butt
11     books out of the children's section?
12          A.      Yes, ma'am.
13          Q.      Did you tell her where to put them?
14          A.      No, ma'am.  Let me -- can I back up a
15     second?
16          Q.      Of course.
17          A.      I told her, that in my opinion, that she
18     needed to take them out of the children's section.  I
19     also told her she does not work for me specific, so I
20     was there, was giving my opinion and my opinion only
21     that these books need to -- didn't -- they didn't need
22     to be in the children's section.
23          Q.      Did you tell her to pick her battles?
24          A.      I don't remember saying that.
25          Q.      Did you tell her that you were going to
```

Veritext Legal Solutions
866 299-5127

```
 1    tell everyone that this is over?
 2         A.    I don't know what "this" is, what you mean
 3    when you said I did tell her -- everyone that this is
 4    over.  I -- I don't know if that -- I don't remember
 5    that.
 6         Q.    Do you remember telling her anything like
 7    that, that you were going to tell people that this is
 8    over, or it's over, anything that -- do you remember
 9    saying anything that she might have interpreted as you
10    saying that you were going to tell everyone it's over?
11              MR. ROGERS:  I am going to object.  Asked
12    and answered.  Go ahead, though.
13              THE WITNESS:  What does that mean?  Keep
14    answering?
15    BY MS. LEONIDA:
16         Q.    Yeah, you can answer.
17              MR. ROGERS:  Yeah, I've objected.  You can
18    answer the question.  Sorry.  I didn't mean to talk
19    over you.
20              THE WITNESS:  I'm sorry.  Repeat the
21    question, please.
22    BY MS. LEONIDA:
23         Q.    The question is:  Did you say anything to
24    Ms. Milum during that conversation about putting --
25    about taking the butt books out of the children's
```

Page 27

```
 1    section, did you say anything to her that's anything
 2    like you're going to tell everyone it's over?
 3                MR. ROGERS:  Objection.  Asked and
 4    answered.
 5         A.    I don't know if I did or not.
 6    BY MS. LEONIDA:
 7         Q.    Do you remember telling Ms. Milum during
 8    that conversation that the next step would be to take
 9    this to Commissioners Court, and if that happens, that
10    they would vote to take them off the shelves and it
11    would be bad publicity for the library, or anything to
12    that effect?
13         A.    So, there's two questions there, or three?
14    I -- I don't think that I told her anything about
15    taking it to Commissioners Court.  I do think that I
16    told her that that was -- was bad for the library.  I
17    don't know about publicity.
18         Q.    Okay.  Did you tell that her the
19    Commissioners Court would vote to take the books off
20    the shelves?
21         A.    No.  I answered that while ago.  We
22    don't -- we don't do that.  We don't take books off the
23    shelf or put books on the shelf.
24         Q.    So if Ms. Milum had written a note to --
25    had written down that day that you said that the next
```

Page 28

```
 1    step would be to take this to Commissioners Court and

 2    the Commissioners Court would vote to take the books

 3    off the shelves, she would be lying; is that right?

 4              MR. ROGERS:  Objection.  Asked and

 5    answered.  Argumentative.

 6    BY MS. LEONIDA:

 7         Q.    You can answer.

 8         A.    I don't know what she wrote down.  There --

 9    she didn't write nothing down while I was there that I

10    remember, but I don't remember saying that.

11         Q.    Is it possible that you could have said

12    that to her and you don't remember?

13         A.    That I could have said that -- that we were

14    going to go to Commissioners Court?

15         Q.    Okay, let me -- let me just ask the

16    question from the beginning so we're all on the same

17    page.

18         A.    Thank you.  Thank you.

19         Q.    Is it possible that you could have said to

20    her the next step would be to take this to

21    Commissioners Court and if that happens we would vote

22    to take them off the shelf?

23         A.    No, I don't remember saying that.  And

24    we -- we don't do that.  Commissioners Court doesn't

25    decide what books are on the shelf.
```

Veritext Legal Solutions
866 299-5127

1          Q.     So, again, if Ms. Milum said that you said

2     that, that would be a lie?

3                 MR. ROGERS:  Objection.  Asked and

4     answered.  Argumentative.

5                 THE WITNESS:  Did someone say something?

6     BY MS. LEONIDA:

7          Q.     You can answer.

8                 MR. ROGERS:  I objected, Commissioner, but

9     you can go ahead and answer.

10                THE WITNESS:  Okay.

11         A.     Once again, calling someone a liar is a big

12    thing to me.  I don't want to call someone a liar, but

13    that, that did not happen.

14    BY MS. LEONIDA:

15         Q.     Mr. Moss, I want to ask you a couple of

16    questions about the library rules about displays.

17         A.     About dis -- about what?  Displays?

18         Q.     Displays, yeah, public displays and

19    exhibits in library.

20         A.     Okay.

21         Q.     Is it true that among the rules and

22    policies of the library, that displays that focus on a

23    public issue must include information about the major

24    aspects of differing points of view?

25         A.     I hate to keep asking you to repeat these.

Page 30

1   That's a pretty long question.

2        Q.     Okay.  Maybe it will help if I share the

3   screen.  I'll put Exhibit 15 back on, and it's what we

4   were looking at earlier about the display and exhibit

5   rules.  Okay.  Can you see the page that says

6   Displays/Exhibits?

7        A.     Yes, ma'am.

8        Q.     Okay.  So, let me ask you again.

9               Is it true that the rules for Llano County

10  Library Systems require that displays that focus on a

11  public issue have to include information from -- from

12  differing points of view?

13       A.     It -- it says that on that page, yes,

14  ma'am.

15       Q.     Is that something that you agree with?

16       A.     I don't know why I wouldn't.

17       Q.     Would you agree that the role of a library

18  is to provide people with access to information from

19  all sides?

20       A.     What do you mean by "all sides"?

21       Q.     That's a great question.  Let me -- let me

22  ask it without it.

23              Would you agree that the role of a library

24  is to provide people with access to information?

25       A.     Yes, ma'am.

Page 31

1      Q.      Would you also agree that it's not the role

2   of a library to advocate for one, say, political

3   position over another?

4      A.      That it's not the --

5      Q.      Yes.

6      A.      -- the job of the library?  Yes, I would

7   agree.

8      Q.      This rule saying that when there's a

9   library display it should show differing points of view

10  is consistent with that, with the library's role of

11  providing access to all kinds of information, right?

12     A.      It's seems to be, yes.

13     Q.      The library meeting room policy that I

14  think you said you were actually on the board of

15  commissioners when that was adopted, right?

16     A.      In 2017?

17     Q.      Yes.

18     A.      Yes, ma'am.

19     Q.      Okay.  So, part of the policy that -- that

20  you adopted says that letting a group use a library to

21  meet does not mean that the library is endorsing that

22  group's views; is that right?

23     A.      I hate to keep doing this to you, but I

24  don't know what that says word for word.  It sounds

25  right, yes, ma'am, but I -- I don't know, I can't quote

Page 32

