# EXHIBIT B
# Part 4

1          IN THE UNITED STATES DISTRICT COURT
              WESTERN DISTRICT OF TEXAS
2                   AUSTIN DIVISION

3  LEILA GREEN LITTLE, et        )
   al.,                          )
4                                )
         Plaintiffs,             )
5                                )
              v.                 ) CIVIL ACTION
6                                )
   LLANO COUNTY, et al.,         ) NO.: 1:22-cv-00424-RP
7                                )
         Defendants.             )

8

9          -----------------------------------

10           ORAL AND VIDEOTAPED DEPOSITION OF

11                    ROCHELLE WELLS

12               APPEARING REMOTELY FROM

13                        TEXAS

14                  OCTOBER 17, 2022

15         -----------------------------------

16      ORAL AND VIDEOTAPED DEPOSITION OF ROCHELLE WELLS,

17 produced as a witness at the instance of the PLAINTIFFS,

18 and duly sworn, was taken in the above-styled and

19 numbered cause on the 17th of October, 2022, from 9:19

20 a.m. to 1:50 p.m., via videoconference, before Velma C.

21 LaChausse, Shorthand Reporter and Notary Public in and

22 for the State of Texas, reported by machine shorthand,

23 appearing remotely from Harris County, Texas, pursuant

24 to the Federal Rules of Civil Procedure and the

25 provisions stated on the record or attached hereto.

Rochelle Wells
October 17, 2022                                        2

```
 1              R E M O T E   A P P E A R A N C E S

 2

 3   FOR THE PLAINTIFFS:
          Ms. Ellen V. Leonida
 4        Mr. Max Bernstein
          BRAUNHAGEY & BORDEN, LLP
 5        351 California Street, 10th Floor
          San Francisco, CA 94104
 6        Phone: (415)509-7273
          E-mail: leonida@braunhagey.com
 7

 8   FOR THE DEFENDANTS:
          Mr. Matthew L. Rienstra
 9        First Assistant County Attorney
          DALRYMPLE, SHELLHORSE, ELLIS & DIAMOND
10        901 South MoPac Expressway
          Austin, TX 78746
11        Phone: (325)247-7733
          E-mail: matt.rienstra@co.llano.tx.us
12
     - and -
13
          Mr. Jonathan F. Mitchell
14        MITCHELL LAW, PLLC
          111 Congress Avenue, Suite 400
15        Austin, TX 78701
          Phone: (512)686-3940
16        E-mail: jonathan@mitchell.law

17
     ALSO PRESENT:
18        Mr. Dwain Rogers
          Ms. Ciara Vij - Videographer
19

20

21

22

23

24

25
```

Rochelle Wells
October 17, 2022                                                3

INDEX

                                                              PAGE

Stipulations........................................ 2

Appearances........................................ 3

WITNESS:  ROCHELLE WELLS

        Examination by Ms. Leonida.................... 4

Signature Waived

Reporter's Certificate........................... 154


                          EXHIBITS

NO.  DESCRIPTION                                     PAGE

1      E-mail Correspondence                         53

2      E-mail Correspondence                         66

3      E-mail Correspondence                         95

4      E-mail Correspondence                         122

Rochelle Wells
October 17, 2022                                          4

```
 1                       PROCEEDINGS
 2              THE VIDEOGRAPHER:  We are now on the
 3    record.  This is the remote video-recorded deposition of
 4    Rochelle Wells.  Today is Monday, October 17th, 2022.
 5    The time is 9:19 a.m.  We are here in the matter of
 6    Leila Green Little, et al., versus Llano County, et al.
 7              Will counsel please state their appearances
 8    for the record, after which the reporter will swear in
 9    the witness.
10              MS. LEONIDA:  Ellen Leonida of BraunHagey &
11    Borden for the plaintiffs.
12              MR. RIENSTRA:  Matt Rienstra on behalf of
13    the defendant, Llano County and et al.
14                       ROCHELLE WELLS,
15    having been first duly sworn, testified as follows:
16              MR. RIENSTRA:  Before we get started,
17    Ms. Videographer, is the glare from the camera from the
18    outside light a problem for you, or do I need to close
19    those doors?
20              THE VIDEOGRAPHER:  No, sir.  It's fine
21    right now.
22              MR. RIENSTRA:  Okay.
23                       EXAMINATION
24    BY MS. LEONIDA:
25        Q.  Good morning, Ms. Wells.
```

Rochelle Wells
October 17, 2022                                                    5

```
 1        A.   Good morning.

 2        Q.   Have you been deposed before?

 3        A.   No.

 4        Q.   Have you ever testified in court?

 5        A.   No.

 6        Q.   I'm going to go over some of the rules about

 7   how a deposition functions just so that we're all on the

 8   same page.

 9             Even though this is being videotaped,

10   there's a reporter who is writing down everything that

11   we say.  So it's really important that we speak clearly

12   and that we don't talk over each other.  Do you

13   understand that?

14        A.   Yes.

15        Q.   It's also important that you answer with "yes"

16   or "no," rather than shaking your head or making any

17   gestures, because the reporter can't take that down.  Do

18   you understand that?

19        A.   Yes.

20        Q.   You're represented by counsel, Mr. Rienstra; he

21   may sometimes object to questions that I ask.  Unless he

22   specifically tells you not to answer the question, you

23   have to answer it even after he objects.  Do you

24   understand that?

25        A.   Yes.
```

Rochelle Wells
October 17, 2022                                    6

1      Q.  I don't want you to guess about anything.

2  Sometimes I might ask for an estimate.  And if you can

3  estimate the answer, you should do so.  But if you don't

4  know the answer to something, just tell me that you

5  don't know.  Understand that?

6      A.  Yes.

7      Q.  If you need a break, let me know that you need

8  a break.  We can take a break at any time.  The only

9  request that I'm making is if I ask a question, you

10  should answer it before taking the break.  Understand

11  that?

12      A.  Yes.

13      Q.  Is there any reason that you can't give

14  truthful and accurate testimony today?

15      A.  No.

16      Q.  You're not ill or on any medication that would

17  prevent you from answering truthfully?

18      A.  No.

19      Q.  Who else is in the room with you?

20      A.  Matt.

21      Q.  Nobody else?

22      A.  No one else.

23      Q.  Do you have a phone with you?

24      A.  Yes.

25      Q.  Can you please turn it off?

Rochelle Wells
October 17, 2022                                    7

```
 1                    MR. RIENSTRA:  That's fine.

 2                    THE WITNESS:  I can turn it off?

 3                    MR. RIENSTRA:  Go ahead.

 4          A.  It is off.

 5          Q.  (BY MS. LEONIDA)  Do you have anything else

 6  with you that might give you text messages or e-mails or

 7  distract you in any way?

 8          A.  No.

 9          Q.  How did you prepare for this deposition today?

10          A.  I prayed and met with my lawyers.

11          Q.  How long did you meet with them for?

12          A.  Two hours.

13          Q.  When did you meet with them?

14          A.  Last week.

15          Q.  How long have you lived in Llano?

16          A.  Nine years.

17          Q.  Where did you live before that?

18          A.  Do you mean immediately before that or where

19  did I grow up?

20          Q.  Immediately before that.

21          A.  Aransas Pass, Texas.

22          Q.  How long did you live there?

23          A.  Four years.

24          Q.  How do you spell that?

25          A.  A-R-A-N-S-A-S, and then the second word is
```

Rochelle Wells
October 17, 2022                                                    8

1    Pass, P-A-S-S.

2         Q.   Where did you live before that?

3         A.   Mobile, Alabama.

4         Q.   How long did you live in Mobile?

5         A.   Four years.

6         Q.   Do you have a Llano County library card?

7         A.   Yes.

8         Q.   How long have you had it?

9         A.   Nine years.

10        Q.   Did you have a library card in Aransas Pass?

11        A.   Yes.

12        Q.   And in Mobile?

13        A.   Yes.

14        Q.   How often do you use the library in Llano

15   County?

16        A.   Do you mean prior to the lawsuit?

17        Q.   Let me ask both.

18             So prior to the lawsuit, how often did you

19   use the library?

20        A.   A few times a month.

21        Q.   What did you use it for?

22        A.   For school.

23        Q.   What do you mean by that?

24        A.   I homeschool my children.

25        Q.   Which sections of the library did you use

1   before the lawsuit?

2        A.   Many sections.   The children's section, the

3   nonfiction section; those two mainly.

4        Q.   Is there more than one children's section at

5   Llano County Library?

6        A.   Yes, there is now.

7        Q.   Before the lawsuit, was there more than one

8   children's section?

9        A.   Yes.

10       Q.   What sections existed before the lawsuit?

11       A.   Well, there was a children's section, and then

12   there was the teenage section.

13       Q.   How many children do you have?

14       A.   Six.

15       Q.   And what are their age ranges?

16       A.   22, 16, 14, 11, 7, 5.

17       Q.   Is it important to you to monitor what your

18   children read?

19       A.   It is important to me to know what they're

20   reading.

21       Q.   Why?

22       A.   Because I'm their parent.

23       Q.   What constraints do you have about things that

24   they may read?

25       A.   My concern could be that it's not true what

Rochelle Wells
October 17, 2022                                                    10

1    they're reading or harmful in some way.

2          Q.   Do you think anybody else should be able to

3    control what your children read?

4          A.   No.

5          Q.   Do you think you should be able to control what

6    other parents' children read?

7          A.   No.

8          Q.   How do you make sure that you know what your

9    children are reading?

10         A.   I can read the book myself.  I can look at

11   reviews.  I can go to the publisher's site.  I can go to

12   blogs.

13         Q.   Do you do all of those things?

14         A.   Yes.

15         Q.   And what do you do if your children are reading

16   something that you think is inappropriate for them?

17         A.   Then I tell them that they are not going to

18   read that any longer.

19         Q.   Do you take it away from them?

20         A.   Yes.

21         Q.   Does that apply to all of your children,

22   including the over-18 children?

23         A.   No.

24         Q.   Do your children go to the library on their

25   own?

Rochelle Wells
October 17, 2022                                    11

1          A.   They did before the lawsuit.

2                     No.   They did before I discovered that

3    certain books are in the library.

4          Q.   Which books are those?

5          A.   This was about five years ago.   I discovered

6    there were books that had topics in them that I did not

7    appreciate, that I didn't want my children to see it,

8    and so I decided from -- my husband and I decided that

9    from then on, I would be making sure I was with them on

10   their library trips.

11         Q.   What were those books?

12         A.   I do not recall the titles.

13         Q.   What were the topics that concerned you?

14         A.   In one book I recall it was encouraging

15   children to disobey their parents.

16         Q.   How did you come upon that book five years ago?

17         A.   My -- one of my daughters brought it to me to

18   see about checking it out, so I said that I would -- we

19   could check it out, and I would pre-read it.   And in my

20   pre-reading in the first few chapters, I discovered

21   that.

22         Q.   Were there any other books whose content you

23   thought was inappropriate for your children at that

24   time?

25         A.   Yes.

Rochelle Wells
October 17, 2022                                    12

1      Q.   Tell me about that content.

2      A.   The book was called Virgin Sex.

3      Q.   What was the problem with Virgin Sex?

4      A.   It was describing sexual acts, and my children

5   don't need to know description of sexual acts.

6      Q.   Was one of your children trying to check that

7   book out?

8      A.   No.  It was on display.

9      Q.   Did you pre-read it or was the title enough for

10  you to know that you had a problem with it?

11     A.   No.  I picked it up and flipped through it to

12  see what it was about.

13     Q.   What did you do when you realized that it was

14  about something that you thought was inappropriate?

15     A.   I took it to the -- one of the librarians at

16  the desk and asked that this not be put on display.

17     Q.   What kind of display was it in?

18     A.   In our library the books will be part -- just

19  in a book -- something to hold the book to keep it on

20  display at the top of the shelves.

21     Q.   Which librarian did you speak to about Virgin

22  Sex?

23     A.   She is no longer there.

24     Q.   What was her name?  What is her name?

25     A.   I do not remember.

Rochelle Wells
October 17, 2022                                    13

1        Q.  How long ago did she work at the library?

2        A.  I do not remember.

3        Q.  How did she respond to your request to take

4   Virgin Sex off the display?

5        A.  She said that she agreed with me, that she had

6   not placed the book there, that it was the head

7   librarian at the time that had ordered it and placed it

8   there, but that she would let her know how I felt.

9        Q.  Was the book removed from the display?

10       A.  No, it was not.

11       Q.  Did you follow up in any way?

12       A.  No, I did not.

13       Q.  What's the -- what's the next book that

14   concerned you in the public library?

15       A.  At that time?

16       Q.  Yes.

17       A.  There was a book --

18              MR. RIENSTRA:  Objection.  Are we still

19   talking about a period five years ago, about?

20              THE WITNESS:  Yes.

21              MR. RIENSTRA:  Okay.

22              Thank you, Ellen.

23       A.  There was a book, Two Girls Mystery book,

24   almost like a Nancy Drew, except that it wasn't Nancy

25   Drew -- like a Nancy Drew, I guess.  I flipped through

Rochelle Wells
October 17, 2022                                    14

1    the book just to get an overview and read some parts,

2    and I noticed that there was some voodoo practices

3    encouraged in the book instead of it being about trying

4    to solve the crime, and that bothered me as a mom that

5    voodoo practices would be in a kid's book.

6         Q.   (BY MS. LEONIDA)  Was one of your children

7    trying to check that book out?  Is that why you flipped

8    through it?

9         A.   Yes, it was handed to me from them.

10        Q.   What did you do when you realized that it

11   contained the voodoo that you thought was inappropriate?

12        A.   I explained to both my daughters we weren't

13   going to check this book out and why, and we found

14   another book.

15        Q.   Was -- did one of the books that you described,

16   that made you decide not to let your children go to the

17   library by themselves?

18        A.   It was all of the above.

19        Q.   Were there any other books that concerned you

20   at that time five years ago?

21        A.   Not that I recall.

22        Q.   Other than Virgin Sex, did you complain to the

23   librarians about any book five years ago?

24        A.   No.

25        Q.   Why not?

Rochelle Wells
October 17, 2022                                    15

1        A.  I hadn't noticed any books that my children
2   handed to me.
3        Q.  Why didn't you complain to the librarian about
4   Two Girls Mystery?
5        A.  Because -- I didn't complain about it because I
6   was seeing a pattern that I needed to be more involved
7   in my children's reading, that it wasn't describing
8   sexual acts.
9        Q.  When is the next time that you came across a
10  library book that you considered inappropriate?
11       A.  That would be last year.
12       Q.  What book was that?
13       A.  That was one of the butt books.
14       Q.  By the "butt books," are you referring to the
15  books called, I broke my butt!, My butt is so noisy!,
16  and other books by that author?
17       A.  Yes, one book in particular.
18       Q.  How did you come across the first butt book
19  that you saw?
20       A.  I have a friend who worked at the library.
21  They told me about this book.
22       Q.  Which -- who's your friend?
23       A.  Rhonda Schneider.
24       Q.  Did she call you to tell you about the book?
25       A.  No.

Rochelle Wells
October 17, 2022                                    16

1      Q.  When did she tell you about the book?

2      A.  I believe it's just when we had seen each

3  other.

4      Q.  Do you remember the approximate day that it

5  was?  Month?  Year?

6      A.  The year was last year.  So it was in the

7  spring.

8              No.  Either it was the very end of spring

9  or where spring and summer meet.  Sorry, I didn't

10  remember.

11      Q.  What did she tell you about the book?

12      A.  She told me about a scene in the book that she

13  thought was inappropriate.

14      Q.  What did she tell you about it?

15      A.  She said there was a -- there was a child with

16  his pants pulled down, and someone was drawing on it.

17      Q.  Someone was drawing on what?

18      A.  The child's butt.

19      Q.  How did you respond when Ms. Schneider told you

20  this information?

21      A.  I wanted to see the book, and I wasn't

22  understanding -- I wasn't -- I was thinking it was a

23  joke book, and so I at first told her it sounded just

24  like a silly kid's book.  I have three sons, so I

25  understand silly kids' books are bathroom humor.

Rochelle Wells
October 17, 2022                                          17

```
 1        Q.  Did she tell you why she was telling you about
 2   this book?
 3        A.  Yes.  She was concerned for children.
 4        Q.  For whose children?
 5        A.  My children, the children of Llano.
 6        Q.  Did she say she wanted the book removed from
 7   the library?
 8        A.  No, I don't -- you know, I don't recall what
 9   her exact words were.
10        Q.  Did you then go and look at the book?
11        A.  Yes.
12        Q.  What was your reaction to the book?
13        A.  I understood what she meant when I saw the
14   picture.
15        Q.  What do you mean by that?
16        A.  What I mean by that is, I have, as I told you,
17   a seven-year-old and a five-year-old, and if an adult
18   came up to them and said they wanted to paint -- to pull
19   down their pants and to paint on their butts, they would
20   be uncomfortable or giggle or run away or the normal
21   response.  But if that same adult were to read this book
22   to them and show them this picture and go all the way
23   through the book and say, now pull down your pants and
24   let me paint on your butt, they would do it.  And I
25   realized this could set my children up and other
```

Rochelle Wells
October 17, 2022                                    18

1    children in Llano for molestation.

2         Q.   How many people read to your children other

3    than you?

4         A.   Several other people.

5         Q.   Was your concern that those people whom you

6    allowed to read to your children would molest your

7    children?

8         A.   No.

9         Q.   Then what was the molestation concern?  Who did

10   you think would molest your children if this book

11   remained in the library?

12        A.   I think that --

13             MR. RIENSTRA:  I'm going to object to form

14   on that, asked and answered.

15             But go ahead, Rochelle.

16        A.   There should not be a book in our public

17   library that can cause a child to be set up to be

18   molested in any way, shape or form.  That goes for my

19   children and for the many children in Llano that I've

20   been a youth leader to or come over to the house to

21   spend the night or we've had sports with.  I don't want

22   any child to be in a place where they can be manipulated

23   to be molested.  And that book, it's very clearly

24   something that could be used to hurt children in that

25   way.

Rochelle Wells
October 17, 2022                                    19

1      Q.   (BY MS. LEONIDA)   Were the other butt books

2  also, in your opinion, books that could be used to

3  molest children?

4      A.   I don't recall.

5      Q.   Can you explain to me exactly how the butt

6  books that you're concerned about would be used -- or

7  could be used to molest a child?

8      A.   I believe I just explained that.

9      Q.   Can you explain it again?

10           MR. RIENSTRA:   Objection; asked and

11  answered, form.  Asked and answered.  She told you that,

12  Ellen.

13      Q.   (BY MS. LEONIDA)   You can go ahead and answer.

14           MR. RIENSTRA:   Tell her again.

15      A.   Okay.  I will repeat my answer again.

16           Normally, a child will not let a person

17  draw on their butt.  But once a child is exposed to a

18  book that encourages anything, then they're more open to

19  it.  And so if my child or any child in Llano was read

20  that book by someone with bad intentions, that would set

21  them up for being molested, being touched even if it was

22  just their butt.  That's how it begins.  It never begins

23  with something awful like you think.

24      Q.   (BY MS. LEONIDA)   And when you say that's how

25  it begins, what are you talking about?

Rochelle Wells
October 17, 2022                              20

1        A.   Molestation.

2        Q.   What do you base that statement on?  How do you

3   know how molestation begins?

4        A.   Because I have family members and friends that

5   have been molested.

6        Q.   Were any of them -- were the butt books

7   involved in any of those incidents?

8        A.   They were not published yet.

9        Q.   Were children's books involved in those

10  incidents?

11       A.   I'm not sure.

12       Q.   Were any books involved in those incidents?

13       A.   I'm not sure.

14       Q.   Do you teach your children to not talk to

15  strangers?

16       A.   Yes.

17       Q.   Do you think knowing your children as you

18  obviously do, that your children would let a stranger

19  read a book to them?

20       A.   Molestation doesn't usually occur by a

21  stranger.

22       Q.   So your concern is that a friend or family

23  member would use the butt books to molest your children?

