# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## AUSTIN DIVISION

| | | |
|---|---|---|
| LEILA GREEN LITTLE, JEANNE PURYEAR, KATHY KENNEDY, REBECCA JONES, RICHARD DAY, CYNTHIA WARING, AND DIANE MOSTER, | § § § § § § | |
| Plaintiffs, | § § | |
| v. | § § § | Civil Action No. 1:22-cv-00424-RP |
| LLANO COUNTY, RON CUNNINGHAM, in his official capacity as Llano County Judge, JERRY DON MOSS, in his official capacity as Llano County Commissioner, PETER JONES, in his official capacity as Llano County Commissioner, MIKE SANDOVAL, in his official capacity as Llano County Commissioner, LINDA RASCHKE, in her official capacity as Llano County Commissioner, AMBER MILUM, in her official capacity as Llano County Library System Director, BONNIE WALLACE, in her official capacity as Llano County Library Board Member, ROCHELLE WELLS, in her official capacity as Llano County Library Board Member, RHONDA SCHNEIDER, in her official capacity as Llano County Library Board Member, and GAY BASKIN, in her official capacity as Llano County Library Board Member, | § § § § § § § § § § § § § § § § § § § § § § § § | |
| Defendants. | § § § | |

## PLAINTIFFS' POST-HEARING BRIEF IN FURTHER SUPPORT OF THEIR MOTION FOR PRELIMINARY INJUNCTION

i

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................ 1

BACKGROUND ................................................................................................. 2

I.     DEFENDANTS BEGIN A CAMPAIGN OF CENSORSHIP WITH THE BUTT AND FART BOOKS .......................................................................... 2

II.    DEFENDANTS REMOVE BOOKS CONTAINING NUDITY. ..................... 4

III.   DEFENDANTS REMOVE PRO-LGBTQ AND RACIAL EQUITY BOOKS. ....................................................................................................... 4

IV.   AFTER LITIGATION BEGINS, DEFENDANTS PRETEXTUALLY CLAIM THEY REMOVED THE BANNED BOOKS AS ROUTINE WEEDING. ................................................................................................. 6

      A.      The Books Defendants Removed Do Not Meet Their Own Criteria for Weeding. 6

      B.      Defendants' Testimony About Weeding Was Contradictory and Implausible ...... 9

      C.      Defendants' Contemporaneously Stated Reasons for Removing Books Had to Do with Viewpoint and Content, Not Weeding ......................................................... 10

V.     DEFENDANTS PROPOSE INADEQUATE POST-LITIGATION "ALTERNATIVES" TO TRADITIONAL ACCESS. .................................... 11

      A.      Interlibrary Loan Is Costly, Slow, and Does Not Include All of the Banned Books. ................................................................................................................. 12

      B.      The Bibliotheca eBook Catalog Omits Most of the Banned Books and Requires Access to Expensive Technology. ...................................................................... 12

      C.      Defendants' Secret Lending Library Is Unknown to Patrons and Functionally Unknowable. ............................................................................................................ 12

ARGUMENT .................................................................................................... 13

I.     LLANO COUNTY'S VIEWPOINT AND CONTENT DISCRIMINATION GIVE PLAINTIFFS A SUBSTANTIAL LIKELIHOOD OF SUCCESS ON THE MERITS. ....................................... 14

      A.      Content- and Viewpoint-Based Removal of Books from a Public Library Violates the First Amendment .......................................................................................... 14

      B.      Defendants Removed the Wallace List Books Because They Disagreed with the Viewpoints Expressed ........................................................................................ 16

C.     Defendants' Removal of Books Was Unconstitutionally Content Based............ 17

D.     Defendants' Actions Did Not Serve a Compelling Government Interest, Nor Were They Narrowly Tailored. ...................................................................................... 18

E.     The Evidence Shows Defendants' Argument That They Properly Weeded the Books Is a Pretext. .................................................................................................. 19

II.    PLAINTIFFS   SUFFERED   AND   CONTINUE   TO   SUFFER IRREPARABLE HARM. ............................................................................................... 20

III.   THE EQUITIES AND THE PUBLIC INTEREST WEIGH IN FAVOR OF A PRELIMINARY INJUNCTION...................................................................................... 23

V.    THE  PROPOSED  INJUNCTION  IS  NARROWLY  TAILORED  TO PRESERVE PLAINTIFFS' FIRST AMENDMENT RIGHTS AND DOES NOT IMPOSE UNDUE BURDEN ON DEFENDANTS. ................................................ 24

CONCLUSION........................................................................................................................ 24

CERTIFICATE OF SERVICE ............................................................................................... 25

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Bd. of Educ. v. Pico*,
    457 U.S. 853 (1982) ................................................................................................ 14, 15

*Campbell v. St. Tammany Par. Sch. Bd.*,
    64 F.3d 184 (5th Cir. 1995) .......................................................................................... 14

*Carey v. Brown*,
    447 U.S. 455 (1980) ...................................................................................................... 18

*Chiras v. Miller*,
    432 F.3d 606 (5th Cir. 2005) ........................................................................................ 15

*Cincinnati v. Discovery Network, Inc.*,
    507 U.S. 410 (1993) ...................................................................................................... 17

*Counts v. Cedarville Sch. Dist.*,
    295 F. Supp. 2d 996 (W.D. Ark. 2003) .................................................................. 15, 23

*Ctr. for Biological Diversity, Inc. v. BP Am. Prod. Co.*,
    704 F.3d 413 (5th Cir. 2013) ........................................................................................ 21

Denver Area Educational Telecommunications Consortium, Inc. v. F.C.C.
    518 U.S. 727 (1996) ................................................................................................ 23, 24

*Egli v. Chester Cnty. Libr. Sys.*,
    394 F. Supp. 3d 497 (E.D. Pa. 2019) ............................................................................ 15

*Elrod v. Burns*,
    427 U.S. 347 (1976) (plurality opinion) .................................................................. 14, 21

*Franciscan All., Inc. v. Burwell*,
    227 F. Supp. 3d 660 (N.D. Tex. 2016) ......................................................................... 24

*Gay Guardian Newspaper v. Ohoopee Reg'l Libr. Sys.*,
    235 F. Supp. 2d 1362 (S.D. Ga. 2002) ......................................................................... 15

*Iancu v. Brunetti*,
    139 S. Ct. 2294 (2019) ...................................................................................... 15, 16, 17

*Ingebretsen v. Jackson Pub. Sch. Dist.*,
    88 F.3d 274 (5th Cir. 1996) .................................................................................... 14, 20

*Int'l Soc. for Krishna Consciousness, Inc. v. Lee*,
    505 U.S. 672 (1992) .......................................................................................... 17, 18, 19

*Matal v. Tam*,
137 S. Ct. 1744 (2017) ........................................................................................ 16

*Minarcini v. Strongsville City Sch. Dist.*,
541 F.2d 577 (6th Cir. 1976) ............................................................................. 14

*Opulent Life Church v. City of Holly Springs, Miss.*,
697 F.3d 279 (5th Cir. 2012) ............................................................................. 13

*Pratt v. Ind. Sch. Dist. No. 831*,
670 F.2d 771 (8th Cir. 1982) ............................................................................. 14

*R.A.V. v. City of St. Paul*,
505 U.S. 377 (1992) ........................................................................................... 17

*Reed v. Town of Gilbert*,
576 U.S. 155 (2015) ................................................................................ 2, 15, 17

