UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | |
|---|---|
| **Leila Green Little**, et al., | |
| Plaintiffs, | |
| v. | Case No. 1:22-cv-00424-RP |
| **Llano County**, et al., | |
| Defendants. | |

## RESPONSE TO PLAINTIFFS' POST-HEARING BRIEF IN SUPPORT OF THEIR MOTION FOR PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

Table of contents ...........................................................................................................i

Table of authorities ......................................................................................................ii

Response to the plaintiffs' statement of facts.............................................................2

    A. All 17 of the disputed books are available for the plaintiffs to check out
from the Llano library's in-house checkout system...............................................3

    B. The Llano library's in-house checkout system is not "secret" and each of
the plaintiffs knows about it ..................................................................................6

    C. The decision to weed the 17 disputed books belonged solely to Amber
Milum, and Milum decided to weed each of those 17 books for reasons
unrelated to viewpoint or content .........................................................................7

        1. Only Amber Milum's motivations are relevant in determining whether
any of the 17 books were weeded because of their content or viewpoint ........ 9

        2. Ms. Milum weeded the 17 disputed books because she believed that
each of them met the library's criteria for weeding ....................................11

Argument .....................................................................................................................19

    I. The plaintiffs have not made a "clear showing" of likely success on the merits.......19

    A. The in-house checkout system does not and cannot violate the plaintiffs'
First Amendment right to access information .....................................................19

    B. A public library's weeding decisions are subject only to rational-basis review...... 22

    C. Amber Milum did not engage in viewpoint or content discrimination when
weeding the 17 disputed books ...........................................................................25

    II. The plaintiffs have not made a "clear showing" of irreparable harm .....................28

    III. The Court should deny out of hand the requested relief in paragraphs 3
through 6 of the plaintiffs' proposed order ..........................................................29

    IV. If the Court awards a preliminary injunction, it should be directed only to
Amber Milum .......................................................................................................30

Conclusion ...................................................................................................................30

Certificate of service ...................................................................................................31

# TABLE OF AUTHORITIES

**Cases**

*ACLU of Florida, Inc. v. Miami-Dade County School Board*,
  557 F.3d 1177 (11th Cir. 2009) ........................................................... 2

*Barber v. Bryant*, 860 F.3d 345 (5th Cir. 2017) ..................................... 6

*Board of Education v. Pico*, 457 U.S. 853 (1982) ................................. 8, 22, 23, 24

*Campbell v. St. Tammany Parish School Board*, 64 F.3d 184 (5th Cir. 1995) .... 22, 23

*Chiras v. Miller*, 432 F.3d 606 (5th Cir. 2005) ....................................... 21, 24, 25

*CK-W by and through TK v. Wentzville R-IV School District*,
  --- F. Supp. 3d ----, 2022 WL 3138989, *5 (W.D. Mo.) ...................... 22, 23, 28

*Coon v. Ledbetter*, 780 F.2d 1158 (5th Cir. 1986) ................................ 20

*Counts v. Cedarville School District*, 295 F. Supp. 2d 996 (W.D. Ark. 2003) ......... 20

*Garrett v. Clarke*, 147 F.3d 745 (8th Cir. 1998) ................................... 20

*In re Gee*, 941 F.3d 153 (5th Cir. 2019) ............................................... 1

*Jones v. District of Columbia*, 177 F. Supp. 3d 542 (D.D.C. 2016) ........ 28

*Roe v. Cypress-Fairbanks Independent School District*,
  53 F.4th 334 (5th Cir. 2022) ............................................................... 29

*Serra v. U.S. General Sevices Administration*, 847 F.2d 1045 (2d Cir. 1988) ......... 23

*Sund v. City of Wichita Falls*, 121 F. Supp. 2d 530 (N.D. Tex. 2000) ............. 20, 21

*Texas Medical Providers Performing Abortion Services v. Lakey*,
  667 F.3d 570 (5th Cir. 2012) ............................................................. 19

*TransUnion LLC v. Ramirez*, 141 S. Ct. 2190 (2021) ........................... 1, 2

*United States v. American Library Ass'n Inc.*, 539 U.S. 194 (2003) .... 21, 22, 24, 25

*Valley Forge Christian College v. Americans United for Separation of Church
  and State, Inc.*, 454 U.S. 464 (1982) ................................................. 28

*Virgil v. School Board of Columbia County, Florida*,
  862 F.2d 1517 (11th Cir. 1989) ........................................................... 23

*Winter v. Natural Resources Defense Council*, 555 U.S. 7 (2008) ......... 28

**Statutes**

42 U.S.C. § 1983 ................................................................................ 1, 20

**Other Authorities**

David P. Currie, *Misunderstanding Standing*, 1981 Sup. Ct. Rev. 41 ............ 20

Every one of the 17 disputed books is currently available for the plaintiffs to check out at the Llano library—just as they were before the books were weeded. The only difference is that the books are available through the library's in-house check-out system rather than on the shelves and in the catalog. But none of that inflicts any First Amendment injury on the plaintiffs, because all of the plaintiffs are fully aware of the library's in-house check-out system and know that the disputed books remain available for them to check out. So each plaintiff has the same "right to access information" that they had before the books were weeded.

The plaintiffs cannot show a violation of their First Amendment rights when they *know* that the disputed books remain available for check out at Llano library. And they certainly cannot establish "irreparable harm" when they can check out the disputed books with the same ease as before. The plaintiffs have produced no evidence or testimony showing how they would be "irreparably harmed" by obtaining these books through the in-house check-out system rather than the catalog and shelves. And they present no argument for how the defendants have deprived them of their supposed "right to access information" when the defendants have fully preserved the plaintiffs' ability to check out the disputed books.

The plaintiffs complain that the in-house checkout system is insufficient because *other* library patrons might not be aware of it.[1] But the plaintiffs have no standing to assert the First Amendment rights of non-parties, and neither 42 U.S.C. § 1983 nor the Declaratory Judgment Act allows the plaintiffs to sue over their alleged violations of someone else's constitutional rights. The plaintiffs appear to have forgotten that courts exist to resolve disputes between named litigants, not to act as "roving commissions"[2] empowered to pass judgment

---

1.  *See* Pls.' Br., ECF No. 91, at 12–13; *id*. at 21–22.
2.  *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2203 (2021); *see also id*. ("Federal courts do not possess a roving commission to publicly opine on every legal question. Federal courts do not exercise general legal oversight of the Legislative and Executive Branches, or of private entities."); *In re Gee*, 941 F.3d 153, 161 (5th Cir. 2019) ("'[U]nder our constitutional system[,] courts are not roving commissions assigned to pass judgment on the validity of the Nation's laws.'" (quoting *Broadrick v. Oklahoma*, 413 U.S. 601, 610–11 (1973)).

on the conduct of the Llano public-library system. *See TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2205 (2021) ("Article III grants federal courts the power to redress harms that defendants cause plaintiffs, not a freewheeling power to hold defendants accountable for legal infractions." (citation and internal quotation marks omitted)). So the plaintiffs must make a "clear showing" that the defendants are violating *the plaintiffs'* First Amendment rights by offering the disputed books through an in-house checkout system of which the plaintiffs are fully aware. And the plaintiffs must make a "clear showing" that *they* will suffer irreparable harm if they obtain books through the in-house checkout system. They have come nowhere close to making any showing — let alone a "clear showing" — on either of these requirements, so they are not entitled to the "extraordinary remedy" of a preliminary injunction.

## RESPONSE TO THE PLAINTIFFS' STATEMENT OF FACTS

The plaintiffs' recitation of the facts is incomplete and (in many places) demonstrably false. Throughout their brief, the plaintiffs deploy imprecise terminology (such as "remove" books, which is unclear whether to refers to a temporary decision to pull the book from the shelves for review or permanent decision to weed the book from the library's shelves and catalog) and tiresome hyperbole. Saying that the 17 disputed books have been "banned" or "censored" is histrionic when each of those books remains available for patrons to check out through the library's in-house system and (for most of the books) through additional means such as Bibliotheca or InterLibrary Loan. Books that have been weeded from the shelves yet remain available to library patrons through other means have not been "banned" or "censored" — any more than the thousands of books that the Llano library system weeds each year. The plaintiffs apparently think they gain a rhetorical advantage from throwing around terms like "banned" or "censored," but candid advocacy requires one to accurately describe the actions of an opposing litigant. *See, e.g., ACLU of Florida, Inc. v. Miami-Dade County School Board*, 557 F.3d 1177, 1218 (11th Cir. 2009) ("Book banning takes place where a

government or its officials forbid or prohibit others from having a book. . . . [R]emoving a book from [library] shelves is not book banning.").

The Court deserves an accurate recitation of the facts before it rules on the motion for preliminary injunction—especially when the Court's ruling is likely to be reviewed on appeal. So we must begin by addressing the outright falsehoods that appear throughout the plaintiffs' brief before considering the relevant legal standards and applying the law to the facts.

