# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
### AUSTIN DIVISION

**Leila Green Little**, et al.,

                Plaintiffs,

v.

**Llano County**, et al.,

                Defendants.

Case No. 1:22-cv-00424-RP

## RESPONSE TO PLAINTIFFS' POST-HEARING BRIEF IN SUPPORT OF THEIR MOTION FOR PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

Table of contents ................................................................................................................... i

Table of authorities .............................................................................................................. ii

Response to the plaintiffs' statement of facts.................................................................2

    A. All 17 of the disputed books are available for the plaintiffs to check out
       from the Llano library's in-house checkout system..............................................3

    B. The Llano library's in-house checkout system is not "secret" and each of
       the plaintiffs knows about it ..................................................................................6

    C. The decision to weed the 17 disputed books belonged solely to Amber
       Milum, and Milum decided to weed each of those 17 books for reasons
       unrelated to viewpoint or content .......................................................................7

       1. Only Amber Milum's motivations are relevant in determining whether
          any of the 17 books were weeded because of their content or viewpoint ........ 9

       2. Ms. Milum weeded the 17 disputed books because she believed that
          each of them met the library's criteria for weeding ....................................11

Argument .............................................................................................................................19

    I. The plaintiffs have not made a "clear showing" of likely success on the merits.......19

       A. The in-house checkout system does not and cannot violate the plaintiffs'
         First Amendment right to access information ....................................................19

       B. A public library's weeding decisions are subject only to rational-basis review...... 22

       C. Amber Milum did not engage in viewpoint or content discrimination when
         weeding the 17 disputed books ...........................................................................25

    II. The plaintiffs have not made a "clear showing" of irreparable harm .....................28

    III.The Court should deny out of hand the requested relief in paragraphs 3
       through 6 of the plaintiffs' proposed order ...........................................................29

    IV. If the Court awards a preliminary injunction, it should be directed only to
       Amber Milum ...........................................................................................................30

Conclusion ...........................................................................................................................30

Certificate of service ..........................................................................................................31

## TABLE OF AUTHORITIES

**Cases**

*ACLU of Florida, Inc. v. Miami-Dade County School Board*,
   557 F.3d 1177 (11th Cir. 2009) ............................................ 2

*Barber v. Bryant*, 860 F.3d 345 (5th Cir. 2017) ...................................... 6

*Board of Education v. Pico*, 457 U.S. 853 (1982) .................................. 8, 22, 23, 24

*Campbell v. St. Tammany Parish School Board*, 64 F.3d 184 (5th Cir. 1995) .... 22, 23

*Chiras v. Miller*, 432 F.3d 606 (5th Cir. 2005) ........................................ 21, 24, 25

*CK-W by and through TK v. Wentzville R-IV School District*,
   --- F. Supp. 3d ----, 2022 WL 3138989, *5 (W.D. Mo.) ...................... 22, 23, 28

*Coon v. Ledbetter*, 780 F.2d 1158 (5th Cir. 1986) .................................. 20

*Counts v. Cedarville School District*, 295 F. Supp. 2d 996 (W.D. Ark. 2003) ......... 20

*Garrett v. Clarke*, 147 F.3d 745 (8th Cir. 1998) .................................... 20

*In re Gee*, 941 F.3d 153 (5th Cir. 2019) .............................................. 1

*Jones v. District of Columbia*, 177 F. Supp. 3d 542 (D.D.C. 2016) ...................... 28

*Roe v. Cypress-Fairbanks Independent School District*,
   53 F.4th 334 (5th Cir. 2022) .............................................................. 29

*Serra v. U.S. General Sevices Administration*, 847 F.2d 1045 (2d Cir. 1988) ......... 23

*Sund v. City of Wichita Falls*, 121 F. Supp. 2d 530 (N.D. Tex. 2000) .............. 20, 21

*Texas Medical Providers Performing Abortion Services v. Lakey*,
   667 F.3d 570 (5th Cir. 2012) ............................................................. 19

*TransUnion LLC v. Ramirez*, 141 S. Ct. 2190 (2021) ...................................... 1, 2

*United States v. American Library Ass'n Inc.*, 539 U.S. 194 (2003) .... 21, 22, 24, 25

*Valley Forge Christian College v. Americans United for Separation of Church
   and State, Inc.*, 454 U.S. 464 (1982) ................................................ 28

*Virgil v. School Board of Columbia County, Florida*,
   862 F.2d 1517 (11th Cir. 1989) ....................................................... 23

*Winter v. Natural Resources Defense Council*, 555 U.S. 7 (2008) ...................... 28

**Statutes**

42 U.S.C. § 1983 ............................................................................ 1, 20

**Other Authorities**

David P. Currie, *Misunderstanding Standing*, 1981 Sup. Ct. Rev. 41 .................... 20

Every one of the 17 disputed books is currently available for the plaintiffs to check out at the Llano library—just as they were before the books were weeded. The only difference is that the books are available through the library's in-house check-out system rather than on the shelves and in the catalog. But none of that inflicts any First Amendment injury on the plaintiffs, because all of the plaintiffs are fully aware of the library's in-house check-out system and know that the disputed books remain available for them to check out. So each plaintiff has the same "right to access information" that they had before the books were weeded.

The plaintiffs cannot show a violation of their First Amendment rights when they *know* that the disputed books remain available for check out at Llano library. And they certainly cannot establish "irreparable harm" when they can check out the disputed books with the same ease as before. The plaintiffs have produced no evidence or testimony showing how they would be "irreparably harmed" by obtaining these books through the in-house check-out system rather than the catalog and shelves. And they present no argument for how the defendants have deprived them of their supposed "right to access information" when the defendants have fully preserved the plaintiffs' ability to check out the disputed books.

The plaintiffs complain that the in-house checkout system is insufficient because *other* library patrons might not be aware of it.[1] But the plaintiffs have no standing to assert the First Amendment rights of non-parties, and neither 42 U.S.C. § 1983 nor the Declaratory Judgment Act allows the plaintiffs to sue over their alleged violations of someone else's constitutional rights. The plaintiffs appear to have forgotten that courts exist to resolve disputes between named litigants, not to act as "roving commissions"[2] empowered to pass judgment

---

1. *See* Pls.' Br., ECF No. 91, at 12–13; *id*. at 21–22.

2. *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2203 (2021); *see also id*. ("Federal courts do not possess a roving commission to publicly opine on every legal question. Federal courts do not exercise general legal oversight of the Legislative and Executive Branches, or of private entities."); *In re Gee*, 941 F.3d 153, 161 (5th Cir. 2019) ("'[U]nder our constitutional system[,] courts are not roving commissions assigned to pass judgment on the validity of the Nation's laws.'" (quoting *Broadrick v. Oklahoma*, 413 U.S. 601, 610–11 (1973)).

on the conduct of the Llano public-library system. *See TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2205 (2021) ("Article III grants federal courts the power to redress harms that defendants cause plaintiffs, not a freewheeling power to hold defendants accountable for legal infractions." (citation and internal quotation marks omitted)). So the plaintiffs must make a "clear showing" that the defendants are violating *the plaintiffs'* First Amendment rights by offering the disputed books through an in-house checkout system of which the plaintiffs are fully aware. And the plaintiffs must make a "clear showing" that *they* will suffer irreparable harm if they obtain books through the in-house checkout system. They have come nowhere close to making any showing—let alone a "clear showing"—on either of these requirements, so they are not entitled to the "extraordinary remedy" of a preliminary injunction.

## RESPONSE TO THE PLAINTIFFS' STATEMENT OF FACTS

The plaintiffs' recitation of the facts is incomplete and (in many places) demonstrably false. Throughout their brief, the plaintiffs deploy imprecise terminology (such as "remove" books, which is unclear whether to refers to a temporary decision to pull the book from the shelves for review or permanent decision to weed the book from the library's shelves and catalog) and tiresome hyperbole. Saying that the 17 disputed books have been "banned" or "censored" is histrionic when each of those books remains available for patrons to check out through the library's in-house system and (for most of the books) through additional means such as Bibliotheca or InterLibrary Loan. Books that have been weeded from the shelves yet remain available to library patrons through other means have not been "banned" or "censored"—any more than the thousands of books that the Llano library system weeds each year. The plaintiffs apparently think they gain a rhetorical advantage from throwing around terms like "banned" or "censored," but candid advocacy requires one to accurately describe the actions of an opposing litigant. *See, e.g., ACLU of Florida, Inc. v. Miami-Dade County School Board*, 557 F.3d 1177, 1218 (11th Cir. 2009) ("Book banning takes place where a

government or its officials forbid or prohibit others from having a book. . . . [R]emoving a book from [library] shelves is not book banning.").

The Court deserves an accurate recitation of the facts before it rules on the motion for preliminary injunction—especially when the Court's ruling is likely to be reviewed on appeal. So we must begin by addressing the outright falsehoods that appear throughout the plaintiffs' brief before considering the relevant legal standards and applying the law to the facts.

### A.     All 17 Of The Disputed Books Are Available For The Plaintiffs to Check Out From The Llano Library's In-House Checkout System

The plaintiffs repeatedly and falsely claim that Llano library's in-house check-out program includes only nine of the 17 disputed books. *See* Pls.' Br., ECF No. 91, at 22 (complaining that "only nine" of the books are available through in-house checkout); *id.* at 13 ("The [nine] donated books make up the entirety of the Llano Library's in-house checkout program."). Those statements are demonstrably untrue and misrepresent the factual record.

The plaintiffs' "only nine books" claim appears to be derived from Amber Milum's declaration of July 23, 2022, which reports that the library had accepted a donation of nine books, and that Milum added those donated books to Llano library's already existing in-house checkout system. *See* Milum Supp. Decl., ECF No. 53, at ¶¶ 3–4. But Ms. Milum's declaration of July 15, 2022, makes clear that the three "butt" books and the four "fart" books were already part of the library's in-house checkout system, which is why they were excluded from the subsequent nine-book donation. *See* Milum Decl., ECF No. 49-1, at ¶¶ 10–11. Paragraph 10 of Ms. Milum's declaration provides a chart explaining how

> each of the [disputed] books is currently available to the plaintiffs in at least one of the following three ways: (1) On Bibliotheca/CloudLibrary; (2) For check out from the Llano County library system through Inter Library loan; or (3) *For check out directly from the Llano County library system through its 'in-house checkout' system,* in which a personal or donated book is made available to library patrons for check out.

*Id.* at 10 (emphasis added). And the chart itself contained the following entries for the "butt" and "fart" books:

| Title | Author | Availability |
|-------|--------|--------------|
| *My Butt is So Noisy!, I Broke My Butt!, I Need a New Butt* | McMillan, Dawn | Inter Library loan, <mark>Physical copies available for in-house checkout</mark> |
| *Larry the Farting Leprechaun, Gary the Goose and His Gas on the Loose, Freddie the Farting Snowman, Harvey the Heart Has Too Many Farts* | Bexley, Jane | Inter Library loan, <mark>Physical copies available for in-house checkout</mark> |

*Id.* at ¶ 10 (highlighting added).[3] Ms. Milum then explained that the donor would send copies only of the books that were not already available through in-house checkout:

> [A] donor who wishes to remain anonymous has pledged to me that he will donate physical copies of each of the books listed in the chart for inclusion in Llano County's "in-house checkout" *if those books are not already available for checkout through that in-house checkout system.* I have promised that donor that I will accept his gift and add each of those books to our collection of titles available for in-house checkout. *This will ensure that each of the plaintiffs can check out physical copies of each of the disputed books from the Llano County library system without having to use Inter Library loan or Bibliotheca* if they find those alternatives inconvenient.

*Id.* at ¶ 11 (emphasis added). Ms. Milum's declarations are as clear as can be: The in-house checkout system includes each of the three "butt" books and each of the four "fart" books, plus the nine additional books that were donated on July 21, 2022.

Ms. Milum also testified that each of the "butt" and "fart" books is currently available to patrons through Llano library's in-house checkout system. *See* Hr'g Tr. Vol. 1 at 132:5–7 ("Q. Are the Butt books and the Fart books currently available for checkout in the library? A. Yes."); *id.* at 114:8–23. Plaintiff Leila Little acknowledged that each of the "butt" and "fart" books, along with each of the nine books that was donated on July 21, 2022, is currently available through in-house check out. *See* Hr'g Tr. Vol. 2 at 67:21–70:8. And plaintiffs'

---

3.    *See also id.* at ¶ 18 ("Each of the plaintiffs can also check out physical copies of the following books directly from the Llano County libraries: (1) *My Butt is So Noisy!, I Broke My Butt!,* and *I Need a New Butt* by Dawn McMillan; (2) *Larry the Farting Leprechaun, Gary the Goose and His Gas on the Loose, Freddie the Farting Snowman* by Dawn McMillian.").

counsel knows full well that the "butt" and "fart" books are included in the in-house check-out system, as they repeatedly elicited this testimony during their examination of Ms. Milum:

> Q. The Llano County Library System has an inhouse checkout program?
> A. Yes. . . .
> Q. In this case, the books that we talked about that you weeded in November of 2021 *and in August of 2021*, those books are not available in the Llano County card catalog system, correct?
> A. Right.
> Q. *You have those books available behind a desk in the library?*
> A. Yes.

Hr'g Tr. Vol. 1 at 114:8–23 (emphasis added).[4] For the plaintiffs to assert that "only nine" books are available through the in-house checkout system in the teeth of these declarations and this courtroom testimony is nothing short of misrepresentation.