```
 1    the policy.
 2         Q.    Okay.  I don't expect you to.  So let me
 3    see if this helps you remember.  I'll just give you a
 4    minute to look at the highlighted -- well, you can look
 5    at the entire meeting room policy --
 6         A.    Yes.
 7         Q.    -- but there is a portion that I've
 8    highlighted.
 9         A.    Yes, ma'am, it does say that.
10         Q.    Okay.
11         A.    Thank you.
12         Q.    And that's also because it's not a
13    library's role to pick one side of a debate, right?
14         A.    I -- yeah, I don't know if that's why
15    that's in there or not, but I would assume so.
16         Q.    So to put it a different way, then, groups
17    are allowed to meet at the library even if, say, the
18    librarians disagree with that group's point of view,
19    right?
20         A.    Yes, I think so.
21         Q.    And groups are allowed to meet at the
22    library even if they -- all of the commissioners
23    disagree with that group's point of view, right?
24         A.    Yeah, commissioners have nothing to -- we
25    don't have nothing to do with the leasing out or
```

Page 33

1   renting the meeting room.

2        Q.      Okay.  So I want to talk now about the

3   Materials Selection Policy.  And having learned my

4   lesson from the last two series of questions, I'm just

5   going to put it on the screen for you now.

6        A.      Thank you.  Okay.

7        Q.      So, can you see this Materials Selection

8   Policy?

9        A.      Yes, ma'am.

10       Q.      And this is the policy that applies now

11  from August of twenty oh -- from 2006 to now, it's the

12  current policy, right?

13       A.      I believe so.

14       Q.      Can you read the highlighted part of that

15  policy?  I can make it bigger for you.

16       A.      Do you want me to read it out loud?

17       Q.      Yes, please.

18       A.      Just the highlighted part?

19       Q.      Just the highlighted part.

20       A.      "'In no case should any book be excluded

21  because of race or nationality or the political or

22  religious views of the writer.  There should be the

23  fullest practicable -- practicable provision of

24  material presenting all points of view concerning the

25  problems and issues of our times ... international,

Page 34

1    national and local; and media or other reading

2    materials of sound factual authority should not be

3    proscribed or removed from the library shelves because

4    of partisan or doctrinal disapproval'.   The library

5    does not promulgate particular beliefs or view -- or

6    views, nor is the selection of any given media

7    equivalent or -- to endorsement of the viewpoint of the

8    author expressed" herein.   "...therein."   Sorry.

9         Q.      Thank you.  Do you -- do you agree with

10    that, with that, personally --

11         A.      Yes --

12         Q.      -- that policy?

13         A.      Yes, I do.

14         Q.      And that is definitely the county's policy,

15    correct?

16         A.      Yes, ma'am, I think so.

17         Q.      So, the fact that a book exists in Llano

18    County Library System doesn't mean that -- that the

19    county agrees with what that book says, correct?

20         A.      Will you repeat that?

21         Q.      Sure.  The fact that a book is in the Llano

22    County Library System doesn't mean that Llano County

23    agrees with what that book says, does it?

24         A.      I -- I don't -- I don't guess.  I don't

25    know.  I don't have any idea what all the books are in

                                                Page 35

1      the library.

2             Q.     Okay --

3             A.     I --

4             Q.     -- let me -- let me give you some examples

5      then, maybe.  There is a book, and I'm going to share

6      my screen now and what I can do is just take

7      screenshots of this afterwards, I'm going to call this

8      Exhibit 16.

9                    (Marked Deposition Ex. 16)

10     BY MS. LEONIDA:

11            Q.     So, Mr. Moss, can you see the Llano County

12     Library search page that's on the screen in front of

13     you?

14            A.     I do, I think, yes, I do see a page here.

15     I'm assuming that's what you are talking about, the

16     Llano County.  Yes, I do.

17            Q.     So there's a book in the Llano County

18     Library System called, If You Give a Pig the White

19     House, right?

20            A.     I don't know.  I guess.  It says that right

21     there.

22            Q.     Yeah, and it says it's available in the

23     Kingston Branch, right?  Kingsland.  Sorry.

24            A.     Where does it say that?

25            Q.     Is that what this KB is?

1          A.      Oh.  I'm sorry.  I missed that.  Yeah.  I

2     think so, yes, ma'am.

3          Q.      Okay.  So this book that basically makes

4     fun of former President Trump, you wouldn't say that

5     this book speaks for Llano County because it's included

6     in the library system, would you?

7          A.      No.

8          Q.      Right.  So Llan -- Llano County is not

9     trying to express the view that former President Trump

10    is a buffoon just because it has this book that makes

11    fun of him on the shelves; isn't that right?

12         A.      Once again, you -- you're talking about a

13    government body, so as far as I'm concerned, no.

14         Q.      Okay.  Okay.  I'm going to look up another

15    book.

16         A.      Okay.

17         Q.      Okay.  So, Llano County also carries this

18    book called Fear: Trump in the White House.  Do you see

19    that?

20         A.      I do see that.

21         Q.      It's available in multiple branches, right?

22         A.      I don't know.  You scooted over or

23    something.  I can't see that end there anymore.

24         Q.      Can you see that now?

25         A.      No, ma'am.  That part of my screen is

Veritext Legal Solutions
866 299-5127

1    still... I don't know.  It's not there.  It -- it cuts

2    off right past where it says Author.

3         Q.    Okay.  So then hypothetically speaking if

4    you could see the -- sorry.  If you could see the rest

5    of this screen and it showed that this book called

6    Fear: In the Trump White House was available in all

7    branches at the Llano County Library, that doesn't mean

8    that Llano County endorses what this book says, does

9    it?

10         A.    No, ma'am, I don't think so.

11         Q.    So if this book says that President Trump

12    is a liar who jeopardized national security for his own

13    selfish needs, that is not the opinion of Llano County,

14    is it?

15         A.    No, no, ma'am.  Once again you asked the

16    question, that -- there's a lot of -- lot of people in

17    Llano County.  I'm one person.  So my opinion, no, it

18    does not represent Llano County, doesn't.

19         Q.    Are you familiar with a book called Mein

20    Kampf written by Adolph Hitler?  Are you familiar with

21    a book called Mein Kampf which was written by Adolph

22    Hitler?

23         A.    No, ma'am.

24         Q.    If there was a book by Adolph Hitler in the

25    Llano County Library, that book definitely does not

1    represent the views of Llano County, right?

2           A.      Not my view.

3           Q.      Would you agree that Llano County carries

4    all of these books that don't represent the views of

5    the county because of the document that you were just

6    reading to us, because the library doesn't promulgate

7    particular beliefs or views and endorse the viewpoints

8    of the authors represented in the library?

9                   MR. ROGERS:   Object to the compound

10   question.

11   BY MS. LEONIDA:

12          Q.      You can answer.

13          A.      Will you repeat?

14          Q.      Sure.   Would you agree with me that the

15   reason that the library can carry these books that --

16   that the people of Llano -- let me re -- let me ask it

17   again.

18                  Would you agree with me that the reason

19   that the library carries these books that you said

20   don't represent the views of Llano County, the reason

21   that these books are in there is because the library

22   doesn't promulgate a particular belief and it doesn't

23   endorse the viewpoint of the people that write the

24   books in the library?

25                  MR. ROGERS:   Same objection.

Page 39

1          A.      Yes.

2      BY MS. LEONIDA:

3          Q.      Okay.  Llano County Library also has a copy

4      of the Bible, the Koran and the Torah; is that right?

5          A.      I don't know.

6          Q.      If the --

7          A.      I don't check out many books.

8          Q.      Okay.  If the Llano County Library has a --

9      has the Bible in there and also a book about evolution,

10     that would be contradictory, right?

11         A.      I don't know what you mean by that

12     question.

13         Q.      Okay.  So, Llano County Library can have or

14     has books that contradict each other, does that make

15     sense, do you -- would you agree with that?

16         A.      They can have.  I don't know what they

17     have, what all the books that are in there.  They can

18     have.

19         Q.      Okay.  Would you agree that one of the

20     reasons they can have books that contradict each other

21     is because the county doesn't pick a side when it

22     selects a book; the book is just there for information?

23         A.      There you go with sides again.  I'm not

24     sure what that means.

25         Q.      I can ask a -- oh --

                                              Page 40

```
1        A.      Yes.  Yes, ma'am, please do.
2        Q.      Okay.  I'll ask a different question.  So
3   if for example the -- the library has a copy of the
4   Bible and also a copy of the Koran, those books tell
5   different stories about how the world came into being.
6   Does the library -- is the library saying that either
7   one is right just by -- is the county saying that
8   either one of those is right just by having it in the
9   library?
10       A.      No, ma'am.
11       Q.      Is there -- is there, in your opinion as a
12  County Commissioner, is there any problem with having
13  books about gay people in the library?
14       A.      No, ma'am.
15       Q.      Books about same sex couples who are in
16  love can have artistic value, right?
17       A.      Yes.
18       Q.      And it doesn't mean that the county is
19  endorsing any particular lifestyle to have those books
20  in the library, right?
21       A.      Correct.
22       Q.      Do you need a break?  We've been going a
23  little while.
24       A.      No, I -- I'm good.
25       Q.      Okay.  Great.
```

Page 41

1          A.      We started late and I have something this

2     evening.

3          Q.      Okay.   I think you should be able to get

4     there.

5                  So, we were talking about how the

6     library -- the county isn't trying to express a view by

7     putting a book in the library.  Would you agree that by

8     selecting a book for the library, the county isn't

9     trying to express the views in the book, if that makes

10    sense?

11         A.      The county doesn't select.  We keep

12    saying -- we don't.  You keep saying the county put

13    these books.  The county is not buying these books.

14         Q.      Okay.

15         A.      The -- the library -- the librarians or

16    head librarian orders these books.  Now -- I'm sorry.

17    I did not answer your question.  What was it again?

18         Q.      No, I'm glad, I definitely want you to

19    correct me if I'm saying something that -- that doesn't

20    make sense to you or if the premise is wrong.  So let

21    me break it up into two different questions.

22                 When the Library Director selects a book,

23    is the Library Director selecting that book to express

24    the views of the Commissioners Court or the county?

25         A.      No, ma'am.

                                              Page  42

1    Q.      And when the Library Director selects a

2    book, is the -- does the Commissioners Court look at

3    every book that's selected to make sure that that book

4    is -- expresses a view that they're trying to express?

5    A.      Luckily, no.

6    Q.      Why do you say luckily?

7    A.      Because I'm sure there's a lot of books.  I

8    don't have time for that.

9    Q.      Do you know if any commissioner has time

10   for that?

11   A.      I -- I don't know what the other

12   commissioners do, you know, on a daily -- I don't know

13   how much time they have.

14   Q.      How often do you meet?

15   A.      We meet a minimum of twice per month as a

16   court, but we may meet other times.

17   Q.      Do you talk to the other commissioners more

18   than twice a month?

19   A.      Not very often.  We -- there's laws against

20   quorums.

21   Q.      Okay.  Do you talk to them individually,

22   then?

23   A.      No.  Once again, you -- you've got to --

24   you can't do that very much because if you talk to one

25   commissioner about one thing and then you talk to

Page 43

1    another commissioner about the same thing, that's

2    considered a walking forum and so, no, ma'am, I do not

3    talk to them very much at all.

4         Q.      Okay.  Are you aware of any commissioners

5    that get involved in telling the Library Director what

6    books to pick?

7         A.      I am not aware, no.

8         Q.      Okay.  Who is Rochelle Wells?

9         A.      She is, as far as I know, she's -- she's --

10   well, I do know she is one of the people I appointed to

11   the Library Advisory Board, a concerned, involved

12   home-school mother.  Pretty much all I know.

13        Q.      Have you ever talked to her about library

14   issues?

15        A.      Yes, ma'am.

16        Q.      Tell me about those conversations.

17        A.      Oh, well, as you said earlier, I think they

18   may have started in August, and -- and she is one of

19   the people asking questions about books in the

20   children's section in the library, and before that, I

21   didn't know her.  Still don't know her, but -- very

22   well.  But we -- we've talked about books that were in

23   the children's section of the library.  I think that's

24   about it.  I don't know the details of the

25   conversations.

Veritext Legal Solutions
866 299-5127

1          Q.      Okay.  Did you continue to talk to her

2     through the fall of 2021?

3          A.      I believe so, yes, ma'am.

4          Q.      Okay.  Who is Chris Jones?

5          A.      Chris Jones, she is a constituent and

6     that -- that has showed concerns about the same, that

7     rides a motorcycle, and that's all I know.

8          Q.      When you say concerns about the same, what

9     do you mean?

10          A.      Some of the -- the books, children's

11     books -- I'm sorry.  Some of the books in the

12     children's section.

13                    (Marked Deposition Ex. 17)

14     BY MS. LEONIDA:

15          Q.      Okay.  I am going to show you what will be

16     marked Exhibit 17.

17          A.      Okay.

18          Q.      And this is an email that was forwarded to

19     you by Chris Jones from Rochelle Wells.  Do you see

20     that?

21          A.      I do.  I read slow, though, so give me a --

22     do you want me to read it, some of it, or what do you

23     want me to do?

24          Q.      No no, take your time.

25          A.      Okay.  Yeah.  Thank you for highlighting

                                                          Page 45

1    things you want me to look at.  Huh.  Yeah, I see some

2    of that.

3         Q.    Okay.  Just let me know when you're done.

4    I have -- I --

5         A.    Okay.

6         Q.    -- just have some follow-up questions about

7    this.

8         A.    Okay.  Hold on a second, please.  Okay.

9    I've read all of that that is on the screen.

10        Q.    Okay.  So the first question that I have is

11   you see there's a reference there that I highlighted

12   about, "Commissioner Moss and Judge Cunningham have

13   instructed Amber, the head librarian, to remove certain

14   books..."?

15        A.    I see that.

16        Q.    Okay.  What books were those?

17        A.    There's something missing there and any --

18   any books that I have talked to her about, which, once

19   again was strictly my opinion, I made it very clear

20   that she doesn't work under me, but was a book out -- a

21   couple of books out of the children's section of the

22   library -- not out of the library.  The -- there's --

23   to answer the second part of that question, there's

24   a -- the butt books that we had talked about earlier,

25   and I just seen the -- a part of one of them that was