24       A.   That could be a concern.

25       Q.   Is there a particular friend or family member

Rochelle Wells
October 17, 2022                                          21

```
 1   that you're concerned about that might use the butt
 2   books to molest your children?
 3              MR. RIENSTRA:  I'm going to object to that
 4   question.  I'm going to instruct the witness not to
 5   answer it.  Ellen, that's going beyond the scope of
 6   discovery.  It does not lead to anything that is the
 7   basis of your client's lawsuits against the county or
 8   any of the defendants.
 9              MS. LEONIDA:  That is not a proper reason
10   to instruct a witness not to answer that.  Only
11   privilege is a proper reason to instruct a witness not
12   to answer; I will note for the record.
13              MR. RIENSTRA:  All right.  We'll take that
14   up with the judge.
15      Q.  (BY MS. LEONIDA)  What did you do -- well, let
16   me back up.
17              So the one butt book had an illustration,
18   was it, or a photograph of somebody painting on a butt?
19      A.  An illustration.
20      Q.  Did you read the other butt books, any of them?
21      A.  I know I read parts of them.
22      Q.  Did you have similar concerns about the other
23   butt books?
24      A.  I don't remember.
25      Q.  What did you do in response to your concern
```

Rochelle Wells
October 17, 2022                                22

```
1   about the butt book with the illustration that we've
2   been talking about?
3        A.  I went to the director and the head -- no.  It
4   was the librarian -- the children's librarian and the
5   director.
6        Q.  Who is that person?  Who are those people,
7   rather?
8        A.  Persons.  Tina was the children's librarian,
9   and Amber is the director.
10       Q.  Did you speak with them together or separately?
11       A.  Together.
12       Q.  What did you say to them?
13       A.  I told them what I just told you about -- about
14   that picture in particular.
15       Q.  Did you tell them that you wanted anything done
16   in response to your observations of the picture?
17       A.  Yes.
18       Q.  What did you tell them that you wanted to have
19   happen?
20       A.  I asked them to keep the book out of the
21   library.
22       Q.  What was their response?
23       A.  That they disagreed with me.
24       Q.  Did you talk about it further that day?
25       A.  With them?
```

Rochelle Wells
October 17, 2022                                          23

1        Q.  Yes.

2        A.  I was in Amber's office with Amber and Tina for

3  maybe 30 minutes, and we discussed that.

4        Q.  Tell me about that 30-minute conversation.

5        A.  I told them how I felt, and they told me how

6  they felt.

7        Q.  What did you think about how they felt?

8        A.  I thought that I disagreed with them.

9        Q.  Did you tell them that?

10       A.  Yes.

11       Q.  Did you tell them what you were going to do

12  next?

13       A.  I did not have a plan for what I was going to

14  do next.

15       Q.  What did you do next?

16       A.  The next thing is I went to the judge.

17       Q.  Who's the judge?

18       A.  Judge Cunningham.

19       Q.  Do you remember how long after you talked to

20  Amber and Tina you went to see Judge Cunningham?

21       A.  I don't recall.

22       Q.  Do you know if it was within the week?

23       A.  No, it was not within the week.

24       Q.  Do you know if it was within a month of talking

25  to Amber and Tina?

Rochelle Wells
October 17, 2022                                    24

1        A.   I don't remember.

2        Q.   What did you say to Judge Cunningham?

3        A.   I showed him the picture that upset me and

4   concerned me.

5        Q.   And what did you tell him?

6        A.   I told him the same thing I told Amber and

7   Tina, that I wanted it removed from the library.

8        Q.   How were you able to show him the picture?

9        A.   I had -- I was with two other women, and one of

10  the women had the book.

11       Q.   Who had the book?

12       A.   Jo Leigh Ares.

13       Q.   Who is the other woman that was with you and

14  Jo Leigh Ares?

15       A.   Eva Carter.

16       Q.   And why did you go to Judge Cunningham?

17       A.   Because he's the judge, and I thought that

18  would be the best person to speak with after speaking to

19  the director of the library.

20       Q.   Had you spoken to Judge Cunningham before?

21       A.   No.

22       Q.   Had you ever met him before?

23       A.   Not that I recall.

24       Q.   So you told Judge Cunningham that you wanted

25  the books removed from the library.  Is that right?

Rochelle Wells
October 17, 2022                                          25

```
 1        A.   Yes.

 2        Q.   And then you showed him the book?

 3        A.   At the same time, yes.

 4        Q.   Did you tell him you only wanted that one book

 5   with the illustration of drawing on a butt removed or

 6   did you say you wanted all of the butt books removed?

 7        A.   I believe I said I wanted all of the butt books

 8   removed.

 9        Q.   Other than the book that we discussed with the

10   illustration, why did you want the other butt books

11   removed?

12        A.   I believe I felt that if an author was putting

13   children in such a position in one book, that he could

14   do it in other books, and that his books did not belong

15   in the library with children.

16        Q.   Did you read all of his books?

17        A.   The ones that we had, I browsed through.

18        Q.   So you explained to Judge Cunningham that you

19   believe this author's books should not be in the

20   library.  Correct?

21        A.   Yes.  I don't know that he agreed with me.  I

22   don't remember if he agreed with me.

23        Q.   What do you remember about the rest of that

24   conversation?

25        A.   I remember that he agreed with me and the two
```

Rochelle Wells
October 17, 2022                                    26

1   other ladies that the picture wasn't appropriate and

2   shouldn't be in the hands of children.

3          Q.   Did he tell you what he was going to do about

4   that?

5          A.   I don't remember exactly.

6          Q.   What do you remember about what Judge

7   Cunningham told you during that conversation?

8          A.   I don't remember what he said.  So if I said

9   it, it wouldn't -- it could possibly not be true.

10         Q.   Do you remember anything that Judge Cunningham

11  said to you, not word for word, but the gist of what he

12  said?

13         A.   Just what I shared, that this book could be

14  used in a harmful way to children.  Those were my words.

15         Q.   Did Judge Cunningham agree with that?

16         A.   Yes.

17         Q.   Did you talk to Judge Cunningham about removing

18  the book from the library so that children would not be

19  harmed by it?

20         A.   Yes.

21         Q.   And did he agree that he would do that?

22         A.   I guess yes would be the answer to that.

23  How --

24                  MR. RIENSTRA:  Objection; response.

25         Q.   (BY MS. LEONIDA)  You can finish.

```
 1      A.   What were you saying?

 2               MR. RIENSTRA:   No.   Just go ahead and

 3  answer the question.

 4      A.   I said yes, but I don't know the "how," if

 5  that's what you're asking for.

 6      Q.   (BY MS. LEONIDA)   Okay.   So just to make sure I

 7  understand your answer, so he did say he would remove

 8  the book from the library but he didn't tell you how he

 9  would do that.   Is that right?

10               MR. RIENSTRA:   Objection; form, misstates

11  the evidence -- or testimony.

12      A.   I don't recall what he said.   I don't remember

13  if he said, Rochelle, I'm taking this out of the

14  library.   I don't remember him saying that.

15      Q.   (BY MS. LEONIDA)   So what do you remember him

16  saying?   And, again, I'm not asking you to remember his

17  exact words, but what do you remember him communicating

18  to you?

19               MR. RIENSTRA:   Objection; asked and

20  answered.

21      Q.   (BY MS. LEONIDA)   You can go ahead and answer.

22      A.   I remember him saying that he agreed with us

23  that the book was harmful to children.

24      Q.   And what did he say about your request to

25  remove it from the library?
```

Rochelle Wells
October 17, 2022                              28

1        A.   That he understood why I was asking for it to

2   be removed from the library.

3        Q.   Did he say that he would try to get it removed

4   from the library?

5               MR. RIENSTRA:   I'm going to object; asked

6   and answered.

7               But go ahead and answer, if you can.

8        A.   I'm going to say yes because I know he agreed

9   with me about it being harmful to children.   But then

10  again, like I said, I don't know how he phrased it.

11       Q.   (BY MS. LEONIDA)   Is it right that you said

12  that this was more -- your conversation with

13  Judge Cunningham, your first one, was more than a couple

14  of weeks after you talked to Amber and Tina.   Is that

15  right?

16              MR. RIENSTRA:   Objection; asked and

17  answered.

18       Q.   (BY MS. LEONIDA)   You can answer.

19              MR. RIENSTRA:   You can answer if you recall

20  when it was that you spoke to Judge Cunningham.

21       A.   I don't recall.   I know it was -- at least a

22  week had gone by.

23       Q.   (BY MS. LEONIDA)   During that week, where were

24  the butt books?

25       A.   I don't know.

Rochelle Wells
October 17, 2022                                    29

1        Q.  Did you ever check out any butt books?

2        A.  I don't think so.

3        Q.  Did you ever talk to any other people about the

4   butt books and the danger that you thought they posed?

5        A.  By "people," what do you mean?

6        Q.  Human beings.  Did you talk to any other people

7   about the danger that you thought the butt books posed?

8        A.  I was asking if you meant like officials or

9   library people.

10       Q.  No.  Just anybody.

11       A.  Yes.

12       Q.  Who did you talk to?

13       A.  I talked to several of my friends.

14       Q.  Which friends?

15       A.  I don't recall which friends.  Most likely all

16   of them.

17       Q.  Did you talk to anybody about strategies for

18   getting the butt books out of the library before the

19   county intervened?

20       A.  No.

21            MR. RIENSTRA:  Objection; form.

22       Q.  (BY MS. LEONIDA)  Did you talk to anybody about

23   checking out the books from the library so that they

24   wouldn't be available to other people?

25       A.  Yes.

Rochelle Wells
October 17, 2022                                    30

1        Q.   Who did you talk to about that?

2        A.   I don't recall.

3        Q.   Would you, in fact, ever check out the butt

4   books from the library so that they wouldn't be

5   available to other people?

6             MR. RIENSTRA:   Objection.

7             You can go ahead and answer.

8        A.   I don't remember.

9        Q.   (BY MS. LEONIDA)   Do you remember ever checking

10  out any butt books?

11       A.   I don't remember.

12       Q.   Were there any other books that you were

13  concerned about around that same time, other than the

14  butt books?

15       A.   The fart books.

16       Q.   What was the problem with the fart books?

17       A.   There were a few problems with the fart books.

18       Q.   What were they?

19       A.   One was that they were -- they were

20  inappropriate.  And because I have sons, I know that

21  they think it's funny, even if it's inappropriate.  And

22  it could cause them to get in trouble with their friends

23  in school, and I thought that was a good book for a joke

24  store but not for a county library.

25             The other one was that I was having

Rochelle Wells
October 17, 2022                                    31

1   difficulty finding lots of very good books for

2   education, and I don't mean just -- just, you know,

3   learning facts, but good books for children.  And my

4   concern was that we were spending our tax money on books

5   like the butt book that can be harmful to children and

6   the fart book that encourages bad behavior but not

7   purchase any books for educational purposes.

8        Q.  Let me take those concerns one by one.

9            What was inappropriate about the fart

10  books?

11       A.  Have you seen the fart books?

12       Q.  What was inappropriate about the fart books,

13  Ms. Wells?

14       A.  You have, I can tell.

15           One in particular stands out to me.

16       Q.  (BY MS. LEONIDA)  I'm sorry?

17       A.  There is one page in particular that I can

18  recall in my head.  I don't remember all of them.  It

19  was a smellogram or it's taking a picture of your fart.

20       Q.  And what was your concern about that?

21       A.  That I know many boys in this town that will

22  get in lots of trouble for doing something like that,

23  including my sons; disrespectful and inappropriate

24  behavior.

25       Q.  Did you also want the fart books removed from

Rochelle Wells
October 17, 2022                                        32

```
 1   the library?
 2        A.  Yes.
 3        Q.  Did you talk to the librarians about that?
 4        A.  Yes.
 5        Q.  Did you talk to Judge Cunningham about that?
 6        A.  Yes, a little.
 7        Q.  Was that at the same time that you talked to
 8   him about the butt books?
 9        A.  Yes.
10        Q.  Did he agree with you that the fart books
11   didn't belong in the library?
12        A.  I don't recall.
13        Q.  You said that one of the other problems with
14   the fart books was that you couldn't find good books in
15   the library for education.  What do you mean by that?
16        A.  I mean that prior to Amber being there, the --
17   the library had begun reading books that maybe -- they
18   weren't the new books.  They were old books to make way
19   for new books, but those new books were still very good.
20   And so when I would go to look for titles, I couldn't
21   find them anymore, and in their place I would find
22   brand-new books that were silly.  There's a place for
23   silliness, but the majority of the books coming in were
24   silly, and so I was voicing my opinion as a taxpayer
25   that I would like them -- and I came with a list of
```

Rochelle Wells
October 17, 2022                                              33

1    books of suggestions that I had been looking for from

2    high school to, you know, kindergarten, that I had

3    wanted to suggest purchasing instead of books like the

4    fart book.

5         Q.   Who did you give that list to?

6         A.   I just handed it to Tina and Amber when I was

7    there.  I don't recall who took them or I don't...

8         Q.   Do you remember what conversations you had

9    about the list of books that you wanted them to

10   purchase?

11        A.   I told them -- pardon me -- that I maybe

12   circled a few in particular that were wonderful books

13   that the library would benefit from purchasing.

14        Q.   Was this the same conversation during which you

15   asked them to remove the butt books?

16        A.   Yes.

17        Q.   Did you also ask them to remove the fart books?

18        A.   Yes.

19        Q.   What was their response to that?

20        A.   I remember Tina saying she understood where I

21   was coming from, but that she disagreed with me.

22        Q.   You said you talked to your friends.  Actually,

23   let me -- I don't want to put words in your mouth.

24             Did you say that you talked to your friends

25   about checking the butt books out of the library so that

Rochelle Wells
October 17, 2022                                                    34

1   they wouldn't be available for anybody else to check

2   out?

3        A.  I recall it in conversation.  I don't know that

4   I said it, but I do recall a conversation where that was

5   said.

6        Q.  Did you agree that that was the right thing to

7   do?

8        A.  Yes.

9        Q.  Did you also talk to your friends about

10  checking out the fart books so that they would not be

11  available for people to check out?

12       A.  I don't remember.

13       Q.  Do you think that that's a good idea, as you

14  sit here now, to remove the fart books from the library

15  so nobody else has access to them?

16       A.  I think there's a difference between books that

17  can get you in trouble from your parents and books that

18  can cause physical harm to children -- and that can

19  cause physical harm to children.  Removing those takes

20  precedence over books that could just get you in

21  trouble.

22       Q.  Do you think that the fart books belong in the

23  library?

24       A.  No.

25       Q.  I think my Internet might have missed -- might

Rochelle Wells
October 17, 2022                                    35

```
 1  have skipped over the answer.
 2              Do you believe the fart books belong in the
 3  library?
 4       A.  No.
 5       Q.  What was the next conversation that you had
 6  with Judge Cunningham about books for the library?
 7       A.  I didn't speak to him in person again for a
 8  long time.
 9       Q.  Did you speak to him on the phone?
10       A.  I don't think so.
11       Q.  Did you e-mail with him?
12       A.  Yes.
13       Q.  What was the next communication between you and
14  Judge Cunningham regarding books in the library?
15       A.  I don't recall.
16       Q.  What was it about?
17       A.  I know it was about books, but I don't recall
18  the e-mail.
19       Q.  What is the Llano County Library Advisory
20  Board?
21       A.  Is that the question?  Okay.  I didn't know if
22  there was more.
23              It is a board appointed by the
24  commissioners and the judge to advise them on policy
25  regarding the Llano County libraries.
```

Rochelle Wells
October 17, 2022                                        36

```
 1          Q.  How long have you known that the Library Board
 2   exists?
 3          A.  I didn't know about it until it came up in
 4   Commissioners Court.
 5          Q.  When did it come up in Commissioners Court?
 6          A.  I believe at the end of the year.  I'm not --
 7   I'm not 100 percent, but that's the first time I've
 8   heard that word.
 9          Q.  The end of the year, are you talking about
10   2021?
11          A.  Yes.
12          Q.  How did it come up at Commissioners Court?
13   What was the context?
14          A.  Well, it had to do with the library, but that's
15   all I recall.  I don't remember what was being
16   discussed.
17          Q.  Are you a member of the Library Board?
18               MR. RIENSTRA:  Objection; form.
19          Q.  (BY MS. LEONIDA)  You can answer.
20          A.  Yes, I was appointed to be part of the Library
21   Advisory Board.
22          Q.  When were you appointed to the Library Advisory
23   Board?
24          A.  I believe in January.
25          Q.  Who appointed you to the Library Board?
```

Rochelle Wells
October 17, 2022                              37

```
 1        A.  Commissioner Moss.
 2        Q.  Was anybody else appointed to the Library Board
 3   at the same time that you were?
 4        A.  The whole board was newly appointed.
 5        Q.  Who was appointed to the new board at the same
 6   time as you?
 7        A.  I will try to remember all of their names.  In
 8   my precinct it was myself, Robin Tibbs, Rhonda
 9   Schneider.  The Judge's appointment was Bonnie Wallace.
10   Ravelle -- I'm sorry, I can't remember all their last
11   names -- was for the Lakeshore Library, and Gay Baskin
12   was president, and Nancy Miller.  They'd be mad at me
13   that I forgot all their names.  I haven't seen them in a
14   while.  There's like three others.  I can't remember
15   their names right now.
16        Q.  That's all right.  Were all of the new library
17   board appointees people that you previously knew?
18        A.  No.
19        Q.  Who had you -- who had you known before January
20   of 2022?  Who was appointed to the Library Board at that
21   same time as you?
22        A.  By "known," do you mean met --
23        Q.  Yes.
24        A.  -- or familiar with?  Just had met before?
25        Q.  Yes.
```

Rochelle Wells
October 17, 2022                                    38

1          A.   I had met -- I met Bonnie before, but just

2    someone had introduced me to her, introduced me.

3                    MR. RIENSTRA:   Who was that?

4                    THE WITNESS:   Bonnie.

5                    MR. RIENSTRA:   Oh, okay.

6          A.   Bonnie Wallace.  I had met Robin Tibbs once

7    before, and then I knew Rhonda Schneider, and I didn't

8    know anyone else.

9          Q.   (BY MS. LEONIDA)   How did you come to be

10   appointed?

11         A.   Sorry.  I remember.  Anita was another one of

12   our -- is also from our precinct.

13         Q.   Okay.  How did you come to be appointed to the

14   Library Board?

15         A.   Commissioner Moss called me and asked me if I

16   would.

17         Q.   How do you know Commissioner Moss?

18         A.   Because he's my commissioner.

19         Q.   How long have you known him?

20         A.   I met him last year for the first time.

21         Q.   What kinds of things did you and

22   Commissioner Moss talk about?

23         A.   Can you be more specific?

24         Q.   Sure.  Before he appointed you to the Library

25   Board, what kinds of things did you talk to him about?

Rochelle Wells
October 17, 2022                                    39

1        A.   Okay.  About library books.

2        Q.   When did you start talking to him about library

3   books?

4        A.   I believe the end of the summer.

5        Q.   Of 2021?

6        A.   Of '21, yes.

7        Q.   Why did you go to see Commissioner Moss about

8   library books at the end of the summer of 2021?

9        A.   Because he was -- I discovered that after

10  speaking to the director, that I needed to go to the

11  commissioner about the butt book.  And so I called him

12  and told him about the butt book because he's my

13  commissioner.

14       Q.   You said that the director told you to talk to

15  the commissioner?

16       A.   No, no.  I didn't know who I would speak to

17  next in the process of trying to have this book removed

18  from the library.

19       Q.   Did you talk to Judge Cunningham first or

20  Commissioner Moss first?

21       A.   Judge Cunningham first.

22       Q.   Then when you talked to Commissioner Moss, what

23  was his reaction to your concerns about the butt book?

24       A.   He was much like mine, not understanding,

25  because he is a man and he has a son, understanding how

Rochelle Wells
October 17, 2022                                           40

1    butts could be harmful, you know, like I had felt.  And

2    then I described the picture so that he had a better

3    idea of what I was referring to.

4         Q.  Was anybody else there during this

5    conversation?

6         A.  No.

7         Q.  Did you say it was on the phone?

8         A.  Yes.

9         Q.  So once you explained your concerns to him, did

10   he agree with you that this was problematic?

11        A.  Not at the first, like I said, but then when

12   I -- like I told -- I think he went to see the picture

13   himself and then realized what I was meaning.

14        Q.  What do you mean by that?  What did he -- how

15   do you know that he realized what you were meaning?

16        A.  He had to go see the book himself in the

17   library.

18        Q.  So you talked to him after he saw the book?

19        A.  Yes.

20        Q.  And what was that conversation?

21        A.  That conversation was, I believe, the book has

22   been removed.

23        Q.  Do you remember anything else that was said in

24   that conversation?

25        A.  No.

Rochelle Wells
October 17, 2022                                    41

1        Q.  Did you thank him?

2        A.  Yes.

3        Q.  Did you talk to Commissioner Cunning- --

4   sorry -- Commissioner Moss at all between when you

5   expressed your concerns and then when he told you that

6   the book had been removed?

7        A.  No.

8        Q.  Did you talk to Commissioner Moss between the

9   conversation where he told you the book had been removed

10  and when he asked you to be on the Library Board?