*Robinson v. Hunt County*,
921 F.3d 440 (5th Cir. 2019) ....................................................................... 16, 17

*Rosenberger v. Rector & Visitors of Univ. of Va.*,
515 U.S. 819 (1995) ........................................................................................... 16

*Sable Communications of Cal., Inc. v. F.C.C.*,
492 U.S. 115 (1989) ........................................................................................... 18

*Sorrell v. IMS Health, Inc.*,
564 U.S. 552 (2011) ........................................................................................... 14

*Sund v. City of Wichita Falls*,
121 F. Supp. 2d 530 (N.D. Tex. 2000) ...................................................... passim

*Texans for Free Enter. v. Texas Ethics Comm'n*,
732 F.3d 535 (5th Cir. 2013) ................................................................. 2, 14, 20

*Texans for Free Enter.*, 732 F.3d at 539 ................................................................. 23

*Texas v. Johnson*,
491 U.S. 397 (1989) ........................................................................................... 16

*Turner Broad. Sys., Inc. v. F.C.C.*,
512 U.S. 622 (1994) ........................................................................................... 14

*United States v. Am. Libr. Ass'n, Inc.*,
539 U.S. 194 (2003) ........................................................................................... 15

*United States v. Playboy Ent. Grp., Inc.*,
529 U.S. 803 (2000) ............................................................................... 15, 18, 21

*Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*,
   425 U.S. 748 (1976)....................................................................................................... 24

*Williams-Yulee v. Fla. Bar*,
   575 U.S. 433 (2015)....................................................................................................... 18

**Other Authorities**

11A Charles Alan Wright, Arthur R. Miller, & Mary K. Kane, Fed. Prac. and Proc. §
   2948.1 (3d ed. 2008) ..................................................................................................... 21

## <u>INTRODUCTION</u>

The evidence adduced at the October 2022 Hearing ("Hearing") on Plaintiffs' Motion for Preliminary Injunction confirmed what has been evident from the start of this case: Defendants violated Plaintiffs' First Amendment rights by unconstitutionally removing books from the Llano County libraries because county officials disapproved of the viewpoints and contents of those books. Defendants' contemporaneous communications uniformly evince their antipathy toward three categories of books: (1) books adopting favorable views of the LGBTQ community or advancing the position that systemic racial disparities exist in the United States; (2) books containing illustrations of nudity for comedic or educational purposes; and (3) several light-hearted children's books designed to acknowledge children's curiosity about basic bodily functions. During the second half of 2021, Defendants removed all three categories of books because they disagreed with the viewpoints expressed in the LGBTQ and racial equity books and they disapproved of the contents of all three categories.

Defendants offered two post-hoc justifications for their unconstitutional actions. *First*, they tried to recast their removal of the books as part of the routine process of "weeding" unused and damaged books from library shelves. But evidence presented at the Hearing revealed this to be bare pretext—the removed books did not meet the criteria for weeding and all contemporaneous evidence showed that Defendants removed the books based on their content and viewpoint. *Second*, Defendants claimed that "alternative"—and more burdensome—means of accessing the disputed books, including interlibrary loan, electronic books, and a secret repository at one library branch (created personally by Defendants' litigation counsel after he had been retained), meant that the books they had targeted were still available to the public. These efforts at voluntary cessation do not eliminate the need for relief.

Plaintiffs have met the standard for issuance of a preliminary injunction. Plaintiffs are likely to prevail on the merits because viewpoint and content discrimination are repugnant to the First Amendment. *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015). There is no government interest, much less a compelling one, in banning the books at issue. Indeed, Defendants have not even attempted to argue otherwise. Irreparable harm is also easily established because the "loss of First Amendment freedoms for even minimal periods of time constitutes irreparable injury." *Texans for Free Enter. v. Texas Ethics Comm'n*, 732 F.3d 535, 539 (5th Cir. 2013). Finally, the balance of equities and public interest also militate strongly in favor of Plaintiffs. On the one hand, Defendants incur no injury in allowing people to read books if they want to do so. On the other hand, Plaintiffs and the public will suffer if no relief is issued. The First Amendment protects free discourse and the right to read about unpopular ideas, and the public has a compelling interest in seeing that the marketplace of ideas remains a free one.

## **BACKGROUND**

### I.   **DEFENDANTS BEGIN A CAMPAIGN OF CENSORSHIP WITH THE BUTT AND FART BOOKS.**

In the summer of 2021, at the direction of her Llano County superiors, Library Director Amber Milum—who personally selected the Butt and Fart Books[1] as valuable additions to the children's section of the public library based on her training and experience[2]—permanently

---

[1] The "Butt Books" as referenced herein are Dawn McMillan titles: (1) *My Butt Is So Noisy*, (2) *I Broke My Butt*, and (3) *I Need a New Butt*. The "Fart Books" as referenced herein are Jane Bexley titles: (1) *Larry the Farting Leprechaun*, (2) *Gary the Goose and His Gas on the Loose*, (3) *Freddie the Farting Snowman*, and (4) *Harvey the Heart Had Too Many Farts*.

[2] Milum found the series of lighthearted children's books appropriate for the Llano Library, based on solely positive reviews, and "thought they would be funny." She never changed her mind that "they were appropriate for the age range" to which they were targeted. *See* Hr'g Tr. Vol. 1 at 59:24-60:23; 64:3-8.

removed all seven titles from the Library.

This censorship was put into motion by the complaints of Rochelle Wells and Rhonda Schneider.[3] *See, e.g.*, Hr'g Tr. Vol 1 at 24:20-22; 64:1-2; 177:9-178:14; Ex. 52 at 1-2. Wells and Schneider first conducted their own personal campaign to keep these titles out of circulation because of their assessment of the content; they began repeatedly checking out the Butt and Fart Books, keeping them off the shelves and inaccessible to other library patrons. Hr'g Tr. Vol 1 at 24:20-24; Vol. 2 at 5:23-6:10; 106:23-107:3. Then, they escalated their concerns to library staff and senior Llano County officials. Wells, who simply "believe[s] the Fart Books don't belong in our library," asked the librarian (Milum) and the two top Llano County officials (Moss and Cunningham) to remove the Butt and Fart Books from the Library. Hr'g Tr. Vol 1. at 178:10-190:6.

In direct response to these requests by Wells—which were based on her concerns over a single illustration on *one* page of *one* of the books—Moss and Cunningham directed Milum to remove the Butt and Fart Books. Ex. 2A; Hr'g Tr. Vol. 1 at 67:1-3, 172:7-11, 127:24-128:5. On August 3, 2021, Moss met with Milum, and "told [her] to take the books out of the system;" and Milum followed her superior's directive, taking the books from the shelves and permanently deleting them from the library catalog specifically because of their content. *See* Ex. 52 at 1-2; Hr'g Tr. Vol. 1 at 64:18-21; 66:9-25; 172:7-11; 127:24-128:5.[4]

---

[3] At the time of these initial complaints, both Wells and Schneider were simply local residents. But, as the book-banning campaign progressed, each was elevated to placement on the Llano County Advisory Board, replacing longtime board members who were ousted with no contemporaneous explanation.

[4] At the hearing, Milum attempted to deny that she removed the Butt and Fart Books at least in part because she was so directed by Moss, but after reviewing her contemporaneous notes of the meeting—"an accurate reflection of the conversation,"—she agreed she had been so instructed.