### A. All 17 Of The Disputed Books Are Available For The Plaintiffs to Check Out From The Llano Library's In-House Checkout System

The plaintiffs repeatedly and falsely claim that Llano library's in-house check-out program includes only nine of the 17 disputed books. *See* Pls.' Br., ECF No. 91, at 22 (complaining that "only nine" of the books are available through in-house checkout); *id.* at 13 ("The [nine] donated books make up the entirety of the Llano Library's in-house checkout program."). Those statements are demonstrably untrue and misrepresent the factual record.

The plaintiffs' "only nine books" claim appears to be derived from Amber Milum's declaration of July 23, 2022, which reports that the library had accepted a donation of nine books, and that Milum added those donated books to Llano library's already existing in-house checkout system. *See* Milum Supp. Decl., ECF No. 53, at ¶¶ 3–4. But Ms. Milum's declaration of July 15, 2022, makes clear that the three "butt" books and the four "fart" books were already part of the library's in-house checkout system, which is why they were excluded from the subsequent nine-book donation. *See* Milum Decl., ECF No. 49-1, at ¶¶ 10–11. Paragraph 10 of Ms. Milum's declaration provides a chart explaining how

> each of the [disputed] books is currently available to the plaintiffs in at least one of the following three ways: (1) On Bibliotheca/CloudLibrary; (2) For check out from the Llano County library system through Inter Library loan; or (3) *For check out directly from the Llano County library system through its 'in-house checkout' system,* in which a personal or donated book is made available to library patrons for check out.

*Id.* at 10 (emphasis added). And the chart itself contained the following entries for the "butt" and "fart" books:

| Title | Author | Availability |
|-------|--------|--------------|
| *My Butt is So Noisy!, I Broke My Butt!, I Need a New Butt* | McMillan, Dawn | Inter Library loan, ==Physical copies available for in-house checkout== |
| *Larry the Farting Leprechaun, Gary the Goose and His Gas on the Loose, Freddie the Farting Snowman, Harvey the Heart Has Too Many Farts* | Bexley, Jane | Inter Library loan, ==Physical copies available for in-house checkout== |

*Id.* at ¶ 10 (highlighting added).[3] Ms. Milum then explained that the donor would send copies only of the books that were not already available through in-house checkout:

> [A] donor who wishes to remain anonymous has pledged to me that he will donate physical copies of each of the books listed in the chart for inclusion in Llano County's "in-house checkout" *if those books are not already available for checkout through that in-house checkout system.* I have promised that donor that I will accept his gift and add each of those books to our collection of titles available for in-house checkout. *This will ensure that each of the plaintiffs can check out physical copies of each of the disputed books from the Llano County library system without having to use Inter Library loan or Bibliotheca if they find those alternatives inconvenient.*

*Id.* at ¶ 11 (emphasis added). Ms. Milum's declarations are as clear as can be: The in-house checkout system includes each of the three "butt" books and each of the four "fart" books, plus the nine additional books that were donated on July 21, 2022.

Ms. Milum also testified that each of the "butt" and "fart" books is currently available to patrons through Llano library's in-house checkout system. *See* Hr'g Tr. Vol. 1 at 132:5–7 ("Q. Are the Butt books and the Fart books currently available for checkout in the library? A. Yes."); *id.* at 114:8–23. Plaintiff Leila Little acknowledged that each of the "butt" and "fart" books, along with each of the nine books that was donated on July 21, 2022, is currently available through in-house check out. *See* Hr'g Tr. Vol. 2 at 67:21–70:8. And plaintiffs'

---

3.    *See also id.* at ¶ 18 ("Each of the plaintiffs can also check out physical copies of the following books directly from the Llano County libraries: (1) *My Butt is So Noisy!, I Broke My Butt!,* and *I Need a New Butt* by Dawn McMillan; (2) *Larry the Farting Leprechaun, Gary the Goose and His Gas on the Loose, Freddie the Farting Snowman* by Dawn McMillian.").

counsel knows full well that the "butt" and "fart" books are included in the in-house check-out system, as they repeatedly elicited this testimony during their examination of Ms. Milum:

> Q. The Llano County Library System has an inhouse checkout program?
> A. Yes. . . .
> Q. In this case, the books that we talked about that you weeded in November of 2021 *and in August of 2021*, those books are not available in the Llano County card catalog system, correct?
> A. Right.
> Q. *You have those books available behind a desk in the library?*
> A. Yes.

Hr'g Tr. Vol. 1 at 114:8–23 (emphasis added).[4] For the plaintiffs to assert that "only nine" books are available through the in-house checkout system in the teeth of these declarations and this courtroom testimony is nothing short of misrepresentation.

The only one of the 17 disputed books that is unaccounted for in Ms. Milum's declarations and testimony is *Under the Moon: A Catwoman's Tale*. This book was not included in the donation of July 21, 2022, because none of the seven plaintiffs complained about the removal of *Under the Moon* or expressed any interest in checking out the book.[5] So the plaintiffs have failed to make a "clear showing" of injury in fact from the weeding of that book,

---

4. *See also id.* at 121:8–122:4 ("Q. . . . The books that were removed on November 11th, let's start with Caste, right? Caste does not appear in the online catalog at all? A. Right. Q. The only copy is in the back room where patrons can't see it? . . . Q. And *that's true of all of the books that you weeded in November of 2021 and August of 2021 that we've been talking about, correct?* A. Yes." (emphasis added)). Ms. Milum weeded the "butt" books in August of 2021. *See id.* at 63:24–25 (Q. Now, you removed the Butt books from circulation in August of 2021, correct? A. Yes.").

5. *See* Day Decl., ECF No. 22-2, at ¶ 4 (no mention of *Under the Moon*); Jones Decl., ECF No. 22-3, at ¶ 3 (same); Kennedy Decl., ECF No. 22-4, at ¶ 3 (same); Little Decl., ECF No. 22-5, at ¶ 3 (same); Moster Decl., No. 22-7, at ¶ 3 (same); Puryear Decl., ECF No. 22-9, at ¶ 3 (same); Waring Decl., No. 22-11, at ¶ 3 (same); *see also* Hr'g Tr. Vol. 2 at 28:6–70:20 (testimony of plaintiff Leila Green Little, which never mentions *Under the Moon* or expresses any desire to check it out); Third Milum Decl. ¶ 5 (attached as Exhibit 5) ("*Under the Moon: A Catwoman's Tale*, by Lauren Myracle, was not included in the original donation of July 23, 2022, because none of the plaintiffs complained about the removal of that book or expressed interest in checking out that book in their sworn declarations.").

and they cannot obtain a preliminary injunction that orders its return to the shelves. *See Barber v. Bryant*, 860 F.3d 345, 352 (5th Cir. 2017) ("Because a preliminary injunction 'may only be awarded upon a clear showing that the plaintiff is entitled to such relief,' the plaintiffs must make a 'clear showing' that they have standing to maintain the preliminary injunction." (citation omitted)). Out of an abundance of caution, however, the Llano library accepted a donation of *Under the Moon* on October 31, 2022, and added it to the in-house collection the next day. *See* Third Milum Decl. ¶ 6 (attached as Exhibit 5). So all 17 of the disputed books (including *Under the Moon*) are available for the plaintiffs to check out through the in-house library system. *See id.*

## B.   The Llano Library's In-House Checkout System Is Not "Secret" And Each Of The Plaintiffs Knows About It

The plaintiffs' claim that Llano library's in-house checkout is "secret" is equally false. Not only was this system publicly disclosed in court filings and at the hearing, but plaintiff Leila Little testified that she read about the in-house checkout system in the newspaper and was told about it by a librarian:

> I believe I first became aware of that through legal documents pertaining to this litigation. Following that, I did read about it. I believe it was in the Daily Trib newspaper that referred to the court filings referring to it. And following that, a librarian had told me about it.

Hr'g Tr. Vol. 2 at 42:18–22; *see also id.* at 78:9–12 ("My awareness is based on, again, my viewing of the legal documents, my reading in the newspaper that reported on the legal documents referring to this inhouse system, and information given to me by librarians."). All seven plaintiffs attended the hearing at which the in-house checkout system was discussed, so they are acutely aware of its existence. *See, e.g.*, Hr'g Tr. Vol. 2 at 42:18–22, 67:3–70:8, 78:9–12, 114:23–117:7 (Milum discussing extensively the in-house library system); *see also* Hr'g Tr. Vol. 1 at 54:12–55:16 (Castelan testifying about the in-house check out system).

The plaintiffs are also aware that the disputed books in the case—including the "butt" and "fart" books—are available through Llano library's in-house system, because they heard

testimony that repeatedly referred to those books when describing the titles available through in-house checkout. *See* Hr'g Tr. Vol. 1 at 114:8–23, 121:8–122:4, 131:5–132:10 (Milum testifying that 16 of the disputed books are available for in-house check out and mentioning each by name.). The only disputed book that went unmentioned was *Under The Moon*, but that book has since been added to the in-house collection,[6] and none of the plaintiffs produced testimony or evidence that they wanted to check out that book.