The only one of the 17 disputed books that is unaccounted for in Ms. Milum's declarations and testimony is *Under the Moon: A Catwoman's Tale*. This book was not included in the donation of July 21, 2022, because none of the seven plaintiffs complained about the removal of *Under the Moon* or expressed any interest in checking out the book.[5] So the plaintiffs have failed to make a "clear showing" of injury in fact from the weeding of that book,

---

4. *See also id.* at 121:8–122:4 ("Q. . . . The books that were removed on November 11th, let's start with Caste, right? Caste does not appear in the online catalog at all? A. Right. Q. The only copy is in the back room where patrons can't see it? . . . Q. And *that's true of all of the books that you weeded in November of 2021 and August of 2021 that we've been talking about, correct?* A. Yes." (emphasis added)). Ms. Milum weeded the "butt" books in August of 2021. *See id.* at 63:24–25 (Q. Now, you removed the Butt books from circulation in August of 2021, correct? A. Yes.").

5. *See* Day Decl., ECF No. 22-2, at ¶ 4 (no mention of *Under the Moon*); Jones Decl., ECF No. 22-3, at ¶ 3 (same); Kennedy Decl., ECF No. 22-4, at ¶ 3 (same); Little Decl., ECF No. 22-5, at ¶ 3 (same); Moster Decl., No. 22-7, at ¶ 3 (same); Puryear Decl., ECF No. 22-9, at ¶ 3 (same); Waring Decl., No. 22-11, at ¶ 3 (same); *see also* Hr'g Tr. Vol. 2 at 28:6–70:20 (testimony of plaintiff Leila Green Little, which never mentions *Under the Moon* or expresses any desire to check it out); Third Milum Decl. ¶ 5 (attached as Exhibit 5) ("*Under the Moon: A Catwoman's Tale*, by Lauren Myracle, was not included in the original donation of July 23, 2022, because none of the plaintiffs complained about the removal of that book or expressed interest in checking out that book in their sworn declarations.").

and they cannot obtain a preliminary injunction that orders its return to the shelves. *See Barber v. Bryant*, 860 F.3d 345, 352 (5th Cir. 2017) ("Because a preliminary injunction 'may only be awarded upon a clear showing that the plaintiff is entitled to such relief,' the plaintiffs must make a 'clear showing' that they have standing to maintain the preliminary injunction." (citation omitted)). Out of an abundance of caution, however, the Llano library accepted a donation of *Under the Moon* on October 31, 2022, and added it to the in-house collection the next day. *See* Third Milum Decl. ¶ 6 (attached as Exhibit 5). So all 17 of the disputed books (including *Under the Moon*) are available for the plaintiffs to check out through the in-house library system. *See id.*

### B.   The Llano Library's In-House Checkout System Is Not "Secret" And Each Of The Plaintiffs Knows About It

The plaintiffs' claim that Llano library's in-house checkout is "secret" is equally false. Not only was this system publicly disclosed in court filings and at the hearing, but plaintiff Leila Little testified that she read about the in-house checkout system in the newspaper and was told about it by a librarian:

> I believe I first became aware of that through legal documents pertaining to this litigation. Following that, I did read about it. I believe it was in the Daily Trib newspaper that referred to the court filings referring to it. And following that, a librarian had told me about it.

Hr'g Tr. Vol. 2 at 42:18–22; *see also id.* at 78:9–12 ("My awareness is based on, again, my viewing of the legal documents, my reading in the newspaper that reported on the legal documents referring to this inhouse system, and information given to me by librarians."). All seven plaintiffs attended the hearing at which the in-house checkout system was discussed, so they are acutely aware of its existence. *See, e.g.*, Hr'g Tr. Vol. 2 at 42:18–22, 67:3–70:8, 78:9–12, 114:23–117:7 (Milum discussing extensively the in-house library system); *see also* Hr'g Tr. Vol. 1 at 54:12–55:16 (Castelan testifying about the in-house check out system).

The plaintiffs are also aware that the disputed books in the case—including the "butt" and "fart" books—are available through Llano library's in-house system, because they heard

testimony that repeatedly referred to those books when describing the titles available through in-house checkout. *See* Hr'g Tr. Vol. 1 at 114:8–23, 121:8–122:4, 131:5–132:10 (Milum testifying that 16 of the disputed books are available for in-house check out and mentioning each by name.). The only disputed book that went unmentioned was *Under The Moon*, but that book has since been added to the in-house collection,[6] and none of the plaintiffs produced testimony or evidence that they wanted to check out that book.

### C. The Decision To Weed The 17 Disputed Books Belonged Solely To Amber Milum, And Milum Decided To Weed Each Of Those 17 Books For Reasons Unrelated To Viewpoint Or Content

The plaintiffs' claim that the disputed books were weeded because "the defendants" disapproved of the content or viewpoints in those books is also false. Amber Milum alone made the decisions to weed each of the 17 disputed books from the library shelves.[7] And Ms. Milum has declared and testified under oath that she weeded those 17 books for reasons unrelated to their content or viewpoints.[8] Ms. Milum didn't even read the books on Bonnie

---

6. *See* Third Milum Decl. ¶ 6 (attached as Exhibit 5).

7. *See* Hr'g Tr. Vol. 1 at 130:23–131:3 ("Q. Were any of your ultimate decisions to weed any book from the library shelves influenced in any way by anyone on the commissioners' court? A. No. Q. Were they influenced by anyone on the library advisory board? A. No."); *id.* at 90:16–17, 92:23–93:1, 97:9–12, 98:6–8, 98:24–99:3, 100:3–5, 101:13–19, 103:10–13; Milum Decl., ECF No. 49-1, at ¶16 ("I was never instructed or pressured by the County Judge or any of the County Commissioners to weed or otherwise permanently remove any books from the Llano County libraries. I was also never instructed to remove any books from the libraries by the Llano County Advisory Board."); Third Milum Decl. ¶ 15 ("I alone made the decisions to weed the 17 disputed books in this case. No other defendant in this case, including Bonnie Wallace, Rochelle Wells, Rhonda Schneider, Jerry Don Moss, or Ron Cunningham, has ever weeded a book from Llano library or directed me to weed a book. Nor has any of these individuals pressured or attempted to pressure me to weed any book from the library.").

8. *See* Milum Decl., ECF No. 49-1, at ¶ 15 ("I did not consider the content of any of the books I weeded when I made the decision to weed them. I also did not consider any of the viewpoints expressed in any of the books I weeded. I weeded the books based on the objective criteria I always use in determining which books to weed."); *id.* at ¶ 17 ("No book was removed based on its content or viewpoint during this process.").

Wallace's list,[9] so she could not have based her decision to weed those books on content or viewpoints that she wasn't even aware of.

The plaintiffs do not claim that Ms. Milum is lying in her declarations or courtroom testimony, and none of the plaintiffs' witnesses or declarants claim to have personal knowledge of Ms. Milum's subjective state of mind. So the testimony on Ms. Milum's actual motivations for weeding the 17 books is unrebutted, and it conclusively refutes the plaintiffs' accusation that Ms. Milum engaged in "content discrimination" or "viewpoint discrimina-tion." *See Board of Education v. Pico*, 457 U.S. 853, 870–71 (1982) (plurality op. of Brennan, J.) ("[W]hether petitioners' removal of books from their school libraries denied respondents their First Amendment rights depends upon the motivation behind petitioners' actions.").

Instead, the plaintiffs deliberately conflate the decision to temporarily pull the books for review with the decision to permanently "weed" the books and erase them from the library catalog. The plaintiffs' brief uses the verb "remove" interchangeably to encompass each of these actions, without indicating whether "remove" is referring to the *temporary* "removal" of the hundreds of books that were placed on a cart for Ms. Milum to review—the vast majority of which were returned to the library shelves, and all of which remained available for checkout while Ms. Milum conducted her review[10]—or the *permanent* "removal" that occurred when Ms. Milum decided to weed the 17 books at issue in this lawsuit.[11]

Here is an example of the plaintiffs' obfuscation: Their assertion that Ms. Milum "knew the books were on the Wallace List, and she knew that was why she removed them." Pls.' Br.,

---

9.   *See* Hr'g Tr. Vol. 1 at 104:3–5 ("Q. Have you read any of the books that we've been talking about? A. No.").

10.   *See* Hr'g Tr. Vol. 1 at 30 ("[W]hile they were on the cart in Amber's office, were they available to be checked out? A. Yes. We just had to ask for them.").

11.   For an example of the former meaning of "remove" in the plaintiffs' brief, *see* Pls.' Br., ECF No. 91, at 4 ("[T]he library was closed for three days, and librarians were in-structed to *remove* any book that depicted nudity of any kind." (emphasis added)). For an example of the latter meaning of "remove," *see id.* at 19 ("[T]he books Defendants *removed* do not meet the Library's weeding criteria" (emphasis added)).

ECF No. 91, at 16–17. If the word "remove" refers to Milum's decision to *temporarily* pull the books for review, then the statement is truthful. Milum did pull books from the Wallace List to determine whether they met the criteria for weeding. *See* Hr'g Tr. Vol. 1 at 83:8 ("I pulled them to review them, not to weed them."). But if the word "remove" refers to Milum's decision to *permanently* remove, *i.e.*, weed the book, then the statement is false. Milum decided to weed the books because (in her judgment) they met the criteria for weeding, not because Bonnie Wallace wanted the books removed. *See* Third Milum Decl. ¶¶ 38–39. The plaintiffs elide this distinction throughout their brief to create the impression that the reasons behind the *temporary* removal of the hundreds of books that were placed on a cart for review were the same reasons behind the *permanent* removal of the 17 books that got weeded.

But there is nothing unconstitutional about taking a library book off a shelf to *review* whether it should be weeded, especially when the book remains available for checkout during the review process.[12] So the motivations behind the requests that Ms. Milum *examine* the books that were temporarily pulled are irrelevant to this lawsuit. The only injury that the plaintiffs are seeking to remedy is the injury caused by the decision to *weed* the 17 disputed books, which no longer appear in the library shelves or catalog. And the only relevant motivations are those behind the decisions to weed, *i.e.*, the decisions to *permanently* remove the 17 disputed books from the library's catalog and shelves. Ms. Milum testified that she weeded those books because (in her judgment) they met the criteria for weeding, and the plaintiffs have no evidence that Ms. Milum is lying about her motivations for weeding those books.

### 1.   Only Amber Milum's Motivations Are Relevant In Determining Whether Any Of The 17 Books Were Weeded Because Of Their Content Or Viewpoint

Amber Milum is the only defendant who has authority to weed books from the Llano library,[13] and the decisions to weed the 17 disputed books were made by Ms. Milum alone.[14]

---

12.   *See* note 10, *supra*.

13.   *See* note 16, *infra*; see note 18, *infra*.

14.   *See* note 7, *supra*; Third Milum Decl. ¶ 15.

The plaintiffs' preoccupation with the motivations of Bonnie Wallace and Rochelle Wells—and their attempts to use the statements of Wallace and Wells to impute motivations to "the defendants" as a collective whole—is a sideshow. *See* Pls.' Br., ECF No. 91, at 5–6; *id*. at 11; *id*. at 16–18. Bonnie Wallace, Rochelle Wells, Rhonda Schneider, and Jerry Don Moss did not weed or temporarily remove a single book from Llano library,[15] and they have no authority to move a library book or instruct anyone to do so.[16] Ron Cunningham instructed Amber Milum to temporarily pull books from the library shelves for review,[17] but he never instructed Ms. Milum (or anyone else at the library) to permanently weed a book.[18] The plaintiffs' brief repeatedly and falsely states that "Defendants" (plural) "removed" the disputed books—apparently in an effort to make Bonnie Wallace's and Rochelle Wells's subjective motivations relevant to this case. There is only one defendant who "removed," *i.e.*, weeded the books from the Llano library.[19] And only the motivations of *that* defendant will determine whether the books were removed for content- or viewpoint-based reasons.

---

15.  *See* Third Milum Decl. ¶ 15 (attached as Exhibit 5) ("No other defendant in this case, including Bonnie Wallace, Rochelle Wells, Rhonda Schneider, Jerry Don Moss, or Ron Cunningham, has ever weeded a book from Llano library or directed me to weed a book."); Hr'g Tr. Vol. 2 at 164:20–24 (Moss) ("Q. How many times, if any, did you direct Amber Milum to remove a particular book from the Llano County Library System? A. I did not direct her to remove any books from the library.").

16.  *See* Hr'g Tr. Vol. 2 at 111:6–13 ("Q. Does Bonnie Wallace or Rochelle Wells have any authority to remove or weed a book from the Llano County libraries? A. No. Q. Does Bonnie Wallace, or Rochelle Wells, or any member of the library advisory board have authority to direct you to weed or remove a book? A. No."); *id*. at 112:24–113:5 ("Q. Does Jerry Don Moss have any authority or ability to remove or weed a book from the Llano County Library System? A. No. Q. Does Jerry Don Moss have the authority to direct you to weed or remove a book? A. No.").

17.  *See, e.g.*, Hr'g Tr. Vol. 1 at 145:8–13.

18.  Cunningham Decl., ECF No. 49-2, at ¶ 11 ("I have never instructed any library staff, including Ms. Milum, to remove any books from the Llano County library shelves. Nor have l removed any books. It is not within my duties as County Judge to either acquire or remove books from the libraries."); Hr'g Tr. Vol. 2 at 156:16–17 (testimony of Ron Cunningham) ("At no point did I instruct her to pull those books from the shelves.").