```
 1    never on the shelf to start with as far as I
 2    understand, and then there's a book that's called, It's
 3    Perfectly Normal that was in the ten-and-under section
 4    that shows people having sex.
 5              Did I answer your question?
 6         Q.    Yes, so those are -- those are the books
 7    that Ms. -- is it Ms. or Mrs. Wells?
 8         A.    I don't have no idea.
 9         Q.    Okay.
10         A.    Well, I guess it's Mrs. Wells.
11         Q.    So those are the books that Mrs. Wells is
12    talking about when she says that -- that you and Judge
13    Cunningham have instructed Amber, the head librarian,
14    to remove certain books?
15         A.    I assume so.  But I don't know what Judge
16    Cunningham has done or hasn't done.
17         Q.    Okay.  Did you have a meeting with
18    Mrs. Wells, do you remember having a meeting with
19    Mrs. Wells around the time of this email?
20         A.    I am horrible with timelines, so I'm not
21    sure about the time of this email, but I have met with
22    Ms. Wells before.
23         Q.    Okay.  Were some of those meetings before
24    Thanksgiving of last year?
25         A.    I think so, yes.
```

Page 47

```
 1          Q.      At any of those meetings, did you talk
 2     about what's referenced down here as a "16-page list of
 3     CRT and LGBTQ books"?
 4          A.      No, ma'am.
 5          Q.      So, when it says at the bottom of this
 6     summary here, "Chris Jones has combed through that
 7     16-page list of CRT and LGBTQ book to see which we have
 8     in Llano County libraries," and that they are going to
 9     be sending a list of the ones that are inappropriate
10     along with a summary to Commissioner Moss.  Is that
11     something that you all talked about --
12          A.      No.
13          Q.      -- people doing?  No?
14          A.      I get -- I get advice all the time.  I -- I
15     don't remember that, no.
16          Q.      Do you know what list they're talking
17     about?
18          A.      No, ma'am, I do not.
19          Q.      Okay.  Do you know what CRT stands for?
20          A.      CRT?  I -- I do not.  What does --
21          Q.      What --
22          A.      -- it stand for?
23          Q.      Go ahead.  I'm sorry?
24          A.      What does it -- what does it stand for?
25          Q.      I'm asking if you know because it looks
```

Veritext Legal Solutions
866 299-5127

1    from this like you -- like you all might have talked

2    about it at a meeting.

3          A.    I'm asking you.  I -- I know you're asking

4    the questions.  I don't know what it stands for, no.

5          Q.    Okay.  Did you ever talk to anybody about

6    CRT as far as you know?

7          A.    No, ma'am, but it would be helpful if I

8    knew what it meant.

9          Q.    Well, then, my next question is did you

10   ever talk to anybody about critical race theory?

11         A.    That's what it means I guess.  Oh.  No

12   ma'am.

13         Q.    Do you know what LGBTQ stands for in

14   Mrs. Wells' email here?

15         A.    It represents the homosexual community, the

16   way I understand it.

17         Q.    Have you ever -- go ahead.

18         A.    I didn't say nothing.

19         Q.    Okay.  Have you ever talked to anybody

20   about those kinds of books?

21         A.    People have talked to me.

22         Q.    Which people?

23         A.    I -- I don't know.  There -- there was a

24   lady that attended Commissioners Court and made public

25   comments a couple of times, but I don't -- I don't

                                        Page 49

1    remember her name.

2         Q.     What was she commenting about?

3         A.     About homosexual books being in our library

4    system.

5         Q.     What was her opinion on that?

6         A.     I didn't have one.  That was on public

7    comments, and we -- that we could not respond.

8         Q.     Sorry.  I asked what was -- what was her

9    opinion?

10        A.     Oh, what was her opinion.  I'm sorry.  I'm

11   sorry.  I don't know if she actually stated her

12   opinion.  She was -- she was complaining about them

13   being in the library.

14        Q.     Did anybody on the -- did any of the

15   commissioners respond to what she said at that meeting

16   or later?

17        A.     I don't know about later, but we can't --

18   we could not respond, it's on public comments, and it

19   was not on our agenda, of course.

20        Q.     The books that you -- that you and -- well,

21   the books that you said that you instructed Amber the

22   head librarian to remove, I think you said the one butt

23   book, and what was the other book that you -- that you

24   mentioned?

25        A.     I didn't --

```
 1              MR. ROGERS:  Objection.  That misstates
 2   testimony.
 3   BY MS. LEONIDA:
 4       Q.    What was the other book that you mentioned
 5   you talked to Amber about?
 6       A.    Yeah, I didn't instruct her to do anything.
 7   It's -- what was the -- I'm not sure.  You said one of
 8   the books in the question.  What was the other -- well,
 9   what -- what's the question?
10       Q.    The question was:  When you were talking
11   about the books that let's say you suggested to Amber
12   that you thought might not belong in the children's
13   section, what were -- what were the names of those
14   books again?
15       A.    Well, there was the butt book that -- that
16   you referenced to start with, and It's Perfectly
17   Normal.
18       Q.    Any other books that you talked to her
19   about?
20       A.    I don't think so, no.  No ma'am.
21       Q.    Okay.  Did you read It's Perfectly Normal?
22       A.    I did not read it.  I flipped through the
23   pages, I looked at the pages, looked at the pictures.
24       Q.    Did you read any reviews of that book?
25       A.    No, ma'am.
```

Page 51

1        Q.      Did you talk to anybody who had read the
2    book?
3        A.      I didn't talk to them, but we -- we had a
4    lot of public comments about it.
5        Q.      Tell me about that.
6        A.      Most of them was from Ms. Little talking
7    about the book several times in -- several times in the
8    Commissioners Court on public comments.
9        Q.      Did anybody else talk about the book in
10   public comments besides Ms. Little?
11       A.      I think so, but I don't remember who, that
12   they -- she was -- definitely talked about it more than
13   anyone.
14       Q.      You said that you suggested that that book
15   didn't belong in the children's section because of the
16   pictures.  Do you -- what pictures are you talking
17   about?
18       A.      It shows people having sex, animated people
19   having sex, in the ten-and-under section of the
20   library.
21       Q.      Where did you tell the Library Director to
22   put that book when you said that you didn't think it
23   belonged in the children's section?
24       A.      Actually, the person I talked to about that
25   to start with was the children's librarian at the time,

Veritext Legal Solutions
866 299-5127

1    and that was my opinion, and she agreed, and I don't

2    know that I told them what section to put it in, but in

3    an -- in the -- at -- at one of the other sections.

4        Q.    What was the name of that librarian that

5    you talked to about it?

6        A.    Tina.  I believe her last name is

7    Castillon.  Tina Castillon.

8        Q.    Did you see what she did with the book

9    after you talked about it?

10       A.    No, ma'am.

11       Q.    Did she tell you what she did with the book

12   after you talked about it?

13       A.    I don't think so.

14       Q.    Did you ever hear from anybody else what

15   happened to that book after you talked to Tina about

16   it?

17       A.    I think -- I think that book was put in the

18   adult section, and then later was weeded because it

19   hadn't been checked out.

20       Q.    Tell me more about that.  How do you

21   know --

22       A.    You had -- your -

23       Q.    How do you know it was weeded?

24       A.    Your guess is as good as mine.  I -- I got

25   a complaint that books were being removed from the

                                                  Page 53

1    library, so I went back to the library and asked Amber

2    Milum, the Library Director, what was going on, why was

3    she removing books from the library, and she said she

4    was not removing books, she was doing her, part of her

5    job, they were weeding books, which was books that had

6    not been checked out in a certain amount of time, and I

7    don't remember what the time is, how -- the length is

8    that they -- that if they haven't been checked out,

9    books that hadn't been checked out were taken off the

10   shelves to make room for different books that -- that

11   were wanted or asked, you know, as being checked out by

12   the public, and I think that -- I'm pretty sure that

13   book was one of them.

14        Q.    Did she tell you any other books that had

15   been weeded?

16        A.    No, no, ma'am, didn't go into details about

17   what books it was.  I knew afterwards when all this

18   started that that -- that that was one of the books.

19        Q.    Do you remember approximately what time -

20   and maybe by reference to a holiday, before or after

21   Thanksgiving or Christmas - what time it was that you

22   asked Ms. Milum about where this book was and she told

23   you that it had been weeded?

24        A.    I didn't ask Ms. Milum where that book was.

25        Q.    Then I misunderstood.  How did you find out

Page 54

1    that that book had been weeded?

2         A.    Okay.  We may be talking about two

3    different times here.  But when you asked me about just

4    a second ago, the last question about -- you asked me

5    to tell you about how I knew books were weeded, and --

6    which I had never heard of before then, and turns out

7    that's something that libraries do.  I think that it

8    may have been when y'all served me with papers.  I

9    don't remember exactly when I found out that that book

10   was in the weeding process, or, you know, had been

11   weeded.

12        Q.    Okay.  So we served you with papers, and

13   then what did you do next in terms of --

14        A.    I called a lawyer.

15        Q.    And then after you called the lawyer, did

16   you make some effort to figure out whether books had

17   been removed from the library?

18        A.    Well, the books had been weeded before that

19   that I knew -- that -- the ones that y'all named, I

20   didn't really make much of an effort to -- to go to the

21   library to actually see if they had been weeded, which

22   books had been weeded and which books hadn't.

23        Q.    When is the first time that you talked to

24   anybody at the library about weeding?  You said that

25   you just found out that this happened.  When, when was

Page 55