11       A.  Yes.

12       Q.  How frequently did you talk to

13  Commissioner Moss between when he told you that he had

14  removed the butt book and asked you to be on the Library

15  Board?

16       A.  I don't think it was very frequent at all.  I

17  don't -- but I don't recall.

18       Q.  Do you recall what you talked about during that

19  period?

20       A.  From the time when I first spoke with him until

21  I was appointed on the Advisory Board?

22       Q.  Yes.

23       A.  Yes.  There were other books that were starting

24  to come to light that were also harmful to children.

25       Q.  What books were those?

Rochelle Wells
October 17, 2022                                          42

1          A.   I don't recall the titles.

2          Q.   What was harmful to children in those books?

3    You can start with the first one.

4          A.   Books that were sexual in content.

5          Q.   What do you mean by that?

6          A.   That they were sexual.  I mean, the -- there

7    was a sexual book.  It wasn't just "See Dick and Jane

8    Play Ball," you know.  There was some sexuality added to

9    it or sexual -- overtly sexual things or...

10         Q.   Descriptions of sexual behavior?

11         A.   Yes.

12         Q.   Was it sort of similar to the problem that you

13   had with Virgin Sex five years ago?

14         A.   Maybe that was one aspect of some of the books.

15         Q.   Is it fair to say that you thought those books

16   should be removed from the library?

17         A.   Yes.

18         Q.   Did you ask Commissioner Moss to remove those

19   books from the library?

20         A.   I don't recall.

21         Q.   You do recall talking to him about those books,

22   though, you said.  Right?

23         A.   (Nodding head.)

24         Q.   So if you weren't talking to him to get those

25   books removed, why would you have been talking about

Rochelle Wells
October 17, 2022                                    43

1   them, talking to him about those books at all?

2       A.  No.  I understand what you're saying.  I guess

3   what I'm saying is, I don't remember going with the list

4   and saying this book, you know, but yes, if the books

5   were sexual in content, you know, for minors, then I

6   wanted them removed.

7       Q.  And that's what you went to talk to

8   Commissioner Moss about?

9       A.  That is one thing I had spoken to him about.

10      Q.  What else have you spoken to him about?

11      A.  Between the times of first having met him and

12   before I was appointed to the Advisory Board?

13      Q.  Yes.

14      A.  Okay.  I told him that I was praying for him.

15   That's the gist of our conversations, the library or I

16   am praying for him, and that I'm thankful that he's

17   doing it for children in Llano.

18      Q.  So you told him you were thankful for that?

19      A.  Yes.

20      Q.  What was he doing to stand up for children in

21   Llano that you were thankful for?

22      A.  I'm thankful that he wanted the -- that he had

23   the butt book removed, that he understood that sexual

24   material is particularly -- I'm thinking about

25   Commissioners Court where he said, I don't care if it's,

Rochelle Wells
October 17, 2022                                          44

1    you know, heterosexual or homosexual sex.  It doesn't

2    need to be in the hands of children.  It was a graphic

3    book in particular you're referring to.

4         Q.  Would you say generally that Commissioner Moss

5    was an ally of yours in trying to remove inappropriate

6    books from the library?

7              MR. RIENSTRA:  Objection; form, vague.

8         Q.  (BY MS. LEONIDA)  You can answer.

9              MR. RIENSTRA:  You can answer.

10        A.  I would say that he's representing the people

11   that voted for him.

12        Q.  (BY MS. LEONIDA)  And you were grateful for

13   what Commissioner Moss did to help you remove

14   inappropriate content from the library.  Right?

15        A.  I was grateful for him having protected

16   children.  It was not just myself alone.

17        Q.  And by protecting children, you mean removing

18   inappropriate books from the library.  Is that right?

19              MR. RIENSTRA:  Objection; form, vague,

20   asked and answered.

21        Q.  (BY MS. LEONIDA)  You can answer.

22        A.  I was thankful to him for removing harmful

23   content from the children's section.

24        Q.  Did he move it to a different section of the

25   library or did he remove it from the library entirely?

Rochelle Wells
October 17, 2022                                    45

```
 1              MR. RIENSTRA:  Objection; form, vague,
 2  assumes facts not in evidence.
 3        Q.  (BY MS. LEONIDA)  You can answer.
 4        A.  I don't know.
 5        Q.  The -- the people that you knew who were
 6  appointed to the Library Board in January of 2022, the
 7  same time as you were, had you talked to those people
 8  about your concern with inappropriate books in the
 9  library?
10        A.  Rhonda was the only one that I had spoken with
11  because she was my friend, but she's the only one I had
12  spoken with really about it.
13        Q.  Did you join the library because you wanted to
14  control the kinds of books that ended up there?
15        A.  I joined the library nine years ago.
16        Q.  I'm sorry.  The Library Board, did you join the
17  Library Board because you wanted to control the kinds of
18  books that ended up in the library?
19              MR. RIENSTRA:  Objection; vague.
20        Q.  (BY MS. LEONIDA)  You can answer.
21        A.  I was asked to join the Library Advisory Board,
22  and I thought that I had a good perspective as being a
23  mom of five [sic], having different English literature,
24  being a patron of lots of libraries and a homeschool
25  mother, I felt that gave me a unique perspective when it
```

Rochelle Wells
October 17, 2022                                    46

1    came to advising the commissioners and the judge on the

2    library policies.

3         Q.  Did you want to be involved in what kinds of

4    books were purchased for the library?

5         A.  Yes, I believe parents and taxpayers should

6    have involvement in that.

7         Q.  Did the Library Board, while you were on it,

8    ask the library director to send lists of any books that

9    she wanted to purchase before she purchased them?

10                MR. RIENSTRA:  Objection; form.

11                You can go ahead and answer.

12        A.  Okay.  The Collections Committee that I was a

13   part of was researching the demographic and the patron

14   so that we could see which books would best serve the

15   typical Llano patron.

16        Q.  (BY MS. LEONIDA)  Did the library -- go ahead.

17        A.  And that was part of it, is if they've seen

18   what Amber had wanted to bring in.

19        Q.  Was part of the Library Board's duties, while

20   you were on it, approving the list of books that Amber

21   wanted to buy?

22                MR. RIENSTRA:  Objection; form, vague,

23   assumes facts not in evidence.

24                You may answer.

25        A.  We're an advisory board only, so we don't have

Rochelle Wells
October 17, 2022                                    47

1  that ability.

2       Q.   (BY MS. LEONIDA)   Did you ever tell Amber that

3  you wanted to approve the books that she put on the list

4  that she wanted to buy?

5       A.   I don't remember having said that.

6       Q.   What would you do if Amber sent you a list of

7  books that she wanted to buy and you thought one of them

8  was inappropriate?

9            MR. RIENSTRA:   Objection; form,

10  speculation.

11            (Brief interruption.)

12            MR. RIENSTRA:   Oops, sorry about that.

13       Q.   (BY MS. LEONIDA)   You can answer.

14            MR. RIENSTRA:   I'm going to turn my phone

15  off.  Siri just popped up.  Forgive me.

16       A.   I'm sorry.  Would you repeat the question?

17       Q.   (BY MS. LEONIDA)   What would you do if Amber

18  submitted the -- well, first, did you ask her to submit

19  all book purchases that she wanted to make to the

20  Library Board?

21       A.   Yes.

22       Q.   "Yes"?

23       A.   Yes.

24       Q.   What would you do if there was a book on that

25  list that you thought was inappropriate?

Rochelle Wells
October 17, 2022                                    48

```
 1        A.  "Inappropriate," what do you mean?
 2        Q.  What would you do if one of the butt books was
 3   on that list?
 4        A.  I would have shown it to the Collections
 5   Committee and had us read it and look at it, and then we
 6   would, as a committee, you know, see how we feel, and
 7   then we would present that to the board, and then the
 8   board would have to make an advisement from there.  But
 9   we never got to that.  So that's all hearsay; that's
10   what I think.
11        Q.  Do you know what hearsay is?
12        A.  No.  I'm sorry.  This is all conjecture.
13   That's a better word.
14             MR. RIENSTRA:  For the -- I'm just going
15   to, for the record, object to the form of the question.
16   Calls for speculation.
17        Q.  (BY MS. LEONIDA)  Did Amber ever ask you for
18   approval to buy books?
19        A.  No.
20        Q.  Do you know, are you familiar with something
21   called the labeling project?
22        A.  Could you explain?
23             MR. RIENSTRA:  Objection; form.
24        A.  No, I'm not.  I would need an explanation.
25        Q.  (BY MS. LEONIDA)  Were you ever -- did you ever
```

Rochelle Wells
October 17, 2022                                    49

1   talk to anybody about putting labels on books in the

2   Llano County Library?

3        A.   Amber and Tina had mentioned that when I went

4   to speak with them about the butt books.

5        Q.   And what did they say about that?

6        A.   They said they were going to label certain

7   books or label all books.

8        Q.   Did that ever come up while you were on the

9   Library Board?

10       A.   I don't remember.

11       Q.   Did you ever talk to anybody about labeling

12   books again?

13            MR. RIENSTRA:   Objection; form.  Misstates

14   her testimony.

15       Q.   (BY MS. LEONIDA)  Did you ever talk to anybody

16   about labeling books again?

17            MR. RIENSTRA:  Same objection.

18       Q.   (BY MS. LEONIDA)  You can answer.

19            MR. RIENSTRA:  You can answer.  I'm sorry.

20       A.   You mean, did I speak to Amber and Tina about

21   it again?

22       Q.   (BY MS. LEONIDA)  Anybody.

23       A.   Well, when I discussed my conversation with

24   Amber and Tina, with my husband or a friend, it came up

25   then.

Rochelle Wells
October 17, 2022                                    50

```
 1        Q.  Any other times?

 2        A.  I don't remember.

 3        Q.  Will the Library Board meetings when -- well,

 4   first, how often did the Library Board meet starting in

 5   January when you were appointed?

 6              MR. RIENSTRA:  Objection; form, misstates

 7   her testimony, and assumes facts not in evidence.

 8        Q.  (BY MS. LEONIDA)  You can answer.

 9        A.  I don't remember how often we met.

10        Q.  Was it weekly?

11        A.  No, I don't recall it being weekly.

12        Q.  Do you think it was more than once a week or --

13        A.  No, I didn't.  I believe we had a meeting every

14   month.

15        Q.  What was your role in the Library Board?  Did

16   you have an official title?

17              MR. RIENSTRA:  Objection; vague, assumes

18   facts not in evidence, misstates her testimony.

19              You can answer, Amber -- I mean, I'm sorry,

20   Rochelle.

21        A.  I was a secretary.

22        Q.  (BY MS. LEONIDA)  What did your duties as

23   secretary consist of?

24        A.  I would take the minutes and type them out and

25   send them to the board, and I would take anything that
```

Rochelle Wells
October 17, 2022                                          51

```
 1   was passed out, hand it out at the meeting, and file
 2   that.
 3        Q.   At some point did the Library Board vote on
 4   whether the meeting should be open to the public?
 5                  MR. RIENSTRA:   Objection; misstates her
 6   testimony, assumes facts not in evidence.
 7                  Go ahead and answer.
 8        A.   Yes.
 9        Q.   (BY MS. LEONIDA)   How did you vote on that
10   question?
11        A.   Whether to keep it closed or open?
12        Q.   The meetings, yes.
13        A.   I voted to have them closed.
14        Q.   Why?
15        A.   Because it's like the -- when two parents are
16   discussing going to Disneyland in front of their
17   children, the kids take their word as gospel even though
18   they're discussing it.  And what I noticed is that
19   certain people would come to the meetings and be privy
20   to our discussions about things that we were still
21   thinking about or just throwing around, and then they
22   would see that as gospel.  And so it wasn't helping the
23   library county system at all to have them be -- because
24   we would only come together, you know, once a month and
25   discuss things, and so they would state as fact just
```

Rochelle Wells
October 17, 2022                                                52

1    things that we were discussing, say that they were going

2    to happen when we were only in the beginning stages of

3    throwing the ball around about ideas.

4         Q.   Can you give me an example of that?  I'm not

5    sure I understand what you're talking about.

6         A.   Yes.  When we were discussing biblioteka, I

7    still had more information to gather to present to the

8    board.  I was being placed in charge of finding

9    information about it.  And so the questions that went

10   unanswered were then spoken in Commissioners Court as

11   having no answer, when in reality the answer had not yet

12   come.

13        Q.   And when were you looking at biblioteka?

14   Approximately what month?  Was it, like, right when you

15   joined the board?

16        A.   No, I don't recall when exactly I started

17   looking at biblioteka.

18        Q.   Do you remember e-mailing with a woman named

19   Cheryll, is it Mabray or Magray?

20        A.   Cheryll.

21             MR. RIENSTRA:  Mabray.

22        A.   She's an Advisory Board member.

23        Q.   (BY MS. LEONIDA)  Do you remember e-mailing

24   with her in January 2022 about closing Library Board

25   meetings?

Rochelle Wells
October 17, 2022                                                53

```
 1          A.   I don't remember specifically.

 2          Q.   Do you remember ever e-mailing with her about

 3   closing Library Board meetings?

 4          A.   I remember e-mailing with her because we would

 5   e-mail different members, board members.

 6          Q.   Okay.  I'm going to show you what will be

 7   Exhibit 1.

 8                    (Exhibit No. 1 was marked.)

 9          Q.   (BY MS. LEONIDA)   Can you see that, Ms. Wells?

10          A.   Yes.

11          Q.   Let me know when you've had a chance to review

12   it.

13          A.   (Witness perusing document.)   Okay.

14          Q.   Are you done?

15          A.   Yes.

16          Q.   Okay.  So Ms. Mabray, who is she talking about

17   when she said, "I think we can ask them to leave if we

18   want"?

19          A.   Oh, I'm sorry.  What was your question?

20          Q.   Who's Ms. Mabray talking about when she writes

21   to you, "I think we can ask them to leave if we want"?

22          A.   She was speaking to anyone -- about anyone who

23   would be at the meeting, I believe.

24          Q.   Yeah.  Why were you -- why were you talking to

25   other Library Board members about asking people to
```

Rochelle Wells
October 17, 2022                                    54

1    leave?

2                   MR. RIENSTRA:   Objection; asked and

3    answered.

4         Q.   (BY MS. LEONIDA)   You can answer.

5         A.   I believe I already answered that.

6         Q.   Ms. Wells, one of the ground rules we talked

7    about earlier was you have to answer my questions even

8    if counsel is objecting.

9         A.   Okay.   Sorry.   I'm just trying to...   She spoke

10   of this because I believe all of us on the board felt

11   that coming in in the middle of a conversation on the

12   Advisory Board, as we're processing and thinking of

13   ideas, was being taken to mean that's what was going to

14   happen, even though we were only an advisory board and

15   even though we weren't presenting something to vote on.

16        Q.   You finally voted to close the Library Board

17   meetings in March of 2022.   Correct?

18        A.   Yes.

19        Q.   So you would have had two meetings prior to

20   that.   Right?

21        A.   I believe we had three or four meetings

22   already.

23        Q.   Okay.   What had the Library Board talked about

24   at those three or four meetings?   Let's start with the

25   first one.

Rochelle Wells
October 17, 2022                                          55

1        A.   I don't recall what we spoke of.  I do remember

2   one in particular which I referred to which was

3   biblioteka.

4        Q.   And that was before March 3rd of 2022?

5        A.   I don't remember the time.  I'm sorry.

6        Q.   When you were on the -- well, you're still on

7   the Library Advisory Board.  Correct?

8        A.   Is it -- I guess, technically.

9        Q.   After you were appointed to the Library

10  Advisory Board in January of 2022, you asked Amber Milam

11  for a number of documents.  Correct?

12       A.   Yes.

13       Q.   You asked her for a list of unique readers.  Is

14  that right?

15       A.   Among other things, yes.

16       Q.   What is that?

17       A.   Do you have the paper to refresh my memory?

18       Q.   I'm just asking what you remember.  You said

19  you remembered asking her for a list of unique readers

20  among other things.  What is a list of unique readers?

21            MR. RIENSTRA:  Objection; asked and

22  answered.

23       Q.   (BY MS. LEONIDA)  You can answer.

24       A.   I can't recall.

25       Q.   Why did you ask her for it?

Rochelle Wells
October 17, 2022                                    56

1        A.   I don't remember what it is, so I can't answer

2   that truthfully.

3        Q.   You received it.  Right?

4        A.   I believe so.

5        Q.   So --

6        A.   There's lots of paperwork when I was on the

7   advisory board.  I'm sorry if I can't have it like that

8   (indicating) in my head.

9        Q.   So when you received it, did you look at it?

10        A.   I believe so.

11        Q.   And what was it?

12             MR. RIENSTRA:  Objection; asked and

13   answered.

14        A.   I don't remember what the unique user [sic] is.

15   I'm sorry.  I can't answer that.

16        Q.   (BY MS. LEONIDA)  You also asked Amber for a

17   list of book request forms.  Right?

18        A.   I think so.

19        Q.   And those are books requested by patrons?

20        A.   That's -- I can't remember if I asked her or

21   not.

22        Q.   Why would you want that list?

23             MR. RIENSTRA:  Objection; vague.  If she

24   doesn't recall the list, how can she recall why?

25        Q.   (BY MS. LEONIDA)  You can answer.

Rochelle Wells
October 17, 2022                                    57

1        A.   All of the items I asked from Amber pertain to

2   one of the committees I was part of.  It was just taking

3   in information and research for research purposes.

4        Q.   For what?  What were you researching?

5        A.   The Advisory Board.

6        Q.   What was the Advisory Board researching that

7   you were collecting information for?

8        A.   Just different types of policies to advise the

9   Commissioners Court on.

10        Q.   What types of policies?

11        A.   There's -- well, gosh.  There's so many.  I was

12   on the PR Committee and I was on the Collections

13   Committee, just to name two that needed research.  I

14   wasn't the only one asking for these from Amber.  We all

15   were asking her for things.

16        Q.   What kinds of policies were you thinking about

17   or researching?  Like, a policy for what?

18        A.   Well, there's -- there's policies regarding the

19   thing in the library system.  So if you touch it, policy

20   for pretty much...

21        Q.   And which ones were you researching?

22        A.   I don't recall all of them because the

23   Collections Committee was a large umbrella under which

24   there were lots of different policies.  I'm sorry.  I

25   can't give you one specific one because there were many.

Rochelle Wells
October 17, 2022                                          58

1        Q.   Do you remember any of them?

2        A.   One that we worked on was a policy regarding

3   biblioteka.

4        Q.   Do you remember any other policies that you

5   were researching?

6        A.   I remember looking at the weeding.

7        Q.   Why did you look at that?

8        A.   Because the Collections Committee felt it was

9   our job to understand how books were chosen, how they

10  were kept, and yeah.

11       Q.   So what exactly was the Collections Committee?

12       A.   Collections refers to the items in the library

13  that they purchased and, therefore, collect.

14       Q.   And what did the Collections Committee do?

15       A.   Collections Committee looked at the policies

16  concerning the collections and to see if they needed to

17  be updated, more specifics, new -- new policy because

18  things had changed since they were last written.

19       Q.   What kinds of things had changed?

20            MR. RIENSTRA:  Objection; form.  And also

21  let her finish her answer.

22            Were you finished?

23            THE WITNESS:  I was finished because it's

24  very general.

25            MR. RIENSTRA:  Okay, Ellen.

Rochelle Wells
October 17, 2022                                    59

1       Q.  (BY MS. LEONIDA)  You can answer, Ms. Wells.
2   What kinds of things had changed?
3       A.  Well, you know, post-COVID world, things had
4   changed.  Internet usage, just the way things were run
5   had changed, and all the Advisory Board agreed that
6   there was a lot of gray in the policy and it needed to
7   be specific.  We had lawyers on the board; they felt
8   exactly the same way.  So we just were doing lots of
9   research to make everything --
10      Q.  I'm sorry.  Go ahead.  I thought you were done.
11      A.  We were doing lots of research in order to
12  present to the Commissioners Court something that we
13  thought would help the library systems.
14      Q.  Are you talking about the weeding policy where
15  there was a lot of gray and you were trying to present
16  something?
17                  MR. RIENSTRA:  Objection; misstates --
18  form, misstates her testimony.
19                  Go ahead and answer.
20      A.  I'm sorry.  I thought you were talking about
21  the Advisory Board and collections.
22      Q.  (BY MS. LEONIDA)  That's what I'm asking to
23  clarify.  When you say there was a lot of gray in the
24  policy, which policy or policies are you talking about?
25      A.  As a whole, the policies to the library system.