## II.      DEFENDANTS REMOVE BOOKS CONTAINING NUDITY.

After the removal of the Butt and Fart Books, Cunningham instructed Milum to remove from the shelves "[a]ny books with photos of naked or sexual conduct regardless if they are animated or actual photos." Ex. 60; Hr'g Tr. Vol. 1 at 69:1-17; Hr'g Tr. Vol. 2 at 139:18-140:4. Following this directive, the library was closed for three days, and librarians were instructed to remove any book that depicted nudity of any kind. Hundreds of books, including books about potty training and getting dressed, were removed from shelves. Hr'g Tr. Vol. 1 at 29:21-30:20; 109:8-14.

One of the casualties of this review was Maurice Sendak's classic, Caldecott Award-winning book *In the Night Kitchen*, first published over fifty years ago. Milum removed *In the Night Kitchen* from the library system because it includes illustrations of a naked toddler. Hr'g Tr. Vol. 1 at 70:13-18, 71:9-15, 95:5-8. Defendants also purged *It's Perfectly Normal* by Robie Harris, an illustrated children's health book that had been on the shelves since 2006. Hr'g Tr. Vol. 1 at 28:14-21, 29:13-20, 75:3-11; Hr'g Tr. Vol. 2 at 140:5-10. *It's Perfectly Normal* helps readers understand puberty and discusses ways to stay safe on the internet. Hr'g Tr. Vol. 1 at 28:10-24. After Moss ordered the removal of this particular book from the Llano Library, Wells thanked him for "making [Milum] remove the book because of its 'disgusting' photos." *See* Ex. 19.

## III.     DEFENDANTS REMOVE PRO-LGBTQ AND RACIAL EQUITY BOOKS.

Having successfully convinced county officials to execute their censorship campaign on children's books, Wells and Schneider began targeting books outside the children's section. On

---

*See* Hr'g Tr. Vol. 1 at 65:7-9; Ex. 2B. She also agreed that "Cunningham also directed [her] to remove the books." *See* Hr'g Tr. Vol. 1 at 67:1-3.

October 25, 2021, Texas State Representative Matt Krause (Chairman of the Texas House "Committee on General Investigating") published a 16-page list of supposedly "objectionable" books on race, sexuality, and gender identity (the "Krause List"). Ex. 6.

Just three days after the Krause List was issued, on October 28, 2021, Milum emailed Cunningham about *How to Be an Antiracist* by Ibram X. Kendi, which she referred to as the "Critical race theory book" and which Milum noted she and Cunningham had previously discussed. Ex. 7; Hr'g Tr. Vol. 1 at 78:2-21. Milum's email explains that Milum "wanted to let [Cunningham] know before it came up in any of [his] meetings" that, although the book was still in the system, it was now hidden behind the front desk and was "no longer on the shelf." Ex. 7.

In the meantime, Wells and her associates agreed via email to take a "couple of pages each" of the "16 pages of [Krause List] books" to ascertain if any of the titles were available in the Llano County Library. Ex. 8. The resulting table of Krause List titles available at the Llano County public libraries, referred to herein as the "Wallace List," was "the list of books that Bonnie Wallace thought were inappropriate and should be removed from the Llano County Library System."[5] Hr'g Tr. Vol. 1 at 72:13-21, 81:6-9, 89:15-25.[6] Milum's "boss" Cunningham

---

[5] The books on the Wallace List included *Caste: The Origins of Our Discontent* by Isabel Wilkerson; *They Called Themselves the K.K.K: The Birth of an American Terrorist Group* by Susan Campbell Bartoletti; *Spinning* by Tillie Walden; *Being Jazz: My Life as a (Transgender) Teen* by Jazz Jennings; *Shine* by Lauren Myracle; *Under the Moon: A Catwoman Tale* by Lauren Myracle; *Gabi, a Girl in Pieces* by Isabel Quintero; and *Freakboy* by Kristin Elizabeth Clark.

[6] Subsequently, in an email thread including Moss, Wells reported that Moss and Cunningham had "instructed" Milum to "remove certain books," including *Lawn Boy*, *Gender Queer*, and "the Butt Book," and she thanked Moss "for [his] help in this situation and all [he had] done to remedy it!" Ex. 8.; Hr'g Tr. Vol. 2 at 9:10-19. Wells then reported that the work of ascertaining which of the "CRT and LGBTQ book[s]" were in the Library had been completed. Their next steps were to "research the content of the ones [they had] found," along with related other titles and to send a list "of the ones that are found to be inappropriate, along with a summary, to Commissioner Moss." Ex. 8.

sent her the Wallace List on November 10, 2021, forwarding an email describing the books on

the list as "pornographic filth." Ex. 5; Hr'g Tr. Vol. 1 at 90:1-9, 96:21-97:6. As Milum put it at

her deposition, "When I received [the Wallace List], we went and pulled all of those books."

Hr'g Tr. Vol. 1 at 82:8-9.

Defendants thus admitted that the reason that these "CRT and LGBTQ" books were

"selected for weeding" was because they were on the "[Wallace List]." *See id.* at 82:3-10, 82:24-

83:3, 84:12-13 (*Shine*), 84:8-9 (*Spinning*), 84:10-11 (*Being Jazz*), 84:16-17 (*Gabi, A Girl in*

*Pieces*), 84:18-19 (*Freakboy*), 84:20-21 (*Caste*), 94:23-25 (*They Called Themselves the KKK*).

And Milum readily admitted that *no books other than those on the Wallace List* were weeded at

this time. *Id.* at 84:2-7.

## IV.   AFTER LITIGATION BEGINS, DEFENDANTS PRETEXTUALLY CLAIM THEY REMOVED THE BANNED BOOKS AS ROUTINE WEEDING.

Although no contemporaneous document supports the contention, after this litigation was

initiated, Defendants contrived a pretextual explanation to excuse their censorship. They claimed

that the books were "weeded," meaning removed from the catalog, pursuant to library policies.

### A.   The Books Defendants Removed Do Not Meet Their Own Criteria for Weeding.

"Weeding" is the process by which a library removes books to make space for new

purchases. Hr'g Tr. Vol. 2 at 71:20-25. The Llano Library System uses the "CREW" method to

determine which books to weed from the library catalog, Ex. 23, and has continuously used the

CREW method, and only the CREW method, for weeding since no later than June 2019. Hr'g Tr.

Vol. 1 at 13:19-20, 18:12-15. CREW stands for "Continuous Review, Evaluation and Weeding."

Ex. 23 at 2. "The CREW method uses an acronym, MUSTIE, to indicate when an item should be

removed from the collection." *Id.* MUSTIE stands for: "**M**isleading and/or factually inaccurate,"

"**U**gly (worn out beyond mending or rebinding)," "**S**uperseded by a new edition or a better

source," "**T**rivial (of no discernable literary or scientific merit), "**I**rrelevant to the needs and interests of the community," and "**E**lsewhere (the material may be easily borrowed from another source)." *Id.*

Weeding decisions "are based on some combination of these criteria—that is, an item will probably *not* be discarded based on meeting *only one* of [the MUSTIE] criteria." *Id.* (emphasis added). Tina Castelan, a former Llano County Children's Librarian, explained that historically the Llano Library looked for two or three MUSTIE criteria to be satisfied for weeding eligibility. Hr'g Tr. Vol. 1 at 21:17-21. Milum agreed with that assessment. Hr'g Tr. Vol. 2 at 125:2-5. By way of example, irrelevance alone is not a sufficient basis to weed books. Indeed, there are currently more than 5,800 books in the Llano Library that have not been checked out since March 1, 2018, and thus technically would meet the irrelevance criteria. Ex. 79.