### C. The Decision To Weed The 17 Disputed Books Belonged Solely To Amber Milum, And Milum Decided To Weed Each Of Those 17 Books For Reasons Unrelated To Viewpoint Or Content

The plaintiffs' claim that the disputed books were weeded because "the defendants" disapproved of the content or viewpoints in those books is also false. Amber Milum alone made the decisions to weed each of the 17 disputed books from the library shelves.[7] And Ms. Milum has declared and testified under oath that she weeded those 17 books for reasons unrelated to their content or viewpoints.[8] Ms. Milum didn't even read the books on Bonnie

---

6.  *See* Third Milum Decl. ¶ 6 (attached as Exhibit 5).

7.  *See* Hr'g Tr. Vol. 1 at 130:23–131:3 ("Q. Were any of your ultimate decisions to weed any book from the library shelves influenced in any way by anyone on the commissioners' court? A. No. Q. Were they influenced by anyone on the library advisory board? A. No."); *id.* at 90:16–17, 92:23–93:1, 97:9–12, 98:6–8, 98:24–99:3, 100:3–5, 101:13–19, 103:10–13; Milum Decl., ECF No. 49-1, at ¶16 ("I was never instructed or pressured by the County Judge or any of the County Commissioners to weed or otherwise permanently remove any books from the Llano County libraries. I was also never instructed to remove any books from the libraries by the Llano County Advisory Board."); Third Milum Decl. ¶ 15 ("I alone made the decisions to weed the 17 disputed books in this case. No other defendant in this case, including Bonnie Wallace, Rochelle Wells, Rhonda Schneider, Jerry Don Moss, or Ron Cunningham, has ever weeded a book from Llano library or directed me to weed a book. Nor has any of these individuals pressured or attempted to pressure me to weed any book from the library.").

8.  *See* Milum Decl., ECF No. 49-1, at ¶ 15 ("I did not consider the content of any of the books I weeded when I made the decision to weed them. I also did not consider any of the viewpoints expressed in any of the books I weeded. I weeded the books based on the objective criteria I always use in determining which books to weed."); *id.* at ¶ 17 ("No book was removed based on its content or viewpoint during this process.").

Wallace's list,[9] so she could not have based her decision to weed those books on content or viewpoints that she wasn't even aware of.

The plaintiffs do not claim that Ms. Milum is lying in her declarations or courtroom testimony, and none of the plaintiffs' witnesses or declarants claim to have personal knowledge of Ms. Milum's subjective state of mind. So the testimony on Ms. Milum's actual motivations for weeding the 17 books is unrebutted, and it conclusively refutes the plaintiffs' accusation that Ms. Milum engaged in "content discrimination" or "viewpoint discrimination." *See Board of Education v. Pico*, 457 U.S. 853, 870–71 (1982) (plurality op. of Brennan, J.) ("[W]hether petitioners' removal of books from their school libraries denied respondents their First Amendment rights depends upon the motivation behind petitioners' actions.").

Instead, the plaintiffs deliberately conflate the decision to temporarily pull the books for review with the decision to permanently "weed" the books and erase them from the library catalog. The plaintiffs' brief uses the verb "remove" interchangeably to encompass each of these actions, without indicating whether "remove" is referring to the *temporary* "removal" of the hundreds of books that were placed on a cart for Ms. Milum to review — the vast majority of which were returned to the library shelves, and all of which remained available for checkout while Ms. Milum conducted her review[10] — or the *permanent* "removal" that occurred when Ms. Milum decided to weed the 17 books at issue in this lawsuit.[11]

Here is an example of the plaintiffs' obfuscation: Their assertion that Ms. Milum "knew the books were on the Wallace List, and she knew that was why she removed them." Pls.' Br.,

---

9.   *See* Hr'g Tr. Vol. 1 at 104:3–5 ("Q. Have you read any of the books that we've been talking about? A. No.").

10.  *See* Hr'g Tr. Vol. 1 at 30 ("[W]hile they were on the cart in Amber's office, were they available to be checked out? A. Yes. We just had to ask for them.").

11.  For an example of the former meaning of "remove" in the plaintiffs' brief, *see* Pls.' Br., ECF No. 91, at 4 ("[T]he library was closed for three days, and librarians were instructed to *remove* any book that depicted nudity of any kind." (emphasis added)). For an example of the latter meaning of "remove," *see id.* at 19 ("[T]he books Defendants *removed* do not meet the Library's weeding criteria" (emphasis added)).

ECF No. 91, at 16–17. If the word "remove" refers to Milum's decision to *temporarily* pull the books for review, then the statement is truthful. Milum did pull books from the Wallace List to determine whether they met the criteria for weeding. *See* Hr'g Tr. Vol. 1 at 83:8 ("I pulled them to review them, not to weed them."). But if the word "remove" refers to Milum's decision to *permanently* remove, *i.e.*, weed the book, then the statement is false. Milum decided to weed the books because (in her judgment) they met the criteria for weeding, not because Bonnie Wallace wanted the books removed. *See* Third Milum Decl. ¶¶ 38–39. The plaintiffs elide this distinction throughout their brief to create the impression that the reasons behind the *temporary* removal of the hundreds of books that were placed on a cart for review were the same reasons behind the *permanent* removal of the 17 books that got weeded.

But there is nothing unconstitutional about taking a library book off a shelf to *review* whether it should be weeded, especially when the book remains available for checkout during the review process.[12] So the motivations behind the requests that Ms. Milum *examine* the books that were temporarily pulled are irrelevant to this lawsuit. The only injury that the plaintiffs are seeking to remedy is the injury caused by the decision to *weed* the 17 disputed books, which no longer appear in the library shelves or catalog. And the only relevant motivations are those behind the decisions to weed, *i.e.*, the decisions to *permanently* remove the 17 disputed books from the library's catalog and shelves. Ms. Milum testified that she weeded those books because (in her judgment) they met the criteria for weeding, and the plaintiffs have no evidence that Ms. Milum is lying about her motivations for weeding those books.

### 1. Only Amber Milum's Motivations Are Relevant In Determining Whether Any Of The 17 Books Were Weeded Because Of Their Content Or Viewpoint

Amber Milum is the only defendant who has authority to weed books from the Llano library,[13] and the decisions to weed the 17 disputed books were made by Ms. Milum alone.[14]

---

12.  *See* note 10, *supra*.

13.  *See* note 16, *infra*; see note 18, *infra*.

14.  *See* note 7, *supra*; Third Milum Decl. ¶ 15.

The plaintiffs' preoccupation with the motivations of Bonnie Wallace and Rochelle Wells—and their attempts to use the statements of Wallace and Wells to impute motivations to "the defendants" as a collective whole—is a sideshow. *See* Pls.' Br., ECF No. 91, at 5–6; *id*. at 11; *id*. at 16–18. Bonnie Wallace, Rochelle Wells, Rhonda Schneider, and Jerry Don Moss did not weed or temporarily remove a single book from Llano library,[15] and they have no authority to move a library book or instruct anyone to do so.[16] Ron Cunningham instructed Amber Milum to temporarily pull books from the library shelves for review,[17] but he never instructed Ms. Milum (or anyone else at the library) to permanently weed a book.[18] The plaintiffs' brief repeatedly and falsely states that "Defendants" (plural) "removed" the disputed books—apparently in an effort to make Bonnie Wallace's and Rochelle Wells's subjective motivations relevant to this case. There is only one defendant who "removed," *i.e.*, weeded the books from the Llano library.[19] And only the motivations of *that* defendant will determine whether the books were removed for content- or viewpoint-based reasons.

15. *See* Third Milum Decl. ¶ 15 (attached as Exhibit 5) ("No other defendant in this case, including Bonnie Wallace, Rochelle Wells, Rhonda Schneider, Jerry Don Moss, or Ron Cunningham, has ever weeded a book from Llano library or directed me to weed a book."); Hr'g Tr. Vol. 2 at 164:20–24 (Moss) ("Q. How many times, if any, did you direct Amber Milum to remove a particular book from the Llano County Library System? A. I did not direct her to remove any books from the library.").

16. *See* Hr'g Tr. Vol. 2 at 111:6–13 ("Q. Does Bonnie Wallace or Rochelle Wells have any authority to remove or weed a book from the Llano County libraries? A. No. Q. Does Bonnie Wallace, or Rochelle Wells, or any member of the library advisory board have authority to direct you to weed or remove a book? A. No."); *id*. at 112:24–113:5 ("Q. Does Jerry Don Moss have any authority or ability to remove or weed a book from the Llano County Library System? A. No. Q. Does Jerry Don Moss have the authority to direct you to weed or remove a book? A. No.").

17. *See, e.g.*, Hr'g Tr. Vol. 1 at 145:8–13.

18. Cunningham Decl., ECF No. 49-2, at ¶ 11 ("I have never instructed any library staff, including Ms. Milum, to remove any books from the Llano County library shelves. Nor have l removed any books. It is not within my duties as County Judge to either acquire or remove books from the libraries."); Hr'g Tr. Vol. 2 at 156:16–17 (testimony of Ron Cunningham) ("At no point did I instruct her to pull those books from the shelves.").