19.  *See* Third Milum Decl. ¶ 16 ("The plaintiffs' claim that the "defendants" (plural) weeded or temporarily removed books from the Llano library is false. I am the only

### 2.   Ms. Milum Weeded The 17 Disputed Books Because She Believed That Each Of Them Met The Library's Criteria For Weeding

Ms. Milum explained in her declarations and testimony why she weeded nine of the ten books that were weeded in the fall of 2021: Each of those books (in her judgment) met the criteria for weeding under the CREW and MUSTIE factors. *See* Milum Decl., ECF No. 49-1, at ¶¶ 8, 12–16; Hr'g Tr. Vol. 2 95:16–106:20 (explaining reasons for weeding *Freakboy*, *Being Jazz:*, *Gabi, A Girl In Pieces*, *They Called Themselves The KKK*, *Spinning*, *Shine*, *Caste: The Origins of Discontent*, *It's Perfectly Normal*, and *In The Night Kitchen*).[20]

Ms. Milum also explained her reasons for weeding the "butt" and "fart" books[21] in August of 2021: (1) No one had asked for or inquired about the "butt" books that were continuously being checked out by Rochelle Wells and Rhonda Schneider;[22] (2) The actions of Wells and Schenider would render the "butt" and "fart" books inaccessible to other patrons;[23] and (3) The "butt" and "fart" books were trivial and "didn't really meet anyone's needs," and they remained available to patrons through interlibrary loans, so the books satisfied the "Trivial" and "Elsewhere" factors for weeding under the MUSTIE framework.[24]

---

defendant who weeded the 17 disputed books from the Llano library, and I am the only defendant who temporarily removed any of those books from the shelves.").

20.  Ms. Milum did not previously explain her reasons for weeding *Under The Moon. See* note 5 and accompanying text. Ms. Milum weeded that book because it wasn't getting checked out enough. *See* Third Milum Decl. ¶ 19.

21.  The plaintiffs' claim that Ms. Milum "permanently removed all seven titles from the library" is false. *See* Pls.' Br., ECF No. 91, at 2–3. Each of the books remains available for check-out through the in-house checkout system. *See* Third Milum Decl. ¶ 9.

22.  Hr'g Tr. Vol. 2 at 106:24–25 ("[N]obody else asked for it."); *id.* at 107:8–9. The plaintiffs falsely claim that Wells and Schneider were checking out *all* of the "butt" and "fart" books. *See* Pls.' Br., ECF No. 91, at 3 ("[T]hey began repeatedly checking out the Butt *and Fart* Books, keeping them off the shelves and inaccessible to other library patrons." (emphasis added)). Wells and Schneider checked out only two of the three "butt" books, and the remaining "butt" book and the "fart" books were never placed on the shelves or checked out. *See* Third Milum Decl. ¶ 10.

23.  Hr'g Tr. Vol. 2 at 106:21–107:24.

24.  Hr'g Tr. Vol. 2 at 107:25–108:9; *id.* at 107:12 ("[I]t was just silly trivial books"); *id.* at 107:2–3 ("They were more trivial books, anyway."). The plaintiffs' claim that Judge Cunningham and Commissioner Moss "directed" Milum to weed the "butt" and "fart"

The plaintiffs do not claim and produced no evidence that Ms. Milum is lying in her declarations or courtroom testimony. And none of the other witnesses claimed to know Ms. Milum's subjective state of mind or denied that Ms. Milum believed that the books qualified for weeding. The defendants falsely claim that Ms. Milum's stated reasons were "manufacture[d] . . . after the fact,"[25] but Ms. Milum has declared unequivocally that these were her actual reasons and motivations at the time the books were weeded,[26] and the defendants have produced nothing in the way of evidence to show that Ms. Milum lied to the court.

Yet the plaintiffs insist that the *real* reason Ms. Milum weeded these books is because she disapproved of their viewpoints or content. *See* Pls.' Br., ECF No. 91, at 6–11; 16–20. They make this claim because (according to the plaintiffs) the disputed books did not meet the library's criteria for weeding, and they base his claim on the testimony of a single witness, Tina Castelan, who claimed that Milum's decisions to weed some of disputed books violated the library's weeding policies. *See id.* at 6–9; Hr'g Tr. Vol. 1 at 33:15–45:18. Castelan's accusation is false and is soundly refuted by Ms. Milum's courtroom testimony and declarations. *See* Hr'g Tr. Vol. 2 at 95:16–109:12; Milum Decl., ECF No. 49-1; Third Milum Decl.

The Llano library system's criteria for weeding appears on a chart on the first page of Plaintiffs' Exhibit 23, which we have attached to this brief as Exhibit 1. *See* Third Milum Decl. ¶ 22. According to this chart, a book's eligibility for weeding depends on its Dewey

---

books is false. *See* Pls.' Br., ECF No. 91, at 3. Judge Cunningham recommended only that Ms. Milum *temporarily* remove those books from the shelves. *See* Pls.' Ex. 2A ("Amber, I am still receiving calls, letters and emails concerning the Farts and Butts books. I think it is best to remove these books from the shelves *for now*." (emphasis added)). See Second Cunningham Decl. ¶¶ 3–5 (attached as Exhibit 3); Third Milum Decl. ¶ 14. Commissioner Moss never even discussed the "fart" books with Milum, and he merely expressed his opinion that the "butt" books did not belong in the children's section. *See* Second Moss Decl. ¶¶ 3–4; Third Milum Decl. ¶¶ 11–12.

25.  Pls.' Br., ECF No. 91, at 20.

26.  *See* Third Milum Decl. ¶ 21 ("[M]y stated reasons for weeding the books were my actual reasons and motivations for weeding the books at the moment the decision was made. . . . [N]othing in my testimony was 'manufacture[d] . . . after the fact.'").

decimal class. *See id*. If one looks at the second line on the left-half columns, for example, a book in Dewey class 020 would is accompanied by the entry 10/3/MUSTIE, where the first number stands for "age," the second number "years since last circulation," and the third category "condition." *See* Ex. 1. That means a book in Dewey class 020 (or any other category marked with 10/3/MUSTIE) becomes eligible for weeding if:

1. It is more than 10 years old;
2. It has been three years or since its last circulation; *or*
3. It qualifies for weeding the MUSTIE criteria.

Third Milum Decl. ¶ 23. Only one of the three categories needs to be met; each is a sufficient and not a necessary condition to make a book eligible for weeding.[27]

The MUSTIE criteria stand for Misleading, Ugly, Superseded, Trivial, Irrelevant, or Elsewhere, and each of these categories was explained at the hearing. *See* Hr'g Tr. 90:15–93:9. It is permissible and sometimes prudent for a librarian to weed a book based on the presence of a single MUSTIE factor, such as books that are seriously damaged (Ugly), that have been replaced by a new edition in the library (Superseded), or that haven't been checked out in 10 years (Irrelevant). Third Milum Decl. ¶ 24. But when a book only barely meets a single MUSTIE factor, or if the issue with the book is a relatively minor one, a librarian will often (but not always) look for the presence of an additional MUSTIE factor before deciding to weed the book. *See id*. The CREW and MUSTIE factors are guidelines, not hard-and-fast rules. *See* Hr'g Tr. Vol. 2 at 108:21–23 ("[E]very librarian is just trained differently by their bosses and you use your own judgment on a lot of this.").

Every single book that Milum weeded met at least one of the MUSTIE factors, and nearly all of them satisfied two and possibly more of those factors. Milum thoroughly explained this in her courtroom testimony. *See* Hr'g Tr. Vol. 2 95:16–108:9. Castelan's testimony did not rebut any of this. To begin, Castelan *conceded* that *Freakboy* was appropriately

---

27.   Sometimes a factor is marked with an "X"; that means the factor should not be considered when weeding books in that Dewey range. *See* Ex. 1.

weeded because of its poor circulation record. *See* Hr'g Tr. Vol. 1 at 38:25–39:7. With respect to the remaining 16 books, Castelan opined only that the *circulation record* of those 16 books was not, in her opinion, enough to support a decision to weed. *See id*. But Castelan was never asked whether any of the other MUSTIE factors could support Milum's decision to weed those 16 books, such as the "Ugly," "Trivial," or "Elsewhere" criteria, and Castelan did not rebut Milum's reliance (or potential reliance) on those factors. Milum, for example, testified that the "butt" and "fart" books were appropriately weeded under the "Trivial" and "Else-where" categories,[28] and that the "Elsewhere" category supported her decision to weed the other disputed books.[29] Castelan never even addressed (let alone rebutted) this. Apparently the lawyer who examined Castelan thinks that having a witness opine that a book fails qualify for weeding on the ground of insufficient check-outs eliminates any possibility that the same book could qualify for weeding under the remaining MUSTIE factors.

Castelan's testimony was mistaken in other respects. She claimed, for example, that *It's Perfectly Normal* was improperly weeded "because its last checkout was in 2018,"[30] but under the Llano library's CREW chart a book in that Dewey class becomes eligible for weeding three years since its last checkout. *See* Third Milum Decl. ¶ 27. Castelan also testified that *Gabi, a Girl in Pieces* was improperly weeded "because [it's] last checkout was 2018 and we've had it since 2016." Hr'g Tr. Vol. 1 at 44:12–14. But *Gabi* is a Young Adults book, which becomes eligible for weeding two years after its last circulation or three years after it was first acquired. *See* Third Milum Decl. ¶ 28. *Gabi* qualified for weeding under either criterion. Castelan also claimed that *Being Jazz* was improperly weeded because the Llano libraries "only had one or two of the books that pertained to its subject." Hr'g Tr. Vol. 1 at 42:17–18. That is untrue; there are no fewer than 10 other books on the subject of

---

28.

29.

30.   Hr'g Tr. Vol. 1 at 37:15.

transgender youth in the Llano library system, in addition to the copy of *Being Jazz* that remains in circulation at the Kingsland library. *See* Third Milum Decl. ¶ 29.

But Castelan's errors pale in comparison to the misrepresentations in the plaintiffs' brief. The plaintiffs claim that Castelan "explained that historically the Llano Library looked for two or three MUSTIE criteria to be satisfied for weeding eligibility" and that "Milum agreed with that assessment." Pls.' Br., ECF No. 91, at 7. That is a dishonest characterization of the testimony. Here is what Castelan actually said:

> Q. Does any one MUSTIE factor mean that a book is weeded?
> A. No. It's *usually* a combination.
> Q. Is there a minimum number?
> A. So *my minimum number* was always two to three.

Hr'g Tr. Vol. 1 at 21:17–21 (emphasis added). Castelan was not testifying about "historical" practices at the Llano library; she was describing her own personal application of the MUSTIE factors. She also hedged by saying that it's "usually" a combination of factors, a qualification that the plaintiffs omit in their description of Castelan's testimony. And here is the relevant testimony from Amber Milum:

> Q. You also testified previously that a book not having been checked out in three years alone is not a sufficient reason by itself to weed that book, correct?
> A. Yes.

Hr'g Tr. Vol. 2 at 125:2–5. This exchange does not remotely signify agreement with the claim that "historically the Llano Library looked for two or three MUSTIE criteria to be satisfied for weeding eligibility." Milum was asked about only *one* hypothetical MUSTIE factor—a book's not having been checked out in *three* years—and whether a book of that sort should automatically be weeded in that particular scenario. She did not say that two or more MUSTIE factors must always be present before a book is weeded, or that the Llano library "historically" followed such a practice. *See* Third Milum Decl. ¶ 25.

The plaintiffs are also misrepresenting evidence when they claim that "the CREW Manual states that books are to remain on shelves unless they do not circulate 'for 3–5 years.'"

Pls.' Br., ECF No. 91, at 10 (citing Pls.' Ex. 23 at 44). The document that they cite is not the CREW manual, but a slideshow produced by Dawn Volger, who is not an employee of Llano County and has no authority over the Llano library system. And the slideshow does not come anywhere close to saying that books must "remain on shelves unless they do not circulate 'for 3–5 years.'" The relevant slide is attached as Exhibit 2 to this brief; it contains unexplained bullet points with the headline "Unused Materials Specifics," and it lists "Non-circulating for 3–5 years" as one of many bullet points that appear on the slide. The most that one can infer from this slide is that a book's failure to circulate for 3–5 years is one among many factors to consider is whether a book is sufficiently "unused" to warrant weed-ing—not that it is forbidden to weed any book unless and until it goes uncirculated for 3–5 years. And in all events, the Llano library system's weeding chart rejects the three-year mini-mum rule that plaintiffs are attempting to concoct, as it specifically allows Juvenile Fiction and Young Adult Fiction to become eligible for weeding after *two* years since last circulation, and several of the 17 weeded books fall into those categories. *See* Third Milum Decl. ¶ 26; *see also* Ex. 1. And a book can *still* be weeded even if it has been checked out within the last two or three years if its overall circulation rate is low or if it meets other criteria for weeding. *See* Hr'g Tr. Vol. 2 at 133:22–24 ("Q. The MUSTIE criteria have a threshold of three years for fiction books; isn't that right? A. No. It's just a guideline.").