```
 1    that?  Was it --
 2         A.     Well, it wasn't yesterday.  So when I say I
 3    just found out, I'm not -- I'm sorry.  Did I cut you
 4    off?
 5         Q.     Nope.  Go ahead and answer.
 6         A.     I'm not sure on the time or month or year
 7    even.  It was -- I think it was in 2021.  I -- I don't
 8    know what their -- I don't know when they were weeded.
 9    I'm not sure.  I'm sorry.  There was a -- I don't
10    remember even who asked me.  I'm trying to think.
11    There -- there was a lady that asked me if I knew that
12    was going on and I went down there, but I do not
13    remember what time it -- what time that was or -- or
14    day or month, no ma'am.
15         Q.     Okay.  You said a lady asked you if you
16    knew that was going on.  What -- do you remember what
17    lady that was?
18         A.     I think it was Linda Gammage.
19         Q.     And what did Linda Gammage ask you, to the
20    best of your memory?
21         A.     Asked me if I knew books -- or what books
22    had been remove -- were being removed from the library.
23         Q.     What did you think when she asked you that?
24         A.     I wondered what in the world was going on,
25    so I went down there and asked.
```

Page 56

1      Q.      Who did you ask?

2      A.      Amber.  I've told that you already.  I

3  told -- I asked Amber Milum just in -- what -- what

4  books were being removed from the library, and she said

5  they weren't removed, they were being weeded because of

6  the lack of use, lack of circulation.

7      Q.      Okay.  And this happened at the end of

8  2021?  I just want to make sure that we're talking

9  about the same conversations.

10      A.      I don't know, ma'am, no, ma'am, I can't --

11  I can't say exactly if it -- it may have been Janu --

12  it was -- it may have been November, it may have been

13  January.  I'm not sure about the timeline.

14      Q.      It was before the lawsuit was filed?

15      A.      Yes, ma'am.

16      Q.      Okay.  So, going back to Exhibit 17, which

17  was that, that email that you were reading --

18      A.      Okay.

19      Q.      -- about Chris Jones going through the

20  16-page list of books.  If you remember, at the end of

21  that email it said, "Thank you, Chris, for all that

22  work!  We will be sending a list of the ones that are

23  found to be inappropriate, along with a summary, to

24  Commissioner Moss."

25              Did you ever get anything, did you ever get

Page 57

```
 1    a list of inappropriate books, or summaries?
 2         A.    If I did, I didn't look at it.
 3         Q.    Do you know what -- what they meant
 4    by "inappropriate" in that email?
 5         A.    I do not know exactly.
 6         Q.    Do you remember in November of 2021 talking
 7    to Amber Milum and Judge Cunningham about removing
 8    books that depict sexual activity or nudity from the
 9    library?
10         A.    Once again, I'm -- I'm horrible with dates.
11    And timeline, I'm not sure about timeline, but I don't
12    remember what the -- with -- talking to them about it.
13    If -- I know that I had talked to Amber about taking
14    books out of the children's section that were in --
15    were inappropriate, but not removing books from the
16    library.
17         Q.    I am going to share my screen again to show
18    you another document.
19         A.    Okay.  Okay.
20               (Marked Deposition Ex. 18)
21    BY MS. LEONIDA:
22         Q.    So, this, which will be Exhibit 18, there
23    is an email that you are copied on from Judge
24    Cunningham to Ms. Milum on --
25         A.    Can you scoot it down just a little?
```

                                                    Page 58

1       Q.      That way?

2       A.      Yes, ma'am.  Okay.  I couldn't -- I don't

3    know what you want me to see on it.

4       Q.      I'm seeing if this refreshes your

5    recollection about any meetings that you had.  So,

6    this -- this email here from Judge Cunningham to

7    Ms. Milum that copies you.

8       A.      Okay.  Okay.

9       Q.      It says, "As we discussed in our meeting at

10   my office at 9:45 ... on November 9 ... any and all

11   books that depict any type of sexual activity or

12   questionable nudity are to be pulled immediately."

13              Do you remember that meeting?

14      A.      I do not.  I'm going to read that.  "As we

15   discussed in our meeting ..."  I do not.  I don't

16   believe I was at that meeting.

17      Q.      Okay.  Do you remember getting this email

18   talking about the meeting?

19      A.      Once again, I get emails all the time

20   that -- and most of them I don't read.  I -- I'm sure I

21   got it because it says it went to me.  I don't know why

22   my -- why is the email marked out?

23      Q.      I think it's for your privacy, Mr. Moss.  It

24   probably did not go to your Llano County address.  So.

25      A.      Okay.

1        Q.    Do you remember getting the email that

2    Ms. Milum sent in response where she says, "We're

3    working on getting these books pulled.  I will also

4    work on the lists that she provided."

5            Do you remember getting that email?

6        A.    I don't know.  Can I read it?

7        Q.    Sure.

8        A.    That kind of seems familiar, but honestly

9    I -- I don't know.  I can't say that I do remember that

10    email from November of 2021 there.

11        Q.    Do you remember any communications, either

12    on the phone, email, text, just running into people, do

13    you remember any communications about getting books

14    pulled that involved any type of sexual activity or

15    nudity?

16        A.    There was several conversations with --

17    that I had with concerned citizens and Amber and I

18    think the Judge at different times about books that

19    showed nudity out of the children's section.  But when

20    you say pulled, maybe pulled from the children's

21    section, yes, I do, I -- I don't remember with who or a

22    time, timeline, but yes, there were several

23    conversations.

24        Q.    Why don't you tell me what you remember

25    about those conversations.  Let's start with -- with

Page 60

```
 1    Judge Cunningham.  Tell me about what you and he talked
 2    about in that regard.
 3         A.    I knew you were going to ask me that.  I
 4    think that we talked about, I asked his opinion maybe
 5    on those book -- nudity books being in the children's
 6    section and the he felt the same as I did, that they
 7    shouldn't be there in the children's section of the
 8    library.  I don't remember exact details of the
 9    conversation, you know, word for word, but -- and the
10    same with Amber, she -- I think she felt the same way,
11    that they shouldn't be in the children's section of the
12    library, maybe she was going to label -- at some point
13    she was going to label the books or the -- the sections
14    Young Adult, Children's, Adult, label them better maybe
15    in -- in -- in the library, in all three libraries, but
16    I don't remember all the conversation.
17         Q.    Do you remember talking to -- actually, let
18    me ask a different question.
19               Judge Cunningham, what's his role?
20         A.    He's the County Judge.
21         Q.    What does that mean?  What's his --
22         A.    I don't know --
23         Q.    -- job?
24         A.    I don't want his job.  He -- he's the --
25    he's the presiding officer of the Commissioners Court
```

Veritext Legal Solutions
866 299-5127

```
 1    and he has County Court here in the courthouse.  He's
 2    the bud -- head budget officer, he's -- he oversees
 3    departments that don't have an elected official,
 4    Building and Maintenance, Permitting, Library System,
 5    kind of Road and Bridge, I do -- I do most of the Road
 6    and Bridge, though.
 7         Q.    Is that a full-time job?
 8         A.    What's that?
 9         Q.    The judge.
10         A.    Yes, sir -- or yes, ma'am.  I'm sorry.
11    Yes.
12         Q.    Is the judge allowed to tell the Library
13    Director what books to pull from the shelves?
14               MR. ROGERS:  Objection to the extent it is
15    beyond his personal knowledge and might call for
16    speculation.
17    BY MS. LEONIDA:
18         Q.    You can answer.
19         A.    What is the -- as far as I know, he -- once
20    again, I don't know what the Judge thinks or does on a
21    daily basis.  I don't know the answer to that question.
22    Would you ask it again?
23         Q.    Yeah, as far as you know, is -- is the
24    Judge, is Judge Cunningham allowed to tell the Library
25    Director what books to -- to remove from the library?
```

Page 62

1      A.    I don't -- I don't think that he would tell
2  some -- tell them what books to remove from the
3  library, no.  Maybe -- maybe change sections, but --
4  but I don't -- I don't know.  I don't think so.
5      Q.    Do you think he has the authority to do
6  that, is that something a judge is allowed to do?
7              MR. ROGERS:  Objection.  Form.
8      A.    I don't know about other counties, or Llano
9  County is -- I don't know that either, to be honest
10  with you.  He -- the department heads work under him,
11  that, like I said, that aren't -- that don't have an
12  elected official in their office.  Honestly, I don't
13  know that.  You would think I would since I've been a
14  commissioner for 15 years, but I don't know the answer
15  to that question.
16              (Marked Deposition Ex. 19)
17  BY MS. LEONIDA:
18      Q.    Let me ask you about one more email and
19  then we'll take a short break.  This is going to be
20  Exhibit 19.  And this is an email to you from
21  Ms. Milum, and I'll just give you a minute to read it.
22  Let me know when you're done.
23      A.    Okay.  Okay.  I've read it.
24      Q.    Do you remember asking Ms. Milum for a form
25  about reconsidering books or removing books or moving

Page 63

1    books?

2         A.    I -- I asked her about -- I did ask her

3    about the form.

4         Q.    What did you ask her about it?

5         A.    I'm trying to think about that.  I think I

6    asked her if it existed, maybe, you know, or if she had

7    -- if she had the form, that there's -- there was talk

8    if there was a complaint form, if someone had a

9    complaint about the library, there was a complaint

10   form.

11        Q.    Why did you ask her about that?

12        A.    I don't know.  I think because there were

13   some complaints in the library and no one had been

14   given a form to fill out, you know, to -- I guess

15   official.

16        Q.    So then she sent you this form that's part

17   of Exhibit 19, right?

18        A.    I'm assuming that's the same.  I -- I don't

19   know.  I'm assuming that's the form that she sent me,

20   yes, ma'am.

21        Q.    Does it look like the form that she sent

22   you?

23        A.    I don't remember what it looked like.

24        Q.    Are you aware of any other form that people

25   use to -- that people fill out about books in the

                                            Page 64

1      library system?

2           A.     I don't think there's one been updated

3      since that one probably, so, no, ma'am, in the -- i the

4      Llano County Library System, I -- not that I know of.

5           Q.     Okay.  I think this is a good time to - for

6      me anyway - to take a break.  Do you need any more than

7      five minutes, Mr. Moss?

8           A.     No, ma'am.

9           Q.     Okay.  Let's take five minutes.

10          A.     Okay.

11                 THE VIDEOGRAPHER:  We are going off the

12     record at 2:58 p.m.

13                    (Break from 2:58 p.m. until 3:11 p.m.)

14                 THE VIDEOGRAPHER:  We are going back on the

15     record at 3:11 p.m.

16     BY MS. LEONIDA:

17          Q.     Mr. Moss, do you know a woman named Bonnie

18     Wallace?

19          A.     Yes, ma'am, I do.

20          Q.     How do you know her?

21          A.     Well, she is a member of the Library

22     Advisory Board also.  And I think before that, I don't

23     know that I did know her, I know -- I knew her husband

24     a little longer, he's involved in the hospital here in

25     town -- in our county, but Ms. Wallace is a -- like I

                                                    Page 65

1   said, a Library Advisory Board member.  Of course,

2   she's named in this lawsuit.  And really that's as far

3   as I know her.  I don't really know her outside of

4   that.

5                    (Marked Deposition Ex. 21)

6   BY MS. LEONIDA:

7        Q.      Okay.  I am going to show you Exhibit 21, a

8   spreadsheet.

9        A.      Okay.

10       Q.      And this is a list of books that

11  Ms. Wallace made that were in the library that she had

12  some concerns about.  Have you seen this before?

13       A.      I don't know.  I don't think so.  Not that

14  I recall -- not that I recall.

15       Q.      Okay.  So I'm going to ask you to look at

16  all of the books on this list, and I guess if there are

17  a lot of books, it may take a while.  Just let me know

18  when you need me to scroll down.

19       A.      I don't have to remember them, do I?

20       Q.      No.

21       A.      Okay.  Okay.

22       Q.      Have you heard of any of these books,

23  Mr. Moss?

24       A.      Not that I can -- not that I recognized.

25       Q.      Do you have any reason to think that any of

                                          Page 66

```
1      these books do not have artistic value?