Rochelle Wells
October 17, 2022                                    60

```
 1        Q.  Which policies?

 2        A.  All of them.

 3        Q.  Can you just list them then?

 4        A.  No.  There are so many policies.  I'm sorry.

 5   I'm just being honest.  There were so many, I don't

 6   recall.  And I haven't been functioning as a Library

 7   Advisory Board member for many months now, so honestly,

 8   it's hard to recall those things when I'm not working

 9   with them now.

10        Q.  Obviously, you can't recall anything that you

11   don't actually remember, but it sounds like when you're

12   talking about a policy that has some gray in it, you're

13   thinking about a specific thing.  Can you give me -- can

14   you tell me what you were referring to when you said

15   that?

16             MR. RIENSTRA:  Objection; form, misstates

17   her testimony.

18             Answer as best you can.

19             MS. LEONIDA:  I'm going to ask Counsel to

20   refrain from coaching the witness.  You can object as to

21   form, and any verbiage beyond that is improper.

22             MR. RIENSTRA:  Okay.  Ellen, here is what

23   we're going to do.  I'm going to start --

24   Madam Reporter, I'm going to object; form, and I'm going

25   to say vague, misstates testimony, previously answered,
```

Rochelle Wells
October 17, 2022                                              61

```
 1   and then she can answer.  You're right, Ellen.  I'll do
 2   that.  But you've asked her about these policies.  It
 3   sounds like there was gray in one of the policies.  She
 4   previously testified there were a lot of policies that
 5   the board was looking at.  Then you kind of jump and
 6   kind of throw Collections Committee in there, and then
 7   you kind of go into policies again, and she's already
 8   told you she doesn't remember all the policies.
 9               MS. LEONIDA:  I'd like to mark the record
10   at this juncture, Counsel is testifying and making a
11   speech for purposes I can only speculate about.  It is
12   completely improper.  And if Counsel persists in this
13   behavior, I will stop this deposition and seek ruling
14   from the judge.
15       Q.  (BY MS. LEONIDA)  Ms. Wells, when you were
16   talking about gray areas that you thought needed
17   addressing, what were you -- what were you thinking?
18       A.  I was referring in general to the policies, all
19   of them.  I didn't have any particular policy in mind
20   when I said that.
21       Q.  So what's an example of a policy that had a
22   gray area that you thought needed updating?
23       A.  Well, an area, for example, in our computer
24   policies, and the -- one of the committees had to get
25   very specific with the use of and update the language
```

Rochelle Wells
October 17, 2022                                          62

1   for laws which we had attorneys, like I said.  So that's

2   an example of getting specific on the policy and not

3   keeping it general.

4        Q.   Okay.  What's another example?

5        A.   I can't think of anything else right now.

6        Q.   One of the things you asked Amber for was a

7   list of books ordered in 2021.  Is that right?

8        A.   Yes.

9        Q.   Why did you want that?

10        A.   Again, I was -- as part of the Collections

11  Committee, we were taking in -- pardon me -- seeing what

12  was being ordered, the demographics and all those things

13  to see if what was being ordered reflect the patrons.

14        Q.   How were you --

15        A.   I'm sorry.

16        Q.   Go ahead.  You can finish.  Go ahead.

17        A.   That was an easier way than for us to go look

18  at all the books in the library.

19        Q.   And how were you making that determination

20  whether it reflected the patrons?

21        A.   Well, we had Rhonda Schneider on our Advisory

22  Board.  She was the only actual library person who

23  worked in the library, and she's very familiar with the

24  books that the patrons were checking out.  We also --

25  what else?  I mean, I've lived here for nine years.  So

Rochelle Wells
October 17, 2022                                    63

1    I have an idea of the people that come in here, and I

2    know whenever I walk into the library, I know lots of

3    people familiar with, you know, the books -- or I'm

4    sorry.  Can you say the question again, too, so I can be

5    more specific?

6        Q.   Sure.  You said that you were reviewing the

7    books purchased in prior years to see if they reflected

8    the patrons, and I was asking how you made that

9    determination.

10       A.   How they reflected?  Okay.  Yes.  So we looked

11   at just the demographic who, you know, you get from the

12   census, from, you know, the -- how many people were

13   checking out books per month and what -- adult and

14   children, and we were taking all those things into

15   account to see if the books then that we were purchasing

16   reflected the taste of the wants of the patrons in Llano

17   County and not just what the ALA said was popular or

18   different groups say was popular because the librarians

19   get a list of books, hey, you should do this, you should

20   buy these, but they don't necessarily reflect the

21   interest of the people in Llano County.

22       Q.   You said you used the census as part of this

23   determination?

24       A.   Yes.  A census is one of the things that we

25   also researched and had with us.

Rochelle Wells
October 17, 2022                                    64

1          Q.   How did that factor into figuring out what

2    books should be in the library?

3          A.   Well, the census tells you how many older

4    people there are, children, households,

5    married/unmarried, just to get a more accurate view of

6    Llano County.

7          Q.   Did you do like a poll or a survey of Llano

8    County residents to see what they wanted to read?

9          A.   No.

10         Q.   Did you have like an open meeting where you

11   invited people from Llano County to come and tell you

12   what they wanted to read?

13         A.   No.  We had a librarian who was familiar with

14   the different branches and what the patrons had been

15   checking out.

16         Q.   And who was that again?

17         A.   Rhonda Schneider.

18         Q.   And what did she -- how was she familiar with

19   it?  Did she bring you spreadsheets or was she just

20   telling you, like, from her experience?  What

21   information did she give you about what people were

22   checking out?

23         A.   Well, she would say, you know, we have ordered

24   books like this before but they don't get checked out

25   because it's not what the patrons are wanting.  That's

Rochelle Wells
October 17, 2022                                    65

1    one thing I remember her saying.

2         Q.   What was the list of books ordered in 2021?

3    Were you hoping to get rid of the books that weren't

4    popular or what was your thinking there when you asked

5    for that list?

6         A.   No.  The purpose was to make the use of our

7    taxpayer dollars to put into books that the patrons were

8    wanting or needing.  We also asked the schools if there

9    were books that they wanted and not all of them replied,

10   but we were getting as much information as possible to

11   give the best advisement possible.

12        Q.   Okay.  But the list of books that were already

13   there, how was that going to save taxpayer dollars?  I'm

14   just trying to understand.

15        A.   Just to learn from mistakes, you know, how much

16   money is going towards a certain series that isn't

17   popular or a genre where we could put the money into

18   more popular genres or genres that weren't there that

19   were needed.

20             MS. LEONIDA:  So we've been going a little

21   bit.  I'm assuming -- I'm imagining that the court

22   reporter would like a break?

23             THE REPORTER:  I'm fine.

24             MR. RIENSTRA:  We're not opposed.

25             MS. LEONIDA:  I'm sorry.  What was that?

Rochelle Wells
October 17, 2022                                    66

```
 1                    MR. RIENSTRA:  We're not opposed, Ellen.

 2                    MS. LEONIDA:  Okay.  Ms. -- is it

 3  LaChausse?

 4                    THE REPORTER:  LaChausse.

 5                    MS. LEONIDA:  LaChausse.  How long do you

 6  think?  How long do you want?

 7                    THE REPORTER:  Five or ten minutes is fine.

 8                    MR. RIENSTRA:  Let's do ten.

 9                    THE VIDEOGRAPHER:  We're off the record at

10  10:54 a.m.

11                    (Recess taken.)

12                    THE VIDEOGRAPHER:  We are on the record at

13  11:06 a.m.

14       Q.  (BY MS. LEONIDA)  Ms. Wells, I'm going to show

15  you what will be Exhibit 2.

16                    (Exhibit No. 2 was marked.)

17       Q.  (BY MS. LEONIDA)  Do you recognize that?

18       A.  (Witness perusing document.)  I'm still reading

19  it, sorry.  Okay.

20                    I'm sorry.  What was your question again?

21       Q.  Exhibit 2 is an e-mail that you wrote.

22  Correct?

23       A.  It's part of one, yes.

24       Q.  Is there something missing from --

25       A.  No.  I'm sorry.  Just there's other people on
```

Rochelle Wells
October 17, 2022                                    67

1    the e-mail.  It's not just solely my e-mail.

2         Q.  But the part that's highlighted that starts,

3    "On Thursday, November 11, 7:28 p.m., Rochelle Wells

4    wrote," that's the part that you wrote?

5         A.  Yes.

6         Q.  And the entirety of what you wrote is on the

7    screen.  Right?

8         A.  Yes.

9         Q.  Do you know what the Krause list is?

10        A.  The Krause list?

11        Q.  The Krause list.

12        A.  Yes, I'm familiar with it.

13        Q.  What is it?

14        A.  It's a list put together by Mr. Krause,

15   16 pages of books.

16        Q.  What kinds of books?

17        A.  Well, here it says LGBTQ and CRT.

18        Q.  Okay.  It says that because you wrote that?

19        A.  I did write that, yes.

20        Q.  Okay.  When did you first hear of the Krause

21   list?

22        A.  I recall someone sending me an article where it

23   was mentioned.

24        Q.  Who is that person?

25        A.  I don't recall.

Rochelle Wells
October 17, 2022                                           68

```
 1        Q.  Do you recall whether you got that article
 2   shortly before you sent this e-mail or was it a long
 3   time before you sent the e-mail?
 4        A.  I don't recall.
 5        Q.  The article that you're talking about, is that
 6   the article that you attached a link to at the bottom of
 7   this e-mail in The Texan?
 8        A.  Yes.
 9        Q.  Do you know what the purpose of the Krause list
10   was, why Representative Krause put the list together?
11        A.  His purpose, no, I'm not sure.
12        Q.  Why were you interested in it?
13        A.  If I recall it was because there were other
14   cities that had books like the butt book that they were
15   wanting to keep out of the hands of children as well
16   with sexual content, and that's why it was sent to me, I
17   believe, and that's why the person, I believe, said to
18   read the article.  It interested me.
19        Q.  Okay.  What is CRT?
20        A.  It is a -- it's a -- it's a -- well, my -- how
21   I understand it?
22        Q.  Yes.  What did you mean when you wrote "CRT" in
23   this e-mail, for example?
24        A.  My understanding of it are books trying to
25   push, for example, books that encouraged violence to
```

Rochelle Wells
October 17, 2022                          69

1  police officers or pushing one person over another based

2  on their skin tone.

3       Q.  And that's -- the 16-page list of CRT and LGBTQ

4  books, that included books written for adults.  Correct?

5       A.  I'm not sure.

6       Q.  Okay.  Did you look at the list before you sent

7  this e-mail to everybody about it?

8       A.  I don't recall.

9       Q.  Who is Chris Jones?

10      A.  Chris Jones is a woman who lives in Llano

11 County.

12      Q.  Did she send you information about the Krause

13 list?

14      A.  Are you asking me if she was the person who

15 sent -- who told me about the Krause list?

16      Q.  No.  I'm asking -- sorry, I'll be clear.

17           Have you ever talked to Chris Jones about

18 the Krause list or communicated with her in any way

19 about the Krause list?

20      A.  Yes.

21      Q.  What did you and Chris Jones talk about

22 regarding the Krause list?

23      A.  I didn't talk to her about the list.  She had

24 gone through the list and discovered that there was some

25 books on that list in our county system.

Rochelle Wells
October 17, 2022                                    70

1        Q.   How did you feel about that?

2        A.   It didn't surprise me.

3        Q.   Did you have any other feelings about the fact

4   that there were books on the Krause list in your county

5   system?

6        A.   It would depend on the book.

7        Q.   What do you mean by that?

8        A.   Well, just because it's on a list doesn't mean

9   I have any feeling toward it.  I don't know what the

10  book is about.

11       Q.   Okay.  So you wanted to research the contents

12  of all the Krause list books that were in the library.

13  Is that right?

14       A.   Yes.

15       Q.   What did you mean by that?

16       A.   That -- to research the content, not just to

17  take a list and say have these removed.  You need to

18  look at a book first and see what it's about.

19       Q.   And then what if you thought it was

20  inappropriate?  What's the next step?

21       A.   If it's inappropriate, the next step is to

22  either speak with the director or with the commissioner.

23       Q.   To get the book removed from the library?

24       A.   Yes.

25       Q.   And one of the ways that you knew that that was

Rochelle Wells
October 17, 2022                              71

1   an effective way to get the book removed from the

2   library is as it says here because you spoke with

3   Commissioner Moss and Judge Cunningham, and they had

4   books removed at your request.  Is that right?

5       A.  Not at my request, but at the request of many

6   of the people in Llano.

7       Q.  Okay.  You were one of those people that

8   requested to have the books removed.  Right?

9       A.  Yes.

10      Q.  In this e-mail when you say that the

11  commissioner and the judge have instructed the librarian

12  to remove certain books, do you remember which books

13  you're talking about right there?

14      A.  I'm going to read it.  Are you talking about

15  the first paragraph?

16      Q.  The first sentence where it says,

17  "Commissioner Moss and Judge Cunningham have instructed

18  Amber, the head librarian, to remove certain books"?

19      A.  Okay.  What was the question again concerning

20  that sentence?

21      Q.  Do you remember which books you were referring

22  to when you write, "Certain books"?

23      A.  Well, it says here that one of them was Lawn

24  Boy and Gender Queer.

25      Q.  Okay.  Did Commissioner Moss and Judge

Rochelle Wells
October 17, 2022                                    72

1   Cunningham tell you that they had instructed her to

2   remove the books?

3        A.  I don't recall.

4        Q.  Then how did you know that?

5        A.  I am trying to remember how I knew that.  I'm

6   sorry.  I don't believe I spoke with Judge Cunningham,

7   but I was in contact with Commissioner Moss as my

8   commissioner, like I said before, about books or

9   whenever I would find one.

10       Q.  So is he the one that told you that he and

11  Judge Cunningham had instructed Amber, the head

12  librarian, to remove certain books?

13       A.  I don't remember, to be honest.

14       Q.  Did Amber tell you that they had instructed her

15  to remove the books?

16       A.  No.

17       Q.  So if it wasn't Commissioner Moss, who was it

18  who told you that?

19       A.  I'm just being honest with you.  I don't

20  remember who told me.

21       Q.  Okay.  Somebody told you.  Right?

22       A.  Yes.

23       Q.  You weren't there when they instructed Amber to

24  remove the books, were you?

25       A.  No, I was not.

Rochelle Wells
October 17, 2022                                73

1      Q.   Okay.  So somebody told you that they had

2  instructed her to remove the books.  Right?

3      A.   Someone told me, yes.

4      Q.   Okay.  And you don't think it was Judge

5  Cunningham?

6      A.   I don't believe so because I did not speak very

7  much with Judge Cunningham.

8      Q.   Okay.  So it was probably Commissioner Moss?

9          MR. RIENSTRA:  Objection; form, calls for

10  speculation.

11      A.   I don't remember.  I'm not going to say it was

12  him.  I don't remember.  I want to be truthful.

13      Q.   (BY MS. LEONIDA)  We all want you to be

14  truthful, Ms. Wells.

15          When you later write, "Commissioner Moss,

16  we are very grateful for your help in this situation and

17  all you have done," what are you referring to there?

18      A.   I just mean part of helping us to take, I

19  guess, books like Lawn Boy and Gender Queer and the butt

20  book out of the library, books that are being harmful to

21  children.

22      Q.   How did he help you do that?

23      A.   Because as commissioner, he was able to do

24  that.

25      Q.   To do what?

Rochelle Wells
October 17, 2022                                    74

1      A.   Have the books removed.

2      Q.   Do you remember how many times you met with

3   Commissioner Moss -- or let me rephrase that.

4            Do you remember how many times you talked

5   to Commissioner Moss about this issue of inappropriate

6   books in the library?

7      A.   No.

8      Q.   Was it more than ten?

9      A.   I don't know.

10     Q.   Do you remember how many times you e-mailed

11  with Commissioner Moss about the issue of inappropriate

12  books in the library?

13     A.   No.

14     Q.   Did you e-mail Commissioner Moss about

15  inappropriate books in the library ever?

16     A.   Yes.

17     Q.   Did he e-mail you back?

18     A.   Sometimes, I believe so.

19     Q.   Do you happen to remember any of those specific

20  e-mail communications?

21     A.   I mean, they all pertain to the library.

22  That's all.  I just know that they're related to books

23  in the library -- I'm sorry -- because I did e-mail him

24  prior to -- are we talking about prior to me being

25  appointed to the Advisory Board also?

Rochelle Wells
October 17, 2022                                    75

1        Q.  Yes, the entire time you've known him.

2        A.  I'm sorry.  So the whole -- the whole time I've

3   been on the Advisory Board until the first time that I

4   had met him?

5        Q.  Yeah.  In your -- I'm talking about in your

6   entire life.

7        A.  Okay.  I'm just trying to make sure we're not

8   in a certain time period anymore.

9        Q.  Yeah, no time period.

10       A.  So I would write to him about the books, but

11  being an advisory board member, I'd write to him how the

12  board was doing, you know, just because he appointed me,

13  just to keep him in the loop.  Like, we were all doing

14  that.

15       Q.  Who do you mean by "we"?

16       A.  I'm sorry.  The Advisory Board members were all

17  going back to the commissioners just to keep them in the

18  loop that we're working on this or we're working, you

19  know, just because they appointed us.

20       Q.  Okay.  And was it you that was sort of

21  responsible for communicating with Commissioner Moss

22  because he had appointed you?

23       A.  I wouldn't say that.  I wasn't responsible.  I

24  just thought I should communicate with him what was

25  going on because he appointed me.

Rochelle Wells
October 17, 2022                                              76

```
 1        Q.  So not responsible then, but you did
 2   communicate with Mr. Moss about what was going on
 3   because he appointed you.  Is that right?
 4        A.  Yes.
 5        Q.  And he would write back to you?
 6        A.  Not every time.
 7        Q.  But sometimes?
 8        A.  Sometimes.
 9        Q.  Did you talk to him on the phone also?
10        A.  Every now and then.
11        Q.  And did you talk to him in person ever?
12        A.  Yes.
13        Q.  One of the things that you say in this e-mail
14   is that you're going to be sending a list of the books
15   that are found to be inappropriate to Commissioner Moss.
16   Do you see that?
17        A.  Yes.
18        Q.  Tell me more about that.
19        A.  That we were sending a list of the ones that
20   were found on the Krause list to Commissioner Moss.
21        Q.  Why were you going to do that?
22        A.  Because if they were in the minor section and
23   they were harmful, then they shouldn't be in the
24   library.
25        Q.  And Commissioner Moss would get them removed
```

Rochelle Wells
October 17, 2022                                    77

1  from the library?

2           MR. RIENSTRA:  Objection; form,

3  speculation.

4      A.  I don't know.  I don't know that he would take

5  every one off of there, but it would be as a constituent

6  saying, here are the books that I believe are harmful to

7  children that we have in our library.

8      Q.  (BY MS. LEONIDA)  So this paragraph about the

9  16-page list of CRT and LGBTQ books in the library, that

10 paragraph doesn't say anything about children, does it?

11     A.  No.

12     Q.  I'm sorry.  I couldn't hear you.

13     A.  No, but that's who I'm referring to are minors.

14 That's all that I referred to are minors.

15     Q.  Nothing in this e-mail actually refers to

16 minors in that second paragraph rather, right, about the

17 list?

18     A.  No, but -- you're correct.  I never said the

19 word "minors," but that's all my concern was.  Well, it

20 says there, "If you go into the library, you'll see

21 Amber and Tina in the children's section labeling

22 books."  So obviously, my concern is with the minors in

23 the library, not adult books.

24     Q.  When Ms. Jones sent you the list of books that

25 were in the library that were also on the Krause list,

Rochelle Wells
October 17, 2022                                          78

1    did she send that to you in the form of an Excel

2    spreadsheet?

3         A.   Yes.

4         Q.   Did you then take responsibility for reading

5    some of the books on that sheet to see if they were

6    inappropriate?

7         A.   I believe -- I had already looked at some books

8    on the Krause list and researched them, not just to see

9    if they're in our library but just to read what they

10   were about.

11        Q.   Which books?

12        A.   That, I don't recall.  There was a lot of books

13   on the 16 pages.

14        Q.   Which books did you read to see what they were

15   about?  Which did you investigate personally?

16        A.   I don't remember the names of those.

17        Q.   Well, starting with the first one, what was it

18   about?

19        A.   I don't remember.

20        Q.   Do you remember any of them that you

21   investigated personally?

22        A.   No, I don't remember the specifics of them.  I

23   just -- I would start -- I started to -- with the first

24   book, I would go to the author's page from the

25   publisher, blogs that were, you know, more in support of

Rochelle Wells
October 17, 2022                                    79

1    that book.  So I could read excerpts or get excerpts

2    from Kindle if possible or Amazon, things like that.