Based on her experience as a librarian, her knowledge of the CREW factors and MUSTIE criteria, and her review of each of the Banned Books, Tina Castelan testified that all but one of the Banned Books were weeded improperly and contrary to Llano County Library policies. Hr'g Tr. Vol. 1 at 33:15-34:3, 35:7-38:16, 40:1-41:8, 41:16-42:19, 43:12-44:14, 45:5-18. Indeed, none of the Banned Books—which were removed from the shelves and the library catalog—met more than one MUSTIE criterion, and most met none. Ex. 52; Hr'g Tr. Vol. 1 at 42:14-19, 43:20-25.

| Title | Deleted | All-Time Circs | Circ Within 3 Years? | Special Topic Book? | Evidence of Damage? |
|---|---|---|---|---|---|
| I Need a New Butt! | 2021-07-20 | 0 | | | No |
| Larry The Farting Leprechaun | 2021-08-05 | 0 | | | No |
| Harvey The Heart Had Too Many Farts | 2021-08-05 | 0 | | | No |
| Gary the Goose and His Gas on the Loose | 2021-08-05 | 0 | | | No |
| Freddie the Farting Snowman | 2021-08-05 | 0 | | | No |
| I Broke My Butt! | 2021-08-09 | 4 | Yes | | No |
| My Butt is So Noisy! | 2021-08-09 | 4 | Yes | | No |
| It's Perfectly Normal: Changing Bodies, Growing Up, Sex, and Sexual Health | 2021-10-12 | 7 | Yes | | No |
| In the Night Kitchen | 2021-11-09 | 33 | Yes | | No |
| Shine | 2021-11-12 | 10 | Yes | | No |
| Spinning | 2021-11-12 | 4 | Yes | | No |
| Caste: The Origins of Our Discontents | 2021-11-12 | 3 | Yes | | No |
| Being Jazz: My Life as a (Transgender) Teen | 2021-11-12 | 1 | No | Yes | No |
| They Called Themselves the K.K.K.: The Birth of an American Terrorist Group | 2021-11-12 | 2 | No | Yes | No |
| Gabi, a Girl in Pieces | 2021-11-17 | 3 | Yes | | No |
| Under the Moon: A Catwoman Tale | 2021-11-18 | 4 | Yes | | No |
| Freakboy | 2021-11-12 | 1 | No | | No |

As Castelan testified, and as the above chart shows, five of the books—the Fart Books and *I Need a New Butt*—were brand new and were weeded before they even hit the shelves. Hr'g Tr. Vol. 1 at 33:15-34:3 (*I Need a New Butt*), 34:4-13 (*Larry the Farting Leprechaun*), 34:16-18 (*Harvey the Heart Had Too Many Farts*), 34:19-35:1 (*Gary the Goose and His Gas on the Loose*), 35:2-6 (*Freddie the Farting Snowman*). There is no Library policy, or factor under CREW or MUSTIE, by which new books may be weeded before they make it into circulation. And Defendants did not provide a single reason under CREW or MUSTIE justifying the removal of the Fart Books and *I Need a New Butt.*

As for the other two Butt Books—*I Broke My Butt* and *My Butt Is So Noisy*—Castelan explained that, because the books were brand new and had already been checked out four times each, they did not meet *any* of the MUSTIE criteria. *Id.* at 35:7-36:19. Milum's testimony to the contrary was nonsensical, as she explained that the books were getting checked out *too much*, and that is why she weeded them. Hr'g Tr. Vol. 1 at 125:22-24. Of course, a book being too popular is not a proper reason to weed it under CREW or MUSTIE. *Id*. at 133:25-134:3.

*In the Night Kitchen* and *It's Perfectly Normal* also did not meet the CREW and MUSTIE criteria for weeding. *In the Night Kitchen* was checked out 33 times while in the Llano Library, including in 2020, and it did not meet any other MUSTIE factor. *Id.* at 37:20-38:16. As for *It's Perfectly Normal*, that title was checked out within three years of its removal and it was special topic book, meaning it was the "only book of its category that is as extensive in its information that it gives." *Id.* at 37:15-19. Accordingly, it was not eligible to be weeded. Any testimony to the contrary is belied by the fact that Moss told Castelan he did not want the book in the library, *id.* at 29:2-9, and then made Milum "remove *It's Perfectly Normal*," *id.* at 197:8-10.

The majority of the remaining Banned Books were in regular circulation, had been checked out within three years of their removal, and did not otherwise meet any of the MUSTIE criteria for weeding. In fact, Castelan's testimony that none of these books were properly weeded pursuant to the Library's policies is supported by the record. *Id.* at 40:1-41:8, 41:16-42:6, 44:1-14, 45:5-18. For example, *Caste* was checked out three separate times in the eleven months before it was removed from the library system, and there is no record anywhere of the book being damaged. *Id.* at 90:19-23. *Being Jazz* and *They Called Themselves the K.K.K.* were unique special topic titles so, even though they had not been checked out within three years, they were not eligible for weeding under the Library's historic application of the MUSTIE criteria. *Id.* at 22:6-10, 42:14-19, 43:20-25. According to Castelan, only one of the Banned Books—*Freakboy*—which was last checked out in 2016, was weeded consistent with MUSTIE criteria. *Id.* at 38:25-39:9.

### B. Defendants' Testimony About Weeding Was Contradictory and Implausible.

In addition to being contradicted by Castelan's testimony and the record evidence, Milum's testimony that the Banned Books were properly weeded was riddled with contradictory and implausible statements. Hr'g Tr. Vol. 2 at 97:3-11; 99:6-13, 101:22-102:5, 102:18-25, 104:5-

15, 105:2-8, 105:17-24. *First*, the CREW Manual states that books are to remain on shelves unless they do not circulate "for 3-5 years." Ex. 23 at 44. It is also implausible that, as part of a standard weeding application, Milum would remove the Banned Books (most of which had been checked out within the previous three years) for lack of circulation but leave approximately *5,800* titles that had not been checked out in those prior three years on the shelves, including hundreds which had not been checked out for decades. *Compare* Ex. 52 *with* Ex. 79A; *see also, e.g.*, Hr'g Tr. Vol. 2 at 127:21-25, 136:4-7. Indeed, that is why when pressed, Milum could not come up with any reason to justify *Caste*'s removal, other than the obvious—it was removed for its viewpoint and content—and suggested that "it was possibly put in a different stack when we were looking through all these other books because it was new." Hr'g Tr. Vol. 1 at 91:6-9.

*Second*, by Milum's own admission, there was no need to weed books in November 2021 because the Commissioners Court suspended all new purchases a month *earlier*. Hr'g Tr. Vol. 2 at 120:25-121:10. *Finally*, Milum's testimony regarding *In the Night Kitchen* was flatly contradicted by physical evidence. Milum testified at the Hearing that the book met the Ugly factor because "it was old and worn." Hr'g Tr. Vol. 1 at 93:24-25. However, when the physical copy of *In the Night Kitchen* removed from the Library was introduced into evidence, it was found to be "in excellent condition" and lacking "any tears or stains or any damage." Ex. 91; Hr'g Tr. Vol. 2 at 41:11-42:7.