19. *See* Third Milum Decl. ¶ 16 ("The plaintiffs' claim that the "defendants" (plural) weeded or temporarily removed books from the Llano library is false. I am the only

### 2.    Ms. Milum Weeded The 17 Disputed Books Because She Believed That Each Of Them Met The Library's Criteria For Weeding

Ms. Milum explained in her declarations and testimony why she weeded nine of the ten books that were weeded in the fall of 2021: Each of those books (in her judgment) met the criteria for weeding under the CREW and MUSTIE factors. *See* Milum Decl., ECF No. 49-1, at ¶¶ 8, 12–16; Hr'g Tr. Vol. 2 95:16–106:20 (explaining reasons for weeding *Freakboy*, *Being Jazz:*, *Gabi, A Girl In Pieces*, *They Called Themselves The KKK*, *Spinning*, *Shine*, *Caste: The Origins of Discontent*, *It's Perfectly Normal*, and *In The Night Kitchen*).[20]

Ms. Milum also explained her reasons for weeding the "butt" and "fart" books[21] in August of 2021: (1) No one had asked for or inquired about the "butt" books that were continuously being checked out by Rochelle Wells and Rhonda Schneider;[22] (2) The actions of Wells and Scheneider would render the "butt" and "fart" books inaccessible to other patrons;[23] and (3) The "butt" and "fart" books were trivial and "didn't really meet anyone's needs," and they remained available to patrons through interlibrary loans, so the books satisfied the "Trivial" and "Elsewhere" factors for weeding under the MUSTIE framework.[24]

---

defendant who weeded the 17 disputed books from the Llano library, and I am the only defendant who temporarily removed any of those books from the shelves.").

20.  Ms. Milum did not previously explain her reasons for weeding *Under The Moon*. *See* note 5 and accompanying text. Ms. Milum weeded that book because it wasn't getting checked out enough. *See* Third Milum Decl. ¶ 19.

21.  The plaintiffs' claim that Ms. Milum "permanently removed all seven titles from the library" is false. *See* Pls.' Br., ECF No. 91, at 2–3. Each of the books remains available for check-out through the in-house checkout system. *See* Third Milum Decl. ¶ 9.

22.  Hr'g Tr. Vol. 2 at 106:24–25 ("[N]obody else asked for it."); *id.* at 107:8–9. The plaintiffs falsely claim that Wells and Schneider were checking out *all* of the "butt" and "fart" books. *See* Pls.' Br., ECF No. 91, at 3 ("[T]hey began repeatedly checking out the Butt *and Fart* Books, keeping them off the shelves and inaccessible to other library patrons." (emphasis added)). Wells and Schneider checked out only two of the three "butt" books, and the remaining "butt" book and the "fart" books were never placed on the shelves or checked out. *See* Third Milum Decl. ¶ 10.

23.  Hr'g Tr. Vol. 2 at 106:21–107:24.

24.  Hr'g Tr. Vol. 2 at 107:25–108:9; *id.* at 107:12 ("[I]t was just silly trivial books"); *id.* at 107:2–3 ("They were more trivial books, anyway."). The plaintiffs' claim that Judge Cunningham and Commissioner Moss "directed" Milum to weed the "butt" and "fart"

The plaintiffs do not claim and produced no evidence that Ms. Milum is lying in her declarations or courtroom testimony. And none of the other witnesses claimed to know Ms. Milum's subjective state of mind or denied that Ms. Milum believed that the books qualified for weeding. The defendants falsely claim that Ms. Milum's stated reasons were "manufacture[d] . . . after the fact,"[25] but Ms. Milum has declared unequivocally that these were her actual reasons and motivations at the time the books were weeded,[26] and the defendants have produced nothing in the way of evidence to show that Ms. Milum lied to the court.

Yet the plaintiffs insist that the *real* reason Ms. Milum weeded these books is because she disapproved of their viewpoints or content. *See* Pls.' Br., ECF No. 91, at 6–11; 16–20. They make this claim because (according to the plaintiffs) the disputed books did not meet the library's criteria for weeding, and they base his claim on the testimony of a single witness, Tina Castelan, who claimed that Milum's decisions to weed some of disputed books violated the library's weeding policies. *See id.* at 6–9; Hr'g Tr. Vol. 1 at 33:15–45:18. Castelan's accusation is false and is soundly refuted by Ms. Milum's courtroom testimony and declarations. *See* Hr'g Tr. Vol. 2 at 95:16–109:12; Milum Decl., ECF No. 49-1; Third Milum Decl.

The Llano library system's criteria for weeding appears on a chart on the first page of Plaintiffs' Exhibit 23, which we have attached to this brief as Exhibit 1. *See* Third Milum Decl. ¶ 22. According to this chart, a book's eligibility for weeding depends on its Dewey

---

books is false. *See* Pls.' Br., ECF No. 91, at 3. Judge Cunningham recommended only that Ms. Milum *temporarily* remove those books from the shelves. *See* Pls.' Ex. 2A ("Amber, I am still receiving calls, letters and emails concerning the Farts and Butts books. I think it is best to remove these books from the shelves *for now*." (emphasis added)). See Second Cunningham Decl. ¶¶ 3–5 (attached as Exhibit 3); Third Milum Decl. ¶ 14. Commissioner Moss never even discussed the "fart" books with Milum, and he merely expressed his opinion that the "butt" books did not belong in the children's section. *See* Second Moss Decl. ¶¶ 3–4; Third Milum Decl. ¶¶ 11–12.

25. Pls.' Br., ECF No. 91, at 20.

26. *See* Third Milum Decl. ¶ 21 ("[M]y stated reasons for weeding the books were my actual reasons and motivations for weeding the books at the moment the decision was made. . . . [N]othing in my testimony was 'manufacture[d] . . . after the fact.'").

decimal class. *See id*. If one looks at the second line on the left-half columns, for example, a book in Dewey class 020 would is accompanied by the entry 10/3/MUSTIE, where the first number stands for "age," the second number "years since last circulation," and the third category "condition." *See* Ex. 1. That means a book in Dewey class 020 (or any other category marked with 10/3/MUSTIE) becomes eligible for weeding if:

1. It is more than 10 years old;
2. It has been three years or since its last circulation; *or*
3. It qualifies for weeding the MUSTIE criteria.

Third Milum Decl. ¶ 23. Only one of the three categories needs to be met; each is a sufficient and not a necessary condition to make a book eligible for weeding.[27]

The MUSTIE criteria stand for Misleading, Ugly, Superseded, Trivial, Irrelevant, or Elsewhere, and each of these categories was explained at the hearing. *See* Hr'g Tr. 90:15–93:9. It is permissible and sometimes prudent for a librarian to weed a book based on the presence of a single MUSTIE factor, such as books that are seriously damaged (Ugly), that have been replaced by a new edition in the library (Superseded), or that haven't been checked out in 10 years (Irrelevant). Third Milum Decl. ¶ 24. But when a book only barely meets a single MUSTIE factor, or if the issue with the book is a relatively minor one, a librarian will often (but not always) look for the presence of an additional MUSTIE factor before deciding to weed the book. *See id*. The CREW and MUSTIE factors are guidelines, not hard-and-fast rules. *See* Hr'g Tr. Vol. 2 at 108:21–23 ("[E]very librarian is just trained differently by their bosses and you use your own judgment on a lot of this.").

Every single book that Milum weeded met at least one of the MUSTIE factors, and nearly all of them satisfied two and possibly more of those factors. Milum thoroughly explained this in her courtroom testimony. *See* Hr'g Tr. Vol. 2 95:16–108:9. Castelan's testimony did not rebut any of this. To begin, Castelan *conceded* that *Freakboy* was appropriately

---

27.   Sometimes a factor is marked with an "X"; that means the factor should not be considered when weeding books in that Dewey range. *See* Ex. 1.

weeded because of its poor circulation record. *See* Hr'g Tr. Vol. 1 at 38:25–39:7. With respect to the remaining 16 books, Castelan opined only that the *circulation record* of those 16 books was not, in her opinion, enough to support a decision to weed. *See id.* But Castelan was never asked whether any of the other MUSTIE factors could support Milum's decision to weed those 16 books, such as the "Ugly," "Trivial," or "Elsewhere" criteria, and Castelan did not rebut Milum's reliance (or potential reliance) on those factors. Milum, for example, testified that the "butt" and "fart" books were appropriately weeded under the "Trivial" and "Else-where" categories,[28] and that the "Elsewhere" category supported her decision to weed the other disputed books.[29] Castelan never even addressed (let alone rebutted) this. Apparently the lawyer who examined Castelan thinks that having a witness opine that a book fails qualify for weeding on the ground of insufficient check-outs eliminates any possibility that the same book could qualify for weeding under the remaining MUSTIE factors.