And this is just the beginning of the plaintiffs' falsehoods and misrepresentations. The plaintiffs, for example, claim that Castelan "review[ed] each of the Banned Books,"[31] but Castelan never testified that she "reviewed" the books that Milum had weeded, or that she based her weeding opinions on an individualized "review" of the books themselves. The plaintiffs' claim that "none" of the weeded books "met more than one MUSTIE criterion," and that "most met none"[32] is false and was refuted by Milum's testimony, which the plaintiffs do not acknowledge. *See* Hr'g Tr. Vol. 2 95:16–108:9. Their claim that "Defendants did not

---

31.  Pls.' Br., ECF No. 91, at 7.
32.  Pls.' Br., ECF No. 91, at 7.

provide a single reason under CREW or MUSTIE justifying the removal of the Fart Books and *I Need a New Butt*[33] is false; Milum testified that these books qualified for weeding under the "Trivial," "Irrelevant," and "Elsewhere" criteria. *See* Hr'g Tr. Vol. 2 at 107:8–9. (Do the plaintiffs want to deny that these books fall within the "Trivial" category?) Their claim that new books cannot be "weeded" before they are placed on the shelves is false. *See* Third Milum Decl. ¶ 30.

The plaintiffs' claim that *It's Perfectly Normal* "was checked out within three years of its removal"[34] is false; plaintiffs' exhibit 52 shows that the last checkout was September 22, 2018, and it was weeded on October 12, 2021. *See* Third Milum Decl. ¶ 27. Their claim that *It's Perfectly Normal* cannot be weeded because it qualifies as a "special topic book"[35] is false and misrepresents Castelan's testimony. Castelan did not testify or opine that *It's Perfectly Normal* qualifies as a "special topic book," nor did she testify that *It's Perfectly Normal* (or special topic books) are "not eligible to be weeded." *See* Hr'g Tr. Vol. 1 at 37:15–19; Third Milum Decl. ¶ 31. The plaintiffs' claim that Moss "told Castelan he did not want the book in the library"[36] is false; Moss told Castelan only that "he wouldn't have wanted his children or his grandchildren to see it"[37] and expressed his opinion that it should be placed in a section of the library other than the children's section. *See* Second Moss Decl. ¶ 5 (attached as Exhibit 4). The plaintiffs' claim that Moss "made Milum remove"[38] *It's Perfectly Normal* is false. *See id.* at ¶¶ 5–10; Third Milum Decl. ¶ 13.

The plaintiffs' claim that Milum has "le[ft] approximately 5,800 titles" on the shelves that had not been checked out in the previous three years is false. *See* Pls.' Br., ECF No. 91, at 10. Milum became the system director on February 1, 2021, and she has not yet had the

---

33. Pls.' Br., ECF No. 91, at 8.
34. Pls.' Br., ECF No. 91, at 9.
35. Pls.' Br., ECF No. 91, at 9.
36. Pls.' Br., ECF No. 91, at 9.
37. Hr'g Tr. Vol. 1 at 29:8–9
38. Pls.' Br., ECF No. 91, at 9 (internal quotation mark omitted).

opportunity to conduct a thorough weed of the library system. *See* Third Milum Decl. ¶ 32. The library system has been understaffed (and therefore under-weeded) for years, which is why there are so many books on the shelves that should be weeded but have not yet been. *See id*. The plaintiffs are also wrong to say that Milum admitted that there was "no need to weed books" after the Commissioners Court had suspended new book purchases. *See* Pls.' Br., ECF No. 91, at 10 (citing Hr'g Tr. Vol. 2 at 120:25–121:10). Milum was asked only whether the weeding in November of 2021 was done "to make room for new books," and she acknowledged that it was not. *See* Hr'g Tr. Vol. 2 at 121:6–10 ("Q. So when you did the weeding based on Ms. Wallace's list that was e-mailed to you by your boss, you weren't doing that to make room for new books because you weren't allowed to order new books, correct? A. Right."). Milum never said that there was "no need to weed books" at that time. Weeding is needed regardless of whether new books are coming in because: (1) Shelf space costs money; (2) The presence of unused books frustrates and distracts employees and patrons who must sift through unnecessary clutter; (3) Weeding helps librarians identify holes in their collection and understand the community's desires and needs. *See* Third Milum Decl. ¶ 33.

Castelan conceded that *Being Jazz* "could have been" weeded consistent with CREW/MUSTIE criteria, even though she personally would have left it in. *See* Hr'g Tr. Vol. 1 at 42:14–19. The plaintiffs' brief, however, falsely claims that Castelan testified that the decision to weed *Being Jazz* was inconsistent with MUSTIE criteria. *See* Pls.' Br., ECF No. 9 ("According to Castelan, only one of the Banned Books—*Freakboy*— . . . was weeded consistent with MUSTIE criteria.").

* * *

The Court cannot and should not trust any factual assertion that appears in the plaintiffs' brief. We have hit on the most egregious misrepresentations, but we cannot in the allotted pages unpack every one of the misstatements that permeate their filing. The adversarial process cannot function when a litigant misrepresents the factual record to this extent. We encourage the Court to carefully compare the plaintiffs' factual claims with the primary sources

before accepting or relying on any factual claim in the plaintiffs' brief. The Court may also wish to consider striking the plaintiffs' brief and instructing them to submit a replacement that accurately relates the factual record and corrects each of the falsehoods that appears in their current submission. There are too many factual errors and misrepresentations of testimony in the current submission for a court to trust anything that the plaintiffs say.

## ARGUMENT

The plaintiffs (once again) refuse to acknowledge the "clear showing" requirement, but that does not absolve them of their obligation to "clearly carr[y] the burden of persuasion on all four requirements" of the preliminary-injunction standard. *Tex. Med. Providers Performing Abortion Servs. v. Lakey*, 667 F.3d 570 (5th Cir. 2012); Defs.' Br., ECF No. 49, at 8–9 (collecting authorities). We have already explained why the plaintiffs cannot make a "clear showing" of likely success or a "clear showing" of irreparable harm. *See id.* at 9–13 (merits); *id.* at 14 (harm). Nothing that the plaintiffs have said rebuts our previous arguments.

## I. THE PLAINTIFFS HAVE NOT MADE A "CLEAR SHOWING" OF LIKELY SUCCESS ON THE MERITS

The plaintiffs cannot make a "clear showing" of likely success for three separate and independent reasons. First, the plaintiffs cannot establish a violation of their First Amendment rights when they can obtain each of the disputed books through the in-house checkout system. Second, a public library's weeding decisions are subject only to rational-basis review. Third, even if one were to imagine that content and viewpoint discrimination are prohibited in public-library weeding decisions, the plaintiffs have filed to make a "clear showing" that Amber Milum weeded the books because she opposed their content or viewpoints.

### A. The In-House Checkout System Does Not And Cannot Violate The Plaintiffs' First Amendment Right To Access Information

The plaintiffs' First Amendment claims are doomed because each of the 17 books remains available for them to check out through Llano library's in-house system. The plaintiffs do not explain how the defendants are violating their "right to receive information" when

they remain able to check out and read every one of these books from Llano library. They complain that *other* library patrons may not be aware of the in-house checkout option,[39] but the plaintiffs must establish a violation of their own constitutional rights and not someone else's. *See supra* at 1–2; *Coon v. Ledbetter*, 780 F.2d 1158 (5th Cir. 1986) (plaintiffs who invoke 42 U.S.C. § 1983 are "required to prove some violation of their *personal* rights." (emphasis added)); *id.* (citing rulings from other federal courts that prohibit litigants from asserting third-party rights under section 1983); *Garrett v. Clarke*, 147 F.3d 745 (8th Cir. 1998) ("Garrett may not base his Section 1983 action on a violation of the rights of third parties."); David P. Currie, *Misunderstanding Standing*, 1981 Sup. Ct. Rev. 41, 45.

The plaintiffs made no showing that the in-house checkout system violates *their* First Amendment rights or burdens *them* in any way. They complain that there is "only one copy of each book," which is located "only at the Llano branch,"[40] but that was equally true before the books were weeded, so it does not diminish the plaintiffs' "right to receive information." *See* Third Milum Decl. ¶ 34. The plaintiffs complain that the disputed books "are not advertised," which means that *other* library patrons "have no way of knowing they exist or finding them." Pls.' Br., ECF No. 91, at 22. But that does not burden the plaintiffs, who are fully aware of the in-house checkout system and the availability of the disputed books. *See* Hr'g Tr. Vol. 2 at 42:12–15. The plaintiffs accuse the defendants of sending "a chilling message"[41] by operating the in-house checkout system, but that is an ideological grievance and has nothing to do with whether the defendants are violating the *plaintiffs'* First Amendment rights.

The plaintiffs rely on *Sund v. City of Wichita Falls*, 121 F. Supp. 2d 530 (N.D. Tex. 2000), and *Counts v. Cedarville School District*, 295 F. Supp. 2d 996 (W.D. Ark. 2003), which held that public libraries violated the First Amendment by making it more burdensome for the plaintiffs (or their next friends) to obtain certain books. These cases are inapposite

---

39.  *See* Pls.' Br., ECF No. 91, at 12–13, 22.
40.  *See* Pls.' Br., ECF No. 91, at 22.
41.  Pls.' Br., ECF No. 91, at 22.

because the in-house check-out system does not burden the plaintiffs in any way, and the plaintiffs do not explain how they are burdened by the defendants' actions. It is *easier* to obtain a book by asking for it at the reference desk than by searching through the card catalog and book stacks—and each of the plaintiffs already knows that this is how they must obtain and check out those disputed books. The defendants are not burdening the plaintiffs' ability to obtain these books in the slightest, so there is no conceivable infringement of the plaintiffs' constitutional "right to receive information."

*Sund* and *Counts* are also incompatible with the Supreme Court's subsequent ruling in *United States v. American Library Ass'n Inc.*, 539 U.S. 194 (2003), and the Fifth Circuit's ruling in *Chiras v. Miller*, 432 F.3d 606 (5th Cir. 2005). *Sund* claims that public libraries are "limited public forums" and that any content-based weeding or book-placement decision is subject to strict scrutiny. *See Sund*, 121 F. Supp. 2d at 548. The *American Library* plurality rejected that stance—a stance that *Chriras* subsequently embraced as the law of the Fifth Circuit. *See American Library*, 539 U.S. at 204 (plurality op. of Rehnquist, C.J.); *Chiras*, 432 F.3d at 614 ("'[J]ust as forum analysis and heightened judicial scrutiny are incompatible with the role of public television stations and the role of the NEA, they are also incompatible with the discretion that public libraries must have to fulfill their traditional missions.'" (quoting *American Library*, 539 U.S. at 204 (plurality op.)). *Counts* likewise applied strict scrutiny to a supposedly content-based restriction requiring parental consent before students could check out Harry Potter books from a school library. But neither the plurality opinion in *American Library* nor either of the concurrences applied strict scrutiny to content-based restrictions on library materials, and a six-justice majority upheld the content-based restrictions imposed by the Children's Internet Protection Act (CIPA) without any one of the six justices suggesting that strict scrutiny (or any type of heightened scrutiny) should apply. *See American Library*, 539 U.S. at 198–214 (plurality op.); *id*. at 214–15 (Kennedy, J., concurring in the judgment); *id*. at 215–20 (Breyer, J., concurring in the judgment).

Finally, Justice Kennedy's and Justice Breyer's concurrences in *American Library* make clear that "small" or non-significant burdens on a library's patron's ability to obtain materials do not violate the First Amendment. *See id.* at 215 (Kennedy, J., concurring in the judgment) (upholding restriction after concluding that the plaintiffs failed to "show that the ability of adult library users to have access to the material is burdened in any significant degree"); *id.* at 220 (upholding restricting given the "comparatively small burden that the Act imposes upon the library patron"). Here, there are *no* "burdens" imposed on the plaintiffs, as the in-house checkout option spares them the inconvenience of having to search for the disputed books on the library shelves. And even if the plaintiffs attempted to theorize or concoct a "burden," it would be far less of a burden than that imposed by CIPA, which required adult users to ask a librarian to unblock filtered materials before access would be allowed.

### B.    A Public Library's Weeding Decisions Are Subject Only To Rational-Basis Review

The plaintiffs claim that the First Amendment "prohibits the removal of books from libraries based either content or viewpoint discrimination." Pls.' Br., ECF No. 91, at 14. That is nonsense. No decision of the Supreme Court or the Fifth Circuit has ever held that public libraries are forbidden to make content- or viewpoint-based weeding decisions. Even Justice Brennan's plurality opinion in *Pico*, which represents the most restrictive view of public-library decisionmaking taken by a Supreme Court justice,[42] acknowledges that content discrimination is permissible and inevitable in library-book selection, and it allows libraries to remove books based on content that is "pervasively vulgar" or that lacks "educational suitability." *Pico*, 457 U.S. at 871 (1982) (plurality op.); *Campbell v. St. Tammany Parish School Board*, 64 F.3d 184 (5th Cir. 1995) ("The Court in its plurality opinion implicitly recognized

---

42.   *See Pico*, 457 U.S. at 885 (1982) (Burger, C.J., dissenting) (describing the Brennan plurality opinion as "a lavish expansion going beyond any prior holding under the First Amendment"); *CK-W by and through TK v. Wentzville R-IV School District*, --- F. Supp. 3d ----, 2022 WL 3138989, *5 (W.D. Mo.) (describing "Justice Brennan's approach" as "the most expansive view of the purported right at play").