2          A.     What do you mean by "artistic value"?

3          Q.     Do you have any reason to think that any of

4      these books don't belong in a library?

5          A.     Oh.  No, ma'am.

6          Q.     Do you have any reason to think that any of

7      these books should be or should have been removed from

8      the Llano County Library?

9                 MR. ROGERS:  I would just object it calls

10     for speculation since he doesn't have knowledge of the

11     books.

12     BY MS. LEONIDA:

13         Q.     You can answer.

14         A.     Will you repeat that?

15         Q.     Do you have any reason to think that any of

16     these books do not belong in the Llano County Library

17     System?

18                MR. ROGERS:  Same objection.

19         A.     Well, looking over here on this -- on this

20     page that you are showing me, it looks like some of

21     them haven't been checked out.  But as far as shouldn't

22     be in the library, no, I do not.

23     BY MS. LEONIDA:

24         Q.     Looking at this list of books, you don't

25     have any reason to believe that anything in these books
```

Page 67

```
 1     is pornographic, do you?
 2              MR. ROGERS:  Objection.  Speculation.
 3        A.     Exactly.  It's speculation.  I don't know
 4     what's in the books.
 5     BY MS. LEONIDA:
 6        Q.     Okay.  So because you don't know what's in
 7     the books, it would be fair to say that you would have
 8     no reason to think that there's pornography in these
 9     books, because you don't know, right?
10        A.     I want to look at them again before I
11     answer that question.
12        Q.     Oh.  Of course.  Just let me -- let me know
13     when you're done and let me know when you need me to
14     scroll.
15        A.     Okay.  No, ma'am.
16        Q.     Mr. Moss, are you familiar with the
17     Collection Review Committee?
18        A.     How so?  What do you mean familiar with
19     them?
20        Q.     Are you familiar with any organization in
21     Llano County called the Collection Review Committee?
22        A.     There is a committee that the Library
23     Advisory Board formed.
24        Q.     Tell me everything you know about that
25     committee.
```

1        A.      They were, as far as I know, they look

2    at -- look at the books that haven't been checked out,

3    and recommend books to the librarians to purchase or --

4    or -- I guess.  I really don't know, honestly, what

5    they do.

6        Q.      To the extent that you do know, like,

7    what's -- what's the source of your information?  Why

8    did you just say that you think that they recommend

9    books to -- books to put in the library and books to

10   not have in the library, how do you know that?

11       A.      Well, I went -- was at a Library Advisory

12   Board meeting when they were talking about that

13   committee or establishing that committee maybe.

14       Q.      And would that have been in February of

15   this year?

16       A.      It could have been.  I don't know what date

17   that was.

18               (Marked Deposition Ex. 20)

19   BY MS. LEONIDA:

20       Q.      Okay.  I am going to show you another

21   email.

22       A.      Okay.

23       Q.      It will be Exhibit 20.  I'm not sure if I

24   showed it to you, but it's going to be Exhibit 20.  Do

25   you see that that's an email from Bonnie Wallace to you

Page 69

1    and a few other people that talks about meeting with

2    Gay and herself yesterday.  Is that the meeting that

3    you are talking about?

4         A.    No, ma'am.  The meeting I'm talking

5    about -- I don't know what that is.  The meeting I'm

6    talking about was at a Library Advisory Board meeting.

7         Q.    Do you remember getting this email?

8         A.    I don't remember it.

9         Q.    The Library Advisory Board meeting where

10   they talked about creating this committee to review

11   books, do you remember approximately when that was, if

12   it was this year, last year, again, maybe in relation

13   to a holiday?

14        A.    I think it was in 2021.  I think it was

15   before the first of the year.  They weren't -- there

16   were -- yes, I think it was in the first of the year --

17   before the first of the year.

18        Q.    Whose idea was it to set up this committee

19   within the library, or this committee outside the

20   Library Advisory Board?

21              MR. ROGERS:  Objection.  Assumes facts not

22   in evidence, and misstates testimony.  I don't think it

23   was outside the library.

24        A.    It wasn't.

25   BY MS. LEONIDA:

1          Q.      So was the committee made up of Library

2     Advisory Board members?

3          A.      It was supposed to be.  I don't think I was

4     at the meeting where they actually appointed members to

5     that, but -- and I do not know who brought that up.

6          Q.      Are you a member of the Library Advisory

7     Board?

8          A.      No, ma'am.

9          Q.      Why were you at the meeting at the Library

10    Advisory Board?

11         A.      That was before they were private.  I go to

12    lots of meetings.

13         Q.      Do you go to every Library Advisory Board

14    meeting?

15         A.      No, ma'am.

16         Q.      Why did you go to this particular one?

17         A.      I don't know.

18         Q.      How many Library Advisory Board meetings

19    have you been to?

20         A.      Maybe two or three when they first started.

21         Q.      What do you mean when they first started?

22         A.      When they first started back after everyone

23    had been -- everyone's term had expired, so, when they

24    started, when we reappointed the members, or appointed

25    members, we -- and they started back, that's all --

                                                    Page 71

1    that's what I mean when they first started.

2         Q.    Okay.

3         A.    This -- whenever that was.  I don't know

4    what time, when that was.

5         Q.    So, before you appointed the four new

6    library board members that we had discussed earlier,

7    you had never been to a Library Advisory Board meeting?

8         A.    I think they were all private.  I don't

9    think they were open.  So the answer to that is no, I

10   had not.

11        Q.    So when you appointed these four new

12   people, did they make the library board meetings open

13   for the first time in Llano County history?

14        A.    Once again, that's a long time, so I'm not

15   sure how long there has been a Library Advisory Board,

16   but they -- these meet -- their meetings were open to

17   the public at first.

18        Q.    Did the Commissioners Court or the library

19   board take some action to make the meetings open when

20   you -- because I think you said they had been private

21   before.  Did something happen to open them up?

22        A.    I don't know.  The Commissioners Court did

23   not take action to open them up, I know that, or close

24   them, for that matter.

25        Q.    Who has the authority to say whether the

                                          Page 72

1    library board meetings are open or closed?

2         A.    I should know, but I don't know the answer

3    to that question.

4         Q.    Okay.  Before you -- before you appointed

5    these four new library board members and started going

6    to meetings for the first time, before that, had you

7    ever tried to go to a library board meeting and they

8    wouldn't let you in?

9         A.    No, ma'am.

10        Q.    So then can you explain to me why you --

11   why did you suddenly start going to Library Advisory

12   Board meetings?

13        A.    Well, as with a lot of things in the

14   county, I lose -- don't lose my place, but we make

15   decisions, budgetary, for offices, and at times I'll

16   try to go to other meetings in other offices and learn

17   things about the county or -- or, you know, the other

18   departments.

19        Q.    What did you learn about the county at this

20   first library board meeting that you attended?

21        A.    Not very much.  Nothing really.  Nothing

22   really.  They -- it may have been their second or third

23   meeting since the board was reestablished, the Library

24   Advisory Board was reestablished.  I don't remember

25   what meeting it was that I went to first, but not much.

Veritext Legal Solutions
866 299-5127

1      Q.      The meeting that you went to where they

2   formed the Collection Review Committee, what was

3   discussed at that meeting?

4      A.      Well, I don't know that I went to the

5   meeting where they formed that.  When I went to the

6   meeting, they were talking about having committees,

7   different -- that committee and different committees to

8   do research and -- and look at policies and things like

9   that.

10      Q.      Okay, what were they saying about those

11   committees, about forming those committees?

12      A.      Just that they thought it would be easier,

13   instead of have everyone looking at everything, have a

14   committee made of themselves, some of the -- some of

15   the board members meet and then report back to their

16   board at later meetings.

17      Q.      What would be the purpose of them reporting

18   back to their board at later meetings?

19      A.      I don't want to object, but that's

20   speculation, too.  I don't know what -- I don't know.

21      Q.      When they were talking -- let me back up.

22   You were there when they talked about forming these

23   committees, right?

24      A.      Yes, ma'am.

25      Q.      So you heard them talking about why they

Page 74

1    wanted to form committees?

2         A.    I was there one time.  I don't know what

3    else they talked about other meetings.

4         Q.    Okay.  Let's just focus on the one time

5    that you were there, then.

6         A.    Okay.

7         Q.    There you are at the Library Advisory

8    Committee meeting, you heard them talking about why

9    they wanted to form a Collection Review Committee,

10   right?

11        A.    Not necessarily why, just -- just about all

12   the committees.  They talked about all of the

13   committees that they wanted to form as a whole.

14        Q.    Okay.  So you heard them talking about all

15   the committees they wanted to form as a whole.

16        A.    Okay.

17        Q.    How many committees were there?

18        A.    I think there were four or five.  I think

19   maybe, maybe four.  I'm not sure.  I don't remember

20   exactly.  There was four.  Four or so.  Four or five.

21        Q.    What was each of those four or five

22   committees going to do?  What was its role?

23        A.    I knew you were fixing to ask me that.  Oh,

24   there was a collection, maybe a checkout, I don't

25   remember the title of the committee, maybe a checkout

Veritext Legal Solutions
866 299-5127

1    and return policy, maybe a -- it mostly had to do with

2    policies, that I remember, you know, looking at pol --

3    looking at library policies or operations, things like

4    that.

5          Q.     I think you also said that they were then

6    going to report back to the Library Advisory Committee?

7          A.     Library Advisory Board, yes, ma'am.

8          Q.     Board.  Sorry.

9          A.     That's what they talked about.

10         Q.     Okay.  What power does the Library Advisory

11   Board have to act on these committees' recommendations?

12         A.     They don't, they don't have any power, they

13   don't make decisions, they make -- they make their

14   recommendation or advise the Commissioners Court on

15   what they think would need to be changed in policies

16   and operations, things like that.  They don't have any

17   power.  It's a --

18         Q.     So they advise -- oh, go ahead.

19         A.     It -- I don't have any -- I don't even know

20   what I was going to say.

21         Q.     Okay.  So the Library Advisory Committee

22   gets information fro -- or Library Advisory Board -

23   sorry - gets information from these committees, and

24   then the Library Advisory Board reports to the

25   Commissioners Court with recommendations, right?