3         Q.  Do you remember the subject matter of any of

4    the books that you researched?

5         A.  Yes, some.

6         Q.  Okay.  Tell me about it.

7         A.  Well, there were some about sexual experiences.

8    There were some about -- about CRT.  That's what I

9    remember.

10        Q.  Okay.  The ones about -- do you know what CRT

11   stands for?

12        A.  I can't remember what it stands for, but you

13   can tell me.

14        Q.  The books that you researched, you said there

15   was some about CRT?  What was the general nature of the

16   books?

17        A.  It was related to that umbrella of topics.  The

18   one that I recall was pitting races against each other,

19   pitting people with different skin tones against each

20   other.

21        Q.  Do you remember what it was called, by any

22   chance?

23        A.  I don't.  I'm sorry.

24        Q.  Did you think that it was appropriate?

25        A.  No, it's not appropriate to pit people against

Rochelle Wells
October 17, 2022                                    80

1   each other.

2        Q.  Did you think it was appropriate to have that

3   book in the library?

4        A.  I don't remember if that book was in our

5   library.  It's just one of the ones that I remember

6   having read about.

7        Q.  Do you think it's appropriate to have a book

8   like that in the Llano County Library?

9        A.  No, I don't believe it's appropriate to have

10  books where one child thinks he's better than another

11  because of his skin tone.

12       Q.  So the book that you're talking about was about

13  children?

14       A.  Yes, it was a minor's book.

15       Q.  When you talk about sending a list of the ones

16  that are found to be inappropriate along with a summary

17  to Commissioner Moss, what was the criteria for

18  appropriateness that you-all were going to use on that

19  list?

20       A.  I'm a parent, so there's not really criteria.

21  It's just, you know, books that would be harmful to

22  children.  We didn't -- I don't remember discussing with

23  anyone a criteria.  I think it was probably why I wrote

24  the one with the summary so that there is justification

25  for that.

Rochelle Wells
October 17, 2022                                        81

```
 1        Q.   Justification for Commissioner Moss to remove
 2   the inappropriate book?
 3        A.   Justification for why I found it inappropriate
 4   for others.
 5        Q.   Okay.  But you were sending it to
 6   Commissioner Moss to get it removed.  Right?
 7        A.   There -- I don't recall him actually having a
 8   list of things to get removed.  I don't -- maybe I
 9   did -- I wrote this a long time ago -- because I don't
10   remember there being a list of the summary.  So I don't
11   know if that was just something said that never
12   happened.
13        Q.   So the plan was at the time you sent this
14   e-mail on November 11th of 2021, the plan was to send a
15   list of inappropriate books so that Commissioner Moss
16   could get them out of the library, but you're not sure
17   if that ever happened?
18             MR. RIENSTRA:  Objection; form,
19   speculation, assumes facts not in evidence.
20        A.   It says that we would be sending a list of
21   titles and summary, so that's what my intention was or
22   our intentions were based on what it says.
23        Q.   (BY MS. LEONIDA)  So you said that you remember
24   Chris Jones sending you the Excel spreadsheet of all of
25   the Krause list books that were in the Llano County
```

Rochelle Wells
October 17, 2022                                    82

```
 1   Library.  Is that right?
 2        A.  Yes.
 3        Q.  Did you know which of those books were
 4   children's books and which were adult books when you got
 5   that list?
 6        A.  I don't recall.
 7        Q.  Do you remember anybody telling you that they
 8   were only children's books or only adult books?
 9        A.  I don't recall that either.
10        Q.  As you sit here today, is your understanding
11   that that list includes both children's books and adult
12   books?
13        A.  I don't know.
14        Q.  So you still don't know if there are any -- you
15   don't know if there's a single children's book on that
16   list.  Is that fair to say?
17        A.  Well, that's not what you were asking me.  You
18   asked if there were adult and children's books on the
19   list, and I said I don't know.
20        Q.  So do you know if there are any children's
21   books on the list?
22        A.  I believe there were books in the minor section
23   on that list.
24        Q.  And you know that from the spreadsheet?
25        A.  I'm referring to the spreadsheet that Chris put
```

Rochelle Wells
October 17, 2022                                        83

1  together.

2       Q.  So you looked at the spreadsheet that Chris put

3  together?

4       A.  I briefly looked over it.

5       Q.  Okay.  And in looking over it briefly, you saw

6  that some of the books were in the children's section.

7  Is that what you said?

8       A.  I'm saying I can't remember.

9       Q.  Okay.  So I guess that goes back to my original

10 question.  So do you know -- do you know if there were

11 any children's books on that list at all?

12      A.  I believe there were because Chris and myself

13 and everyone else that was concerned for the children of

14 Llano weren't concerned for the adults of Llano, and,

15 therefore, there must have been books in the minors'

16 section on that list.

17      Q.  But you're just speculating?  You didn't look

18 to see if any of the books were in the children's

19 section?

20              MR. RIENSTRA:  Objection; form,

21 argumentative.

22      Q.  (BY MS. LEONIDA)  You can answer.

23      A.  What I've said is, I've already done it.  I had

24 already looked through a lot of that list, and I knew

25 there were books that we had in the children's section

Rochelle Wells
October 17, 2022                                    84

1   already.  And so they must have been on Chris's list,

2   but I don't recall how many were in the adult list, how

3   many were in the minors' list.  I don't remember.

4          Q.  I think I understand now.  So when you looked

5   at it, you saw that there were some books in the

6   children's section, but you don't recall how many.  Is

7   that right?

8          A.  Correct.

9          Q.  Okay.  So then you also would have seen that

10  there were some books in the adult section, and you

11  don't recall how many.  Is that also true?

12         A.  I don't know that I would have recalled books

13  from the adult section because that wasn't where I was

14  concerned.

15         Q.  But you do know that the whole -- all of the

16  entire list that Chris sent you, those were not all

17  books in the children's section.  You know that.  Right?

18         A.  I don't remember if they were mixed or not.

19  I'm just being honest.  I just, honestly, briefly looked

20  at her list because I had started looking at the Krause

21  list myself to research, like I shared with you, and

22  then she said, I've already gone through them all, and I

23  briefly opened up the thing and then I closed it and

24  that was it.  I didn't...

25         Q.  Did you ever look at it again?

Rochelle Wells
October 17, 2022                                    85

1        A.   I might have, but I don't remember.

2        Q.   Do you remember talking to Chris about taking

3   books from the Krause list out of the library so that

4   nobody else could access them?

5        A.   I can't remember.

6        Q.   Is that something that you might have done?

7        A.   I couldn't say that.  I don't remember.

8        Q.   Well, you know yourself.  Is that something

9   that you would do, check out books from the Krause list

10  so that they aren't available in the library?

11            MR. RIENSTRA:  Objection; form, asked and

12  answered.

13       Q.   (BY MS. LEONIDA)  You can answer.

14       A.   Like the butt books, if I found a book that was

15  harmful to a child that could be checked out by a child,

16  I would check it out in order to protect a child.

17       Q.   Would you do that to protect an adult?

18       A.   It's not my job to protect adults.

19       Q.   What would you say to a parent who wanted their

20  children to read one of the fart books about why you

21  don't think it belongs in the library?

22       A.   Can you be more specific about what that

23  conversation would be?

24       Q.   Sure.  If a -- if a parent came up to you and

25  said, I want my child to have access to the fart book in

Rochelle Wells
October 17, 2022                                              86

1   the Llano County Library, why did you remove it, what

2   would you tell her?  How would you respond?

3        A.  I would respond that books that are

4   inappropriate and harmful to children don't belong in

5   our library, but that parents can always buy those books

6   on their own for their children, but that taxpayer money

7   should be spent on books that are not harmful to

8   children or inappropriate.

9        Q.  Once the taxpayer money has already been spent,

10  though, and the fart book is in the library, how does it

11  save taxpayer money to remove it?

12       A.  Well, I already said it's harmful to children.

13  So taxpayers is one side of that coin.  The other side

14  is inappropriate or harmful material for children should

15  not be in the library.

16       Q.  And you think that CRT books are harmful to

17  children.  Is that right?

18       A.  I think that some of the ones that I came in

19  contact with are harmful to children.

20       Q.  And shouldn't be in the library?

21       A.  And should not be in the library.

22       Q.  You also referred to LGBTQ books in that e-mail

23  that you sent.  What do you mean by that?

24       A.  I mean books that are sexual in content, so

25  sexual in content.

Rochelle Wells
October 17, 2022                                      87

1        Q.  Could it have -- so that would include, say,

2   books with descriptions of sexual activity.  Is that

3   right?

4        A.  Yes.

5        Q.  So a Judy Blume book, would that fall in that

6   category?

7        A.  I don't think I've ever read Judy Blume's early

8   books, like Tales of a Fourth Grade Nothing.  Isn't that

9   Judy Blume?

10       Q.  Do you think her books belong in the library?

11       A.  I think if she wrote a book that's

12  inappropriate or harmful to children, then it shouldn't

13  be in the library.  I think she's a great author.

14       Q.  Can you be more specific?  What do you mean by

15  "inappropriate"?

16       A.  I refer to what I said before.  If it's

17  harmful, sexually harmful to children or inappropriate,

18  the example I gave was the fart -- the fart books were

19  the example that I gave encouraging lewd behavior, you

20  know, behavior that would get children in trouble.  And

21  there were books where the behavior might be in a book,

22  but it's -- children are told not to do that or learn to

23  control it, whatever it is.  That's a different context,

24  the context of encouraging inappropriate or lewd

25  behavior or...

Rochelle Wells
October 17, 2022                                    88

1        Q.   Or books that describe sexual activity?

2        A.   Those are harmful books, yes.

3        Q.   You said there's also a young adult section in

4   the Llano County Library.  Did you say that?

5        A.   Yes.

6        Q.   What age ranges are covered in the young adult

7   section?

8        A.   I believe that's junior high, high school.

9        Q.   Do you also believe that it's inappropriate to

10  have books that describe any kind of sexual conduct in

11  the young adult section?

12       A.   For minors, yes.

13       Q.   And by "minors," you mean people under 18?

14       A.   Yes.

15       Q.   Okay.  And that would include -- well, I don't

16  want to put words in your mouth, Ms. Wells.  Would that

17  include books that describe two people kissing?

18       A.   I believe I would need to read this part of the

19  book you're talking about.

20       Q.   Okay.  So if a book just said that two

21  teenagers kissed, would that be disqualifying in your

22  mind?  Should that book be removed from the library?

23       A.   That's the only word that it said in that book

24  that was anything physical, you mean?

25       Q.   Yes.

Rochelle Wells
October 17, 2022                                    89

1        A.   No, it wouldn't be removed.  I don't think it

2   would need to be removed from the library.

3        Q.   Okay.  What if -- what if a book talked about a

4   teenager who was born female but then decided that they

5   were male.  Do you think that's an appropriate book to

6   have in the library in the young adult section?

7        A.   I believe it would depend upon the book and

8   what it's saying.

9        Q.   What would it depend on?

10        A.   The words in the book.

11        Q.   Tell me, like what's an example of words that

12   would be okay and words that would not be okay?

13        A.   An example, things that would not be okay would

14   be -- well, I don't know.  Honestly, I would have to see

15   an example of the book.  You know, if you flipped open

16   to the page of the book and read this chapter, you know,

17   it's very specific to the book.  I would have to see

18   what book you're talking about.  You can't be vague when

19   it comes to something like that.

20        Q.   Do you have a problem -- do you have a problem

21   or do you think it's inappropriate to have books in the

22   Llano County Library where, say, men describe being

23   attracted to other men?

24        A.   Again, I believe it would be -- depend upon the

25   book and the -- how it was worded.

Rochelle Wells
October 17, 2022                                    90

```
 1          Q.  What if there was no mention of sexual contact
 2     at all and a book just talked about a young man being
 3     attracted to another man, is that an appropriate book
 4     for the library?
 5          A.  Again, I would have to see the book itself.
 6     That's -- I would have to see the book, so...
 7          Q.  What do you think about homosexuality,
 8     Ms. Wells?
 9          A.  What do you mean what do I think about it?
10          Q.  Do you approve of it?
11          A.  No.  I'm Christian, and I do not approve of
12     homosexual lifestyle.
13          Q.  Do you think that books that are written about
14     the homosexual lifestyle belong in the library?
15          A.  Again, I would have to read the book.
16          Q.  So you agree that it's possible that a book
17     that's written about gay people being together and in
18     love could be appropriate for the library?
19          A.  I would have to read the book.
20          Q.  So it's possible?
21          A.  Depends on the book.
22          Q.  Have you read any books about LGBTQ issues or
23     with LGBTQ characters?
24          A.  Yes, I have.
25          Q.  Tell me about those books.
```

Rochelle Wells
October 17, 2022                          91

1        A.   There's a book in the library about a little

2   girl.  I say little but junior high school age.  And the

3   whole purpose of the book was it showed that she was a

4   lesbian or that she was going to become a lesbian.  I

5   don't recall the title.  I know you're going to ask me

6   that question.  I just don't remember the title.

7        Q.   So you said the -- I'm sorry.  I don't think I

8   understand.  The purpose of the book was to show what?

9        A.   The little girl's journey to becoming a

10  lesbian.

11       Q.   Okay.  What did you think of that book?

12       A.   I thought it was poorly written, to be honest

13  with you, and I thought it was contrived.

14       Q.   Did you think it belongs in the library?

15       A.   No, I don't think it belongs in the library

16  with confused children because of the -- how contrived

17  it was.

18       Q.   So, in your opinion, that's a book that should

19  be removed from the library?

20       A.   I don't want my children reading that book.

21       Q.   Do you think that book should be removed from

22  the library?

23            MR. RIENSTRA:  Objection; asked and --

24  form, asked and answered.

25       Q.   (BY MS. LEONIDA)  You can answer.

Rochelle Wells
October 17, 2022                                                    92

1        A.   I don't think that book should be in the

2   children's section, in the minor section of the library.

3        Q.   Do you think that book should be removed from

4   the library entirely?

5        A.   No.

6        Q.   In all of the conversations that you had with

7   Commissioner Moss, both before and after you were

8   appointed to the Library Board, did he ever express to

9   you any disagreement with your opinions about what books

10  belonged in the library?

11            MR. RIENSTRA:   Objection; form, vague and

12  speculation.   Calls for speculation and vague.

13       A.   Could you be more particular?

14       Q.   (BY MS. LEONIDA)   Did Commissioner Moss ever

15  disagree with your opinions about what books belonged in

16  the library?

17       A.   I don't recall discussing many books with him,

18  other than the butt book and the fart books, in detail.

19       Q.   Well, you remember that e-mail that we were

20  looking at, Exhibit 2, where you were thanking him for

21  removing books from the library?

22       A.   Yes.

23       Q.   So you talked about those books also?

24       A.   Okay.

25       Q.   Right?

Rochelle Wells
October 17, 2022                                              93

1          A.   The other two books, yes.

2          Q.   Okay.  And I believe you testified that you had

3    many conversations, either phone or e-mail or in person,

4    with Commissioner Moss about appropriate books for the

5    library?  Did you say that?

6          A.   Yes, but I wasn't referring to an exhaustive

7    list.

8          Q.   I'm just saying during -- I'm asking, not

9    saying.  I'm asking, during those many conversations

10   that you had with him, did he ever disagree with you

11   about not specific books but about your general ideas

12   about what belonged in the library?

13         A.   I don't recall.

14         Q.   You forwarded him e-mails about the -- what the

15   Library Advisory Board was doing.  Is that right?

16         A.   If I forwarded him or if I just wrote to him

17   about how the meeting went.

18         Q.   And why did you do that again?

19         A.   Because I was appointed by him.

20         Q.   Did he ask you to report back to him because

21   you were appointed by him?

22         A.   Not that I recall.  Just to keep him, you know,

23   abreast of what was going on.  Like I said, all of the

24   Advisory Board members did the same thing.

25         Q.   Did he ask you to keep him abreast of what was

Rochelle Wells
October 17, 2022                                    94

1  going on?

2      A.  Not the specific words, but yeah, just, you

3  know, let me know how it's going, if you need any help.

4      Q.  We were talking earlier about how -- is it

5  Rhonda Schneider who was a librarian?

6      A.  Yes.

7      Q.  You said that she helped you -- she helped you

8  figure out books that weren't good for the community and

9  not getting checked out.  Is that right?

10     A.  No, she didn't -- she gave her -- she told us,

11  you know, about the books that were being checked out

12  that were the popular books or books that were ordered

13  maybe that never were checked out, and that was, you

14  know...

15     Q.  Did you talk to any other librarians about

16  things like that?

17     A.  I know we had a list of the books from the

18  Lakeshore Library.  It was -- no.  No, because the

19  librarians weren't exactly nice to me wanting to discuss

20  it.

21     Q.  Did you try to talk to the librarians about

22  which books were getting checked out?

23     A.  No.  We had -- we had started doing that and

24  put some of that on pause because we were working on

25  biblioteka.  So we started getting information, and then

Rochelle Wells
October 17, 2022                                    95

1    just kind of stopped so that we could get the biblioteka

2    up and running for the patrons to help to get that

3    started.

4         Q.  Which librarians did you talk to about what

5    books were being checked out?

6         A.  No.  I only got the list.

7         Q.  Okay.

8         A.  We only got the list, and, you know, we were

9    talking about it with Rhonda and sort of her list

10   because she would be the one who recognized the titles

11   or authors that were popular.

12        Q.  I'm going to show you what's going to be

13   Exhibit 3.

14                (Exhibit No. 3 was marked.)

15        Q.  (BY MS. LEONIDA)  Just let me know when you

16   need me to scroll down.

17        A.  (Witness perusing document.)  Okay.  You can

18   scroll.  At the bottom of the page, is that the end of

19   it or are you scrolling?

20        Q.  Let me go up a bit more.

21        A.  Thank you.  Okay.

22                MR. RIENSTRA:  Is that it, Ellen?  Is that

23   the whole of the exhibit?

24                MS. LEONIDA:  Yeah.

25        Q.  (BY MS. LEONIDA)  So, Ms. Wells, this is an

Rochelle Wells
October 17, 2022                                        96

1    e-mail that you sent to Commissioner Moss.  Is that

2    right?

3         A.  Yes.

4         Q.  About a library board meeting.  Correct?

5         A.  Yes.

6         Q.  Okay.  So I'm just going to ask you some

7    questions about the parts that are highlighted, and the

8    highlighting is mine.  It's not on the original exhibit.

9         A.  Okay.

10        Q.  So one of the things that you noted was that it

11   was asked that Amber not be present at all Library Board

12   meetings.  Why did you not want her at the meetings?

13        A.  To be honest with you, I don't remember

14   anymore.

15        Q.  You also said in this e-mail down here, you

16   asked Commissioner Moss if he would be able to persuade

17   Judge Cunningham to keep the meetings closed and include

18   only appointed board members.  Do you see that?

19        A.  Oh, okay.

20             MR. RIENSTRA:  Right there.

21        A.  Sorry.  Your cursor was not next to it, so I

22   was trying to find it.  Okay.  The last paragraph, yes.

23        Q.  (BY MS. LEONIDA)  So why -- why were you asking

24   Commissioner Moss to persuade Judge Cunningham to keep

25   the meetings closed?

Rochelle Wells
October 17, 2022                                    97

```
 1              MR. RIENSTRA:  Objection; form, asked and
 2   answered.
 3              THE WITNESS:  I -- I need to respond?
 4              MR. RIENSTRA:  Yeah, go ahead and answer.
 5         A.  To refer back to my answer before, the words
 6   that were taken were being used as gospel.  We sort of
 7   knew that already.  We couldn't discuss anything because
 8   the discussion didn't mean that it was -- anything was
 9   going to happen.  We still had to discuss and then
10   advise.  That's why we asked for closing until we could
11   get more accomplished.
12         Q.  (BY MS. LEONIDA)  I don't think I understand
13   what you mean by your words were taken as gospel.
14         A.  I mean something that was being said just for
15   the sake of discussing an idea, it was taken as this is
16   what the Library Advisory Board wants to do.  This is
17   what they're going to do.  This is what Llano County is
18   going to do just because a word came out of our mouth,
19   and so that's why.
20         Q.  Was that happening at the board meetings or in
21   newspapers?  What do you mean by --
22         A.  Well, both, yes.
23         Q.  Can you explain?
24         A.  Just that yes, people were saying Advisory
25   Board was going to do this, yes.  The newspaper
```

Rochelle Wells
October 17, 2022                                        98

1  sometimes would write things that was not true, and

2  that's why.

3      Q.  What's an example of that, the newspaper

4  writing something that wasn't true?