### C. Defendants' Contemporaneously Stated Reasons for Removing Books Had to Do with Viewpoint and Content, Not Weeding.

Defendants' true motivation for removing these books from the Llano Library shelves is plain from the record: Milum admitted that "the reason that [the Banned Books] were selected to be weeded and reviewed to be weeded, as opposed to other books, w[as] because Ms. Wallace had them on her list" of books Defendants disagreed with. Hr'g Tr. Vol. 1 at 82:24-83:3. Even

when Milum could not recall what certain titles were about, she knew that these books were on the Wallace List, and that was why she had evaluated them. *Id.* at 101:6-12.

Defendants' pre-litigation correspondence also lays bare their true motivations. For example, in February 2022, Wallace (who had then been elevated from resident to a Library Advisory Board member) circulated to Cunningham and Moss a "Harmful Content Analysis" form for determining whether a book should be removed from the library. Ex. 37; Hr'g Tr. Vol. 1 at 182:10-21. The form offered 13 viewpoint- and content-based grounds to remove books, including categories such as "[r]acist or condescending toward a specific demographic," "[p]romotes globalism or anti patriotism such as burning of the U.S. flag, demeaning towards armed services or members, critical of our nation, ex America is racist, etc.," or "[p]romotes condemnation or mocking of a religion." Ex. 76.

In another plain statement, Wells testified at the hearing that "if there was any book that [in her opinion] was harmful to minors that was in the library, I would speak with the director, [Milum] to have it removed." Hr'g Tr. Vol. 1 at 205:9-14. If Milum disagreed with her assessment—as with the Butt and Fart Books—she would speak to Milum's superiors, County officials Moss and/or Cunningham and have them removed. *Id.* at 205:15-206:12. Wells was not alone. Defendants were not shy about describing the types of books whose content or viewpoints they found to be offensive or inappropriate and unabashedly removing those titles from the library. *See, e.g.*, Hr'g Tr. Vol. 1 at 29:2-9, 197:8-10; Ex. 19.

## V.     DEFENDANTS PROPOSE INADEQUATE POST-LITIGATION "ALTERNATIVES" TO TRADITIONAL ACCESS.

Defendants offered several post-hoc "remedies" for the removal of the Banned Books, but as explained below, those half-hearted measures neither restore the Banned Books to the shelves nor cure the First Amendment violation.

**A.      Interlibrary Loan Is Costly, Slow, and Does Not Include All of the Banned Books.**

Other than *Caste*, *It's Perfectly Normal*, and *Being Jazz*, the other Banned Books are purportedly available through interlibrary loan. Milum Decl., Dkt. No. 49-1, ¶ 10. Interlibrary loan is a service by which patrons can pay money to borrow a book from another library in Texas. Hr'g Tr. Vol. 1 at 53:12-17. Books can take more than a month to arrive through the interlibrary loan program, depending on their location. Hr'g Tr. Vol. 2 at 124:24-125:1. That is, the Banned Books, which used to be freely and immediately available on Llano Library shelves, are now only available to patrons by a request-only service that requires library staff involvement, payment by the patron, and may have wait times of up to a month or more.

**B.      The Bibliotheca eBook Catalog Omits Most of the Banned Books and Requires Access to Expensive Technology.**

In December 2021, Defendants suspended access to OverDrive, the Library System's eBook catalog, because they did not want children to be able to access *Gender Queer* and *Lawn Boy*, 2 out of more than 17,000 books available in the catalog. Hr'g Tr. Vol. 1 at 79:25-81:2; Ex. 88, at 4. In May of 2022 (after this suit was filed), Defendants adopted Bibliotheca and now claim that it cures their constitutional violations. Bibliotheca, however, does not provide access to twelve of the Banned Books. Milum Decl., ¶ 10. It also requires a patron to have a compatible electronic device—a significant expense for some patrons. Hr'g Tr. Vol. 2 at 47:2-4.

**C.      Defendants' Secret Lending Library Is Unknown to Patrons and Functionally Unknowable.**

Finally, in the summer of 2022, Defendants contrived a secret lending library and informed none of the library's patrons of its existence. Specifically, in July—*after* this litigation was filed—Defendants' lawyer, Jonathan Mitchell, donated nine of the Banned Books to the

Llano Library.[7] The donated books make up the entirety of the Llano Library's in-house checkout program. Dkt. No. 53 ("Milum Suppl. Decl.") ¶ 3; Hr'g Tr. Vol. 1 at 116:7-9, 117:1-9; Vol. 2 at 182:10-13. As Defendants have acknowledged, these books are not listed in the Library System catalog—they are kept behind a desk, out of public view. Hr'g Tr. Vol. 1 at 54:23-55:3, 55:25-56:2, 114:16-115:1. Their presence has never been advertised on the library bulletin board or physical signs, and there was no announcement of their presence released in the library newsletter or posted on social media. *Id.* at 55:19-24, 115:2-4, 116:3-6; Hr'g Tr. Vol. 2 at 43:1-19.[8] Their appearance is distinct because they do not have a barcode, spine label, or genre label. Hr'g Tr. Vol. 1 at 55:6-13. The only way that a patron might know these books are available is because "of the lawsuit." *Id.* at 56:6-11.

## ARGUMENT

An applicant for preliminary injunction must show four elements: "(1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable harm if the injunction is not granted; (3) that the threatened injury outweighs any harm that the injunction might cause to the defendant; and (4) that the injunction will not disserve the public interest." *Opulent Life Church v. City of Holly Springs, Miss.*, 697 F.3d 279, 288 (5th Cir. 2012). Where the case revolves around a violation of constitutional rights, the final three elements follow from the constitutional violation. *See Texans for Free Enter. v. Texas Ethics Comm'n*, 732 F.3d 535, 539

---

[7] This fact was revealed at the hearing. In her declaration Milum does not identify Mr. Mitchell, she just refers to an anonymous donor. Dkt. No. 53, ¶ 3. On the stand, Defendants' counsel argued that the identity of the anonymous donor as protected by the attorney client privilege, Hr'g Tr. Vol. 1 at 116:12-23, but Mr. Mitchell later revealed he was the donor, Hr'g Tr. Vol. 2 at 182:10-19.

[8] The library's standard practice is to publicize all newly acquired titles in the Llano County Library System in its newsletter. Hr'g Tr. Vol. 1 at 115:12-14.

(5th Cir. 2013); *accord Ingebretsen v. Jackson Pub. Sch. Dist.*, 88 F.3d 274, 280 (5th Cir. 1996);

*Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion). The evidence presented at the

hearing proves Defendants removed the Banned Books from the public library based on

disapproval of their content or viewpoint in violation of the First Amendment. Defendants'

pretextual claim that the books were properly weeded is demonstrably false, and the alternate

means of access they rely on still impose greater burdens than existed prior to their censorship

campaign. Accordingly, the Court should grant Plaintiffs' motion.

## I. LLANO COUNTY'S VIEWPOINT AND CONTENT DISCRIMINATION GIVE PLAINTIFFS A SUBSTANTIAL LIKELIHOOD OF SUCCESS ON THE MERITS.