Castelan's testimony was mistaken in other respects. She claimed, for example, that *It's Perfectly Normal* was improperly weeded "because its last checkout was in 2018,"[30] but under the Llano library's CREW chart a book in that Dewey class becomes eligible for weeding three years since its last checkout. *See* Third Milum Decl. ¶ 27. Castelan also testified that *Gabi, a Girl in Pieces* was improperly weeded "because [it's] last checkout was 2018 and we've had it since 2016." Hr'g Tr. Vol. 1 at 44:12–14. But *Gabi* is a Young Adults book, which becomes eligible for weeding two years after its last circulation or three years after it was first acquired. *See* Third Milum Decl. ¶ 28. *Gabi* qualified for weeding under either cri-terion. Castelan also claimed that *Being Jazz* was improperly weeded because the Llano li-braries "only had one or two of the books that pertained to its subject." Hr'g Tr. Vol. 1 at 42:17–18. That is untrue; there are no fewer than 10 other books on the subject of

---

28.

29.

30.   Hr'g Tr. Vol. 1 at 37:15.

transgender youth in the Llano library system, in addition to the copy of *Being Jazz* that remains in circulation at the Kingsland library. *See* Third Milum Decl. ¶ 29.

But Castelan's errors pale in comparison to the misrepresentations in the plaintiffs' brief. The plaintiffs claim that Castelan "explained that historically the Llano Library looked for two or three MUSTIE criteria to be satisfied for weeding eligibility" and that "Milum agreed with that assessment." Pls.' Br., ECF No. 91, at 7. That is a dishonest characterization of the testimony. Here is what Castelan actually said:

> Q. Does any one MUSTIE factor mean that a book is weeded?
> A. No. It's *usually* a combination.
> Q. Is there a minimum number?
> A. So *my minimum number* was always two to three.

Hr'g Tr. Vol. 1 at 21:17–21 (emphasis added). Castelan was not testifying about "historical" practices at the Llano library; she was describing her own personal application of the MUSTIE factors. She also hedged by saying that it's "usually" a combination of factors, a qualification that the plaintiffs omit in their description of Castelan's testimony. And here is the relevant testimony from Amber Milum:

> Q. You also testified previously that a book not having been checked out in three years alone is not a sufficient reason by itself to weed that book, correct?
> A. Yes.

Hr'g Tr. Vol. 2 at 125:2–5. This exchange does not remotely signify agreement with the claim that "historically the Llano Library looked for two or three MUSTIE criteria to be satisfied for weeding eligibility." Milum was asked about only *one* hypothetical MUSTIE factor—a book's not having been checked out in *three* years—and whether a book of that sort should automatically be weeded in that particular scenario. She did not say that two or more MUSTIE factors must always be present before a book is weeded, or that the Llano library "historically" followed such a practice. *See* Third Milum Decl. ¶ 25.

The plaintiffs are also misrepresenting evidence when they claim that "the CREW Manual states that books are to remain on shelves unless they do not circulate 'for 3–5 years.'"

Pls.' Br., ECF No. 91, at 10 (citing Pls.' Ex. 23 at 44). The document that they cite is not the CREW manual, but a slideshow produced by Dawn Volger, who is not an employee of Llano County and has no authority over the Llano library system. And the slideshow does not come anywhere close to saying that books must "remain on shelves unless they do not circulate 'for 3–5 years.'" The relevant slide is attached as Exhibit 2 to this brief; it contains unexplained bullet points with the headline "Unused Materials Specifics," and it lists "Non-circulating for 3–5 years" as one of many bullet points that appear on the slide. The most that one can infer from this slide is that a book's failure to circulate for 3–5 years is one among many factors to consider is whether a book is sufficiently "unused" to warrant weeding—not that it is forbidden to weed any book unless and until it goes uncirculated for 3–5 years. And in all events, the Llano library system's weeding chart rejects the three-year minimum rule that plaintiffs are attempting to concoct, as it specifically allows Juvenile Fiction and Young Adult Fiction to become eligible for weeding after *two* years since last circulation, and several of the 17 weeded books fall into those categories. *See* Third Milum Decl. ¶ 26; *see also* Ex. 1. And a book can *still* be weeded even if it has been checked out within the last two or three years if its overall circulation rate is low or if it meets other criteria for weeding. *See* Hr'g Tr. Vol. 2 at 133:22–24 ("Q. The MUSTIE criteria have a threshold of three years for fiction books; isn't that right? A. No. It's just a guideline.").

And this is just the beginning of the plaintiffs' falsehoods and misrepresentations. The plaintiffs, for example, claim that Castelan "review[ed] each of the Banned Books,"[31] but Castelan never testified that she "reviewed" the books that Milum had weeded, or that she based her weeding opinions on an individualized "review" of the books themselves. The plaintiffs' claim that "none" of the weeded books "met more than one MUSTIE criterion," and that "most met none"[32] is false and was refuted by Milum's testimony, which the plaintiffs do not acknowledge. *See* Hr'g Tr. Vol. 2 95:16–108:9. Their claim that "Defendants did not

---

31. Pls.' Br., ECF No. 91, at 7.
32. Pls.' Br., ECF No. 91, at 7.

provide a single reason under CREW or MUSTIE justifying the removal of the Fart Books and *I Need a New Butt*[33] is false; Milum testified that these books qualified for weeding under the "Trivial," "Irrelevant," and "Elsewhere" criteria. *See* Hr'g Tr. Vol. 2 at 107:8–9. (Do the plaintiffs want to deny that these books fall within the "Trivial" category?) Their claim that new books cannot be "weeded" before they are placed on the shelves is false. *See* Third Milum Decl. ¶ 30.

The plaintiffs' claim that *It's Perfectly Normal* "was checked out within three years of its removal"[34] is false; plaintiffs' exhibit 52 shows that the last checkout was September 22, 2018, and it was weeded on October 12, 2021. *See* Third Milum Decl. ¶ 27. Their claim that *It's Perfectly Normal* cannot be weeded because it qualifies as a "special topic book"[35] is false and misrepresents Castelan's testimony. Castelan did not testify or opine that *It's Perfectly Normal* qualifies as a "special topic book," nor did she testify that *It's Perfectly Normal* (or special topic books) are "not eligible to be weeded." *See* Hr'g Tr. Vol. 1 at 37:15–19; Third Milum Decl. ¶ 31. The plaintiffs' claim that Moss "told Castelan he did not want the book in the library"[36] is false; Moss told Castelan only that "he wouldn't have wanted his children or his grandchildren to see it"[37] and expressed his opinion that it should be placed in a section of the library other than the children's section. *See* Second Moss Decl. ¶ 5 (attached as Exhibit 4). The plaintiffs' claim that Moss "made Milum remove"[38] *It's Perfectly Normal* is false. *See id.* at ¶¶ 5–10; Third Milum Decl. ¶ 13.

The plaintiffs' claim that Milum has "le[ft] approximately 5,800 titles" on the shelves that had not been checked out in the previous three years is false. *See* Pls.' Br., ECF No. 91, at 10. Milum became the system director on February 1, 2021, and she has not yet had the

---

33. Pls.' Br., ECF No. 91, at 8.
34. Pls.' Br., ECF No. 91, at 9.
35. Pls.' Br., ECF No. 91, at 9.
36. Pls.' Br., ECF No. 91, at 9.
37. Hr'g Tr. Vol. 1 at 29:8–9
38. Pls.' Br., ECF No. 91, at 9 (internal quotation mark omitted).

opportunity to conduct a thorough weed of the library system. *See* Third Milum Decl. ¶ 32. The library system has been understaffed (and therefore under-weeded) for years, which is why there are so many books on the shelves that should be weeded but have not yet been. *See id*. The plaintiffs are also wrong to say that Milum admitted that there was "no need to weed books" after the Commissioners Court had suspended new book purchases. *See* Pls.' Br., ECF No. 91, at 10 (citing Hr'g Tr. Vol. 2 at 120:25–121:10). Milum was asked only whether the weeding in November of 2021 was done "to make room for new books," and she acknowledged that it was not. *See* Hr'g Tr. Vol. 2 at 121:6–10 ("Q. So when you did the weeding based on Ms. Wallace's list that was e-mailed to you by your boss, you weren't doing that to make room for new books because you weren't allowed to order new books, correct? A. Right."). Milum never said that there was "no need to weed books" at that time. Weeding is needed regardless of whether new books are coming in because: (1) Shelf space costs money; (2) The presence of unused books frustrates and distracts employees and patrons who must sift through unnecessary clutter; (3) Weeding helps librarians identify holes in their collection and understand the community's desires and needs. *See* Third Milum Decl. ¶ 33.

Castelan conceded that *Being Jazz* "could have been" weeded consistent with CREW/MUSTIE criteria, even though she personally would have left it in. *See* Hr'g Tr. Vol. 1 at 42:14–19. The plaintiffs' brief, however, falsely claims that Castelan testified that the decision to weed *Being Jazz* was inconsistent with MUSTIE criteria. *See* Pls.' Br., ECF No. 9 ("According to Castelan, only one of the Banned Books—*Freakboy*— . . . was weeded consistent with MUSTIE criteria.").

* * *

The Court cannot and should not trust any factual assertion that appears in the plaintiffs' brief. We have hit on the most egregious misrepresentations, but we cannot in the allotted pages unpack every one of the misstatements that permeate their filing. The adversarial process cannot function when a litigant misrepresents the factual record to this extent. We encourage the Court to carefully compare the plaintiffs' factual claims with the primary sources

before accepting or relying on any factual claim in the plaintiffs' brief. The Court may also wish to consider striking the plaintiffs' brief and instructing them to submit a replacement that accurately relates the factual record and corrects each of the falsehoods that appears in their current submission. There are too many factual errors and misrepresentations of testimony in the current submission for a court to trust anything that the plaintiffs say.