. . . that an unconstitutional motivation would not be demonstrated if the school officials removed the books from the public school libraries based on a belief that the books were 'pervasively vulgar' or on grounds of 'educational suitability.'"); *see also Pico*, 457 U.S. at 869 (plurality op.) ("[L]ocal school boards have a substantial legitimate role to play in the determination of school library *content*." (emphasis added)); *id*. at 870 (plurality op.) ("Petitioners rightly possess significant discretion to determine the *content* of their school libraries." (emphasis added)); *id*. at 880 (1982) (Blackmun, J., concurring in part and concurring in the judgment) (endorsing specific examples of content and viewpoint discrimination in library-book selection).[43] The *Pico* plurality opinion says only that school libraries may not weed books "in a narrowly partisan or political manner"[44]—a far cry from a total prohibition on viewpoint or content discrimination.

The plurality opinion in *Pico* never received a fifth vote—so it is not law and is not binding authority.[45] The plurality opinion in *American Library is* binding authority because *Chiras* adopts it as the law of the Fifth Circuit—and it gives public libraries "broad discretion to decide what material to provide to their patrons." *See American Library*, 539 U.S. at 204

---

43.  *See Virgil v. School Board of Columbia County, Florida*, 862 F.2d 1517 (11th Cir. 1989) (acknowledging that under Justice Brennan's plurality opinion in *Pico*, the "removal of books from library would be permissible if decision were based on determination that books were 'pervasively vulgar' or not 'educational[ly] suitab[le]'"); *Serra v. U.S. General Sevices Administration*, 847 F.2d 1045 (2d Cir. 1988) ("Removal of books that were pervasively vulgar or educationally unsuitable would, even in the [*Pico*] plurality's view, be 'perfectly permissible.'" (citations omitted); *CK-W by and through TK v. Wentzville R-IV School District*, --- F. Supp. 3d ----, 2022 WL 3138989, *6 (W.D. Mo.) ("[I]t is 'perfectly permissible' for a school to remove a book based upon the book's 'educational suitability.'" (quoting *Board of Education v. Pico*, 457 U.S. 853 (1982) (plurality opinion of Brennan, J.)).

44.  *See Pico*, 457 U.S. at 870 (plurality op.); *id*. at 872 ("[S]chool boards may not remove books from school library shelves simply because they dislike the ideas contained in those books.").

45.  *See Campbell*, 64 F.3d at 189 ("[T]he *Pico* plurality opinion does not constitute binding precedent"); *CK-W by and through TK v. Wentzville R-IV School District*, --- F. Supp. 3d ----, 2022 WL 3138989, *4 (W.D. Mo.) ("Justice Brennan's plurality opinion in *Pico* . . . is not binding.").

(2003) (plurality op.) ("[P]ublic libraries must have broad discretion to decide what material to provide to their patrons."); *Chiras v. Miller*, 432 F.3d 606 (5th Cir. 2005) ("'Public library staffs necessarily consider content in making collection decisions and enjoy broad discretion in making them.'" (citation and internal quotation marks omitted)). It is the rational-basis test, and not the plaintiffs' made-up rule against "content" or "viewpoint" discrimination, that governs a public library's weeding decisions. *See* Defs.' Resp. to Mot. for Prelim. Inj., ECF No. 49 at 11–12 (citing authorities).

The notion that librarians cannot engage in "content discrimination" when weeding books is absurd. Weeding inherently involves content discrimination, as three of the six MUSTIE factors require librarians to discriminate against content that is "Misleading," "Superseded," Or "Trivial." Even Tina Castelan endorsed content discrimination by claiming that "special topic books"—which (in her view) should include LGBTQ books—should not be weeded even when they would otherwise qualify for weeding on account of poor circulation. *See* Hr'g Tr. Vol. 1 at 22:6–19; *id.* at 42:7–43:11. So the plaintiffs are all for content discrimination in the weeding process—as long as librarians discriminate in favor of LGBTQ content and other "special topics" that they support. *See* Pls.' Br., ECF No. 91, at 9.

Viewpoint discrimination may also be appropriate, as books claiming that the earth is flat or that otherwise embrace viewpoints that have been discredited are appropriate candidates for weeding under the "Superseded" factor. *See Pico*, 457 U.S. at 871 (1982) (plurality op.); Even the slideshow on weeding produced by Dawn Vogler, which the plaintiffs falsely equate with "the CREW manual" and cite as if it were holy writ,[46] includes a slide that announces "poor *content* specifics" as a ground for weeding and lists each of the following content-based categories as factors to consider in weeding decisions:

> Trivial subject matter (outdated popular culture)
> Mediocre writing style
> Inaccurate or false information

---

46.   *See* Pls.' Br., ECF No. 91, at 10.

. . .

     Materials that contain *bias, racist, sexist terminology or views*

Pls.' Ex. 22 at 45 (attached as Ex. 2). *All* of these criteria entail content discrimination, and the last one encompasses viewpoint discrimination. Do the plaintiffs think *these* weeding criteria are unconstitutional — even though they are undeniably content- and viewpoint-based?

Of course, the government could never ban or censor a book on these grounds, nor could it use these grounds to discriminate against a writer or speaker in a traditional public forum. But public libraries are different. They are not "forums" of any sort, and they *must* impose content-based (and occasionally viewpoint-based) standards for determining which materials they will house in their limited shelf space. *See American Library*, 539 U.S. at 204 (plurality op.); *Chiras*, 432 F.3d at 614. The plaintiffs do not claim or argue that a public library is a type of "forum" that would trigger rules against viewpoint or content discrimination. And the plaintiffs must deal with the fact that *American Library* upheld a federal statute that *mandated* content discrimination in public libraries. *See American Library*, 539 U.S. at 208 (plurality op.) (acknowledging that CIPA "exclude[s] certain categories of content"); *id*. at 202–03 (plurality op.) (noting that the district court held that CIPA was "a content-based restriction"); *id*. at 241 (Souter, J., dissenting) (criticizing the CIPA regime as "[c]ontent-based blocking and removal").

### C.    Amber Milum Did Not Engage In Viewpoint Or Content Discrimination When Weeding The 17 Disputed Books

There is yet a third reason why the plaintiffs cannot make a "clear showing" of likely success on their First Amendment claims: Even if one were to pretend that the First Amendment prohibits content- or viewpoint-based weeding decisions, the plaintiffs have no evidence that Milum based her weeding decisions on the content or viewpoints of the 17 disputed books. Milum declared and testified repeatedly and unequivocally that her decisions to weed those books were based on her belief that the books were appropriate candidates for weeding on account of poor circulation, and that each of the books (in her judgment) satisfied multiple criteria for weeding under CREW and MUSTIE. The plaintiffs do not allege

that Milum is lying in her declarations or courtroom testimony, and none of their evidence shows that Milum acted out of a desire to suppress the viewpoints or contents of those books.

Castelan never testified or opined that Milum weeded the books because she was hostile to the content or viewpoints expressed in those books. Castelan simply stated that she would have reached a different conclusion in applying the CREW and MUSTIE criteria to some of the 17 books. She never accused Milum of acting in bad faith or out of nefarious or impermissible motives. The plaintiffs also have no evidence that Milum is hostile to books containing nudity, critical race theory, or LGBTQ issues, and Milum specifically denies that she harbors any opposition to these types of books. *See* Third Milum Decl. ¶ 36. All that the plaintiffs have shown is that different librarians can reach different conclusions when applying the CREW and MUSTIE guidelines—something that both Milum and Castelan acknowledged on the witness stand. *See* Hr'g Tr. Vol. 1 at 42:16–19; *id.* at 127:6–19; Hr'g Tr. Vol. 2 at 108:21–109:12; *id.* at 145:13–15 ("[D]ifferent librarians have different, you know, views or decisionmaking skills of what they think should still be on the shelves or not.").

The plaintiffs do not even tell us what "viewpoints" are expressed in the weeded books, and there is no evidence in the record for this court to determine what those "viewpoints" are. Milum didn't read the books on Ms. Wallace's list before weeding them,[47] so she had no way of knowing what "viewpoints" or "positions" were expressed. Milum has also denied knowledge of the "viewpoints" or "positions" in those books. *See* Third Milum Decl. ¶ 38.

The plaintiffs claim that Milum "removed" those books "because they were on the Wallace list,"[48] but the plaintiffs are playing word games with "remove." Milum's decision to pull those books for review (*i.e.*, to *temporarily* remove the book) was because they appeared on Wallace's list, but Milum's decision to weed the books (*i.e.*, to *permanently* remove them) was *solely* because she determined they met the criteria for weeding. The vast majority of

---

47.  *See* Hr'g Tr. Vol. 2 at 104:3–5 ("Q. Have you read any of the books that we've been talking about? A. No.").

48.  *See* Pls.' Br., ECF No. 91, at 17.

books on Wallace's list were returned the shelves after Milum determined that they did *not* meet the criteria for weeding—a fact that the plaintiffs refuse to acknowledge in their brief. *See* Hr'g Tr. Vol. 1 at 93:10–95:4 (Milum weeded only "six or seven" of the 47 books on Wallace's list that she reviewed); Hr'g Tr. Vol. 2 at 94:7–95:4; Third Milum Decl. ¶ 39.[49]

The plaintiffs' evidence of "content" discrimination is equally non-existent. They claim that the "defendants" (they never say *which* defendants) admitted to "removing" books based on content. *See* Pls.' Br., ECF No. 91, at 17–18. But the plaintiffs are (once again) conflating the decision to *temporarily* pull the books for review with the decision to *permanently* remove them. The decision to *temporarily* pull the books from the shelves for review was content-based (though not viewpoint-based),[50] as Judge Cunningham had instructed Ms. Milum to temporarily pull books "with photos of naked or sexual conduct." Pls.' Br., ECF No. 91, at 4. But this does nothing to show that Milum engaged in content or viewpoint discrimination when deciding to *weed* the books after reviewing them—especially when Milum returned the vast majority of these books to the shelves. See Third Milum Decl. ¶¶ 35, 39.

The plaintiffs falsely claim that Ms. Milum "removed *In The Night Kitchen* from the library system because it includes illustrations of a naked toddler." *See* Pls.' Br., ECF No. 91, at 4. Milum's decision to *pull* the book *for review* (*i.e.*, to *temporarily* remove the book) was because of the naked-toddler pictures, but her decision to weed the book (*i.e.*, to "remove the book from the library system") had nothing to do with content or nudity, and Milum would have weeded *In The Night Kitchen* even if there had been no nudity or naked-toddler drawings. *See* Third Milum Decl. ¶ 35; Hr'g Tr. Vol. 1 at 93:20–94:6. The plaintiffs' claim

---

49. The defendants never "admitted" that they "pulled" books on Wallace's list "because the books took positions with which the Defendants disagreed," and the testimony that the plaintiffs cite do not remotely support this claim. *See* Pls.' Br., ECF No. 91, at 16.

50. The decision to temporarily pull the books was not viewpoint-based because all books containing this content were pulled for review, regardless of the viewpoints expressed, and the plaintiffs present no argument for how Judge Cunningham's directive to Ms. Milum could qualify as "viewpoint discrimination."

that Moss "ordered the removal" of *It's Perfectly Normal* is false,[51] as is their insinuation that Ms. Milum removed this book because Moss told her to.

## II. The Plaintiffs Have Not Made A "Clear Showing" Of Irreparable Harm

The plaintiffs have failed to identify *any* harm (let alone an "irreparable" harm) that they will suffer from obtaining the disputed books through the library's in-house checkout system. *See CK-W by and through TK v. Wentzville R-IV School District*, --- F. Supp. 3d ----, 2022 WL 3138989, *9 (W.D. Mo.) (removal of library books did not inflict irreparable harm because it "does not stop any student from reading or discussing the book"). The plaintiffs do not deny that it is easier for them to obtain a book by asking for it at the reference desk rather than by searching a catalog, traipsing among the shelves, and pawing through the books.

The plaintiffs would prefer that the 12 books be returned to the library shelves and restored to the catalog so that *other* patrons can check them out, but that does not inflict irreparable harm *on the plaintiffs. See Winter v. Natural Resources Defense Council*, 555 U.S. 7, 20 (2008) ("A plaintiff seeking a preliminary injunction must establish . . . that *he is* likely to suffer irreparable harm in the absence of preliminary relief." (emphasis added)); *Jones v. District of Columbia*, 177 F. Supp. 3d 542, 546 n. 3 (D.D.C. 2016) ("[T]he irreparable harm prong . . . only concerns harm suffered by the party or parties seeking injunctive relief . . . . [A]ny alleged harm to third parties is properly addressed under the public interest prong"). And the distress that the plaintiffs may experience over the plight of other library patrons does not qualify as Article III injury, let alone "irreparable harm." *See Valley Forge Christian Coll. v. Americans United for Separation of Church and State*, 454 U.S. 464, 485–86 (1982).

---

51.  *See* Second Moss Decl. ¶ 5 ("The plaintiffs' claim that I 'ordered the removal' of *It's Perfectly Normal* from the Llano library is . . . false. . . . I merely expressed my opinion to Tina Castelan that *It's Perfectly Normal* should not be located in the children's section, and that it should be placed in a different section of the library.") (attached as Exhibit 4); *see also* Hr'g Tr. Vol. 1 at 28:25–29:9; Third Milum Decl. ¶ 13 ("The plaintiffs' claim that Commissioner Moss 'ordered the removal' of *It's Perfectly Normal* from the Llano library is false.").