```
 1          A.     I guess that's how they operate, yes.
 2          Q.     And then the Commissioners Court, which
 3     includes you as a commissioner --
 4          A.     Yes, ma'am.
 5          Q.     -- has the authority to hire or fire the
 6     Library Director, right?
 7          A.     Yes, ma'am.
 8          Q.     The Commissioners Court and individual
 9     commissioners like yourself also have the power to make
10     suggestions to the Library Director about, for example,
11     where certain books should be, right?
12          A.     I don't -- not really, no.  I don't guess,
13     no we don't -- we don't do that.  The Commissioners
14     Court doesn't do that.
15          Q.     Individual commissioners can do that,
16     though, right, like you were explaining how you
17     suggested to Ms. Milum that a book maybe should not be
18     in the children's section, right?
19          A.     Well, that's a loaded question.  I -- I
20     give her my opinion; at the same time, I was --
21     expressed to her that I was not her boss or supervisor,
22     that I was not giving her an order, that that was
23     strictly my opinion that those books should not be in
24     the children's section, specifically the one book.
25     After the first conversation of the butt books, I don't
```

1    know what happened there, I -- I -- that was never

2    brought back up to me.

3        Q.    Ms. Milum knows that the Commissioners

4    Court is the only body in Llano County with the

5    authority to fire her; isn't that right?

6                MR. ROGERS:  Objection.  Calls for

7    speculation.

8        A.    I don't know what she knows.  I would

9    think.

10   BY MS. LEONIDA:

11       Q.    Is there any way that Ms. Milum could be

12   fired except for by the Commissioners Court?

13       A.    The judge may have that authority.  I'm not

14   sure.

15       Q.    Okay.  So the Commissioners Court

16   definitely has the authority to fire Ms. Milum or any

17   Library Director, correct?

18       A.    The Library Director, not -- not -- not

19   library employees.

20       Q.    The Commissioners Court has the authority

21   to fire any Library Director, correct?

22       A.    Okay.  The library -- yes, I guess.  The

23   Library Director is in charge of the libraries, the

24   boss of the libraries, yes, ma'am.

25       Q.    Okay.  And that person -- okay.  And that

Veritext Legal Solutions
866 299-5127

 1      person is somebody that the Commissioners Court has the

 2      ability to hire and fire, right?

 3              A.      Yes, ma'am.

 4              Q.      Now, you also think that maybe Judge

 5      Cunningham could, on his own, fire the Library

 6      Director; is that right?

 7              A.      Well, I said maybe.  I'm not sure on that,

 8      honestly.  I'm not sure.  I think so.

 9              Q.      Is there anybody else that you think has

10      the authority to hire or fire a Library Director in

11      Llano County?

12              A.      No, ma'am.

13                      (Marked Deposition Ex. 23)

14      BY MS. LEONIDA:

15              Q.      I am going to show you another form, it's

16      going to be Exhibit 23, just to see if you recognize

17      it.

18                      So, this is the form that was attached to

19      the email that Bonnie Wallace sent you the last time I

20      showed you an exhibit.  Do you -- does this look

21      familiar to you?

22              A.      I don't know that I've seen this form, but

23      I think that Ms. Milum had told me that she had seen

24      this form, or has a -- maybe she -- maybe this form is

25      in the library system.  I'm not sure.

                                                        Page 79

1        Q.      Do you know what this form is for?

2        A.      It says Harmful Content Analysis.  I'm

3    assuming it's looking at books, grading books,

4    whatever.  Can you go down?

5        Q.      Yes.

6        A.      Okay.  I don't know.  You said this was

7    attached to one of those emails?

8        Q.      It was attached to the email that -- that

9    Ms. Wallace sent about the Collection Review Committee.

10       A.      Is that all of it, or does it go down some

11   more?

12       Q.      That's all of it.

13       A.      Yeah, I'm not sure.  There's a lot of words

14   on that thing.  I'm not sure if that's -- if I've seen

15   that or not.  If it was an attachment, I probably

16   haven't, honestly.

17       Q.      Okay.  Did any -- has anybody ever sent you

18   a form, either this form or any other form that

19   analyzes a book?

20       A.      I don't know.  I don't know if that -- if

21   they have or not, if anyone has.

22       Q.      What do you mean you don't know?

23       A.      Well, I can't remember.  I don't know if --

24   I -- I hate to admit this, but I don't look at a lot of

25   emails.  I can't say if someone sent me another one or

1  not.

2      Q.    Do you remember ever receiving anything in

3  writing about a book, complaining about a book, or

4  commenting about a book in the library system?

5      A.    I don't -- I don't think so.  I don't think

6  so.  Maybe, maybe an email, but I don't -- I'm not sure

7  about that either.

8      Q.    Did you read the Complaint that was filed

9  in this case?  You said that you -- you said that you

10  received it.  Did you -- did you read it?

11      A.    From you?

12      Q.    Yes.

13      A.    Yes, ma'am, I did read those.

14      Q.    Did you read the motion for a preliminary

15  injunction that was filed in this case by the

16  plaintiffs?

17      A.    Yes.  Yes, ma'am.

18      Q.    So you then -- did you read the list of

19  books that the plaintiffs are asking the county to put

20  back on the shelves?

21      A.    I did.

22      Q.    Okay.  Let me take some time to go through

23  those books with you.  The book, Caste: The Origins of

24  Our Discontent, as far as you know, is there anything

25  wrong with that book?

1      A.      I've never looked at it, so I can't -- I

2  don't know.  As far as I know, that's right, there's

3  nothing wrong.

4      Q.      Okay.  As far as you know, Caste:  The

5  Origins of our Discontent has artistic value, belongs

6  in a library?

7      A.      You told me not to guess.  I don't know

8  what's in those, what's in that book.

9      Q.      Okay.

10      A.      So, ask me that again.

11      Q.      As far as you know, does the book, Caste:

12  The Origins of our Discontent, is, is it -- let me ask

13  a different question.

14              As far as you know, is that book

15  pornographic?

16      A.      No, I don't know.  I don't know.  No,

17  ma'am, it's not as far as I know.

18      Q.      The book They Called Themselves the K.K.K.:

19  The Birth of an American Terrorist Group, as far as you

20  know, is that book pornographic?

21      A.      As far as I know, it's -- it -- I don't

22  know anything about it.

23      Q.      Okay.  The book Spinning by Tillie Walden,

24  as far as you know, is that book pornographic?

25      A.      What did you say the name?  "Spinning,"

Veritext Legal Solutions
866 299-5127

1  with an S-P?

2         Q.     Yeah.   S-P-I-N-N-I-N-G.

3         A.     Once again, I -- I don't know anything

4  about that book.

5         Q.     As far as you know, is there anything

6  inappropriate about that book?

7         A.     No.

8         Q.     The book In the Night Kitchen by Maurice

9  Sendak, as far as you know, is there anything

10  pornographic about that book?

11         A.     No, ma'am.  I don't -- I don't know

12  anything about it either, for the record.

13         Q.     The book, It's Perfectly Normal:  Changing

14  Bodies, Growing Up, Sex, and Sexual Health by Robie

15  Harris, are you familiar with that book?

16         A.     Is that two books or is that one book?

17         Q.     One book.

18         A.     Okay, yes, I am familiar with it.

19         Q.     As far --

20         A.     Some.  But --

21         Q.     Okay.  As far as you know, does that book

22  have artistic value, does it belong in a library?

23         A.     Another one of those trick questions.

24  It -- it could belong in the library, yes.  Not in the

25  children's section.

Veritext Legal Solutions
866 299-5127

1    Q.    As far as you know, is that book
2  pornography?
3    A.    It looks like it to me.  There's people
4  having sex in that book.
5    Q.    Yet you think that the book is appropriate
6  to have in the adult section of a library?
7    A.    Yes, ma'am, I guess so.
8    Q.    The book, My Butt Is So Noisy!, I Broke My
9  Butt!, and I Need a New Butt!, they're three books,
10  we've talked about the butt books a lot this afternoon,
11  do you think that those books are pornographic?
12    A.    They're awful close.  That's a -- that's a
13  I guess yes, ma'am; I guess, yes, ma'am.
14    Q.    Do you think those books belong in a
15  library?
16    A.    I don't know if -- they don't belong in the
17  children's section.  They -- they could be in the adult
18  section.
19    Q.    Okay.  So they have some -- some artistic
20  value such that they belong in the library, would you
21  agree with that?
22    A.    I don't know if they have any artistic
23  value, but --
24    Q.    But they belong in the adult section?
25    A.    That would be my opinion, yes, ma'am.

Page  84

1      Q.      Okay.  Larry the Farting Leprechaun, Gary

2   the Goose and His Gas on the Loose, Freddie the Farting

3   Snowman and Harvey the Heart Has Too Many Farts, are

4   you familiar with those books?

5      A.      I am not.  I have heard about them, the

6   fart books, but I don't know what's in them.  I don't

7   know the content.

8      Q.      So as far as you know, are those books

9   pornographic?

10      A.      As far as I know, they're not.  I haven't

11   looked at them.

12      Q.      As far as you know, they belong in a

13   library?

14      A.      Just from my knowledge, I -- I don't know

15   how to answer that question.  I don't know what belongs

16   in a library and what isn't.  I guess as far as I know,

17   there's nothing that would keep them from being in a

18   library.

19      Q.      What do you think should keep a book from

20   being in a library?

21      A.      I don't know.  That's what I just said.  I

22   don't know what would -- should keep a book from being

23   at the library.  I really don't.  Just, there are

24   sections for a reason, in my opinion.

25      Q.      In your opinion - and this isn't a trick

1    question - but in your opinion, is there any book that

2    absolutely should not be in the Llano County Public

3    Library in any section?

4        A.    I don't -- I don't guess.

5        Q.    Okay.  Let's go back to this list.

6        A.    Can I make a comment?

7        Q.    Oh, of course.

8        A.    We only have so much room, though, in our

9    library.  That's all.

10       Q.    Okay.  The book, Being Jazz: My Life as a

11   (Transgender) Teen by Jazz Jennings, are you familiar

12   with that book?

13       A.    No, ma'am.  I don't -- I haven't seen it.

14   I don't.

15       Q.    So you have no reason to think that that

16   book is pornographic?

17       A.    No, ma'am.

18       Q.    The book, Shine by Lauren Myracle, do you

19   have any reason to believe that book is pornographic?

20       A.    I haven't seen it either, no, ma'am.

21       Q.    The book, Under the Moon, a Catwoman Tale

22   by Lauren Myracle, do you have any reason to believe

23   that book is pornographic?

24       A.    I haven't seen it either, no, ma'am.

25       Q.    The book, Gabi, a Girl in Pieces by Isabel

                                        Page 86

1    Quintero, do you have any reason to think that book is

2    pornographic?

3         A.    I haven't seen it either, no, ma'am.

4         Q.    And finally, the book Freakboy by Kristen

5    Elizabeth Clark, do you have any reason to think that

6    book is pornographic?

7         A.    What was the name?

8         Q.    Freakboy.

9         A.    Like "freak"?

10        Q.    It's F-R-E-A-K- --

11        A.    Okay.

12        Q.    -- B-O-Y.

13        A.    No, ma'am, I haven't seen it either.

14        Q.    How often does the -- do the members of the

15   Library Advisory Board come to Commissioners Court

16   meetings?

17        A.    I don't know.  They come if there's

18   something on there and concerning their -- their

19   advisory board, or if they're recommending something to

20   us, which is not very often.  Some of them may come

21   for -- for just their knowledge or -- or just to --

22   just -- just be here.  I don't know.  I don't know how

23   often they come.

24        Q.    The whole purpose of the Library Advisory

25   Board is to advise the Commissioners Court on matters

1    involving the library, right?

2         A.    Pretty much.   Policies, yes, ma'am, pretty

3    much.

4         Q.    The --

5         A.    Yes, ma'am.

6         Q.    So, how do they do that, generally?   How do

7    they give that advice?

8         A.    One would -- I guess they would contact one

9    of the commissioners or the Judge to have an agenda

10   item put on, which is how any agenda items are put on

11   the agenda, and one of them or -- or several of them

12   maybe would come and explain -- I guess they would come

13   and explain what it -- what their board talked about or

14   discussed, and their recommendations.

15        Q.    Then how does the Commissioners Court adopt

16   or not adopt the recommendation, what happens next?

17        A.    Well, if it gets on the agenda, if there's

18   something on the agenda about it, it would either -- it