5      A.  I cannot recall a specific example.

6      Q.  Okay.  Then what's an example of somebody

7  saying that the Library Board made a decision that you

8  hadn't actually made?

9      A.  Well, I refer back to the biblioteka again,

10  something that we had said during our board meeting

11  being used as a reason to invalidate biblioteka even

12  though that wasn't the reality and it's because

13  something that had been said at the board meeting.

14      Q.  Will you be a little more specific?  I think

15  it's hard to understand without knowing what was said.

16  It's a little vague.

17      A.  Yeah.  I don't remember the specific, but I

18  remember it was a question about biblioteka that had

19  come up from the Advisory Board because that's what we

20  do.  The Advisory Board, we ask questions in order to

21  come up with the best advice, advisement to the

22  Commissioners Court.  And someone was there just at the

23  board meeting while it was open and said, well,

24  biblioteka doesn't have D&D, but it wasn't true because

25  I had gone back and done research and gotten answers

Rochelle Wells
October 17, 2022                                                99

1    that it had D&D.  I'm sorry.  I wish I could be specific

2    to what D&D were but that's -- I don't recall.  I

3    remember hearing that and going that's because you only

4    heard part of our discussion.  You didn't get to hear

5    the other part of the discussion or the answer.

6         Q.  And that's what led you to ask

7    Commissioner Moss to ask Judge Cunningham to close the

8    meetings?

9         A.  That was one of the thoughts behind it.

10        Q.  Any other thoughts?

11             MR. RIENSTRA:  Objection; form, asked and

12   answered.

13        A.  That was my thought behind it.  I was not the

14   only person in that certain e-mail that wanted a closed

15   meeting.

16        Q.  (BY MS. LEONIDA)  Now, turning your attention

17   to this top part here where you write, "Onto the stuff

18   not in the meeting notes," why was there stuff not in

19   the meeting notes that you wanted to write to

20   Commissioner Moss about?

21        A.  Minutes are not specific.  They're very black

22   and white.  This is what we did, what we voted on.  This

23   is who was present.  But anyone at the meeting would

24   know all the details of how the different votings had

25   happened or the different discussions that had occurred.

Rochelle Wells
October 17, 2022                                                    100

1    And so because Commissioner Moss wasn't there, I was

2    filling him in on everything that had been said that he

3    wouldn't have been able to hear that other people had

4    heard, other library patrons or citizens.

5         Q.   Commissioner Moss was never a member of the

6    Library Advisory Board, was he?

7         A.   No, he can't be.

8         Q.   Directing your attention to this -- the first

9    paragraph of the stuff that's not in the meeting notes,

10   it looks like the National Coalition Against Censorship

11   wrote a letter about -- well, about what?

12        A.   About the In the Night Kitchen book and It's

13   Perfectly Normal.

14        Q.   What did the letter say?

15        A.   I don't remember everything, but it was

16   against -- it was -- it was for having those books in

17   the library.

18        Q.   Were those books that you had asked

19   Commissioner Moss to remove?

20        A.   No.

21        Q.   So how did those books get removed?

22        A.   It is my understanding that Tina showed them to

23   Commissioner Moss as examples of books that she thought

24   shouldn't have been in the library.

25        Q.   How do you -- how did you come to that

U.S. LEGAL SUPPORT, INC
713-653-7100

Rochelle Wells
October 17, 2022                                            101

1   understanding?

2        A.   That's what I had heard.  That's from my

3   memory.  That's what I had heard.

4        Q.   Who did you hear that from?

5        A.   I believe Commissioner -- I believe it was

6   Commissioner Moss when he went to Tina, you know, to get

7   the butt books removed, and is there anything harmful to

8   children in here, and she went to It's Perfectly Normal.

9        Q.   So -- and it sounds like you had that

10  conversation before.  In parentheses here you say, "By

11  the way, some of us saw the photos.  They were

12  disgusting.  So thank you for making her remove It's

13  Perfectly Normal."  So there it looks like you're

14  thanking him for making her remove It's Perfectly Normal

15  from the library.  Right?

16             MR. RIENSTRA:  Objection; form, vague,

17  assumes facts not in evidence.

18        Q.   (BY MS. LEONIDA)  You can answer.

19        A.   It is a harmful book that needed to be removed

20  from the library.  It's not for children.

21        Q.   And you're thanking Commissioner Moss for

22  making her remove it in this e-mail.  Is that right?

23        A.   Yes.  I'm thanking him for having the book

24  removed.

25        Q.   It looks like another concern that you have in

Rochelle Wells
October 17, 2022                                    102

```
 1   this first paragraph and the stuff in the meeting notes
 2   section, like another concern that you're having is how
 3   the Coalition Against Censorship found out which books
 4   had been removed?
 5        A.  Mm-hmm.
 6        Q.  How was it concerning to you?
 7        A.  It was concerning to me as a citizen of Llano,
 8   as a patron of Llano.  I didn't know that other books
 9   had been removed from the library.  I didn't find out
10   until I received a link to the NCAC letter from a friend
11   who asked me if I knew about this.
12        Q.  And if you actually look at -- go ahead and
13   read this paragraph to yourself again.  It looks from
14   this letter like the concern is that you're trying to
15   figure out how NCAC got the information about which
16   books were removed.  Right?
17        A.  Yes.  I thought that's what I just said.  I'm
18   sorry.  That's what I was meaning, how they got the
19   information.
20        Q.  Why was it a problem how they got the
21   information?  Why would it matter to you?
22        A.  Well, why would a national coalition of any
23   sort -- have any sort of interest?  How would they know
24   the goings-on of Llano County Library?  That was my
25   question.
```

Rochelle Wells
October 17, 2022                                        103

1          Q.   Do you think it would have been inappropriate

2    for a librarian to give them that information?

3          A.   Yes.

4          Q.   Why?

5          A.   Because it's bringing in an outside entity that

6    doesn't want to help Llano.  I remember reading the

7    letter, and it was concerning to me because of the books

8    that they were promoting.  This wasn't like, you know,

9    Tom Huff or -- It's Perfectly Normal has graphic sexual

10   drawings in it, and so National Coalition Against

11   Censorship that wants those books in the hands of minors

12   is disturbing to me.

13         Q.   Was that another reason that you wanted the

14   Library Advisory Board meetings closed so outside

15   agencies like this NCAC wouldn't kind of interfere with

16   Llano County business?

17         A.   No.

18         Q.   So I want to direct your attention to this

19   paragraph here, "On this same note, someone reminded her

20   that she said in Commissioners Court that no books were

21   removed.  She said that meant no books were removed in

22   December.  Chris Jones and another patron told me of

23   several books placed into the book sale section of the

24   library that had been inappropriate books.  Is there a

25   reason why she would not be forthcoming with this

Rochelle Wells
October 17, 2022                                           104

```
 1  information?"  Can you just sort of explain to me what's

 2  going on in that paragraph, what the question is and

 3  what the concern is?

 4       A.  We were just wondering why we had one answer

 5  but heard another.  That's just -- that's all I said.

 6       Q.  Okay.  So what was -- what was the answer that

 7  you had and what was the answer that you heard?  What

 8  was the discrepancy there?

 9       A.  Well --

10            MR. RIENSTRA:  Objection; asked and

11  answered, but you can answer.

12       A.  Amber said in Commissioners Court that no books

13  removed but when patrons of the library said that they

14  saw some of those books that had been deemed

15  inappropriate in the book sale section, therefore

16  removed.  We're just wondering, it sounds here, that

17  we're wondering why she just didn't say that.  That's

18  what I'm reading there.

19       Q.  (BY MS. LEONIDA)  What you're reading is an

20  e-mail that you wrote.  Correct?

21       A.  Yes.  Yes.

22       Q.  Okay.

23       A.  I wouldn't remember that if you hadn't shown me

24  the e-mail.

25       Q.  Now that you're looking at it, you remember?
```

Rochelle Wells
October 17, 2022                                    105

1          A.   Right.  I only remember that part of it.

2   That's all I remember.

3          Q.   Did you ever get an answer to that question as

4   to why she would not be forthcoming?

5          A.   I don't know.

6          Q.   At some point you picked up the CREW Weeding

7   Manual in January, is that right, January of 2022?

8          A.   Yes, I picked up something called CREW.

9          Q.   Why did you pick that up?

10         A.   I can't remember what was -- can you tell me

11  what was in that?

12         Q.   If CREW was a Weeding Manual --

13         A.   CREW is a Weeding Manual.  It's the -- per the

14  Weeding Manual.

15         Q.   Yeah.  Well, if CREW was the Weeding Manual --

16  well, let me rephrase it.  I don't want to tell you

17  anything that you don't know.  Did you pick up a Weeding

18  Manual, even if you don't remember what it was called?

19         A.   Yes, I did pick up a Weeding Manual.  Okay.  I

20  got it.

21         Q.   Why were you interested in the Weeding Manual?

22         A.   As part of Collections Committee as one of

23  the -- well, if it's collections, and so I wanted to get

24  our hands on all the information we could about how

25  collections works to understand the processes.

Rochelle Wells
October 17, 2022                                        106

1        Q.   Was the Collections Committee formed -- already

2    formed before you joined the Library Advisory Board or

3    was it a committee that was created after you joined?

4        A.   It was created.  All the committees were new.

5        Q.   Was the -- let me ask you, what's the best way

6    for you to refer to that Excel spreadsheet that Chris

7    Jones sent you of Krause books that were in the Llano

8    County libraries?  What do you call that spreadsheet, if

9    anything?  What's the best way to refer to it so you

10   know what I'm talking about?

11       A.   Chris Jones list.

12       Q.   Chris Jones list.  The Chris Jones list, did it

13   go to every member of the Library Advisory Board?

14       A.   I don't know.  I don't know.

15       Q.   Did you ever talk about the Chris Jones list

16   with other members of the Library Advisory Board?

17       A.   As an advisory board member?

18       Q.   At all.

19       A.   No.  Rhonda Schneider is a friend, so I would

20   have spoken to her about that, but I don't know of

21   anyone else.

22       Q.   Rhonda Schneider is also an advisory board

23   member?

24       A.   Yes.

25       Q.   Okay.  So just to be clear, I'm not asking

Rochelle Wells
October 17, 2022                                    107

```
 1    about whether this was an official conversation in your

 2    capacity as a member of the Library Board.

 3                 MR. RIENSTRA:  Objection; form.

 4         Q.  (BY MS. LEONIDA)  Just who you talked to about

 5    the Chris Jones list, anybody besides Rhonda Schneider?

 6         A.  I don't -- I don't think so.

 7         Q.  What did you and Ms. Schneider talk about

 8    regarding the Chris Jones list?

 9         A.  That, I don't remember.  I just know that we

10    probably would have -- it would have come up, you know.

11         Q.  Do you remember talking to her about it?

12         A.  In particular, no, I don't.

13         Q.  Who else was on the Collection Committee with

14    you?

15         A.  It was Nancy Miller, Gay Baskin, Rhonda

16    Schneider, Robin Tibbs, and myself.

17         Q.  Did the Collection Committee ever come up with

18    any criteria for evaluating books?

19         A.  No.

20         Q.  Did the Collection Committee ever use or talk

21    about using any kind of form for evaluating books?

22         A.  It came up once, but like I said, all of our

23    discussions were tabled once biblioteka came into focus,

24    so yeah.

25         Q.  Did the Collection Committee ever discuss ways
```

Rochelle Wells
October 17, 2022                                          108

1  to keep inappropriate books out of the library system?

2        A.  We discussed how -- not very -- maybe once or

3  within the time that we talked, how to come up with an

4  objective form for when people had an objection to a

5  book.  That was about as far as it got, though, from my

6  memory.

7        Q.  Do you mean a complaint form for people to

8  complain about books?

9        A.  I mean if we can call it that, but I guess you

10 could call it that.

11       Q.  What did you call it?

12       A.  We didn't have a name for it.  We just

13 discussed that it was an issue really to collections

14 that we were going to probably need to address, you

15 know, as an advisement role.

16       Q.  That what was an issue related to collections?

17       A.  Parents in particular thinking -- objecting to

18 certain books and having a way for them to do that.

19       Q.  Was the form going to be limited to parents?

20       A.  No.  That was just in my -- remember, I'm a

21 mom, so I'm thinking like that, but I can't speak for

22 what the other collection members are thinking.

23       Q.  Did the discussion center around creating a

24 form that people could use to object to books that they

25 thought were inappropriate for the library?

Rochelle Wells
October 17, 2022                                          109

1        A.   Yes.   It would be a form related to objections,

2   but we also discussed forms related to books we'd like

3   to see in the library, you know every -- the whole gamut

4   of things.   It wasn't a major focus.   Just brainstorming

5   all the things that we might need to address as a

6   Collections Committee and research.

7        Q.   One of the things that you mentioned in -- I

8   believe it was Exhibit 2, one of your e-mails that we

9   looked at, was that in addition to getting the books

10  that you thought were inappropriate removed, that the

11  Judge and Commissioner Moss also said that no new books

12  would be purchased until this was settled.   Do you

13  remember that?

14       A.   Yes.

15       Q.   Do you recall writing that?

16       A.   Yes.

17       Q.   What was the -- what was the point of that?

18  Why not buy any new books?

19       A.   I believe the e-mail is just giving

20  information.   Can you put the e-mail back up, please?

21       Q.   Sure.

22            MR. RIENSTRA:   You doing okay?

23            THE WITNESS:   I need more water.

24            MR. RIENSTRA:   We'll get you more water.

25            We may need a break in a bit, Ellen, but go

Rochelle Wells
October 17, 2022                                                     110

```
1    ahead with a series of questions till you get to a
2    point, please.
3         Q.  (BY MS. LEONIDA)   Just let me know when your
4    memory is refreshed.
5              MR. RIENSTRA:   Okay.
6         A.   Oh, this part, yes.
7              MR. RIENSTRA:   The second sentence in the
8    second paragraph, okay.
9         A.   I'm sorry.   What was the question regarding
10   that sentence?
11        Q.  (BY MS. LEONIDA)   Okay.   So that sentence,
12   you're updating everybody in your conversation with
13   Commissioner Moss and Judge Cunningham, right, in that
14   e-mail?
15        A.   I believe -- put it up there one more time so I
16   can see.
17        Q.   Yeah.
18        A.   Is it possible to scroll up so I can see the
19   context?
20        Q.   Up would be the person responding to you.   Do
21   you mean down?   Do you want what you're responding to?
22        A.   Okay.   Yes.
23        Q.   Okay.   So here, let's start from the bottom.
24        A.   That's the bottom?
25        Q.   Mm-hmm.
```

Rochelle Wells
October 17, 2022                                          111

1        A.   Okay.   Okay.   So then repeat your question,

2   please.

3        Q.   Okay.   So to help you put it in context, so

4   November 1st, Chris Jones writes an e-mail to see if

5   anybody is interested to see if any of the Krause list

6   books are in the library and is looking for volunteers,

7   right, to help with that process?

8        A.   Yes.

9        Q.   Okay.   Then it looks like later that day also

10  November 1st, Eva Carter volunteers to help with that.

11  Right?

12       A.   Yes.

13       Q.   Okay.   And then is -- your e-mail is on

14  November 11th reporting back on a conversation that you

15  had with Commissioner Moss and Judge Cunningham.   Right?

16       A.   Yes.   Or it could be related to Commissioners

17  Court.   There were lots of parents who were upset by

18  content they discovered in the library.   And so as a

19  parent or a person of Commissioners Court, I would just

20  tell the families who were involved or wanting to be

21  involved or wanting to know what was going on what was

22  going on.   That's all that was.

23       Q.   So what you're telling the families to keep

24  them updated is that Commissioner Moss and

25  Judge Cunningham have instructed Amber to remove certain

Rochelle Wells
October 17, 2022                                                    112

1   books, and that no new books are coming in until this is

2   settled.  Is that right?

3        A.  Yes.

4        Q.  So my question was the second part of that, why

5   no new books coming in until this was settled, why was

6   that important?

7        A.  It was just information.  I don't recall the

8   importance.

9        Q.  You don't recall why they did that?

10       A.  Oh, you asked me why the importance of putting

11  it in the e-mail?  I thought you meant --

12       Q.  Oh, no.  I meant what was the -- sorry.  That

13  was a bad question then.

14            You mentioned that no new books were coming

15  in until this was settled.  Why was it important that no

16  new books come in until this is settled?  Why was that a

17  factor of the plan to protect the children?

18            MR. RIENSTRA:  Objection; form, assumes

19  facts not in evidence, calls for speculation.

20       A.  I thought it came from the judge and

21  Commissioner Moss, so I wasn't involved in that

22  decision.

23            MS. LEONIDA:  Okay.  I think this is a good

24  time to take a break.  Let's take ten minutes, and I'll

25  see you back at 12:30.

Rochelle Wells
October 17, 2022                                                    113

```
 1                    THE WITNESS:  Okay.

 2                    THE VIDEOGRAPHER:  We're off the record at

 3   12:20 p.m.

 4                    (Recess taken.)

 5                    THE VIDEOGRAPHER:  We are on the record at

 6   12:35 p.m.

 7       Q.  (BY MS. LEONIDA)  Ms. Wells, you said in

 8   response to a question earlier that the librarians

 9   weren't nice to you.  What do you mean by that?

10       A.  I mean, they weren't nice to me.

11       Q.  How so?

12       A.  Just how they treated me.

13       Q.  How did they treat you that wasn't nice?  What

14   did they do or say that was not nice?

15       A.  They were short.

16       Q.  All of them?

17       A.  Not all.

18       Q.  Which ones?

19       A.  I don't remember.

20       Q.  Any other complaints about how the librarians

21   treated you?

22       A.  I don't believe I was complaining.  I was just

23   telling you.

24       Q.  Are there any other -- any other things that

25   the librarians did that contributed to you saying that
```

Rochelle Wells
October 17, 2022                                    114

1    they were not nice to you, other than being short?

2         A.   Not that I can remember.

3         Q.   Do you remember the first time that you talked

4    to Judge Cunningham about an issue that you had with the

5    library?

6         A.   What do you mean?

7         Q.   Do you remember what year it was when you first

8    talked to Judge Cunningham about any kind of problem

9    that you were having with the Llano County Library?

10        A.   Are you referring to about books?

11        Q.   No.  I'm referring to anything, any library

12   issue, whether it was Virgin Sex book, the butt book.

13   Do you remember when you first contacted him about a

14   library issue?

15        A.   I just remember it was last year.

16        Q.   And do you remember what the first issue was

17   that you had or what you contacted him about the first

18   time?

19        A.   The butt books.

20        Q.   Okay.  Did you ever get in touch with him about

21   transparency in ordering books?

22        A.   Yes.

23        Q.   Tell me about that.

24        A.   I talked to him about being transparent in book

25   orders.

Rochelle Wells
October 17, 2022                                    115

1          Q.   What do you mean by that?

2          A.   I mean -- I meant -- I believe I meant for the

3     children's section, for minors' section to have an idea

4     of what might be ordered so the parents could see what's

5     coming into the section and make suggestions or -- yes,

6     make suggestions.

7          Q.   What did he say about this when you talked to

8     him?

9          A.   I believe that he spoke with Amber.

10         Q.   Did you ever follow up with him or Amber about

11    that?

12         A.   Yes.

13         Q.   Tell me about that.

14         A.   I e-mailed him and asked about it.

15         Q.   What did you ask?

16         A.   If he had spoken to Amber about what we had

17    talked about.

18         Q.   Did he ever respond to you?

19         A.   Yes.

20         Q.   And what did he say?

21         A.   I don't remember the exact words, but

22    essentially no.

23         Q.   No, he hadn't talked to Amber, or no, there was

24    not going to be any transparency?

25         A.   The latter.

Rochelle Wells
October 17, 2022                                                        116

1        Q.   Did he explain why?

2        A.   Yes.

3        Q.   What did he tell you in that regard?

4        A.   I believe he said that Amber said they posted

5    the books they had ordered.

6        Q.   And what did that mean in terms of the

7    transparency that you wanted?

8        A.   That --

9             MR. RIENSTRA:   Objection; form, vague.   Go

10   ahead.

11        Q.   (BY MS. LEONIDA)   You can answer.

12        A.   Can you restate the question, please?

13        Q.   Yeah.   You said that he said that Amber posted

14   a list, and I'm asking you what that meant in terms of

15   the transparency.   You said that he said no to

16   transparency, and that the reason he gave you was that

17   Amber posted a list.   I'm just trying to figure out the

18   connection between those two things.

19        A.   Amber said she had posted the list of the books

20   that once they were ordered and were coming or that were

21   out for the month and which I was familiar with being a

22   patron, and that was the answer that I received that was

23   sufficient.