### A. Content- and Viewpoint-Based Removal of Books from a Public Library Violates the First Amendment.

The First Amendment prohibits the removal of books from libraries based on either

content or viewpoint discrimination. *See Bd. of Educ. v. Pico*, 457 U.S. 853, 871 (1982);

*Campbell v. St. Tammany Par. Sch. Bd.*, 64 F.3d 184, 188 (5th Cir. 1995); *Sund v. City of

Wichita Falls*, 121 F. Supp. 2d 530, 547-548 (N.D. Tex. 2000).[9] That Defendants' post-litigation

actions have sought to transform their initial outright ban into a burden on access to the Banned

Books does not change the calculus. "Lawmakers may no more silence unwanted speech by

burdening its utterance than by censoring its content." *Sorrell v. IMS Health, Inc.*, 564 U.S. 552,

566 (2011); *see also Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 622, 641-42 (1994) ("Our

precedents thus apply the most exacting scrutiny to regulations that suppress, disadvantage, or

---

[9] While the law protecting individuals' right to receive information from their libraries was developed in the context of school libraries, *see Pico*, 457 U.S. at 871; *Campbell*, 64 F.3d at 188; *Minarcini v. Strongsville City Sch. Dist.*, 541 F.2d 577, 582 (6th Cir. 1976); *Pratt v. Ind. Sch. Dist. No. 831*, 670 F.2d 771, 776 (8th Cir. 1982), the principles set forth in those cases "have even greater force when applied to public libraries," *Sund*, 121 F. Supp. 2d at 547-48.

impose differential burdens upon speech *because* of its content."). "The Government's content-based burdens must satisfy the same rigorous scrutiny as its content-based bans." *United States v. Playboy Ent. Grp., Inc*., 529 U.S. 803, 812 (2000).

To establish a likelihood of success on the merits, therefore, Plaintiffs need only show Defendants removed books from the Llano County Library System—or placed burdens on accessing books—based either on the viewpoints expressed or on their content without narrowly tailoring the burden to a compelling government interest.[10] *See Iancu v. Brunetti*, 139 S. Ct. 2294, 2299 (2019) (viewpoint discrimination); *Reed*, 576 U.S. at 163 (content discrimination). Courts faced with fact patterns similar to—but less extreme than—the current situation in Llano County have had no difficulty concluding there was a constitutional violation. *See, e.g.*, *Counts v. Cedarville Sch. Dist.*, 295 F. Supp. 2d 996, 1001 (W.D. Ark. 2003) (granting summary judgment where school moved Harry Potter books from shelves to "highly visible" location behind the staff counter); *Sund*, 121 F. Supp. 2d at 533-534 (granting preliminary injunction where pro-LGBTQ books were moved from children's section to adult section of library). Defendants were explicit about their animosity toward the viewpoints expressed in the Banned Books at the time they removed those books. Their post hoc efforts to recast their actions as

---

[10] While neither selection nor removal of library books may be based on unlawful discrimination, not every title has a First Amendment right to exist in every library so the standards for selection and removal are necessarily different. *See Chiras v. Miller*, 432 F.3d 606, 619 (5th Cir. 2005) ("Because *Pico* addressed the **removal** of an optional book from the school library, not the **selection** of a textbook for use in the classroom, we decline to apply *Pico* to the facts before us." (emphasis added)). All of Defendants' pre-hearing brief cases dealt with selection, not removal. *See United States v. Am. Libr. Ass'n, Inc.*, 539 U.S. 194, 212 (2003) (library can install devices to exclude pornography); *Chiras*, 432 F.3d at 619 (textbook author has no right to have his book selected for curriculum); *Egli v. Chester Cnty. Libr. Sys.*, 394 F. Supp. 3d 497, 504 (E.D. Pa. 2019) (author does not have a right to have his book selected for library); *Gay Guardian Newspaper v. Ohoopee Reg'l Libr. Sys.*, 235 F. Supp. 2d 1362, 1376 (S.D. Ga. 2002) (library does not have to offer newspapers to the public).

routine "weeding" and to offer partial and more burdensome "alternatives" to traditional access do nothing to remedy the constitutional infirmity of their actions.

### B.     Defendants Removed the Wallace List Books Because They Disagreed with the Viewpoints Expressed.

Viewpoint discrimination—namely, the suppression of information driven by subjective views and opinions—is a *per se* violation of the First Amendment. *Iancu*, 139 S. Ct. at 2299 (if a speech restriction "is viewpoint-based, it is unconstitutional"); *see Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 828-29 (1995) ("It is axiomatic that the government may not regulate speech based on its substantive content or the message it conveys."). "Official censorship based on a state actor's subjective judgment that the content of protected speech is offensive or inappropriate is viewpoint discrimination." *Robinson v. Hunt County*, 921 F.3d 440, 447 (5th Cir. 2019) (citing *Matal v. Tam*, 137 S. Ct. 1744, 1763 (2017); *accord Texas v. Johnson*, 491 U.S. 397 (1989) ("If there is a bedrock principle underlying the First Amendment, it is that the Government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable.").

The record is replete with evidence of Defendants admitting the real reason they pulled the "CRT and LGTBQ" books—including, *Caste: The Origins of Our Discontent*; *They Called Themselves the K.K.K: The Birth of an American Terrorist Group*; *Spinning*; *Being Jazz: My Life as a (Transgender) Teen*; *Shine*; *Under the Moon: A Catwoman Tale*; *Gabi, a Girl in Pieces*; and *Freakboy*—from shelves was because the books took positions with which Defendants disagreed. Ex. 8; Hr'g Tr. Vol 1 at 72:2-21, *id.* at 82:3-10, 82:24-83:3, 83:9-11, 84:2-7; 84:12-13 (*Shine*), 84:8-9 (*Spinning*), 84:10-11 (*Being Jazz*), 84:16-17 (*Gabi, A Girl in Pieces*), 84:18-19 (*Freakboy*), 84:20-21 (*Caste*), 94:23-25 (*They Called Themselves the KKK*), 75:24-76:9 (*How to Be an Anti-Racist*). Even when Milum could not recall what certain books were about, she knew

16

the books were on the Wallace List, and she knew that was why she removed them. *Id*. at 101:8-12. Indeed, "other than the fact that they were on a list entitled pornographic filth that [her] boss sent [her]," Milum testified that she knew nothing about the books she removed. *Id.* at 104:6-9.

Defendants targeted the books because they were on the Wallace List and removed them because they discussed topics Defendants deemed inappropriate or offensive. This is the sort of viewpoint discrimination that constitutes a *per se* violation of the First Amendment. *See Iancu*, 139 S. Ct. at 2299; *Robinson*, 921 F.3d at 447.

**C.      Defendants' Removal of Books Was Unconstitutionally Content Based.**

"Government regulation of speech is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed." *Reed*, 576 U.S. at 163. Content discrimination is a violation of the First Amendment unless narrowly tailored to achieve a compelling government interest. *Id.*; *Int'l Soc. for Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672, 678 (1992); *R.A.V. v. City of St. Paul*, 505 U.S. 377, 382 (1992) ("Content-based regulations are presumptively invalid."). An action that is "content based on its face is subject to strict scrutiny regardless of the government's benign motive, content-neutral justification, or lack of 'animus toward the ideas contained' in the regulated speech." *Reed*, 576 U.S. at 165 (quoting *Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 429 (1993)). Defendants' conduct easily meets this standard because they admittedly removed books discussing bodily functions and books depicting nudity based on content and have not offered, much less proven, a compelling government interest in doing so.