## ARGUMENT

The plaintiffs (once again) refuse to acknowledge the "clear showing" requirement, but that does not absolve them of their obligation to "clearly carr[y] the burden of persuasion on all four requirements" of the preliminary-injunction standard. *Tex. Med. Providers Performing Abortion Servs. v. Lakey*, 667 F.3d 570 (5th Cir. 2012); Defs.' Br., ECF No. 49, at 8–9 (collecting authorities). We have already explained why the plaintiffs cannot make a "clear showing" of likely success or a "clear showing" of irreparable harm. *See id*. at 9–13 (merits); *id*. at 14 (harm). Nothing that the plaintiffs have said rebuts our previous arguments.

## I. THE PLAINTIFFS HAVE NOT MADE A "CLEAR SHOWING" OF LIKELY SUCCESS ON THE MERITS

The plaintiffs cannot make a "clear showing" of likely success for three separate and independent reasons. First, the plaintiffs cannot establish a violation of their First Amendment rights when they can obtain each of the disputed books through the in-house checkout system. Second, a public library's weeding decisions are subject only to rational-basis review. Third, even if one were to imagine that content and viewpoint discrimination are prohibited in public-library weeding decisions, the plaintiffs have filed to make a "clear showing" that Amber Milum weeded the books because she opposed their content or viewpoints.

### A. The In-House Checkout System Does Not And Cannot Violate The Plaintiffs' First Amendment Right To Access Information

The plaintiffs' First Amendment claims are doomed because each of the 17 books remains available for them to check out through Llano library's in-house system. The plaintiffs do not explain how the defendants are violating their "right to receive information" when

they remain able to check out and read every one of these books from Llano library. They complain that *other* library patrons may not be aware of the in-house checkout option,[39] but the plaintiffs must establish a violation of their own constitutional rights and not someone else's. *See supra* at 1–2; *Coon v. Ledbetter*, 780 F.2d 1158 (5th Cir. 1986) (plaintiffs who invoke 42 U.S.C. § 1983 are "required to prove some violation of their *personal* rights." (emphasis added)); *id.* (citing rulings from other federal courts that prohibit litigants from asserting third-party rights under section 1983); *Garrett v. Clarke*, 147 F.3d 745 (8th Cir. 1998) ("Garrett may not base his Section 1983 action on a violation of the rights of third parties."); David P. Currie, *Misunderstanding Standing*, 1981 Sup. Ct. Rev. 41, 45.

The plaintiffs made no showing that the in-house checkout system violates *their* First Amendment rights or burdens *them* in any way. They complain that there is "only one copy of each book," which is located "only at the Llano branch,"[40] but that was equally true before the books were weeded, so it does not diminish the plaintiffs' "right to receive information." *See* Third Milum Decl. ¶ 34. The plaintiffs complain that the disputed books "are not advertised," which means that *other* library patrons "have no way of knowing they exist or finding them." Pls.' Br., ECF No. 91, at 22. But that does not burden the plaintiffs, who are fully aware of the in-house checkout system and the availability of the disputed books. *See* Hr'g Tr. Vol. 2 at 42:12–15. The plaintiffs accuse the defendants of sending "a chilling message"[41] by operating the in-house checkout system, but that is an ideological grievance and has nothing to do with whether the defendants are violating the *plaintiffs'* First Amendment rights.

The plaintiffs rely on *Sund v. City of Wichita Falls*, 121 F. Supp. 2d 530 (N.D. Tex. 2000), and *Counts v. Cedarville School District*, 295 F. Supp. 2d 996 (W.D. Ark. 2003), which held that public libraries violated the First Amendment by making it more burdensome for the plaintiffs (or their next friends) to obtain certain books. These cases are inapposite

---

39.  *See* Pls.' Br., ECF No. 91, at 12–13, 22.
40.  *See* Pls.' Br., ECF No. 91, at 22.
41.  Pls.' Br., ECF No. 91, at 22.

because the in-house check-out system does not burden the plaintiffs in any way, and the plaintiffs do not explain how they are burdened by the defendants' actions. It is *easier* to obtain a book by asking for it at the reference desk than by searching through the card catalog and book stacks—and each of the plaintiffs already knows that this is how they must obtain and check out those disputed books. The defendants are not burdening the plaintiffs' ability to obtain these books in the slightest, so there is no conceivable infringement of the plaintiffs' constitutional "right to receive information."

*Sund* and *Counts* are also incompatible with the Supreme Court's subsequent ruling in *United States v. American Library Ass'n Inc.*, 539 U.S. 194 (2003), and the Fifth Circuit's ruling in *Chiras v. Miller*, 432 F.3d 606 (5th Cir. 2005). *Sund* claims that public libraries are "limited public forums" and that any content-based weeding or book-placement decision is subject to strict scrutiny. *See Sund*, 121 F. Supp. 2d at 548. The *American Library* plurality rejected that stance—a stance that *Chriras* subsequently embraced as the law of the Fifth Circuit. *See American Library*, 539 U.S. at 204 (plurality op. of Rehnquist, C.J.); *Chiras*, 432 F.3d at 614 ("'[J]ust as forum analysis and heightened judicial scrutiny are incompatible with the role of public television stations and the role of the NEA, they are also incompatible with the discretion that public libraries must have to fulfill their traditional missions.'" (quoting *American Library*, 539 U.S. at 204 (plurality op.). *Counts* likewise applied strict scrutiny to a supposedly content-based restriction requiring parental consent before students could check out Harry Potter books from a school library. But neither the plurality opinion in *American Library* nor either of the concurrences applied strict scrutiny to content-based restrictions on library materials, and a six-justice majority upheld the content-based restrictions imposed by the Children's Internet Protection Act (CIPA) without any one of the six justices suggesting that strict scrutiny (or any type of heightened scrutiny) should apply. *See American Library*, 539 U.S. at 198–214 (plurality op.); *id.* at 214–15 (Kennedy, J., concurring in the judgment); *id.* at 215–20 (Breyer, J., concurring in the judgment).

Finally, Justice Kennedy's and Justice Breyer's concurrences in *American Library* make clear that "small" or non-significant burdens on a library's patron's ability to obtain materials do not violate the First Amendment. *See id.* at 215 (Kennedy, J., concurring in the judgment) (upholding restriction after concluding that the plaintiffs failed to "show that the ability of adult library users to have access to the material is burdened in any significant degree"); *id.* at 220 (upholding restricting given the "comparatively small burden that the Act imposes upon the library patron"). Here, there are *no* "burdens" imposed on the plaintiffs, as the in-house checkout option spares them the inconvenience of having to search for the disputed books on the library shelves. And even if the plaintiffs attempted to theorize or concoct a "burden," it would be far less of a burden than that imposed by CIPA, which required adult users to ask a librarian to unblock filtered materials before access would be allowed.

### B. A Public Library's Weeding Decisions Are Subject Only To Rational-Basis Review

The plaintiffs claim that the First Amendment "prohibits the removal of books from libraries based either content or viewpoint discrimination." Pls.' Br., ECF No. 91, at 14. That is nonsense. No decision of the Supreme Court or the Fifth Circuit has ever held that public libraries are forbidden to make content- or viewpoint-based weeding decisions. Even Justice Brennan's plurality opinion in *Pico*, which represents the most restrictive view of public-library decisionmaking taken by a Supreme Court justice,[42] acknowledges that content discrimination is permissible and inevitable in library-book selection, and it allows libraries to remove books based on content that is "pervasively vulgar" or that lacks "educational suitability." *Pico*, 457 U.S. at 871 (1982) (plurality op.); *Campbell v. St. Tammany Parish School Board*, 64 F.3d 184 (5th Cir. 1995) ("The Court in its plurality opinion implicitly recognized

---

42. *See Pico*, 457 U.S. at 885 (1982) (Burger, C.J., dissenting) (describing the Brennan plurality opinion as "a lavish expansion going beyond any prior holding under the First Amendment"); *CK-W by and through TK v. Wentzville R-IV School District*, --- F. Supp. 3d ----, 2022 WL 3138989, *5 (W.D. Mo.) (describing "Justice Brennan's approach" as "the most expansive view of the purported right at play").

. . . that an unconstitutional motivation would not be demonstrated if the school officials removed the books from the public school libraries based on a belief that the books were 'pervasively vulgar' or on grounds of 'educational suitability.'"); *see also Pico*, 457 U.S. at 869 (plurality op.) ("[L]ocal school boards have a substantial legitimate role to play in the determination of school library *content*." (emphasis added)); *id*. at 870 (plurality op.) ("Petitioners rightly possess significant discretion to determine the *content* of their school libraries." (emphasis added)); *id*. at 880 (1982) (Blackmun, J., concurring in part and concurring in the judgment) (endorsing specific examples of content and viewpoint discrimination in library-book selection).[43] The *Pico* plurality opinion says only that school libraries may not weed books "in a narrowly partisan or political manner"[44]—a far cry from a total prohibition on viewpoint or content discrimination.