### III.   THE COURT SHOULD DENY OUT OF HAND THE REQUESTED RELIEF IN PARAGRAPHS 3 THROUGH 6 OF THE PLAINTIFFS' PROPOSED ORDER

The plaintiffs' proposed order demands far more than the return of the 17 disputed books to the library shelves. *See* Pls.' Proposed Order, ECF No. 76-1, at ¶¶ 3–6. But the plaintiffs present no argument for the relief requested in paragraphs 3 through 6 of the proposed order, so they have failed to make a "clear showing" that this requested relief is needed to prevent irreparable harm or that they are likely to obtain this relief at the end of trial. They have also forfeited any request for the relief in paragraphs 3 through 6 by failing to present an argument in their brief. *See Roe v. Cypress-Fairbanks Independent School District*, 53 F.4th 334, 343 n.5 (5th Cir. 2022) (failure to adequately brief an argument results in forfeiture). The Court should deny the relief in those paragraphs for that reason alone.[52]

The Court also cannot award the relief described in paragraphs 3 through 6 because none of the defendants are engaged in the behavior that the plaintiffs seek to enjoin. The defendants testified that they will not weed, conceal, or remove any books until this litigation concludes.[53] The defendants have never restricted and never had any intention of restricting access to any book on Bibliotheca's online platform.[54] And the library advisory board will not be holding any meetings until this litigation concludes.[55] So the plaintiffs could not have shown irreparable harm even if they had tried.

---

52.   The plaintiffs falsely assert that their proposed order "would simply preserve the status quo ante." Pls. Br, ECF No. 91, at 24. Paragraphs 3 and 4 in the proposed order impose burdensome new documentation and reporting requirements on the defendants that never previously existed. *See* Pls.' Proposed Order, ECF No. 76-1, at ¶¶ 3–4.

53.   *See* Hr'g Tr. Vol. 1 at 130:10–11 ("We are not weeding or adding anything to the system until after the litigation is finished."); Hr'g Tr. Vol. 2 at 117:8–13 ("Q. . . . Will you or your colleagues be weeding, or removing, or concealing any book in any of the libraries in the Llano County system between now and the conclusion of this litigation? A. No.").

54.   *See* Hr'g Tr. Vol. 1 at 129:7–10 ("Q. Has anyone in the Llano County Library System ever restricted access to any book on Bibliotheca due to the book's viewpoint or content? A. No."); *id*. at 130: 1–4 ("Q. Will you or any of your colleagues restrict access to any book on Bibliotheca if the motion for preliminary injunction is denied? A. No.").

55.   *See* Hr'g Tr. Vol. 1 at 164:24–165:4 ("Mr. Cunningham, when will the library advisory board have its next scheduled meeting? A. After the completion of this litigation. Q.

---

## IV.   IF THE COURT AWARDS A PRELIMINARY INJUNCTION, IT SHOULD BE DIRECTED ONLY TO AMBER MILUM

Milum is the only defendant with authority to restore books to the library shelves and catalog. So if the Court grants the relief requested in paragraphs 1 and 2 of the proposed order, the injunction should extend only to Amber Milum. The remaining defendants cannot be held responsible for the return of library books when they have no ability or authority to place books on the library shelves or restore them to the library's catalog.

## CONCLUSION

For these reasons, as well as those in our previous briefing (ECF No. 49), the motion for preliminary injunction should be denied.

Respectfully submitted.

DWAIN K. ROGERS
Texas Bar No. 00788311
County Attorney

MATTHEW L. RIENSTRA
Texas Bar No. 16908020
First Assistant County Attorney

Llano County Attorney's Office
Llano County Courthouse
801 Ford Street
Llano, Texas 78643
(325) 247-7733
dwain.rogers@co.llano.tx.us
matt.rienstra@co.llano.tx.us

Dated: December 30, 2022

 /s/ Jonathan F. Mitchell
JONATHAN F. MITCHELL
Texas Bar No. 24075463
Mitchell Law PLLC
111 Congress Avenue, Suite 400
Austin, Texas 78701
(512) 686-3940 (phone)
(512) 686-3941 (fax)
jonathan@mitchell.law

*Counsel for Defendants*

---

Are you saying there won't be any meetings between now and the end of this litigation? A. No, sir."); *see also* Hr'g Tr. Vol. 2 at 26:4–6; *id.* at 75:12–24;

## CERTIFICATE OF SERVICE

I certify that on December 30, 2022, I served this document through CM/ECF upon:

Ellen V. Leonida
Matthew Borden
J. Noah Hagey
Sarah Salomon
Pratik Ghosh
Amy Senia
BraunHagey & Borden LLP
351 California Street, 10th Floor
San Francisco, CA 94104
(415) 599-0210
leonida@braunhagey.com
borden@braunhagey.com
hagey@braunhagey.com
salomon@braunhagey.com
ghosh@braunhagey.com
senia@braunhagey.com

Ryan A. Botkin
Katherine P. Chiarello
María Amelia Calaf
Wittliff | Cutter PLLC
1209 Nueces Street
Austin, Texas 78701
(512) 960-4730 (phone)
(512) 960-4869 (fax)
ryan@wittliffcutter.com
katherine@wittliffcutter.com
mac@wittliffcutter.com

*Counsel for Plaintiffs*

 /s/ Jonathan F. Mitchell 
Jonathan F. Mitchell
*Counsel for Defendants*

# Exhibit 1

# The CREW Method Weeding Chart:

Overview Chart for CREW Formulas Used in Library Collection Weeding

**Please see notes at bottom of page for tips in reading the chart**

| Dewey Class | | Age/Yrs. since last circ./Condition | Dewey Class | Age/Yrs. since last circ./Condition |
|---|---|---|---|---|
| 000 | 011 | 10/X/MUSTIE | 800 | X/X/ MUSTIE |
| | 020 | 10/3/ MUSTIE | 900    910 | 5/3/ MUSTIE (geography & guide books) |
| | 030 | 5/X/ MUSTIE | | |
| | Others | 5/X/ MUSTIE | 920 | 10/3/ MUSTIE (personal narratives) |
| | | | Others | 15/3/ MUSTIE |
| 100 | 133 | 15/X/ MUSTIE | | |
| | 150 | 10/3/MUSTIE | B or 92 | X/2/ MUSTIE |
| | 160 | 10/3/ MUSTIE | (Biography) | |
| 200 | | 10/3/ MUSTIE or 5/X/ MUSTIE | F or FIC (Fiction) | X/2/ MUSTIE |
| 300 | 310 | 2/X/ MUSTIE | E Fiction (Picture Books) | X/2/ MUSTIE |
| | 320 | 5/3/ MUSTIE (tropical) | | |
| | | 10/3/ MUSTIE (historical) | JF (Juvenile Fiction) | X/2/ MUSTIE |
| | 330 | 5/3/ MUSTIE | | |
| | 340 | 10/X/ MUSTIE | | |
| | 350 | 10/X/ MUSTIE | YA (Young Adult Fiction) | 3/2/ MUSTIE |
| | 360 | 5/X/ MUSTIE | | |
| | 370 | 10/3/ MUSTIE | | |
| | 390 | 5/3/ MUSTIE (etiquette) | J and YA Nonfiction | Use Adult Criteria |
| | | 10/3/ MUSTIE (folklore, customs) | | |
| | | | Periodicals and Newspapers | 3/X/X |
| 400 | | 10/3/ MUSTIE | | |
| 500 | 510 | 10/3/ MUSTIE | VF (Vertical File) | 1/2/MUSTIE |
| | 550 | X/3/ MUSTIE | | |
| | 570 | 10/3/ MUSTIE | College Catalogs | 2/X//MUSTIE |
| | 580 | 10/3/ MUSTIE | | |
| | | | NP (Non-print Media and AV) | WORST |
| 600 | 610 | 5/3/ MUSTIE | | |
| | 630 | 5/3/ MUSTIE | | |
| | 635 | 10/3/ MUSTIE | Videocassettes | 12/2/WORST |
| | 640 | 5/3/ MUSTIE | | |
| | 649 | 5/3/ MUSTIE | Local History | X/X/X |
| | 690 | 10/3/ MUSTIE | | |
| | Others | 5/3/ MUSTIE | Donations and Memorials | X/X/MUSTIE |
| 700 | 745 | X/3/ MUSTIE | | |
| | 770 | 5/3/ MUSTIE | Source:  Chart is Courtesy of Library Development Division, Texas State Library (Power Tools, ALA, 1998) | |
| | 790 | 10/3/ MUSTIE | | |
| | Others | X/X/ MUSTIE | | |

**MUSTIE** = **M**isleading, **U**gly, **S**uperseded by new editions or better books, **T**rivial, **I**rrelevant to school community needs and interests, easily obtained **E**lsewhere via interlibrary loan.

**WORST** = **W**orn out, **O**ut of date, **R**arely used, **C**entral office/borough can supply, **T**rivial

**X** = This factor is not applicable to this specific Dewey Range—do not consider it.

MILNER-BEBR-0050
UPDA
Plaintiffs' Exhibit

**23**

# Exhibit 2

# Unused Materials Specifics

- Non-circulating for 3-5 years
- Duplicate copies no longer needed
- Periodicals that are available in full-text
- Unused volumes in sets or series
- Unneeded titles in subject areas used less frequently
- "Hot topics" popular more than 5 years ago
- More books than needed on one topic
- Formats no longer popular (VHS)
- Material that is no longer important to the collection (curricula, demographics)

MILUM 4 RFP - 0059



# Poor Content Specifics

- Outdated and obsolete (computers, law, science, space, health, technology, travel)
- Trivial subject matter (outdated popular culture)
- Mediocre writing style
- Inaccurate or false information
- Unused sets of books (keep used volumes if they meet local needs)
- Repetitious series
- Superseded editions
- Resources not on standard lists or that weren't reviewed
- Materials that contain bias, racist, sexist terminology or views
- Unneeded duplicates
- Self-published or small press titles that are not circulating, especially those added as gifts

MILUM 4 RFP - 0054



# Exhibit 3

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

|  |  |
|---|---|
| **Leila Green Little**, et al.,<br><br>               Plaintiffs,<br><br>v.<br><br>**Llano County**, et al.,<br><br>               Defendants. | Case No. 1:22-cv-00424-RP |

## SECOND DECLARATION OF RON CUNNINGHAM

1.  My name is Ron Cunningham. I am over the age of 18 and fully competent in all respects to make this declaration.

2.  I have personal knowledge of the facts stated in this declaration, and all of these facts are true and correct.

3.  The plaintiffs' claim that I "directed" Amber Milum "to remove the Butt and Fart Books" from Llano library is false. *See* Pls.' Br., ECF No. 91, at 3. My e-mail to Amber Milum, which the plaintiffs introduced as Exhibit 2A, recommended only that Ms. Milum *temporarily* remove those books from the shelves to determine whether they should remain in the children's section of the library. *See* Pls.' Ex. 2A ("Amber, I am still receiving calls, letters and emails concerning the Farts and Butts books. I think it is best to remove these books from the shelves *for now*." (emphasis added)). I never directed Amber Milum or any other library employee to weed those books or any other book.

4.  The plaintiffs' claim that I "directed" the removal of books is based on an e-mail that Rochelle Wells sent on November 11, 2022, which says that Jerry Don Moss and I had "instructed" Ms. Milum to "remove certain books." The plaintiffs introduced this e-mail from Ms. Wells as Exhibit 8 at the hearing on their motion for

preliminary injunction, and they have cited it in their brief. *See* Hr'g Tr. Vol 1 at 198:24–199:12; Pls.' Br., ECF No. 91, at 5 n.6.

5. Ms. Wells was mistaken to assume in her e-mail of November 11, 2022, that I had "directed" Ms. Milum to remove books. I merely asked Ms. Milum to *temporarily* pull certain books to *review* whether they should continue be housed in the library or stored in the children's section. I was not involved in and had nothing to do with Ms. Milum's subsequent decision to weed any of those books. I never instructed or told anyone at the library to weed or temporarily remove any book, either physical books or ebooks.


This concludes my sworn statement. I declare under penalty of perjury that the foregoing is true and correct.


Dated: 12/30/2022

DocuSigned by:

*Ron Cunningham*

19A091CC191246F...

RON CUNNINGHAM

# Exhibit 4

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | |
|---|---|
| **Leila Green Little**, et al., | |
| Plaintiffs, | |
| v. | Case No. 1:22-cv-00424-RP |
| **Llano County**, et al., | |
| Defendants. | |

### SECOND DECLARATION OF JERRY DON MOSS

1.  My name is Jerry Don Moss. I am over the age of 18 and fully competent in all respects to make this declaration.

2.  I have personal knowledge of the facts stated in this declaration, and all of these facts are true and correct.

3.  The plaintiffs' claim that I "directed" Amber Milum "to remove the Butt and Fart Books" from the Llano library is false. I never even discussed the "fart" books with Ms. Milum, let alone "directed" her to weed or temporarily remove those books.

4.  I did discuss the "butt" books (but not the "fart" books) with Ms. Milum, and when I did I merely expressed my opinion that those books should not be in the children's section of the library, and that if it were up to me I would remove those books from the library. I never ordered or directed Ms. Milum to weed or temporarily remove the "butt" books or any other book.