19   would take a motion and a second and a vote from --

20   from members of the Commissioners Court, the five of

21   us.

22        Q.    This year, how many times has the Library

23   Advisory Board comes to -- come to the Commissioners

24   Court with a recommendation, a suggestion, anything

25   that they advised you on?

1          A.      I think two.  I think they've advised us on
2     two things.
3          Q.      Did the Commissioners Court accept both of
4     those two things?
5          A.      Maybe three.
6          Q.      What were those three things?
7          A.      I'm thinking.
8          Q.      Oh, sorry.  Take your time.
9          A.      There's a lot more on our agenda besides
10    library stuff.  I guess maybe there was just two.  One
11    was about online reading, online library app, or I
12    don't know what you would call it, online reading, and
13    the other was about a -- a policy or maybe their
14    by-laws, one or the other, I don't remember.
15         Q.      So, let's start with the online reading
16    one.  What was the advice that the Advisory Board gave
17    you, what were they trying to accomplish?
18         A.      Just to re -- or to get a -- get a online
19    reading program.
20         Q.      And did the Commissioners Court do what the
21    library board advised them to do?
22         A.      We did, I believe we -- we did, yes, ma'am.
23         Q.      What about the second time that the Library
24    Advisory Board advised the Commissioners Court to do
25    something, what did you say that was?

Veritext Legal Solutions
866 299-5127

1      A.      I -- I think it may have been the by-laws,

2   they were updating their by-laws or it was something to

3   do with the library policy, but I'm not exactly sure

4   without -- without going back and looking in the

5   records or something, or -- or minutes.   I'm not -- I'm

6   not exactly sure.

7      Q.      Do you remember whether the -- whether the

8   Commissioners Court did what the Library Advisory Board

9   advised them to do?

10     A.      There were some -- I do remember there were

11  some changes to -- let me think about that a minute.

12  We didn't do exactly what they recommended.   There were

13  some changes, we made -- we approved a policy or

14  by-laws, whichever it was, with some changes

15  recommended by a member of the -- a member or two of

16  the Commissioners Court.

17     Q.      Are the members of the Library Advisory

18  Board allowed to talk to librarians and give their

19  opinions directly about book selection, book placement,

20  things like that?

21     A.      I missed your --

22          MR. ROGERS:   Objection to speculation.

23     A.      Your mouth was moving before I heard you,

24  so I'm not sure if I heard all that question.

25  BY MS. LEONIDA:

Page 90

1        Q.      Okay.  I'll try again.

2               Are the members of the library board, the

3    people that are on it, are the members of the library

4    board allowed to talk to Llano County librarians about

5    library issues?

6               MR. ROGERS:  Objection.  Calls for

7    speculation to the extent it's beyond his personal

8    knowledge.

9               THE WITNESS:  So should I answer?

10   BY MS. LEONIDA:

11       Q.      Yes.

12              MR. ROGERS:  Yes, go ahead and answer if

13   you have any knowledge.

14       A.      Well, it's the Library Advisory Board, for

15   one; not library board.  And -- and I don't know.

16   Allowed?  I -- I don't know who would tell them they

17   couldn't.  I don't -- I don't understand that.  So as

18   far as I know, they are able to talk about -- to the

19   library staff or Amber for sure, or head librarian,

20   Library Director.

21   BY MS. LEONIDA:

22       Q.      Okay.  So the two ways that the library --

23   again, correct me if I'm wrong.  I just want to make

24   sure I understand the -- the picture here.  There --

25   one -- one way that the Library Advisory Board could

Veritext Legal Solutions
866 299-5127

1    influence what happens in the library is by just

2    talking to the librarian directly and making

3    suggestions, right?

4         A.    That's, again, I -- I guess, yes, that's --

5    I'm not -- I can't speak for someone else, so I guess

6    they could.

7         Q.    There's no rule preventing members of the

8    Library Advisory Board from telling librarians how they

9    think things should be done, is there?

10        A.    It would probably be their -- just their

11   opinion.  There's no -- like I said, the Library

12   Advisory Board does not have authority to direct

13   staff -- or to -- to order staff around, no.

14        Q.    Is there a rule that prevents members of

15   the Library Advisory Board from telling staff at a

16   library how they think things should be done?

17        A.    No, they can give their opinions all they

18   want to, I guess.

19        Q.    I guess maybe what I'm asking is like you

20   were saying that you can't talk to just one other

21   commissioner because you need a quorum to talk about

22   commission business, right?

23        A.    Okay.

24        Q.    Is there any rule like that that prevents

25   members of the Library Advisory Board from talking to

1    each other or to the librarian?

2         A.    As far as I know, there is not because we

3    are -- we are a government entity, we are a government

4    body, so, like I said, we have -- we have to publish

5    our agenda 72 hours ahead of time because we are a

6    government body.  So they are not a government or

7    decision-making body for the county.  So I guess as far

8    as I know, there is not a rule that says they can't.

9         Q.    Okay.  So that's one way they can impact

10   the library.  Another way they can impact decisions in

11   the library is to advise the Commissioners Court about

12   what they think should be going on in the library,

13   right?

14        A.    Well, what's one way that they can impact

15   the library?

16        Q.    Is it true that one way they can impact the

17   library is to advise the Commissioners Court about what

18   they think should be happening in the library?

19        A.    Yes, I guess so, yes.

20        Q.    Are you familiar with a program called

21   OverDrive?

22        A.    A little bit, yes, ma'am.

23        Q.    You had some conversations with Ms. Milum

24   about that program and getting rid of it?

25        A.    Well, we -- yes.  Yes.  The answer to

1    that's yes.

2         Q.     Okay.  At one point - and let me just see

3    if you remember before making you look at another email

4    - at one point after the county decided to get rid of

5    OverDrive, Ms. Milum asked you whether she should let

6    library patrons know that they can access OverDrive

7    through neighboring counties, and you told her not to

8    promote that program.  Do you remember that?

9         A.     I -- I remember talking to her about

10   OverDrive, but I don't remember her -- telling her not

11   to promote that program.

12        Q.     Okay, let me --

13        A.     I don't remember that.

14               (Marked Deposition Ex. 24)

15   BY MS. LEONIDA:

16        Q.     Okay.  Let me mark as Exhibit 24 an email

17   from you.  Let me know when you have had a chance to

18   read that.

19        A.     Sure enough.  Right there.  Should I read

20   the bottom part of it, too, or just the top?

21        Q.     Whatever you need to help you remember.

22        A.     Yeah, let me -- let me read it some more.

23        Q.     Okay.

24        A.     That looks like that's from me to Amber.  I

25   see that.

1      Q.      And you're telling her, "I don't think you
2  need to Promote that program," in response to her
3  question about OverDrive, right?
4      A.      Yes.
5      Q.      Why did you say that to her?
6      A.      I don't know, unless, you know, we don't --
7  we don't really promote any program or
8  company county-wide I don't guess.  You know, we're a
9  government entity.  You have to take bids and things
10  like that for other -- for sources.  I don't know why I
11  said that to her.  I didn't remember saying it, either.
12      Q.      So she wasn't asking to you spend county
13  money on a program without a bidding process; she was
14  just asking whether she could tell people that there's
15  a way to get audiobooks while your system was disabled,
16  right?
17      A.      That's what it seems.
18      Q.      And you said that she should not tell
19  people that they could still use OverDrive to get
20  audiobooks while your system was disabled, right?
21      A.      Well, yeah, but just for the record, I told
22  people to call Burnet and get on their system and they
23  could still see OverDrive while ours were disabled, so
24  I'm -- I'm not sure why I said that.
25      Q.      Do you remember who you called to tell them

Page 95

1    that they should get on OverDrive while -- while Llano

2    County didn't have access to eBooks and audiobooks?

3          A.    Well, it -- it's funny you ask that

4    question because it was a person that wasn't happy with

5    their commissioner and -- and I know them also, it was

6    Terri and Kenny Smarr, and they are -- actually they

7    are still a member of the Burnet Library and still

8    access OverDrive I think on a daily basis when they

9    drive.

10         Q.    You said you don't read a lot of your

11    emails, Mr. Moss?

12         A.    No, I don't.  I should, I guess, but I --

13    clearly.

14         Q.    Do you usually respond to emails?

15         A.    No, ma'am, not very often.

16         Q.    What do you do when you get an email, then?

17    How do you -- how do you address it if you don't write

18    back?

19         A.    Sometimes I will see them be -- see those

20    people, you know, and sometimes I just don't address it

21    at all.

22         Q.    At some point between when we filed this

23    lawsuit and today, were you asked to go through your

24    emails to look for any emails that you might have that

25    relate to this case?

1         A.      Yes, ma'am.

2         Q.      What steps did you take to look for those

3    materials?

4         A.      I just went down I don't know how many

5    emails, all through my email, and anything that had

6    anything to do with the library stuff, what y'all

7    recommended or what y'all asked for, I sent it to the

8    lawyer, sent it to the lawyers.

9         Q.      Okay.  Did you look through your sent emails?

10        A.      Well, they should -- no, because they

11   should all be attached, I think.  I hope.  They should

12   all be attached to the first email I got, you know what

13   I mean?  So if you send me an email - this is my

14   example - if you send me an email and I responded back,

15   wouldn't my response be there also when I --

16        Q.      So, it sounds like you didn't specifically

17   look through your sent email folder.

18        A.      I don't know if I did or not.  I don't

19   know.  You -- you have that email.  So someone, I guess

20   someone did.

21        Q.      Okay.  Did -- you've been instructed not to

22   delete any emails from --

23        A.      Oh, yeah, I'm not going to delete anything,

24   no.

25        Q.      Okay.  I think let us -- let's take a

                                          Page 97

1    10-minute break and then -- then we'll be back and

2    we'll be done shortly thereafter.

3           A.    Ten minutes?

4           Q.    Yeah.

5           A.    Is that your decision, or do we get a say

6    in that?

7           Q.    That's my decision.  But on the bright

8    side, I think we'll be done shortly after the 10

9    minutes.

10          A.    I will see you in 10 minutes.

11          Q.    Okay.

12                THE VIDEOGRAPHER:  We are going off the

13   record at 3:59 p.m.

14                (Break from 3:59 p.m. until 4:14 p.m.)

15                THE VIDEOGRAPHER:  We are going back on the

16   record at 4:14 p.m.

17   BY MS. LEONIDA:

18          Q.    Mr. Moss, how long has Llano County had a

19   library system?

20          A.    As long as I know.  I guess forever.  I'm

21   not sure.

22          Q.    Is the -- what's the -- what's the point of

23   having a library system in Llano County, from your

24   perspective?

25          A.    To be educational, but for the kids

1    especially, they do a lot of kids programs at our

2    libraries, and just educational I guess for the -- for

3    the people that live here, but mostly kids, I think

4    that's what -- there's a lot of home-school people now,

5    lot of home-school people will use the libraries, from

6    what I understand.

7         Q.    Is it free to get a library card?

8         A.    I think so, yes, ma'am, I think so.

9         Q.    So for the -- at least for the whole time

10   that you can remember, anybody that lives in Llano

11   County that can't afford to buy books can go to the

12   library and read those books for free?

13        A.    No, I think it used to -- it was -- it used

14   to cost and they used to charge a late fee also, but I

15   don't think that anything's charged now.  But it did --

16   I think -- I'm not sure on the date, but it -- it used

17   to be -- cost to get a library card, I believe.

18        Q.    Do you know how much it used to cost?

19        A.    No, ma'am.

20        Q.    Was it, like -- do you, if you know, was it

21   closer to, like, five dollars or a thousand dollars?

22        A.    It's not a thousand.  I'm not sure.  It

23   shouldn't have been much, if any.  I -- I don't

24   remember at all what it cost.

25        Q.    The library also has meeting rooms?

Veritext Legal Solutions
866 299-5127