24        Q.   Just to make sure I understand, so you were

25   looking for a way to input the list before the books

Rochelle Wells
October 17, 2022                                    117

```
 1   were ordered.  Is that right?  Is that what the

 2   transparency was about?

 3        A.  It was so the parents could have input into

 4   what was coming into the minors' section, yes.

 5        Q.  And his response was that you could not have

 6   input before, but you could see the list after?

 7             MR. RIENSTRA:  Objection; form, calls for

 8   speculation, best evidence rule.

 9        Q.  (BY MS. LEONIDA)  Is that what he said to you?

10        A.  He said that -- it was an e-mail.  I'm trying

11   to remember.  That that was the answer.  That was the

12   response.

13        Q.  That what was the response?

14        A.  The response that Amber already had the books

15   ordered.  That was my answer.

16        Q.  Who is Eva Carter?

17        A.  Eva Carter is a resident of Llano County.

18        Q.  Do you know her?

19        A.  Yes.

20        Q.  How do you know her?

21        A.  I know her from church.

22        Q.  What church is that?

23        A.  I met her at a church.

24        Q.  Which church did you meet her at?

25        A.  PABC.
```

Rochelle Wells
October 17, 2022                                          118

1        Q.   How long ago did you meet her?

2        A.   Nine years ago.

3        Q.   Are you friends?

4        A.   Yes.

5        Q.   Have you talked to Eva Carter about

6    inappropriate books in the Llano County Library?

7        A.   Yes.

8        Q.   What have you talked to her about?  What have

9    you said to her about inappropriate books in the

10   library?

11       A.   Well, I spoke to her about the butt book.

12       Q.   What did you tell her about the butt book?

13       A.   What I had seen and why it could cause

14   children -- how it could cause children to be molested,

15   and she agreed.

16       Q.   Did you talk about the next steps and what to

17   do about the butt book?

18       A.   Well, I told her I was going to go to Amber and

19   Tina.

20       Q.   What did she say to that?

21       A.   I just was giving her -- I just was telling her

22   what I was going to do.

23       Q.   Was she supportive?

24       A.   Yes.

25       Q.   Did she have any other ideas about how to get

Rochelle Wells
October 17, 2022                                              119

1    the butt book out of the library?

2        A.   She thought that talking to Amber and Tina was

3    a good idea.

4        Q.   Did you talk to her again after you talked to

5    Amber and Tina?

6        A.   Yes.

7        Q.   What did you talk about then?

8        A.   Talked about -- she suggested we go to

9    Judge Cunningham.

10       Q.   Did she say why?

11       A.   I don't remember why she suggested that.

12       Q.   What did you think of that idea?

13       A.   I was willing to go with her as a parent.

14       Q.   And did you go with her to see Judge Cunningham

15   together?

16       A.   Yes.

17       Q.   Was that before or after you talked to him

18   about transparency and book orders?

19       A.   I said that at the meeting, at our meeting.

20       Q.   Had you ever met with Judge Cunningham before?

21       A.   No.

22       Q.   I'm sorry.  I couldn't hear you.

23       A.   No.

24       Q.   Okay.  Did Eva Carter say anything at the

25   meeting with Judge Cunningham?

Rochelle Wells
October 17, 2022                                        120

```
1         A.  Not very much.

2         Q.  Do you remember what she did say?

3         A.  I remember her introducing me to the judge.

4         Q.  So she already knew him?

5         A.  Yes.

6         Q.  Do you know how she knew him?

7         A.  No.

8         Q.  Do you work?

9         A.  I'm sorry?

10        Q.  Do you work?  Do you have a job?

11        A.  I -- I am self-employed.

12        Q.  What do you do?

13        A.  I own an Airbnb.

14        Q.  Is that your only job?

15        A.  Yes.

16        Q.  Are you a member of any organizations?

17        A.  You mean in Llano?  In -- or what do you mean?

18        Q.  Anywhere.  Any organizations?  Clubs?

19        A.  I'm sure I do, yes.  I am on the board for the

20   Llano Youth Soccer Association.  Is that what you mean,

21   something like that?

22        Q.  I'd like to know all of the clubs or

23   associations that you're affiliated with.

24        A.  Okay.  The Llano Tea Party.  I'm sure there are

25   others, but I can't think of any.
```

Rochelle Wells
October 17, 2022                                          121

```
 1        Q.  Are there any other meetings that you go to

 2   besides the Soccer Association and the Tea Party?

 3        A.  I can't -- not that I can -- not that I can

 4   recall.

 5        Q.  How often does the Soccer Association meet?

 6        A.  I am new to it, but not very often and then

 7   very often right before soccer season.

 8        Q.  When did you join the Soccer Association?

 9        A.  This last month I was asked to be on the board.

10        Q.  Have you talked to anybody at the Soccer

11   Association about anything going on with books or the

12   library in Llano?

13        A.  No.

14        Q.  What about the Tea Party?  How long have you

15   been a member of the Llano Tea Party?

16        A.  I think I joined last year.

17        Q.  Have you talked to anybody in the Llano Tea

18   Party about books or books in the library system or

19   anything that's going on with books in the Llano County

20   Library?

21        A.  Yes.

22        Q.  Who have you talked to?

23        A.  I'm not sure.

24        Q.  Is it something you talked about at meetings?

25        A.  Well, people would come up and ask me.
```

Rochelle Wells
October 17, 2022                                    122

1          Q.   Ask you what?

2          A.   About the books because they would read the

3    paper.

4          Q.   What kinds of questions were people asking you?

5          A.   I don't remember.

6          Q.   Other than your attorneys -- I never want you

7    to tell me anything that you talk about with your

8    attorneys -- have you talked to anybody else about this

9    lawsuit?

10         A.   My husband.  I told --

11         Q.   Have you talked -- oh.

12         A.   -- my family, my friends.

13         Q.   What have you talked to your friends about

14   regarding the lawsuit?

15         A.   That I was being sued.

16         Q.   What did you tell them you were being sued

17   about?

18         A.   Regarding harmful books in the library that I

19   objected to.

20         Q.   Did you tell them what your role in the lawsuit

21   was?

22         A.   I don't know what my role in the lawsuit is.

23         Q.   I'm going to show you what will be Exhibit 4.

24              (Exhibit No. 4 was marked.)

25         Q.   (BY MS. LEONIDA)  Do you know what that is,

Rochelle Wells
October 17, 2022                                          123

1    Ms. Wells?

2         A.   Yes.

3         Q.   What is it?

4         A.   It says, "Harmful content analysis."

5         Q.   Have you seen it before?

6         A.   Yes.

7         Q.   So what is it?

8         A.   It's harmful content analysis.

9         Q.   Is it a form?  What can you tell me about this

10   document?

11        A.   It is a form, yes.

12        Q.   Where did it come from?

13        A.   It came off the Internet.

14        Q.   How did you first come to see it?

15        A.   I saw it -- I saw it as an example of reading a

16   book objectively.

17        Q.   And what do you mean you "saw it as an example

18   of reading a book objectively," if you could explain

19   that?

20        A.   All right.  Like I referred to it before, as

21   opposed to saying I don't like this book, a person, in

22   my case a parent, could say, here's the examples of what

23   I find harmful or inappropriate.

24        Q.   Did you find this form on the Internet or did

25   somebody send it to you?

Rochelle Wells
October 17, 2022                                          124

```
1        A.  Well, someone sent it to me from the Internet,
2   but I don't know who.  I didn't create anything, is what
3   I'm saying.
4        Q.  Mm-hmm.  And was the point of this form for
5   anybody in the library to object to any book?
6             MR. RIENSTRA:  Objection; form.
7        Q.  (BY MS. LEONIDA)  You can answer.
8             MR. RIENSTRA:  Vague.  I'm just thinking
9   there.
10       A.  I'm sorry.  Can you repeat your question?
11       Q.  (BY MS. LEONIDA)  Yeah.  Was the point of this
12  form -- was this the form you were talking about when
13  you said that you wanted a form for people to be able to
14  object to books that weren't appropriate?
15       A.  Yes, that's one of them.
16       Q.  So was the Library Board conversation going to
17  be -- was this form supposed to be something that
18  existed at the library and patrons could fill it out?
19       A.  This one wasn't supposed to exist in the
20  library.  It was just an example of how to -- what to
21  consider when crafting a form.
22       Q.  What do you mean by that?
23       A.  I mean that what I mentioned before was a way
24  for, in particular parents, I'm referring to myself,
25  find a book that's harmful or inappropriate, they could
```

Rochelle Wells
October 17, 2022                                    125

```
 1    have a form that had -- that was more -- that was
 2    objective with examples of why they deemed it
 3    inappropriate as opposed to just opinion.
 4         Q.   Okay.  So what did you think of this form as an
 5    example?
 6              MR. RIENSTRA:  Ellen, is this the same
 7    exhibit?
 8              MS. LEONIDA:  Same exhibit, yeah,
 9    Exhibit 4.
10              MR. RIENSTRA:  Thank you.
11         A.   I thought it was a very specific list.  I
12    thought it was -- would help the parent if they needed
13    to be specific.
14         Q.   (BY MS. LEONIDA)  Did you discuss this
15    particular form at Library Board meetings?
16         A.   No.
17         Q.   Did you talk about this specific form with
18    anyone?
19         A.   Yes.
20         Q.   Who did you talk to about this form?
21         A.   I showed the Collections Committee just once
22    the form, yeah.
23         Q.   What did the Collections Committee think of the
24    form?
25              MR. RIENSTRA:  Objection; form, calls for
```

Rochelle Wells
October 17, 2022                                        126

```
 1   speculation.

 2        Q.  (BY MS. LEONIDA)  You can answer.

 3        A.  There was a little discussion, but it was just

 4   on top of all the other things we were collecting for

 5   collections.

 6        Q.  What was the discussion?

 7        A.  I don't remember that.

 8        Q.  Did the Collections Committee think that a form

 9   like this was a good thing to have?

10            MR. RIENSTRA:  Objection; form,

11   speculation.

12        A.  I don't remember what everyone's responses were

13   to it.

14        Q.  (BY MS. LEONIDA)  Go ahead.

15        A.  There was other things that we passed out to

16   each other, things that we had found unrelated to each

17   other.  Just mass information for Collections Committee.

18        Q.  Did you think that this form was a good one to

19   achieve your purposes?

20        A.  No.  There were -- I just thought it was a good

21   place to start.

22        Q.  What would you have changed about it to make it

23   work for you in Llano County?

24            MR. RIENSTRA:  Ellen, just for her purposes

25   and your question, can you scroll up and show her the
```

Rochelle Wells
October 17, 2022                                         127

```
 1   entire form so she can give you a good answer or an

 2   appropriate answer?

 3                MS. LEONIDA:  Sure.

 4                MR. RIENSTRA:  Thank you.

 5        Q.  (BY MS. LEONIDA)  So just tell me when you need

 6   me to keep scrolling.

 7        A.  You can keep scrolling.  Okay.  Stop, please.

 8   Okay.  Keep going, please.  Okay.

 9        Q.  Did I go too far?

10        A.  No, ma'am.  That's good.  Is that the bottom of

11   the -- or another page --

12        Q.  That's it.

13        A.  Okay.  I'm sorry.  What was the question again?

14        Q.  The question was, what would you want to change

15   about the form to make it better for your purposes in

16   Llano County?

17        A.  Oh, I can't tell you off the top of my head.

18   That's something I need to think about for a while

19   and...

20        Q.  Okay.  Did -- did the Collection Committee ever

21   decide to have a form?

22        A.  No.

23        Q.  Why not?

24        A.  It never got that far in discussion.  It was...

25        Q.  You -- when you got on -- when you first joined
```

Rochelle Wells
October 17, 2022                                    128

```
 1   the Library Advisory Board, were you talking to other
 2   board members about OverDrive?
 3        A.   When I was appointed -- I'm sorry.  What was
 4   the question?
 5        Q.   Do you know what OverDrive is?
 6        A.   Yes.
 7        Q.   What is it?
 8        A.   It's an online library, basically, the type
 9   libraries utilize, an ebook system.
10        Q.   Did you ever use it?
11        A.   Yes.
12        Q.   At some point did you decide that OverDrive was
13   problematic?
14        A.   I would say I found an issue with OverDrive.
15        Q.   What was that issue?
16        A.   Well, I didn't think it was very user friendly.
17   I didn't like the application.  That was one thing.  But
18   I also --
19                  THE WITNESS:  I'm sorry.  Could you close
20   the door?  It's hard for me to hear.
21                  MR. RIENSTRA:  Ellen, let me just -- we
22   have people -- we're in the law library.  We have people
23   talking rather loudly outside.  I'm going to go tell
24   them to quiet down.  Excuse me.
25                  MS. LEONIDA:  Okay.
```

Rochelle Wells
October 17, 2022                                              129

```
 1                    MR. RIENSTRA:  Go ahead, Ellen, please.
 2           Q.  (BY MS. LEONIDA)  Did you have any other issues
 3    with OverDrive, besides it not being very user-friendly?
 4           A.  Yes.
 5           Q.  In what way?
 6           A.  I discovered that with my 15-year-old's library
 7    card, she could check out -- even after putting filters
 8    in, that she could still check out a sexually-graphic
 9    book.
10           Q.  How did you discover that?
11           A.  I put in the filters because I was checking to
12    see if it was something I could let my daughter use, let
13    my children use, similar to checking out books to let
14    them read, and I discovered that a particular book still
15    would come up.
16           Q.  What book was that?
17           A.  Gender Queer.
18           Q.  Was that a book that you thought didn't belong
19    in the library?
20           A.  That book does not belong in the hands of
21    minors.
22           Q.  Does it belong in a public library?
23           A.  My opinion is no.
24           Q.  Did you share that opinion with
25    Commissioner Moss and Judge Cunningham?
```

Rochelle Wells
October 17, 2022                                    130

```
 1        A.   I don't recall.  I shared that at a
 2   Commissioners Court meeting.
 3        Q.   What did you say at the Commissioners Court
 4   meeting?
 5        A.   Just what I told you.  That I could access it,
 6   and then I said what was sexually graphic about it.
 7        Q.   Were you on the Library Board at that time?
 8        A.   No.
 9        Q.   When you joined the Library Board in January of
10   2022, was OverDrive running?  Was it an option for
11   library patrons?
12             MR. RIENSTRA:  Objection; form, assumes
13   facts not in evidence, misstates her testimony.
14        Q.   (BY MS. LEONIDA)  You can answer.
15        A.   I believe when I joined, we did not have it
16   when I joined.  Not when I joined.  When I was
17   appointed, there was not an ebook system in use or
18   available.
19        Q.   When was OverDrive removed from the library
20   system?
21        A.   In December, I believe.
22             MR. RIENSTRA:  Same objection; form, vague.
23        Q.   (BY MS. LEONIDA)  Do you know why that decision
24   was made?
25             MR. RIENSTRA:  Objection; form, calls for
```

Rochelle Wells
October 17, 2022                                          131

1    speculation.

2              You can answer.

3         A.   Okay.   I know they chose not to renew it.   I

4    know that OverDrive wasn't being helpful trying -- in

5    our -- in wanting to have minors not be able to access

6    the ebooks due to the fact that we discovered that minor

7    children could access sexually harmful content.

8         Q.   (BY MS. LEONIDA)   One of the things that you

9    mentioned as a reason you wanted closed meetings of the

10   Library Board was that people were misrepresenting what

11   you said about biblioteka.   Can you tell me more about

12   that?

13        A.   I can't remember the specific.   I'm sorry.   I

14   just know it was misrepresented.

15        Q.   Do you remember anything about which part of it

16   was being misrepresented?

17              MR. RIENSTRA:   Objection; asked and

18   answered.

19        Q.   (BY MS. LEONIDA)   You can answer.

20        A.   I can't.   I remember there were questions by a

21   few of the Advisory Board members about biblioteka, and

22   I don't know if I had an answer, if I said I'm not sure,

23   and I was going to go find out the answers, which I did.

24   But the lack of answer is what was used at Commissioners

25   Court to this information basically to use against not

Rochelle Wells
October 17, 2022                                    132

1    having biblioteka available for patrons.

2         Q.  What were the answers that you eventually

3    found?

4         A.  That's -- I can't remember.  I don't recall.

5         Q.  When you first got -- we're calling it the

6    Excel spreadsheet?  I can't remember.  I'm sorry.  What

7    did you want to call it?

8         A.  Chris Jones.

9         Q.  Yeah.  When you first got the Chris Jones Excel

10   spreadsheet, did you get it from Chris Jones?

11        A.  Yes.

12        Q.  What did Chris Jones tell you about it?

13        A.  Just what is on that e-mail, that she had gone

14   through the list and these were the ones in the system.

15        Q.  Had you talked to her before you got that

16   e-mail about what the list was?  That e-mail looked like

17   it was not the first conversation about it.

18        A.  My memory, that was about it.  That was just,

19   like I said, here's the Krause list.  Anyone help.  Oh,

20   I already did it.

21        Q.  How did you know what the Krause list was?  If

22   Chris Jones didn't tell you, how did you know?

23        A.  I remember I said that I had been sent an

24   e-mail or text message with a link to that article.

25        Q.  That's right.  And what did the article say?

Rochelle Wells
October 17, 2022                                              133

1        A.  I can't recall.  It was just a book, harmful

2   book-related issue, and then there was a link to the

3   Krause list in it.

4        Q.  Did you know anything about

5   Representative Krause before you read that article?

6        A.  No.

7        Q.  Did you read the article or did you just read

8   the headline and assume that the books were bad?

9        A.  I can't remember if I read the article or

10  browsed it.

11        Q.  I'm sorry.  I missed the end of that answer.

12        A.  I can't recall.

13        Q.  You said you can't read the article or if who

14  did?

15        A.  Or if I browsed.

16        Q.  Oh, browsed.  Or if you browsed it.

17            Did you send the Chris Jones list to

18  anybody else?

19        A.  I think I might have.

20        Q.  Why would you have done that?

21        A.  Because someone asked.

22        Q.  Who asked?

23        A.  I don't recall.

24        Q.  Did you read any of the books on the list?

25  Were you part of that review committee?

Rochelle Wells
October 17, 2022                                    134

1        A.   I did read one book on the list.

2        Q.   Which book was that?

3        A.   I believe that book was on the list, the one I

4   had referred to about the little girl who ends up

5   becoming a lesbian at the end of the book.

6        Q.   It looks in the e-mail communication like

7   Ms. Jones was trying to gather people to read the books

8   and report back on whether they were harmful or not.  Is

9   that right?

10       A.   Yes.

11       Q.   So did you report back on the book that you

12   read?

13       A.   Yes.

14       Q.   How did you do that?  Did you have a

15   conversation?  Did you send an e-mail?

16       A.   I had a conversation with her.

17       Q.   Was there a meeting about the Chris Jones list

18   at that point or did you just call her on the phone one

19   on one?

20       A.   I believe I just spoke with her over the phone.

21       Q.   Was she keeping a list of reviews for harmful

22   content?

23       A.   I don't know.

24       Q.   When you read that book to review it for her,

25   did you use the harmful content review form that we were

Rochelle Wells
October 17, 2022                                          135

1    just looking at that's Exhibit 4?

2         A.  No.

3         Q.  Are you familiar with a book called Caste:  The

4    Origins of Our Discontents?

5         A.  I only know of it.  I didn't read it or

6    research it.  I just have heard of it, but that's all.

7    I couldn't speak to it.

8         Q.  How have you heard of it?

9         A.  Well, maybe on blogs or it was mentioned in

10   articles.  I just remember the title.

11        Q.  Did you ever talk about that book with anybody

12   on the Library Advisory Board?

13        A.  I don't remember.

14        Q.  Are you familiar with a book called They Called

15   Themselves the K.K.K.?

16        A.  Only the title, not the book itself.

17        Q.  How are you familiar with the title?

18        A.  Again, just it's been in the news articles or

19   blogs.

20        Q.  Which news?

21        A.  I don't -- I don't know.

22        Q.  You think you read an article about that book?

23        A.  I can't recall.

24        Q.  Did you ever talk to anybody on the Library

25   Board about that book?

Rochelle Wells
October 17, 2022                                        136

1          A.   No.

2          Q.   Five years ago when you saw Virgin Sex on the

3   display and went to complain to the librarian about it,

4   why didn't you ask the librarian to remove it from the

5   library?

6                    MR. RIENSTRA:   Objection; form, asked and

7   answered.

8                    You can answer.

9          Q.   (BY MS. LEONIDA)   You can answer.

10         A.   Because I was a coward.

11         Q.   And what changed with your reaction to the butt

12   books?