The evidence presented during the Hearing unequivocally demonstrated Defendants removed books from the library based on their content. Indeed, Defendants expressly admitted that the Butt and Fart Books were removed because of their content. Hr'g Tr. Vol. 1 at 127:24-128:5; *see also* Ex. 52 at 1-2; Ex. 2A; Ex. 2; Hr'g Tr. Vol. 1 at 66:9-14. Likewise, Defendants

repeatedly acknowledged that they removed *In the Night Kitchen*, and *It's Perfectly Normal* because of the content of those two books. Hr'g Tr. Vol. 1 at 70:13-18, 71:9-15; Ex. 19. Defendants chose the LGBTQ and racial equity books for removal as a result of their contents as well. Hr'g Tr. Vol. 1 at 82:3-10, 82:24-83:3, 84:12-21, 94:23-25.

### D.   Defendants' Actions Did Not Serve a Compelling Government Interest, nor Were They Narrowly Tailored.

Content-based restrictions may only stand if they survive strict scrutiny; they must be narrowly tailored to serve a compelling government interest. *See Krishna Consciousness*, 505 U.S. at 678. Actions are not narrowly tailored unless they employ "the least restrictive means to further the articulated interest." *United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 813 (2000) (quoting *Sable Communications of Cal., Inc. v. F.C.C.*, 492 U.S. 115, 126 (1989)). Defendants have never identified any governmental interest served by removal of the Banned Books, let alone a compelling one, and their contemporaneous communications evince only a desire to remove books they personally found "disgusting" or "filth[y]." Ex. 5; Ex. 19.

Even if Defendants had identified any arguably compelling governmental interest advanced by their actions, they would still be required to show their approach was narrowly tailored to achieving that objective. But Defendants' approach to removing books was not tailored at all, much less narrowly so. The Supreme Court has repeatedly noted that slipshod actions that target subsets of larger content categories provide evidence that the stated interest is not the defendant's true interest, that the purported government interest is not actually compelling, and that the government's actions fail the narrow tailoring requirement. *See Williams-Yulee v. Fla. Bar*, 575 U.S. 433, 448 (2015) (noting that "underinclusiveness can raise 'doubts about whether the government is in fact pursuing the interest it invokes, rather than disfavoring a particular speaker or viewpoint'"); *Carey v. Brown*, 447 U.S. 455, 468-69 (1980)

(holding prohibition on non-labor picketing was not narrowly tailored to interest in preserving residential privacy because labor picketing could be just as intrusive).

The record reflects a purely ad hoc process wherein books were removed based solely on allegations from sources outside the Llano Library that the books were in some way objectionable. Indeed, not one Defendant who testified at the hearing had read any of the Banned Books. *See, e.g.*, Hr'g Tr. Vol. 1 at 103:23-104:5 (Milum); *id.* at 171:23-24, 174:21-24 (Moss); Hr'g Tr. Vol. 2 at 12:8-12, 23:13-24:12 (Wells); *id.* at 154:7-10 (Cunningham). While removing the Banned Books, Defendants did not employ guidelines for achieving a specified interest, compelling or otherwise. Nor did they seek to minimize the restrictive nature of their actions— initially removing the books entirely and only restoring some of them to a secret repository ordinary library patrons could never discover. And when they eventually tried after the fact to formulate a policy for book removal, their criteria were explicitly viewpoint based. Ex. 37; Ex. 76; Hr'g. Tr. Vol. 1 at 182:10-21.  Defendants' treatment of the Banned Books was thus unconstitutionally content-based. *See Krishna Consciousness*, 505 U.S. at 678.

> **E.    The Evidence Shows Defendants' Argument That They Properly Weeded the Books Is a Pretext.**

Defendants claimed that the books they removed were "weeded," meaning removed from the catalog, pursuant to library policies. This theory—that the books at issue just happened to come up for weeding based on content-neutral principles at the exact moment national groups and prominent political commentators were urging the removal of these titles from libraries, and immediately after an email was circulated referring to the books as "pornographic filth"— contradicts the documentary evidence and Defendants' own testimony. *See supra*, pp. 6-11. Defendants' "weeding" explanation for their actions is transparently pretextual for three reasons: (1) the books Defendants removed do not meet the Library's weeding criteria, Hr'g Tr. Vol. 1 at

33:15-34:3, 35:7-38:16, 40:1-41:8, 41:16-42:19, 43:12-44:14, 45:5-18, (2) Defendants' proffered explanations were contradicted by their own testimony and by physical evidence, *see supra* pp. 9-11, and (3) Defendants' testimony is contradicted by their contemporaneous explanations for why they removed the books, *see supra* pp. 9-11.[11]

Predictably, the evidence adduced at the Hearing further confirms that serendipitous content neutrality did not drive the removal of the Banned Books. In fact, Library staff pulled the Banned Books not as part of any regular weeding process, but explicitly due to concerns about their contents among county and Library officials. Hr'g Tr. Vol. 1 at 82:8-9. Routine weeding would not have involved personal oversight from county officials outside the Library, and county officials had never ordered a book removed prior to Defendants' book-banning campaign. *Id*. at 109:23-3; *see also* Ex. 2A; Ex. 19; Hr'g Tr. Vol. 1 at 67:1-3; *id.* at 172:7-11 (showing Cunningham and Moss, the highest-ranking officials, were copied on correspondence discussing the removal of these books and expressly ordered certain books be removed). The Library removed the Banned Books because Library and county officials objected to their contents. They did so despite—not because of—the Library System's weeding criteria. Defendants' attempt to manufacture a content-neutral explanation for their actions after the fact further proves their contemporaneous conduct was constitutionally impermissible.

## II.   PLAINTIFFS SUFFERED AND CONTINUE TO SUFFER IRREPARABLE HARM.

The "loss of First Amendment freedoms for even minimal periods of time constitutes irreparable injury." *Texans for Free Enter*, 732 F.3d at 539; *accord Ingebretsen*, 88 F.3d at 280;

---

[11]  Defendants have admitted they withheld additional salient evidence of their intent—contemporaneous emails on Yahoo accounts set up for librarians to communicate with each other during the time period at issue. These critical discovery omissions will be the subject of a forthcoming motion to compel.

*Elrod*, 427 U.S. at 373; 11A Charles Alan Wright, Arthur R. Miller, & Mary K. Kane, Fed. Prac. and Proc. § 2948.1 (3d ed. 2008) ("When an alleged deprivation of a constitutional right is involved . . . most courts hold that no further showing of irreparable injury is necessary."). Defendants do not dispute that the Banned Books were available in physical form at the Llano Library in November 2021 before being removed. Ex. 52. Nor do they dispute that none of the Banned Books is currently available on the Library's public shelves or searchable in its public catalog. Hr'g Tr. Vol. 1 at 47:13-17; 55:25-56:2, 91:19-23, 114:16-115:4, 118:8-10.

At the Hearing, Defendants asserted three alternative means of accessing the Banned Books they implicitly contended remedied their constitutional violation: (1) the availability of interlibrary loans, (2) the availability of e-books on Bibliotheca, and (3) the library's secret in-house repository. Defendants' arguments fail as a matter of law because these are quintessential examples of voluntary cessation, which is insufficient to rebut a showing of irreparable harm. *See Ctr. for Biological Diversity, Inc. v. BP Am. Prod. Co.*, 704 F.3d 413, 425 (5th Cir. 2013) (defendants cannot "evade sanction by predictable protestations of repentance and reform after a lawsuit is filed").