The plurality opinion in *Pico* never received a fifth vote—so it is not law and is not binding authority.[45] The plurality opinion in *American Library is* binding authority because *Chiras* adopts it as the law of the Fifth Circuit—and it gives public libraries "broad discretion to decide what material to provide to their patrons." *See American Library*, 539 U.S. at 204

---

43. *See Virgil v. School Board of Columbia County, Florida*, 862 F.2d 1517 (11th Cir. 1989) (acknowledging that under Justice Brennan's plurality opinion in *Pico*, the "removal of books from library would be permissible if decision were based on determination that books were 'pervasively vulgar' or not 'educational[ly] suitab[le]'"); *Serra v. U.S. General Sevices Administration*, 847 F.2d 1045 (2d Cir. 1988) ("Removal of books that were pervasively vulgar or educationally unsuitable would, even in the [*Pico*] plurality's view, be 'perfectly permissible.'" (citations omitted); *CK-W by and through TK v. Wentzville R-IV School District*, --- F. Supp. 3d ----, 2022 WL 3138989, *6 (W.D. Mo.) ("[I]t is 'perfectly permissible' for a school to remove a book based upon the book's 'educational suitability.'" (quoting *Board of Education v. Pico*, 457 U.S. 853 (1982) (plurality opinion of Brennan, J.)).

44. *See Pico*, 457 U.S. at 870 (plurality op.); *id*. at 872 ("[S]chool boards may not remove books from school library shelves simply because they dislike the ideas contained in those books.").

45. *See Campbell*, 64 F.3d at 189 ("[T]he *Pico* plurality opinion does not constitute binding precedent"); *CK-W by and through TK v. Wentzville R-IV School District*, --- F. Supp. 3d ----, 2022 WL 3138989, *4 (W.D. Mo.) ("Justice Brennan's plurality opinion in *Pico* . . . is not binding.").

(2003) (plurality op.) ("[P]ublic libraries must have broad discretion to decide what material to provide to their patrons."); *Chiras v. Miller*, 432 F.3d 606 (5th Cir. 2005) ("'Public library staffs necessarily consider content in making collection decisions and enjoy broad discretion in making them.'" (citation and internal quotation marks omitted)). It is the rational-basis test, and not the plaintiffs' made-up rule against "content" or "viewpoint" discrimination, that governs a public library's weeding decisions. *See* Defs.' Resp. to Mot. for Prelim. Inj., ECF No. 49 at 11–12 (citing authorities).

The notion that librarians cannot engage in "content discrimination" when weeding books is absurd. Weeding inherently involves content discrimination, as three of the six MUSTIE factors require librarians to discriminate against content that is "Misleading," "Superseded," Or "Trivial." Even Tina Castelan endorsed content discrimination by claiming that "special topic books"—which (in her view) should include LGBTQ books—should not be weeded even when they would otherwise qualify for weeding on account of poor circulation. *See* Hr'g Tr. Vol. 1 at 22:6–19; *id*. at 42:7–43:11. So the plaintiffs are all for content discrimination in the weeding process—as long as librarians discriminate in favor of LGBTQ content and other "special topics" that they support. *See* Pls.' Br., ECF No. 91, at 9.

Viewpoint discrimination may also be appropriate, as books claiming that the earth is flat or that otherwise embrace viewpoints that have been discredited are appropriate candidates for weeding under the "Superseded" factor. *See Pico*, 457 U.S. at 871 (1982) (plurality op.); Even the slideshow on weeding produced by Dawn Vogler, which the plaintiffs falsely equate with "the CREW manual" and cite as if it were holy writ,[46] includes a slide that announces "poor *content* specifics" as a ground for weeding and lists each of the following content-based categories as factors to consider in weeding decisions:

Trivial subject matter (outdated popular culture)
Mediocre writing style
Inaccurate or false information

---

46. *See* Pls.' Br., ECF No. 91, at 10.

. . .

      Materials that contain *bias, racist, sexist terminology or views*

Pls.' Ex. 22 at 45 (attached as Ex. 2). *All* of these criteria entail content discrimination, and the last one encompasses viewpoint discrimination. Do the plaintiffs think *these* weeding criteria are unconstitutional—even though they are undeniably content- and viewpoint-based?

    Of course, the government could never ban or censor a book on these grounds, nor could it use these grounds to discriminate against a writer or speaker in a traditional public forum. But public libraries are different. They are not "forums" of any sort, and they *must* impose content-based (and occasionally viewpoint-based) standards for determining which materials they will house in their limited shelf space. *See American Library*, 539 U.S. at 204 (plurality op.); *Chiras*, 432 F.3d at 614. The plaintiffs do not claim or argue that a public library is a type of "forum" that would trigger rules against viewpoint or content discrimination. And the plaintiffs must deal with the fact that *American Library* upheld a federal statute that *mandated* content discrimination in public libraries. *See American Library*, 539 U.S. at 208 (plurality op.) (acknowledging that CIPA "exclude[s] certain categories of content"); *id*. at 202–03 (plurality op.) (noting that the district court held that CIPA was "a content-based restriction"); *id*. at 241 (Souter, J., dissenting) (criticizing the CIPA regime as "[c]ontent-based blocking and removal").

### C.    Amber Milum Did Not Engage In Viewpoint Or Content Discrimination When Weeding The 17 Disputed Books

    There is yet a third reason why the plaintiffs cannot make a "clear showing" of likely success on their First Amendment claims: Even if one were to pretend that the First Amendment prohibits content- or viewpoint-based weeding decisions, the plaintiffs have no evidence that Milum based her weeding decisions on the content or viewpoints of the 17 disputed books. Milum declared and testified repeatedly and unequivocally that her decisions to weed those books were based on her belief that the books were appropriate candidates for weeding on account of poor circulation, and that each of the books (in her judgment) satisfied multiple criteria for weeding under CREW and MUSTIE. The plaintiffs do not allege

that Milum is lying in her declarations or courtroom testimony, and none of their evidence shows that Milum acted out of a desire to suppress the viewpoints or contents of those books.

Castelan never testified or opined that Milum weeded the books because she was hostile to the content or viewpoints expressed in those books. Castelan simply stated that she would have reached a different conclusion in applying the CREW and MUSTIE criteria to some of the 17 books. She never accused Milum of acting in bad faith or out of nefarious or impermissible motives. The plaintiffs also have no evidence that Milum is hostile to books containing nudity, critical race theory, or LGBTQ issues, and Milum specifically denies that she harbors any opposition to these types of books. *See* Third Milum Decl. ¶ 36. All that the plaintiffs have shown is that different librarians can reach different conclusions when applying the CREW and MUSTIE guidelines—something that both Milum and Castelan acknowledged on the witness stand. *See* Hr'g Tr. Vol. 1 at 42:16–19; *id.* at 127:6–19; Hr'g Tr. Vol. 2 at 108:21–109:12; *id.* at 145:13–15 ("[D]ifferent librarians have different, you know, views or decisionmaking skills of what they think should still be on the shelves or not.").

The plaintiffs do not even tell us what "viewpoints" are expressed in the weeded books, and there is no evidence in the record for this court to determine what those "viewpoints" are. Milum didn't read the books on Ms. Wallace's list before weeding them,[47] so she had no way of knowing what "viewpoints" or "positions" were expressed. Milum has also denied knowledge of the "viewpoints" or "positions" in those books. *See* Third Milum Decl. ¶ 38.

The plaintiffs claim that Milum "removed" those books "because they were on the Wallace list,"[48] but the plaintiffs are playing word games with "remove." Milum's decision to pull those books for review (*i.e.*, to *temporarily* remove the book) was because they appeared on Wallace's list, but Milum's decision to weed the books (*i.e.*, to *permanently* remove them) was *solely* because she determined they met the criteria for weeding. The vast majority of

---

47.  *See* Hr'g Tr. Vol. 2 at 104:3–5 ("Q. Have you read any of the books that we've been talking about? A. No.").

48.  *See* Pls.' Br., ECF No. 91, at 17.

books on Wallace's list were returned the shelves after Milum determined that they did *not* meet the criteria for weeding—a fact that the plaintiffs refuse to acknowledge in their brief. *See* Hr'g Tr. Vol. 1 at 93:10–95:4 (Milum weeded only "six or seven" of the 47 books on Wallace's list that she reviewed); Hr'g Tr. Vol. 2 at 94:7–95:4; Third Milum Decl. ¶ 39.[49]

The plaintiffs' evidence of "content" discrimination is equally non-existent. They claim that the "defendants" (they never say *which* defendants) admitted to "removing" books based on content. *See* Pls.' Br., ECF No. 91, at 17–18. But the plaintiffs are (once again) conflating the decision to *temporarily* pull the books for review with the decision to *permanently* remove them. The decision to *temporarily* pull the books from the shelves for review was content-based (though not viewpoint-based),[50] as Judge Cunningham had instructed Ms. Milum to temporarily pull books "with photos of naked or sexual conduct." Pls.' Br., ECF No. 91, at 4. But this does nothing to show that Milum engaged in content or viewpoint discrimination when deciding to *weed* the books after reviewing them—especially when Milum returned the vast majority of these books to the shelves. See Third Milum Decl. ¶¶ 35, 39.