5.  The plaintiffs' claim that I "ordered the removal" of *It's Perfectly Normal* from the Llano library is also false. *See* Pls.' Br., ECF No. 91, at 4. I merely expressed my opinion to Tina Castelan that *It's Perfectly Normal* should not be located in the children's section, and that it should be placed in a different section of the library. I

never ordered or even suggested that the book be weeded or temporarily removed from the library.

6.   I made clear in my previous declaration, in my deposition, and in my courtroom testimony that I never "ordered" or "directed" the removal of any book from the library and that I have no authority over Ms. Milum's decisionmaking, and I merely expressed my opinions that the "butt" books and *It's Perfectly Normal* should not be shelved in the children's section of the library. *See, e.g.*, Moss Decl., ECF No. 49-3, at ¶ 4 ("I made clear to Ms. Milum that I was not her boss and could not tell her what to do. . . . I never directed or suggested that any books be removed from the library based on their content."); Moss Dep. at 26:17–22 ("I told her, that in my opinion, that she needed to take them out of the children's section. I also told her she does not work for me specific, so I was there, was giving my opinion and my opinion only that these books need to—didn't—they didn't need to be in the children's section."); *id.* at 46:18–20 ("[A]ny books that I have talked to her about, which, once again was strictly my opinion, I made it very clear that she doesn't work under me"); Hr'g Tr. Vol. 2 at 164:16–19 ("I made sure and told her that I was not her supervisor . . . . I told her that I didn't think that those books should be in the children's section . . . . That was my personal opinion. Like I said, I wanted to make sure that she understood I wasn't her boss. I think she knew that. So it was just my opinion that it should not be in the children's section of the library."); Hr'g Tr. Vol. 2 at 164:20–24 ("Q. How many times, if any, did you direct Amber Milum to remove a particular book from the Llano County Library System? A. I did not direct her to remove any books from the library.").

7.   The plaintiffs' claim that I "ordered" the removal of *It's Perfectly Normal* is based on an e-mail that Rochelle Wells sent to me on January 19, 2022, in which she wrote: "By the way, some of us saw the photos from the other book—they were disgusting, so thank you for making her remove *It's Perfectly Normal!*" The plaintiffs

introduced this e-mail from Ms. Wells as Exhibit 19 at the hearing on their motion for preliminary injunction, and they have cited it in their brief. *See* Hr'g Tr. Vol 1 at 196:11–198:9; Pls.' Br., ECF No. 91, at 4.

8.  Ms. Wells was mistaken to assume in her e-mail of January 19, 2022, that I had "made" Ms. Milum or Ms. Castelan remove *It's Perfectly Normal.* I did not "make" anyone at the public library remove that book. I merely expressed my opinion to Ms. Castelan that *It's Perfectly Normal* should not be shelved in the children's section of the library. I was not involved in and had nothing to do with Ms. Milum's subsequent decision to weed that book.

9.  The plaintiffs also cite an e-mail that Rochelle Wells sent on November 11, 2021, in which she wrote that:

> Commissioner Moss and Judge Cunningham have instructed Amber, the head librarian, to remove certain books, both physical books and ebooks (via the LIBBY app). There will also be no new books coming in until this is settled. If you go into the library you will see Amber and Tina (Children's librarian) are currently going through the Children's section, labeling books, and I am assuming also removing the books Commissioner Moss has told them to remove. Amber was told to get rid of Lawn Boy and Gender Queer (physical and ebook). Commissioner Moss, we are very grateful for your help in this situation and all you have done to begin to remedy it!

The plaintiffs introduced this e-mail from Ms. Wells as Exhibit 8 at the hearing on their motion for preliminary injunction, and they have cited it in their brief. *See* Hr'g Tr. Vol. 1 at 198:24–199:10; Pls.' Br., ECF No. 91, at 5 n.6.

10.  Ms. Wells's e-mail of November 11, 2021, is mistaken in saying that I "instructed" and "told" Ms. Milum to "remove certain books." I never instructed or told anyone at the library to weed or temporarily remove any book, either physical books or ebooks, and I never instructed Ms. Milum or anyone else to remove *Lawn Boy* or *Gender Queer.*

This concludes my sworn statement. I declare under penalty of perjury that the foregoing is true and correct.

Dated: *12-28-2022*

JERRY DON MOSS

# Exhibit 5

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | |
|---|---|
| **Leila Green Little**, et al., | |
| Plaintiffs, | |
| v. | Case No. 1:22-cv-00424-RP |
| **Llano County**, et al., | |
| Defendants. | |

## THIRD DECLARATION OF AMBER MILUM

1.  My name is Amber Milum. I am over the age of 18 and fully competent in all respects to make this declaration.

2.  I have personal knowledge of the facts stated in this declaration, and all of these facts are true and correct.

3.  The plaintiffs' claim that the Llano Library's in-house check-out program includes only nine of the 17 disputed books is false. *See* Pls.' Br., ECF No. 91, at 13, 22. All 17 of the disputed books are available for check-out through the Llano Library's in-house check-out program.

4.  Each of the three "butt" books and each of the four "fart" books had already been added to the Llano library's in-house checkout before the donation of July 21, 2022. I made this clear in my declaration of July 15, 2022. *See* Decl. of Amber Milum, ECF No. 49-1, at ¶¶ 10–11. The donor sent copies of the nine remaining books that the plaintiffs had expressed interest in checking out at the Llano library. There was no need for the donor to provide the "butt" or "fart" books because I had already added those books to the in-house checkout system before receiving the donation of the nine additional books.

5. *Under the Moon: A Catwoman's Tale*, by Lauren Myracle, was not included in the original donation of July 23, 2022, because none of the plaintiffs complained about the removal of that book or expressed interest in checking out that book in their sworn declarations.

6. On October 31, 2022, I received a physical copy of *Under the Moon* from the same donor who sent the nine books on July 21, 2022. I immediately added the book to the Llano library's in-house checkout system, and it has been available for the plaintiffs (and other library patrons) to check out since November 1, 2022.

7. Every one of the 16 remaining disputed books has been available for the plaintiffs (and other library patrons) to check out since July of 2022.

8. This means that the plaintiffs can check out physical copies of each of the 17 disputed books from the Llano County Library System without having use Inter Library loan or Bibliotheca if they find those alternatives inconvenient.

9. The plaintiffs' claim that I "permanently removed all seven [of the butt and fart books] from the Library" is false. *See* Pls.' Br., ECF No. 91, at 2–3. Each of the books remains available for check-out through the Llano library's in-house checkout system. They also remain available to library patrons through Inter Library loan.

10. The plaintiffs' claim that Rochelle Wells and Rhonda Schneider "began repeatedly checking out the Butt and Fart Books, keeping them off the shelves and inaccessible to other library patrons" is false. *See* Pls.' Br., ECF No. 91, at 3. Ms. Wells and Ms. Schneider checked out only two of the three "butt" books (*My Butt Is So Noisy!* and *I Broke My Butt!*), and they never checked out any of the "fart" books. The remaining "butt" book (*I Need a New Butt*) and the four "fart" books were never placed on the shelves and were never checked out by anyone.

DocuSign Envelope ID: AACB1E3E-5DB5-42BE-AEE8-95043E811BD0

11.   The plaintiffs' claim that Commissioner Moss "directed" me to "remove the Butt and Fart Books" is false. *See* Pls.' Br., ECF No. 91, at 3. Commissioner Moss never even discussed the "fart" books with me and I never showed those books to him. We discussed only the "butt" books. The plaintiffs' claim that Commissioner Moss "directed" the removal of the "fart" books is an outright falsehood. And their claim that I conceded this on cross-examination when confronted with a handwritten note of my conversation with Commissioner Moss misrepresents my testimony and the contents of that handwritten note. *See* Pls.' Br., ECF No. 91, at 3–4 n.4 (claiming that I "agreed" that Moss "instructed" me to remove both the "fart" books and the "butt" books); Pls.' Ex. 2B (handwritten note); Hr'g Tr. Vol. 1 at 65:10–66:25 (cross-examination testimony concerning the handwritten note). The handwritten note of my conversation with Commissioner Moss mentions only the "butt" books and says nothing about the "fart" books. *See* Pls.' Ex. 2B ("Commissioner Moss came back in to talk to me about the 'butt' books."). Acknowledging the authenticity of this handwritten note in no way concedes that Moss "instructed" me to remove the "fart" books, as the plaintiffs claim. *See* Pls.' Br., ECF No. 91, at 3–4 n.4

12.   The plaintiffs' claim that Commissioner Moss "directed" me to remove the "butt" books is also false. Commissioner Moss merely expressed his opinion to me regarding the butt books. He did not think those books should be in the children's section and he said that if it were him he would take them out of the system and for me to pick my battles. Commissioner Moss never ordered or directed me to weed or temporarily remove the butt books (or any other book), and I never conceded on cross-examination that Commissioner Moss had "instructed" or "directed" me to remove those books. *See* Hr'g Tr. Vol. 1 at 65:7–66:25.

13.   The plaintiffs' claim that Commissioner Moss "ordered the removal" of *It's Perfectly Normal* from the Llano library is false. *See* Pls.' Br., ECF No. 91, at 4. Commissioner Moss never ordered the weeding or even the temporary removal of any book in the Llano library. Nor did Commissioner Moss suggest or recommend that *It's Perfectly Normal* be weeded or temporarily removed.

14.   The plaintiffs' claim that Judge Cunningham "directed" me to weed the "butt" and "fart" books is false. *See* Pls.' Br., ECF No. 91, at 3. Judge Cunningham recommended only that I *temporarily* remove those books from the shelves. *See* Pls.' Ex. 2A ("Amber, I am still receiving calls, letters and emails concerning the Farts and Butts books. I think it is best to remove these books from the shelves *for now*." (emphasis added)). He never directed me to weed those books, and my decision to weed those books was entirely my own.

15.   I alone made the decisions to weed the 17 disputed books in this case. No other defendant in this case, including Bonnie Wallace, Rochelle Wells, Rhonda Schneider, Jerry Don Moss, or Ron Cunningham, has ever weeded a book from Llano library or directed me to weed or permanently remove a book from the library. Nor has any of these individuals pressured or attempted to pressure me to weed or permanently remove any book from the library system.

16.   The plaintiffs' repeated claims that the "defendants" (plural) weeded or temporarily removed books from the Llano library are false. I am the only defendant who weeded the 17 disputed books from the Llano library, and I am the only defendant who temporarily removed any of those books from the library shelves.

17.   I have explained in my previous declarations and in my courtroom testimony my reasons for weeding 16 of the 17 the disputed books. *See* Milum Decl., ECF No. 49-1, at ¶¶ 6–8, 12–16; Hr'g Tr. Vol. 2 at 95:16–108:9. I did not previously explain my reasons for weeding *Under The Moon: A Catwoman's Tale* because the plaintiffs have not expressed any desire to check out that book in their sworn declarations or

DocuSign Envelope ID: AACD1F3E-5DB5-42BE-AEE8-95043E811BD0

courtroom testimony. *See* Day Decl., ECF No. 22-2, at ¶ 4 (no mention of *Under the Moon*); Jones Decl., ECF No. 22-3, at ¶ 3 (same); Kennedy Decl., ECF No. 22-4, at ¶ 3 (same); Little Decl., ECF No. 22-5, at ¶ 3 (same); Moster Decl., No. 22-7, at ¶ 3 (same); Puryear Decl., ECF No. 22-9, at ¶ 3 (same); Waring Decl., No. 22-11, at ¶ 3 (same); *see also* Hr'g Tr. Vol. 2 at 28:6–70:20 (testimony of plaintiff Leila Green Little, which never mentions *Under the Moon* or expresses any desire to check it out).

18. I weeded the 10 books that were permanently removed in the fall of 2021 because, in my judgment, these books met the criteria for weeding under the CREW and MUSTIE factors.[1] *See* Milum Decl., ECF No. 49-1, at ¶¶ 8, 12–16; Hr'g Tr. Vol. 2 at 95:16–106:20 (explaining the reasons for weeding *Freakboy*, *Being Jazz: My Life as a Transgender Teen*, *Gabi, A Girl In Pieces*, *They Called Themselves The KKK: The Birth Of An American Terrorist Group*, *Spinning*, *Shine*, *Caste: The Origins of Discontent*, *It's Perfectly Normal*, and *In The Night Kitchen*).

19. I weeded *Under The Moon* because it wasn't getting checked out enough. Although the chart in Exhibit 52 indicates that this book was checked out four times since it was introduced in 2019, it was in reality checked out only twice: once in October of 2019, and once more in June of 2021. The two remaining "check outs" included: (1) An "in-library check in" of June 22, 2021, which occurs when library staff finds a book lying around or misplaced, and brings it to the library desk for check in to ensure that it's not currently checked out before restoring the book to its proper place on the shelves. Although this gets recorded as a "check out/check in," it does not reflect an actual check out by a library patron; and (2) A staff member (Miryam Bailey) checked out and checked in *Under the Moon* on the same day it got weeded, for reasons unbeknownst to me. This too does not signify a checkout by a library patron. So the book had been checked out only twice by library patrons in a three-

---

1. CREW is an acronym that stands for Continuous Review, Evaluation, and Weeding.

year period. In addition, *Under the Moon* remains available to library patrons through inter-library loan, so it satisfies both the "Irrelevant" and "Elsewhere" criteria for weeding.