```
1          A.     I think they each have one meeting room.

2          Q.     Who is allowed to have meetings in those

3    rooms?

4          A.     I think -- I don't think you can have a

5    political party or meetings that are private, I think.

6    So I think pretty much anyone except political parties

7    and -- and private meetings.

8          Q.     Have the meeting rooms been around as long

9    as the libraries have been around?

10         A.     As far as I know.

11         Q.     So, for example, people that home-school

12   their kids can meet in those rooms for that purpose if

13   they wanted to?

14         A.     I guess they could.  I don't know.  I don't

15   think that's against any of the rules there.

16                MS. LEONIDA:  Okay.  I don't think I have

17   any other questions for you.

18                THE WITNESS:  Really?  All right.  My turn?

19                MS. LEONIDA:  Go ahead.

20                MR. ROGERS:  No, technically it would be

21   our turn, Commissioner, but I don't have any questions

22   for you at this time.

23                THE VIDEOGRAPHER:  Okay.  We are going off

24   the record at 4:18 p.m.

25                (Time noted: 4:18 p.m.)
```

Page 100

1                    CHANGES AND SIGNATURE

2        WITNESS: JERRY DON MOSS

3        DATE: June 28, 2022

4        Page/Line     Change                    Reason

5        _____

6        _____

7        _____

8        _____

9        _____

10       _____

11       _____

12       _____

13       _____

14       _____

15       _____

16       _____

17       _____

18       _____

19       _____

20       _____

21       _____

22       _____

23       _____

24       _____

25       _____

                                                  Page 101

1          I, JERRY DON MOSS, have read the foregoing

2     deposition and hereby affix my signature that same is

3     true and correct, except as noted above.

4

5                    _____

                     JERRY DON MOSS

6

7     STATE OF  _____)

8     COUNTY OF _____)

9

10         Before me _____ on this day

11    personally appeared JERRY DON MOSS, known to me (or

12    proved to me on the oath of _____ or

13    through _____ (description of identity card

14    or other document)) to be the person whose name is

15    subscribed to the foregoing instrument and acknowledged

16    to me that he executed the same for the purposes and

17    consideration therein expressed.

18         Given under my hand and seal of office this

19    _____ day of _____, _____.

20

21                    _____

                     Notary Public in and for the

22                   State of _____

23

24

25

                                             Page 102

```
 1              REPORTER'S CERTIFICATION
 2         DEPOSITION OF JERRY DON MOSS
 3                 June 28, 2022
 4         I, Joseph D. Hendrick, Notary Public and
 5   Certified Shorthand Reporter in the State of Texas,
 6   hereby certify to the following:
 7              That the Witness, JERRY DON MOSS, was duly
 8   sworn by the officer and that the transcript of the
 9   oral deposition is a true record of the testimony given
10   by the witness;
11              I further certify that pursuant to FRCP
12   Rule 30(f)(1) the signature of the deponent:
13              X      was requested by the deponent or
14   a party before the completion of the deposition and is
15   to be returned within 30 days from date of receipt of
16   the transcript;
17              _____ was not requested by the
18   deponent or a party before the completion of the
19   deposition;
20              I further certify that the amount of time
21   used by each party is as follows:
22         Ellen V. Leonida - 02:29:42
23         Sarah Salomon - 00:00:00
24         Pratik Ghosh - 00:00:00
25         Dwain K. Rogers - 00:00:00
```

Page 103

```
 1              Jonathan F. Mitchell - 00:00:00
 2              I further certify that I am neither counsel
 3    for, related to, nor employed by any of the parties or
 4    attorneys in the action in which this proceeding was
 5    taken;
 6              Further, I am not a relative or employee of
 7    any attorney of record, nor am I financially or
 8    otherwise interested in the outcome of the action.
 9              Subscribed and sworn to on this date:
10    July 3, 2022.
11
12
13
14
15
16
17
18
                     Joseph D. Hendrick, CSR #947
19                   Expiration Date: 04/30/2023
                     Notary Comm. Exp. 01/13/23
20                   Veritext Legal Solutions
                     Firm Registration No. 571
21                   300 Throckmorton Street, Ste. 1600
                     Fort Worth, TX  76102
22                   Telephone (800) 336-4000
23
24
25
                                              Page 104
```

```
 1    Mr. Dwain K. Rogers, Esq.

 2    drogers@co.llano.tx.us

 3                                    July 3, 2022

 4    RE: Leila Green Little vs. Llano County

 5    June 28, 2022, Jerry Don Moss (JOB NO. 5299892)

 6    The above-referenced transcript has been

 7    completed by Veritext Legal Solutions and

 8    review of the transcript is being handled as follows:

 9    __ Per CA State Code (CCP 2025.520 (a)-(e)) - Contact Veritext

10       to schedule a time to review the original transcript at

11       a Veritext office.

12    __ Per CA State Code (CCP 2025.520 (a)-(e)) - Locked .PDF

13       Transcript - The witness should review the transcript and

14       make any necessary corrections on the errata pages included

15       below, noting the page and line number of the corrections.

16       The witness should then sign and date the errata and penalty

17       of perjury pages and return the completed pages to all

18       appearing counsel within the period of time determined at

19       the deposition or provided by the Code of Civil Procedure.

20    __ Waiving the CA Code of Civil Procedure per Stipulation of

21       Counsel - Original transcript to be released for signature

22       as determined at the deposition.

23    __ Signature Waived - Reading & Signature was waived at the

24       time of the deposition.

25
```

Page 105

1    _X_ Federal R&S Requested (FRCP 30(e)(1)(B)) - Locked .PDF

2       Transcript - The witness should review the transcript and

3       make any necessary corrections on the errata pages included

4       below, noting the page and line number of the corrections.

5       The witness should then sign and date the errata and penalty

6       of perjury pages and return the completed pages to all

7       appearing counsel within the period of time determined at

8       the deposition or provided by the Federal Rules.

9    __ Federal R&S Not Requested - Reading & Signature was not

10      requested before the completion of the deposition.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 106

1    Leila Green Little vs. Llano County

2    Jerry Don Moss (JOB NO. 5299892)

3                    E R R A T A   S H E E T

4    PAGE_____ LINE_____ CHANGE_____

5    _____

6    REASON_____

7    PAGE_____ LINE_____ CHANGE_____

8    _____

9    REASON_____

10   PAGE_____ LINE_____ CHANGE_____

11   _____

12   REASON_____

13   PAGE_____ LINE_____ CHANGE_____

14   _____

15   REASON_____

16   PAGE_____ LINE_____ CHANGE_____

17   _____

18   REASON_____

19   PAGE_____ LINE_____ CHANGE_____

20   _____

21   REASON_____

22

23   _____    _____

24   WITNESS                                  Date

25

                                          Page 107

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.