13         A.   Because I saw that had I spoken up, that there

14   wouldn't have been harmful content that could hurt a

15   child, and I just started speaking up.   And the butt

16   book could ruin so many children's lives; I needed to

17   speak up.

18         Q.   You said the butt book could ruin children's

19   lives or had?

20         A.   It could.

21         Q.   Are you aware of any child's life that was

22   ruined by the butt book?

23         A.   No.

24         Q.   What about In the Night Kitchen?   That was one

25   of the books you referred to in one of your e-mails, if

Rochelle Wells
October 17, 2022                                        137

1    you recall.  Do you remember that book?

2         A.  Yes.

3         Q.  Do you also think that that book is

4    inappropriate for the library?

5         A.  Yes.

6         Q.  Why?

7         A.  Because it shows a child's penis with a bunch

8    of men.  It is not an anatomy book.

9         Q.  What would you say to a parent who wanted to

10   read that book to their children?

11        A.  That's one of those books you can order or go

12   to the bookstore and purchase and read to them in your

13   home.

14        Q.  What's the -- what's the danger to having that

15   book in the library, the danger of having that book in

16   the library?

17        A.  It desensitizes children to being naked around

18   adults, especially three men who are pouring cream and

19   having sexual -- speaking sexual innuendos.  Children

20   should not be comfortable with that.  They should not be

21   made to be comfortable with that because it could set

22   them up.  It's awful.

23        Q.  Would you support other people telling you what

24   books your children should and shouldn't read?  Do you

25   think that's appropriate?

Rochelle Wells
October 17, 2022                                           138

1        A.   I don't believe I ever said that parents

2   shouldn't read their books -- certain books to their

3   children.

4        Q.   What are some books that you have taken out of

5   the library to read to your children?

6        A.   Old Yeller, all of his books.  All of the Fred

7   Gipson's books.  We've read, I think, almost all those.

8   A book -- we just got called The Body -- The Body.

9             THE REPORTER:  I'm sorry.  Could you speak

10   up just a little bit for me, please?

11             THE WITNESS:  Oh.

12        A.   I said a book called The Body, I believe, just

13   for anatomy.  What else did I check out?  That's all I

14   can think of just off the top of my head right now.

15        Q.   (BY MS. LEONIDA)   If somebody decided that

16   Old Yeller was a book that was inappropriate for

17   children and wanted it removed from the library, would

18   you support that decision?

19        A.   It's not an inappropriate book.

20        Q.   What if somebody disagreed with you and thought

21   that it was, would you support that decision to not have

22   it be in the library, assuming you could still order it

23   on Amazon and read it to your children?

24        A.   I think you're asking questions not related to

25   sexually-charged books.  You're talking about a book

Rochelle Wells
October 17, 2022                                    139

1    about a little boy that tells life in the hill country.

2    It's historical fiction about the hill country and about

3    a little boy coming of age and his family and a dog that

4    gets rabies.  That's not in the same level as a little

5    boy who was in bed asleep, all of sudden his clothes

6    fall off of him, and there's three full frontal penis

7    pictures with men pouring cream all over him.  Those are

8    completely different books to compare.  It's like an

9    apple and a piece of broccoli, not even fruit.

10          Q.  I'm not asking you to compare the books,

11   Ms. Wells.  The question that I'm asking you is if a

12   parent came along and said that they think that rabies

13   is a horrifying disease that can result in madness and

14   violence and frothing at the mouth and even kill people

15   and they said that this book is grossly inappropriate

16   for children, I think it should be removed from the

17   library, but anybody that wants to read it can buy it on

18   Amazon, would you agree with that person's decision to

19   remove that book?

20          A.  No.

21          MS. LEONIDA:  I don't know if -- Counsel, I

22   don't know if you want to take a lunch break or just

23   take another short break.  I don't have a lot more, but

24   I know we've been going for a while.

25          MR. RIENSTRA:  Let's take a ten-minute

Rochelle Wells
October 17, 2022                                        140

1  break and let me check with my witness and then we'll

2  come back.  Is that fair?

3                  MS. LEONIDA:  Yeah, that works.

4                  MR. RIENSTRA:  Thank you very much.

5                  THE VIDEOGRAPHER:  We are off the record at

6  1:20 p.m.

7                  (Recess taken.)

8                  THE VIDEOGRAPHER:  We are on the record,

9  1:29 p.m.

10      Q.  (BY MS. LEONIDA)  Ms. Wells, in 2021,

11  approximately how often did you go to the library?

12                  I'm sorry.  Did you answer?

13      A.  Oh, I'm sorry.  I don't remember.

14                  MR. RIENSTRA:  I was about to tell her,

15  please speak up.

16      Q.  (BY MS. LEONIDA)  You know Bonnie Wallace.

17  Right?

18      A.  Yes.

19      Q.  How do you know Bonnie Wallace?

20      A.  I am on the Advisory Board with her.

21      Q.  Did you know her before you were on the

22  Advisory Board together?

23      A.  I have met her.

24      Q.  Had you ever talked to her about library books

25  before you were on the Advisory Board together?

Rochelle Wells
October 17, 2022                                                    141

1        A.   I don't remember.

2        Q.   How did you meet her?

3        A.   I met her at Commissioners Court.

4        Q.   Do you always go to Commissioners Court?

5        A.   No.

6        Q.   When you met her at Commissioners Court, why

7   were you there?

8        A.   I was there about the library books.

9        Q.   Were you there about the butt books?

10        A.   I don't remember.

11        Q.   Was it the -- have you been to more than one

12   Commissioners Court meeting where you talked about

13   library books?

14        A.   Yes.

15        Q.   Did you meet Bonnie Wallace at the first

16   commissioners meeting that you went to -- Commissioners

17   Courts meeting that you went to to talk about library

18   books?

19        A.   I don't remember.

20        Q.   When you met her, was she also at Commissioners

21   Court talking about library books?

22        A.   I don't remember.

23        Q.   Did somebody introduce you or did you start

24   talking to her spontaneously?

25        A.   I don't remember.

Rochelle Wells
October 17, 2022                              142

1        Q.  Is Bonnie Wallace somebody that you

2   communicated with pretty frequently by e-mail about

3   library books in the latter part of 2021?

4        A.  I don't recall.

5        Q.  Do you remember whether you ever got an e-mail

6   from Bonnie Wallace with the subject, "Pornographic

7   filth in the Llano County libraries"?

8        A.  I believe so.

9        Q.  Did you talk to Ms. Wallace about pornographic

10  filth in the Llano County libraries?

11       A.  At the time of that e-mail?

12       Q.  Ever.

13       A.  Yes.

14       Q.  What conversations did you have with

15  Ms. Wallace on that topic?

16       A.  I can't remember the conversations.

17       Q.  Do you remember any single conversation that

18  you ever had with Bonnie Wallace about library books?

19       A.  Not a specific one, no.

20       Q.  Did Ms. Wallace agree with you that the books

21  that you found inappropriate were inappropriate for the

22  library?

23       A.  Yes.

24       Q.  Did she agree with you that those books should

25  be removed from the library?

Rochelle Wells
October 17, 2022                                     143

1          A.   I can't recall.

2          Q.   Do you remember a time in the fall of 2021 when

3     the library was closed for weeding?

4          A.   I believe it was closed in the winter.

5          Q.   Okay.  In the wintertime.  What do you remember

6     about that?

7          A.   I just remember that it was closed.  There was

8     maybe a holiday or something, you know, that went along

9     with it, and it was closed.

10         Q.   Did anybody tell you why it was closed?

11         A.   I believe that Tina and Amber had said they --

12    that's when they were going to do the stickers on the

13    books, and then I found out also, I believe, later

14    weeding.

15         Q.   Take those one at a time.  You said you found

16    out later weeding.  What did you find out about weeding?

17         A.   That they had been -- that they were weeding.

18    I didn't know what that was until I was an Advisory

19    Board member.

20         Q.   Do you remember how you found out later?

21              MR. RIENSTRA:  Objection; form, vague.

22         A.   I don't remember how I found out, I'm sorry.

23         Q.   (BY MS. LEONIDA)  And I think -- what was the

24    first thing that you said you found out about the

25    library being closed in the winter?  You said you found

Rochelle Wells
October 17, 2022                                          144

 1   out -- oh, you said that you thought they were putting

 2   labels on things?

 3        A.   Oh, yes.

 4        Q.   Yeah.  What do you mean putting labels on

 5   things?

 6        A.   The label as to what genre it belonged to.

 7        Q.   Was that a new thing for the Llano County

 8   Library?

 9        A.   Yes.

10        Q.   What kind of genres were the labels

11   identifying?

12        A.   Sci-Fi, romance.

13        Q.   Nothing to do with your concerns or were they?

14        A.   It wasn't targeted at my concerns.  It was just

15   general labeling of the -- all the library books.

16        Q.   Your understanding is there weren't labels

17   about what was appropriate for children or not, or were

18   there?

19        A.   I don't -- I don't know.

20        Q.   Did you have any conversations with anyone

21   about the labels?

22        A.   Just Amber and Tina had told me about it in my

23   first meeting with them.

24        Q.   What did they tell you about it in that

25   meeting?

Rochelle Wells
October 17, 2022                                     145

1          A.   They'll start labeling books.

2          Q.   So that first meeting with them, just so I

3    understand the timeline here, that first meeting is the

4    meeting you're talking about where you asked them to

5    remove the butt book or was that about Virgin Sex?

6          A.   No.  Tina -- it was about the butt books.  The

7    Virgin Sex books was before they were employees.

8          Q.   Okay.  So you went to talk to them about the

9    butt books, and I guess I'm having a hard time

10   understanding how labeling came up.

11         A.   We were just talking about library books in

12   general in the library, and they told me about it.

13         Q.   What did they tell you about it?

14         A.   That they were going to start labeling books by

15   genre.

16         Q.   Do you know what the different genres were

17   besides Sci-Fi?

18         A.   I'm sorry.  I don't.

19         Q.   Okay.

20         A.   And I don't recall them being specific either.

21         Q.   And do you remember why they would bring up

22   Sci-Fi labeling in relation to your concerns about butt

23   books?

24         A.   No, actually.

25         Q.   One of the other books that you mentioned

Rochelle Wells
October 17, 2022                                        146

 1  having a problem with was called It's Perfectly Normal.

 2  Right?  How did that book come to your attention?

 3       A.   I didn't know about it until after the NCAC

 4  e-mail that you showed me or when I referred to it.  I

 5  didn't know about it until then.

 6       Q.   And what did you do to find out about it?

 7       A.   I went online and I looked at everything I

 8  could to find out what it was about, and the pictures

 9  that were harmful in content, to find out what they

10  were, what they looked like.

11       Q.   Were there any other books that you were

12  concerned about, besides the butt books, the fart books,

13  It's Perfectly Normal?

14       A.   Yes.

15       Q.   What -- what were they?

16       A.   I don't recall the titles.

17       Q.   It's okay.  Just tell me what they were about.

18       A.   One was encouraging little boys to cross-dress.

19       Q.   Mm-hmm.  Any other ones?

20       A.   Yes.  Another one was about inventors, and

21  it -- it essentially slammed white men.

22       Q.   Mm-hmm.  Any other ones?

23       A.   Those are the only two I can think of.

24       Q.   Okay.  How did those books come to your

25  attention?

Rochelle Wells
October 17, 2022                                          147

 1        A.   I was in the library and saw them.

 2        Q.   You just picked them up off the shelf?

 3        A.   Yes.

 4        Q.   Do you remember --

 5        A.   They were on the display.

 6        Q.   Okay.  And by "display," what do you mean

 7   exactly?

 8        A.   Like I said earlier, they'll put a book on the

 9   top shelf on a little (indicating), something that holds

10   it up to display it.

11        Q.   Did you see those two books after the butt

12   books or before the butt books?

13        A.   After.

14        Q.   Did you make any effort to get them taken out

15   of the library?  Did you talk to anybody about them?

16        A.   I told Commissioner Moss about those two books.

17        Q.   And what did he say?

18        A.   I don't recall his response.

19        Q.   It looked from your e-mail like he generally

20   was very helpful in your efforts to remove inappropriate

21   library books.  Is that fair to say?

22             MR. RIENSTRA:  Objection; form, vague.  It

23   calls for speculation.

24        Q.   (BY MS. LEONIDA)  You can answer.

25        A.   He was helpful in removing the butt books.

Rochelle Wells
October 17, 2022

148

```
 1        Q.  So that's why you went to him about removing
 2   The Inventor book?
 3        A.  Inventor.  Oh, The Inventor book?
 4        Q.  Yeah.
 5        A.  I don't know that I asked him to remove it.
 6        Q.  So you just went to talk to him about it?
 7        A.  Well, essentially, I started realizing there
 8   were many books in our library that were harmful, and as
 9   our commissioner, made him aware of it.  That's all I
10   can recall.
11        Q.  Do you know approximately when this was in
12   relation to when you saw the butt book, for example?
13        A.  No, I don't remember.
14        Q.  Was it something -- let me start over.
15             Would you pretty regularly go to
16   Commissioner Moss when you saw an inappropriate or
17   harmful book in the library?
18             MR. RIENSTRA:  Objection; form, vague.
19        A.  No.
20        Q.  (BY MS. LEONIDA)  So you went to him about the
21   butt books, the fart books, It's Perfectly Normal, the
22   cross-dressing book, and The Inventor book?
23        A.  I didn't go to him about It's Perfectly Normal.
24        Q.  Okay.  I misunderstood then.
25             So you went to him about the butt books,
```

Rochelle Wells
October 17, 2022                                   149

1    the fart books, The Inventor book, and the encouraging

2    boys to cross-dress book.  Any other books that you can

3    think of that you went to him about?

4         A.  No other books I can think of.

5         Q.  Just so I understand your answer about the

6    other books that were inappropriate or harmful, were

7    there other books but you're not sure that you can

8    remember them or is this the entire universe of harmful

9    books that you're aware of in the library, what we've

10   just been talking about?

11        A.  I don't remember if there's other books.  Those

12   four I remember.

13        Q.  When the library was closed for what you

14   thought was labeling --

15        A.  Mm-hmm.

16        Q.  Was there any discussion?  Did you discuss that

17   with anybody on the Library Board?

18        A.  I wasn't on the Advisory Board when that

19   happened.

20        Q.  When the library was closed for labeling, did

21   you talk to -- to anybody about what was going on and

22   what you felt was going on?

23        A.  (Nodding head.)

24        Q.  Who did you talk to?

25        A.  I don't recall who I spoke with.

Rochelle Wells
October 17, 2022                                    150

1          Q.  Did you talk to Bonnie Wallace about what was

2      going on at the library when it was closed for labeling?

3          A.  I don't recall.

4          Q.  Did you talk to Eva Carter about what was going

5      on at the library when you thought it was closed for

6      labeling?

7          A.  I don't recall.

8          Q.  Do you recall why you thought that it was

9      closed for labeling?

10                 MR. RIENSTRA:  Objection; form, asked and

11     answered.

12         Q.  (BY MS. LEONIDA)  You can answer.

13         A.  I think one of the librarians told us this.

14         Q.  You said "us."  Who else was included in that?

15         A.  I mean, when the patrons were coming in, like

16     that was their answer to what was going on.

17         Q.  Have you talked to people in other counties

18     besides Llano about library books that are potentially

19     harmful or keeping inappropriate books out of libraries?

20         A.  Yes.

21         Q.  Who?

22         A.  My friends who aren't from Llano.

23         Q.  What have you told them about what's going on

24     there?

25         A.  Well, I told them about the lawsuit.

Rochelle Wells
October 17, 2022                                            151

1        Q.   Have you been in touch with any -- any groups

2   in other counties around the country that are dealing

3   with similar issues?

4        A.   No.

5        Q.   When is the last time the library bought new

6   books?

7        A.   I believe it was in November, but I'm not sure.

8        Q.   Why hasn't the library bought any new books

9   since then?

10       A.   I don't know.

11       Q.   You said that the Library Advisory Board --

12   correct me if I'm wrong.  I think you said that the

13   Library Advisory Board asked Amber Milam, the head

14   librarian, to send you a list of books to buy before

15   buying them.  Is that right?

16       A.   We wanted to see the list of books that she

17   wanted to purchase.

18       Q.   Did you give feedback on any of those list of

19   books that she sent you?

20       A.   Can you be more specific?

21       Q.   When she sends you lists of books, do you talk

22   to her about them?

23       A.   Oh.

24            MR. RIENSTRA:  Objection; form, vague,

25   assumes facts not in evidence.

Rochelle Wells
October 17, 2022                                    152

1        A.  No.

2        Q.  (BY MS. LEONIDA)  What is the -- what is your

3   purpose in requesting that she sends you those lists?

4        A.  Well, like I said earlier, we were collecting

5   information about collections, and that's part of it,

6   the collections.  That would become part of the

7   collections.

8        Q.  So it wasn't to get your approval to buy the

9   books?

10        A.  No, it wasn't for that reason.

11             MS. LEONIDA:  I don't have any more

12   questions.

13             MR. RIENSTRA:  We'll reserve our questions

14   till time of trial.  Thank you very much.

15             THE VIDEOGRAPHER:  Before we go off the

16   record, can we please get counsel's transcript and video

17   orders?

18             MS. LEONIDA:  Yes.

19             MR. RIENSTRA:  Go ahead.  You're excused.

20             THE WITNESS:  Okay.

21             MR. RIENSTRA:  Jonathan, will you please

22   put in our order?

23             MR. MITCHELL:  Sure.

24             MR. RIENSTRA:  Thank you.

25             Good meeting you face to face, Ellen.  Take

Rochelle Wells
October 17, 2022                                        153

1    care.

2                   MS. LEONIDA:  Bye.

3                   MR. RIENSTRA:  Bye.

4                   Thank you, Videographer.  Thank you,

5    Court Reporter.  We're out of here.

6                   THE VIDEOGRAPHER:  We're still on.

7    Counsel, I just need to obtain everyone's order.

8                   MR. RIENSTRA:  Okay.  Well, Jonathan

9    Mitchell is going to take care of that for us.  Thank

10   you.

11                  THE VIDEOGRAPHER:  Thank you.

12                  MS. LEONIDA:  So I'd like both.  Do you

13   need anything else from me?

14                  THE VIDEOGRAPHER:  No.  You're good to go.

15                  Mr. Mitchell?

16                  MR. MITCHELL:  We'd also like a transcript,

17   yes, please.

18                  THE VIDEOGRAPHER:  We are off the record at

19   1:50 p.m.

20                  (Proceedings concluded.)

21

22

23

24

25

Rochelle Wells
October 17, 2022                                                    154

```
 1              IN THE UNITED STATES DISTRICT COURT
                   WESTERN DISTRICT OF TEXAS
 2                       AUSTIN DIVISION

 3   LEILA GREEN LITTLE, et        )
     al.,                          )
 4                                 )
            Plaintiffs,            )
 5                                 )
                   v.              )  CIVIL ACTION
 6                                 )
     LLANO COUNTY, et al.,         )  NO.: 1:22-cv-00424-RP
 7                                 )
            Defendants.            )

 8

 9           ------------------------------------

10              REPORTER'S CERTIFICATION

11         ORAL AND VIDEOTAPED DEPOSITION OF

12                   ROCHELLE WELLS

13              APPEARING REMOTELY FROM

14                       TEXAS

15                 OCTOBER 17, 2022

16           ------------------------------------

17

18            I, Velma C. LaChausse, a Shorthand Reporter

19   and Notary Public in and for the State of Texas, do

20   hereby certify that the facts as stated by me in the

21   caption hereto are true; that the above and foregoing

22   answers of the witness, ROCHELLE WELLS, to the

23   interrogatories as indicated were made before me by the

24   said witness after being first duly sworn to testify the

25   truth, and same were reduced to typewriting under my
```

Rochelle Wells
October 17, 2022                                                       155

1   direction; that the above and foregoing deposition as

2   set forth in typewriting is a full, true, and correct

3   transcript of the proceedings had at the time of taking

4   of said deposition.

5              I further certify that I am not, in any

6   capacity, a regular employee of the party in whose

7   behalf this deposition is taken, nor in the regular

8   employ of his attorney; and I certify that I am not

9   interested in the cause, nor of kin or counsel to either

10  of the parties;

11             GIVEN UNDER MY HAND AND SEAL OF OFFICE, on

12  this, the 21st day of October, 2022.

13

14  _____

15  Velma C. LaChausse
    Notary Public in and for
    The State of Texas

16  My Commission Expires: 03-22-2026
    U.S. Legal Support, Inc.

17  Firm Registration No. 122
    16825 Northchase Drive

18  Suite 800
    Houston, Texas 77060

19  Phone: (713)653-7100

20

21

22

23

24

25