Moreover, all three "alternatives" still impermissibly place "a significant burden on Library patrons' ability to gain access to those books." *Sund*, 121 F. Supp. 2d at 534; *see also Playboy*, 529 U.S. at 812 ("The Government's content-based burdens must satisfy the same rigorous scrutiny as its content-based bans."). The Banned Books remain off the Library's public shelves; patrons cannot find them, either purposefully or while browsing, through normal means. The "alternatives" do not restore the ease of access patrons enjoyed prior to Defendants' actions.

<u>Interlibrary Loan</u>. Three of the Banned Books—*Caste*, *It's Perfectly Normal*, and *Being Jazz*—are not available through interlibrary loan at all. Milum Decl., ¶ 10. As for the books that

are available from other libraries, postage for interlibrary loans costs $3.15 per book, and titles can take a month or more to arrive. Hr'g Tr. Vol. 1 at 53:12-17; Hr'g Tr. Vol. 2 at 124:24-125:1. Thus, even where interlibrary loan is possible, it still imposes a constitutionally impermissible burden on access to the Banned Books.

Electronic Books. Bibliotheca does not provide access to twelve of the Banned Books. Milum Decl., ¶ 10. It also requires a patron to have a compatible electronic device—a substantial expense—and does not provide access to a physical book. Hr'g Tr. Vol. 2 at 47:2-4.

Secret In-House Repository: Defendants' secret lending library contains only nine of the Banned Books. Milum Supp. Decl., ¶ 3; Hr'g Tr. Vol. 1 at 116:7-9, 117:1-9; Vol. 2 at 182:10-13. It also places an impermissible burden on those seeking to check out the Banned Books. The books are not advertised in any way nor are they in the library catalog, and thus patrons have no way of knowing they exist or finding them. Hr'g Tr. Vol. 1 at 54:23-57:1 114:16-116:6. There is also only one copy of each book, and they are present only at the Llano branch, further depriving patrons of the opportunity to find and read the Banned Books. *Id.* at 116:7-9, 117:15-17. By hiding the Banned Books behind a desk at the Library, Defendants have sent a chilling message to the community that they believe these books are "bad," and thus patrons "don't want to check them out." *Id.* at 56:23-57:1.

Courts have held similar—and less burdensome—relocations of disfavored books to be unconstitutional. In *Sund v. City of Wichita Falls*, a city moved two children's books portraying LGBTQ relationships in a positive light from the children's section to the adult section. 121 F. Supp. 2d at 533-34. The court found a substantial likelihood of success on the merits because, even though the books remained on publicly accessible shelves, they would not be found by those browsing the children's section or looking for them there; the differential burden was

unconstitutional. *Id.* at 549-51, 554. Similarly, the library in *Counts v. Cedarville School District* relocated the Harry Potter books to a "highly visible" location that was nonetheless inaccessible to students and required parental permission to access them. 295 F. Supp. 2d at 1001. The court held that the "stigmatizing effect" of having to get permission and the fact that patrons could not simply access the books on the shelves constituted an impermissible burden. *Id.* at 1002, 1005.

The Supreme Court reached the same conclusion in a closely analogous case. In *Denver Area Educational Telecommunications Consortium, Inc. v. F.C.C.*, the Court addressed a statute requiring cable providers to segregate "patently offensive" material on a separate, blocked channel subscribers could only access by making a request to their cable provider. 518 U.S. 727, 734, 753 (1996). The Court held the statute unconstitutional, pointing to the fact that viewers could not make decisions minute-to-minute while channel surfing and the stigma associated with having a record of requesting access to disfavored material. *Id.* at 754. The same result should obtain here, where Llano Library patrons cannot make decisions regarding the Banned Books while browsing the shelves and may be deterred from accessing those books from the secret in-house checkout—if they even learn of it—due to the stigma associated with having to request books Llano officials have openly described as "disgusting." Ex. 19.

III.  **THE EQUITIES AND THE PUBLIC INTEREST WEIGH IN FAVOR OF A PRELIMINARY INJUNCTION.**

"[I]njunctions protecting First Amendment freedoms are always in the public interest." *Texans for Free Enter.*, 732 F.3d at 539. "There simply is no interest, let alone a compelling one, in restricting access to non-obscene, fully-protected library books solely on the basis of the majority's disagreement with their perceived message." *Sund*, 121 F. Supp. 2d at 552. As established in Plaintiffs' opening and reply briefs, the specific equities and the public interest in this case also favor a preliminary injunction. Dkt. No. 22 at 20; Dkt. No. 59 at 10. "[T]he onus

should not be on the general public to overcome barriers to their access to fully-protected information." *Sund*, 121 F. Supp. 2d at 551 (citing *Denver Area Educ.*, 518 U.S. at 757). The threatened injury to Plaintiffs—violation their First Amendment right to access information—outweighs Defendants' interest in suppressing viewpoints and content with which they disagree. *See Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 757-58 (1976) (citing cases on First Amendment right to receive information).

## V.   THE PROPOSED INJUNCTION IS NARROWLY TAILORED TO PRESERVE PLAINTIFFS' FIRST AMENDMENT RIGHTS AND DOES NOT IMPOSE UNDUE BURDEN ON DEFENDANTS.

District Courts enjoy broad discretion in awarding injunctive relief. *See Franciscan All., Inc. v. Burwell*, 227 F. Supp. 3d 660, 695 (N.D. Tex. 2016). The injunction Plaintiffs seek would simply preserve the status quo ante by replacing the Banned Books and prohibiting Defendants from violating the First Amendment while this litigation is pending. *See* Dkt. No. 76-1.

## <u>CONCLUSION</u>

For the foregoing reasons, Plaintiffs respectfully request an order preliminarily enjoining Defendants' censorship.


Dated: December 9, 2022                     Respectfully Submitted,

                                            **BRAUNHAGEY & BORDEN LLP**
                                            /s/ *Ellen Leonida*
                                            Ellen V. Leonida (*pro hac vice*)
                                            Matthew Borden (*pro hac vice*)
                                            J. Noah Hagey (*pro hac vice*)
                                            Max Bernstein (*pro hac vice*)

                                            **BraunHagey & Borden LLP**
                                            351 California Street, 10th Floor
                                            San Francisco, CA 94104
                                            Tel & Fax: 415-599-0210
                                            leonida@braunhagey.com
                                            borden@braunhagey.com

hagey@braunhagey.com
bernstein@braunhagey.com

**WITTLIFF | CUTTER PLLC**
/s/ *María Amelia Calaf*
Ryan A. Botkin (TX Bar No. 00793366)
Katherine P. Chiarello (TX Bar No. 24006994)
María Amelia Calaf (TX Bar No. 24081915)
Kayna Stavast Levy (TX Bar No. 24079388)

**Wittliff | Cutter PLLC**
1209 Nueces Street
Austin, Texas 78701
Tel: 512-960-4730
Fax: 512-960-4869
ryan@wittliffcutter.com
katherine@wittliffcutter.com
mac@wittliffcutter.com
kayna@wittliffcutter.com

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on this 9th day of December, 2022, a true and correct copy of the foregoing document was served on all counsel of record who have appeared in this case using the Court's CM/ECF system as a Filing User.

/s/ *Ellen Leonida*
Ellen V. Leonida