The plaintiffs falsely claim that Ms. Milum "removed *In The Night Kitchen* from the library system because it includes illustrations of a naked toddler." *See* Pls.' Br., ECF No. 91, at 4. Milum's decision to *pull* the book *for review* (*i.e.*, to *temporarily* remove the book) was because of the naked-toddler pictures, but her decision to weed the book (*i.e.*, to "remove the book from the library system") had nothing to do with content or nudity, and Milum would have weeded *In The Night Kitchen* even if there had been no nudity or naked-toddler drawings. *See* Third Milum Decl. ¶ 35; Hr'g Tr. Vol. 1 at 93:20–94:6. The plaintiffs' claim

---

49. The defendants never "admitted" that they "pulled" books on Wallace's list "because the books took positions with which the Defendants disagreed," and the testimony that the plaintiffs cite do not remotely support this claim. *See* Pls.' Br., ECF No. 91, at 16.

50. The decision to temporarily pull the books was not viewpoint-based because all books containing this content were pulled for review, regardless of the viewpoints expressed, and the plaintiffs present no argument for how Judge Cunningham's directive to Ms. Milum could qualify as "viewpoint discrimination."

that Moss "ordered the removal" of *It's Perfectly Normal* is false,[51] as is their insinuation that Ms. Milum removed this book because Moss told her to.

## II. The Plaintiffs Have Not Made A "Clear Showing" Of Irreparable Harm

The plaintiffs have failed to identify *any* harm (let alone an "irreparable" harm) that they will suffer from obtaining the disputed books through the library's in-house checkout system. *See CK-W by and through TK v. Wentzville R-IV School District*, --- F. Supp. 3d ----, 2022 WL 3138989, *9 (W.D. Mo.) (removal of library books did not inflict irreparable harm because it "does not stop any student from reading or discussing the book"). The plaintiffs do not deny that it is easier for them to obtain a book by asking for it at the reference desk rather than by searching a catalog, traipsing among the shelves, and pawing through the books.

The plaintiffs would prefer that the 12 books be returned to the library shelves and restored to the catalog so that *other* patrons can check them out, but that does not inflict irreparable harm *on the plaintiffs. See Winter v. Natural Resources Defense Council*, 555 U.S. 7, 20 (2008) ("A plaintiff seeking a preliminary injunction must establish . . . that *he is* likely to suffer irreparable harm in the absence of preliminary relief." (emphasis added)); *Jones v. District of Columbia*, 177 F. Supp. 3d 542, 546 n. 3 (D.D.C. 2016) ("[T]he irreparable harm prong . . . only concerns harm suffered by the party or parties seeking injunctive relief . . . . [A]ny alleged harm to third parties is properly addressed under the public interest prong"). And the distress that the plaintiffs may experience over the plight of other library patrons does not qualify as Article III injury, let alone "irreparable harm." *See Valley Forge Christian Coll. v. Americans United for Separation of Church and State*, 454 U.S. 464, 485–86 (1982).

---

51.  *See* Second Moss Decl. ¶ 5 ("The plaintiffs' claim that I 'ordered the removal' of *It's Perfectly Normal* from the Llano library is . . . false. . . . I merely expressed my opinion to Tina Castelan that *It's Perfectly Normal* should not be located in the children's section, and that it should be placed in a different section of the library.") (attached as Exhibit 4); *see also* Hr'g Tr. Vol. 1 at 28:25–29:9; Third Milum Decl. ¶ 13 ("The plaintiffs' claim that Commissioner Moss 'ordered the removal' of *It's Perfectly Normal* from the Llano library is false.").

## III.   The Court Should Deny Out Of Hand The Requested Relief In Paragraphs 3 Through 6 Of The Plaintiffs' Proposed Order

The plaintiffs' proposed order demands far more than the return of the 17 disputed books to the library shelves. *See* Pls.' Proposed Order, ECF No. 76-1, at ¶¶ 3–6. But the plaintiffs present no argument for the relief requested in paragraphs 3 through 6 of the proposed order, so they have failed to make a "clear showing" that this requested relief is needed to prevent irreparable harm or that they are likely to obtain this relief at the end of trial. They have also forfeited any request for the relief in paragraphs 3 through 6 by failing to present an argument in their brief. *See Roe v. Cypress-Fairbanks Independent School District*, 53 F.4th 334, 343 n.5 (5th Cir. 2022) (failure to adequately brief an argument results in forfeiture). The Court should deny the relief in those paragraphs for that reason alone.[52]

The Court also cannot award the relief described in paragraphs 3 through 6 because none of the defendants are engaged in the behavior that the plaintiffs seek to enjoin. The defendants testified that they will not weed, conceal, or remove any books until this litigation concludes.[53] The defendants have never restricted and never had any intention of restricting access to any book on Bibliotheca's online platform.[54] And the library advisory board will not be holding any meetings until this litigation concludes.[55] So the plaintiffs could not have shown irreparable harm even if they had tried.

---

52. The plaintiffs falsely assert that their proposed order "would simply preserve the status quo ante." Pls. Br, ECF No. 91, at 24. Paragraphs 3 and 4 in the proposed order impose burdensome new documentation and reporting requirements on the defendants that never previously existed. *See* Pls.' Proposed Order, ECF No. 76-1, at ¶¶ 3–4.

53. *See* Hr'g Tr. Vol. 1 at 130:10–11 ("We are not weeding or adding anything to the system until after the litigation is finished."); Hr'g Tr. Vol. 2 at 117:8–13 ("Q. . . . Will you or your colleagues be weeding, or removing, or concealing any book in any of the libraries in the Llano County system between now and the conclusion of this litigation? A. No.").

54. *See* Hr'g Tr. Vol. 1 at 129:7–10 ("Q. Has anyone in the Llano County Library System ever restricted access to any book on Bibliotheca due to the book's viewpoint or content? A. No."); *id.* at 130: 1–4 ("Q. Will you or any of your colleagues restrict access to any book on Bibliotheca if the motion for preliminary injunction is denied? A. No.").

55. *See* Hr'g Tr. Vol. 1 at 164:24–165:4 ("Mr. Cunningham, when will the library advisory board have its next scheduled meeting? A. After the completion of this litigation. Q.

## IV.   IF THE COURT AWARDS A PRELIMINARY INJUNCTION, IT SHOULD BE DIRECTED ONLY TO AMBER MILUM

Milum is the only defendant with authority to restore books to the library shelves and catalog. So if the Court grants the relief requested in paragraphs 1 and 2 of the proposed order, the injunction should extend only to Amber Milum. The remaining defendants cannot be held responsible for the return of library books when they have no ability or authority to place books on the library shelves or restore them to the library's catalog.

## CONCLUSION

For these reasons, as well as those in our previous briefing (ECF No. 49), the motion for preliminary injunction should be denied.

Respectfully submitted.

 _/s/ Jonathan F. Mitchell_

DWAIN K. ROGERS
Texas Bar No. 00788311
County Attorney

JONATHAN F. MITCHELL
Texas Bar No. 24075463
Mitchell Law PLLC
111 Congress Avenue, Suite 400
Austin, Texas 78701
(512) 686-3940 (phone)
(512) 686-3941 (fax)
jonathan@mitchell.law

MATTHEW L. RIENSTRA
Texas Bar No. 16908020
First Assistant County Attorney

Llano County Attorney's Office
Llano County Courthouse
801 Ford Street
Llano, Texas 78643
(325) 247-7733
dwain.rogers@co.llano.tx.us
matt.rienstra@co.llano.tx.us

Dated: December 30, 2022

*Counsel for Defendants*

---

Are you saying there won't be any meetings between now and the end of this litigation? A. No, sir."); *see also* Hr'g Tr. Vol. 2 at 26:4–6; *id*. at 75:12–24;

## CERTIFICATE OF SERVICE

I certify that on December 30, 2022, I served this document through CM/ECF upon:

Ellen V. Leonida
Matthew Borden
J. Noah Hagey
Sarah Salomon
Pratik Ghosh
Amy Senia
BraunHagey & Borden LLP
351 California Street, 10th Floor
San Francisco, CA 94104
(415) 599-0210
leonida@braunhagey.com
borden@braunhagey.com
hagey@braunhagey.com
salomon@braunhagey.com
ghosh@braunhagey.com
senia@braunhagey.com

Ryan A. Botkin
Katherine P. Chiarello
María Amelia Calaf
Wittliff | Cutter PLLC
1209 Nueces Street
Austin, Texas 78701
(512) 960-4730 (phone)
(512) 960-4869 (fax)
ryan@wittliffcutter.com
katherine@wittliffcutter.com
mac@wittliffcutter.com

*Counsel for Plaintiffs*

 /s/ Jonathan F. Mitchell
Jonathan F. Mitchell
*Counsel for Defendants*