20.   I have also explained my reasons for weeding the "butt" and "fart" books in August of 2021. First, no one had asked for or inquired about the two "butt" books that were continuously being checked out by Rochelle Wells and Rhonda Schneider. *See* Hr'g Tr. Vol. 2 at 106:24–25 ("[N]obody else asked for it."); *id*. at 107:8–9. (2) Second, the actions of Ms. Wells and Ms. Schenider would render the "butt" and "fart" books inaccessible to other library patrons if they were placed on the shelves or remained in the system. *See* Hr'g Tr. Vol. 2 at 106:21–107:24. Finally, the "butt" and "fart" books were trivial and "didn't really meet anyone's needs," and they remained available to patrons through interlibrary loans, so the books satisfied the "Trivial" and "Elsewhere" factors for weeding under the MUSTIE guidelines. *See* Hr'g Tr. Vol. 2 at 107:25–108:9; *id*. at 107:12 ("[I]t was just silly trivial books"); *id*. at 107:2–3 ("They were more trivial books, anyway.").

21.   The plaintiffs' brief claims my stated reasons for weeding the disputed books are "pretextual" and "manufacture[d] . . . after the fact." Pls.' Br., ECF No. 91, at 19–20. The plaintiffs' accusation is false and defamatory. I told the truth in my declarations and courtroom testimony, and my stated reasons for weeding the books were my actual reasons and motivations for weeding the books at the moment the decision was made. There is nothing "pretextual" about my testimony, and nothing in my testimony was "manufacture[d] . . . after the fact."

22.   The Llano library system's criteria for weeding appears on a chart on the first page of Plaintiffs' Exhibit 23, which is attached to the defendants' post-hearing brief as Exhibit 1. Under this chart, a book's eligibility for weeding depends on the Dewey class.

23.   If one looks at the second line on the left-half columns in Exhibit 1, for example, a book in Dewey class 020 would is accompanied by the entry 10/3/MUSTIE, where the first number stands for "age," the second number "years since last circulation," and the third category "condition." That means a book in Dewey class 020 (or any other category marked with 10/3/MUSTIE) becomes eligible for weeding if: (1) It is more than 10 years old; (2) It has been three years or since its last circulation; or (3) It qualifies for weeding the MUSTIE criteria. Only one of these three categories needs to be met to make a book in that Dewey range eligible for weeding.

24.   The MUSTIE factors stand for Misleading, Ugly, Superseded, Trivial, Irrelevant, or Elsewhere. It is permissible and sometimes prudent for a librarian to weed a book based on the presence of a single MUSTIE factor, such as books that are seriously damaged (Ugly), that have been replaced by a new edition in the library (Superseded), or that haven't been checked out in 10 years (Irrelevant). But when a book only barely meets a single MUSTIE factor, or if the issue with the book is a relatively minor one, a librarian will often (but not always) look for the presence of an additional MUSTIE factor before deciding to weed the book.

25.   The plaintiffs' brief falsely claims that I "agreed" with the claim that "historically the Llano Library looked for two or three MUSTIE criteria to be satisfied for weeding eligibility" when testifying at the hearing last October. *See* Pls.' Br., ECF No. 91, at 7. I said nothing of the sort in my testimony, and the statement they attribute to me is false in any event. As I mentioned in the previous paragraph, it is permissible and sometimes prudent for a librarian to weed a book based on the presence of a single MUSTIE factor, and the plaintiffs are wrong to assert that Llano library "historically" has weeded books only when two or three MUSTIE criteria are satisfied.

26.     The plaintiffs' brief falsely claims "the CREW Manual" states that books are to remain on shelves unless they do not circulate 'for 3–5 years.'" The CREW Manual says no such thing, and the document that the plaintiffs cite to support this claim is not the CREW Manual. The weeding chart used by the Llano County library system specifically allows Juvenile Fiction and Young Adult Fiction to become eligible for weeding after *two* years since last circulation, and many of the 17 disputed books (including *Freakboy*, *Shine*, and *Gabi, a Girl in Pieces*) fall into those categories.

27.     At the hearing last October, Tina Castelan testified that *It's Perfectly Normal* was improperly weeded "because its last checkout was in 2018." Hr'g Tr. Vol. 1 at 37:15. Castelan is wrong. *It's Perfectly Normal*'s Dewey class is 613, and books in that Dewey class become eligible for weeding after three years under our library's CREW chart. *See* Ex. 1. *It's Perfectly Normal* was last circulated on September 22, 2018, and it was weeded on October 12, 2021—more than three years after its last circulation date.

28.     Castelan also testified that *Gabi, a Girl in Pieces* was improperly weeded "because [it's] last checkout was 2018 and we've had it since 2016." Hr'g Tr. Vol. 1 at 44:12–14. Castelan is wrong. *Gabi, a Girl in Pieces* is a Young Adults book, which becomes eligible for weeding two years after its last circulation or three years after it was first acquired. *See* Ex. 1. *Gabi, a Girl in Pieces* qualified for weeding under either critierion. Castelan's claim that I violated library policy and CREW/MUSTIE criteria by weeding this book is false.

29.     Castelan also testified that she would not have weeded *Being Jazz: My Life as a Transgender Teen*, even though it hadn't been checked out since 2017, because "we only have one or two books that are about this subject." Hr'g Tr. Vol. 1 at 42:25–43:1. Castelan's statement is false. The Llano library system has no fewer than 10 books on the subject of transgender youth available to library patrons, in addition to

the copy of *Being Jazz* at the Kingsland library that I did not weed. Those books include:

- *Beyond Magenta: Transgender Teens Speak Out*, by Susan Kuklin, available at Llano library

- *Some Assembly Required: The Not-So-Secret Life of a Transgender Teen*, by Arin Andrews, available at Llano library

- *Light from Uncommon Stars*, by Ryka Aoki, available at Llano library

- *Unconditional: A Guide to Loving and Supporting Your LGBTQ Child*, by Telaina Eriksen, available at Llano library

- *Far From the Tree: Parents, Children and the Search For Identity*, by Andrew Solomon, available at Llano library

- *Evolution's Rainbow: Diversity, Gender, and Sexuality in Nature and People*, by John Roughgarden, available at Llano library

- *Irreversible Damage: The Transgender Craze Seducing Our Daughters*, by Abigail Shier, available at Llano library

- *Detransition, Baby: A Novel*, by Torrey Peters, available at Kingsland library

- *When The Moon Was Ours*, by Anna Marie McLemore, available at Kingsland library

- *Cemetery Boys*, by Aiden Thomas, available at Kingsland library

30.   The plaintiffs' brief claims that "There is no Library policy, or factor under CREW or MUSTIE, by which new books may be weeded before they make it into circulation." Pls.' Br., ECF No. 91, at 8. That is false. A new book that has yet to be placed on the shelves may be weeded consistent with the CREW/MUSTIE criteria if

a librarian concludes that it is "Trivial" and available "Elsewhere," as I did with *I Need a New Butt* and each of the "fart" books.

31.   The plaintiffs' brief claims that *It's Perfectly Normal* "was not eligible to be weeded" because it qualifies as a "special topic book." Pls.' Br., ECF No. 91, at 9. These claims are false. *It's Perfectly Normal* is not a "special topic book," and sex-education books such as *It's Perfectly Normal* are not considered "special topic books." And "special topic books" are not ineligible for weeding, as the plaintiffs claim. A so-called special topic book may still be weeded if it meets the CREW and MUSTIE criteria, and a librarian must use her own judgment and discretion in deciding whether to weed or retain a so-called special topic book that qualifies for weeding under CREW and MUSTIE.

32.   The plaintiffs' claim that I have left "approximately 5,800 titles" on the shelves that had not been checked out in the previous three years is false. *See* Pls.' Br., ECF No. 91, at 10. I became the system director for the Llano County library system on February 1, 2021. I have not yet had the opportunity to conduct a thorough weed of the library shelves since becoming system director, and we stopped weeding entirely in late 2021. The library system has been understaffed (and therefore under-weeded) for years, which is why there are so many books on the shelves that should be weeded but have not yet been. I did not make any decision to "leave" those 5,800 titles on the shelves or allow those 5,800 books to survive a weeding process, as the plaintiffs insinuate in their brief.

33.   The plaintiffs falsely claim that I admitted on the witness stand that there was "no need to weed books in November of 2021" because the Commissioners Court suspended all new book purchases a month earlier. *See* Pls.' Br., ECF No. 91, at 10 ("[B]y Milum's own admission, there was no need to weed books in November 2021 because the Commissioners Court suspended all new purchases a month earlier." (citing Hr'g Tr. Vol. 2 at 120:25–121:10)). That is a misrepresentation of my

testimony. I was asked whether the weeding in November of 2021 was done "to make room for new books," and I acknowledged that it was not. *See* Hr'g Tr. Vol. 2 at 121:6–10 ("Q. So when you did the weeding based on Ms. Wallace's list that was e-mailed to you by your boss, you weren't doing that to make room for new books because you weren't allowed to order new books, correct? A. Right."). I never said that there was "no need to weed books" at that time. Weeding is needed regardless of whether new books are coming in because: (1) Shelf space costs money; (2) The presence of unused books frustrates and distracts library employees and patrons who must sift through the unnecessary clutter; (3) Weeding helps librarians identify holes in our collection and understand the community's desires and needs. All of this is explained on pages 22–27 the slideshow that the plaintiffs submitted as Exhibit 23.

34.   The plaintiffs' brief complains that the in-house library system has "only one copy" of the disputed books, and that the single copy is located "only at the Llano branch." *See* Pls.' Br., ECF No. 91, at 22. That was equally true before the books were weeded—we had a single copy of each book available for checkout at the Llano library.

35.   The plaintiffs' claim that I "removed *In The Night Kitchen* from the library system because it includes illustrations of a naked toddler" is false. *See* Pls.' Br., ECF No. 91, at 4. My decision to *pull* the book *for review* (*i.e.*, to *temporarily* remove the book) was because of the naked-toddler pictures, as Judge Cunningham had instructed me to pull from the shelves and review all books with nudity. But my decision to weed the book (*i.e.*, to "remove the book from the library system") had nothing whatsoever to do with the content of the book or the pictures of the naked toddler, and I would have weeded *In The Night Kitchen* even if there had been no nudity or drawings of a naked toddler.

36.   I have never in my entire career weeded a book because of its viewpoints, and I have never considered the content of a book when making a weeding decision

except to the extent that the MUSTIE factors might require me to consider whether a book should be considered "misleading," "superseded," "trivial," or "irrelevant." I have no hostility, antipathy, or opposition of any type to the presence of library books discussing critical race theory or LGBTQ issues, regardless of the viewpoints expressed in those books, and the Llano library system has many books on these topics. Nor do I have any hostility, antipathy, or opposition of any type to the presence of library books containing nudity, so long as the depictions are lawful (*i.e.*, no child pornography or obscenity) and intended to serve educational rather than porno-graphic purposes. I do not ever allow my personal views or beliefs to influence my weeding decisions because a library exists to serve the community, and our patrons have diverse beliefs and tastes and reading habits. For the plaintiffs to accuse me of weeding books because I disapprove of nudity, critical race theory, or LGBTQ content is false and defamatory.

37.   I did not consider any of the 17 books that I weeded to be pornographic or in any way inappropriate for a public library. I weeded those books solely based on my application of the CREW/MUSTIE factors.

38.   The plaintiffs accuse me of weeding the books that appeared on Bonnie Wallace's list because I disagreed with the "viewpoints" or "positions" expressed in any of those books. *See* Pls.' Br., ECF No. 91, at 16. The plaintiffs' accusation is false. I did not read any of those books before weeding them, and I am not even aware of the "viewpoints" or "positions" (if any) that might be expressed in any of those books.

39.   The plaintiffs' claim that I "removed" those books "because they were on the Wallace list" is misleading. *See* Pls.' Br., ECF No. 91, at 17. My decision to pull those books for review (*i.e.*, to *temporarily* remove the book) was because they appeared on the Wallace list, but my decision to weed the books (*i.e.*, to *permanently* remove them) was *solely* because I determined they met the criteria for weeding. The vast majority of books on Bonnie Wallace's list were returned to the shelves because

I concluded that they did *not* meet the criteria for weeding. The plaintiffs' statement implies that I *weeded* the books because they appeared on Bonnie Wallace's list, and that is categorically false.

This concludes my sworn statement. I declare under penalty of perjury that the foregoing is true and correct.

Dated: 12/30/2022

DocuSigned by:

*Amber Milum*

24504D1FCF0449A...

AMBER MILUM

# Exhibit 6

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

**Leila Green Little**, et al.,

                    Plaintiffs,

v.

**Llano County**, et al.,

                    Defendants.

Case No. 1:22-cv-00424-RP

## DECLARATION OF JONATHAN F. MITCHELL

1.  My name is Jonathan F. Mitchell. I am over the age of 18 and fully competent in all respects to make this declaration.

2.  I have personal knowledge of the facts stated in this declaration, and all of these facts are true and correct.

3.  I represent the defendants in this litigation.

4.  The document attached as Exhibit 1 to this brief is an authentic copy of the CREW method weeding chart that was introduced by the plaintiffs as part of their Exhibit 23.

5.  The document attached as Exhibit 2 to this brief are authentic copies of pages 44 and 45 of plaintiffs' Exhibit 23, which a part of a slideshow on weeding assembled by Dawn Volger.


   This concludes my sworn statement. I declare under penalty of perjury that the foregoing is true and correct.


Dated: _____

_____
JONATHAN F. MITCHELL