**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | | |
|---|---|---|
| Leila Green Little, *et al.*, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | Civil Action No. 1:22-cv-00424-RP |
| | § | |
| Llano County, *et al.*, | § | |
| | § | |
| Defendants. | § | |

**PLAINTIFFS' REPLY IN SUPPORT OF THEIR POST-HEARING BRIEF**

# TABLE OF CONTENTS

ARGUMENT ....... 2

I. Plaintiffs Have Established a Likelihood of Success on the Merits ....... 2

A. Defendants' Creation of a Secret Repository of Banned Books Is Irrelevant to Plaintiffs' Likelihood of Success and Does Not Negate Irreparable Harm ....... 4

B. Strict Scrutiny Applies to Defendants' Content-Based Removal Decisions and They Have Not Even Attempted to Satisfy That Standard ....... 6

C. Milum Did Not Follow MUSTIE Protocols ....... 10

1. The Record Cannot Be Rewritten with Unauthorized Declarations ....... 10

2. Milum's Weeding Testimony Is Implausible and Not Credible ....... 12

II. Because County Commissioners Are Final Policymakers, the Preliminary Injunction Should Extend to All Defendants ....... 14

CERTIFICATE OF SERVICE ....... 17

In their Response, Defendants ask the Court to reject the evidence that was adduced at the PI hearing in favor of new, unauthorized declarations from three defendants and argue that the secret book repository created by Defendant's lawyer moots Plaintiffs' need for injunctive relief. These arguments are not supported by the law of the Fifth Circuit or the evidence in this case.

All contemporaneous evidence shows that Llano County's removal of books from its library system was driven by political animus and the unprecedented personal involvement of the County's Commissioners Court. In the Fifth Circuit, "the key inquiry in a book removal case is the . . . officials' substantial motivation in arriving at the removal decision." *Campbell v. St. Tammany Par. Sch. Bd.*, 64 F.3d 184, 190 (5th Cir. 1995) (adopting reasoning of the plurality in *Bd. of Educ. v. Pico*, 457 U.S. 853, 872 (1982)). That a library may have greater leeway in its acquisition of materials does not give officials free reign to deny citizens access to already-available materials "simply because they dislike the ideas contained in those books." *Id.* at 188 (quoting *Pico*, 457 U.S. at 872).

Instead of engaging in the "key inquiry" prescribed by the Fifth Circuit, Defendants seek to divert attention with a series of post-litigation efforts to rewrite the facts. Most prominently, they point to a secret book repository created in an attempt to moot Plaintiffs' injuries—an effort that fails for at least three reasons. *First*, this is textbook voluntary cessation and does not moot the need for injunctive relief; Defendants could simply resume the unlawful conduct. This is especially true here because Defendants deny that their conduct was wrongful and have offered shifting accounts of what occurred. *Second*, Defendants waived this argument when their lawyer, who donated the books, largely avoided cross-examination by testifying that he was not going to argue that his donations mooted the need for an injunction. Hr'g Tr. Vol. 2 at 82:4-21. *Third*, keeping the books behind a desk still makes it more difficult, and embarrassing, for Plaintiffs to

check them out. Even if this post hoc conduct were relevant, it still burdens Plaintiffs' First Amendment rights and would not moot the need for an injunction.

Defendants also suggest that whether Milum correctly applied the MUSTIE criteria is dispositive, devoting the bulk of their brief to the subject. On their telling, Milum did not target any of the Banned Books but, coincidentally, weeded those same books under routine weeding criteria shortly after Defendants identified them as pornographic filth. Defendants assert that the Court must believe this narrative because Plaintiffs did not expressly accuse Milum of lying. Not so. As the finder of fact, the Court may assess the veracity of Defendants' story and, based on the evidence presented at the hearing—including Defendants' admission that the books were only pulled for removal because the Commissioners ordered it or they appeared on the Wallace list—find Defendants removed the books before ultimately hiding them from public view.[1] The Court may also consider that Defendants withheld Llano County librarians' internal emails—the most probative evidence of intent—but inaccurately certified their production under Rule 26(g).[2] For all these reasons, the Court should issue the requested injunction.

**ARGUMENT**

**I. Plaintiffs Have Established a Likelihood of Success on the Merits**

The core facts of this case are well-known to the Court. Post-Hr'g Br. at 2-13. Testimony and evidence adduced at the hearing established that:

- Milum, in her capacity as Llano County Library Director, pulled the Banned Books off of the shelves for review because of their content and viewpoint;[3]
- Milum then removed the Banned Books from the Llano County Library shelves and catalog;[4]

[1] Resp. at 8-18, 25-27. Some books were pulled due to individual inquiries from the Commissioners, while others were never made available for circulation for the same reason.
[2] *See* ECF No. 92.
[3] Post-Hr'g Br. at 3-5.
[4] Ex. 52; Milum Dep. Tr. at 78:5-79:13.

- The Banned Books were not eligible to be weeded under the CREW and MUSTIE criteria as those criteria had been previously applied by Milum and Tina Castelan, the only librarians with weeding authority at the Llano Library;[5]
- Milum and Castelan would typically not weed a book unless it met two or more MUSTIE factors;[6]
- Milum followed the instructions of her superiors, Moss and Cunningham, when they wanted books removed from the library;[7]
- Removal of the Banned Books from the Library coincided with a statewide campaign to have the same books removed because of their expressed viewpoints;[8]
- Defendants' lawyer donated new copies of the Banned Books to the "in-house checkout program" after Plaintiffs moved for a preliminary injunction,[9] and Plaintiffs only became aware of the existence of those books through this litigation;[10]
- Plaintiffs legitimately claimed personalized injury as of the filing of this lawsuit.[11]

Defendants' Post-earing Response—complete with new, unauthorized declarations from Milum, Cunningham, and Moss—fails to meaningfully call any of these core facts into question.

[5] Post-Hr'g Br. at 8-11. Plaintiffs acknowledge that *It's Perfectly Normal* was last checked out three years and twenty days before the date it was removed from the library (rather than three years before), but it is the "only book of its category that is as extensive in its information that it gives," Hr'g Tr. Vol. 1 at 37:11-19, which brings it within the definition of "special topic books," *id.* at 22:6-16, and it was not properly weeded.

[6] Hr'g Tr. Vol. 1 at 21:17-21 (Castelan's testimony that she weeded books only if they met two-to-three MUSTIE factors); Milum Dep. Tr. at 24:5-10 (agreeing that decision to weed "are based on some combination of [the MUSTIE] criteria; that is, an item will probably not be discarded based on meeting only one of these criteria); *id.* at 69:3-13 (agreeing that "any one [MUSTIE] factor isn't enough to remove a book");

[7] Hr'g Tr. Vol. 1 at 65:10-67:3, 68:15-69:17, 79:5-7, 89:6-90:9, 91:24-92:4, 98:6-14, 98:24-99:10, 100:3-11, 101:13-19, 103:10-16, 109:8-14; Exs. 2B, 8, 19, 60.

[8] Hr'g Tr. Vol. 1 at 30:24-32:4, 71:16-72:12.

[9] In their Post-Hearing Brief, Plaintiffs wrote that Defendants' counsel donated nine of the Banned Books to the Llano Library, but mistakenly stated that those nine books made up the entire in-house checkout program. Post-Hr'g Br. at 22. At the time of Plaintiffs' opening brief, the in-house checkout program also contained the Butt and Fart Books.

[10] Hr'g Tr. Vol. 2 at 42:16-19. Plaintiffs first learned of the in-house checkout program when Defendants described it in their original opposition papers on July 15, 2022. ECF No. 49.

[11] Each Plaintiff attempted to check out at least one of the Banned Books, none were able to do so, and none were informed that any book was available through "in-house checkout." ECF Nos. 59-2, 59-3, 59-4, 59-5, 59-6, 59-7.

### A. Defendants' Creation of a Secret Repository of Banned Books Is Irrelevant to Plaintiffs' Likelihood of Success and Does Not Negate Irreparable Harm

Defendants argue that, because their lawyer purchased and donated the Banned Books to the library to be held behind a desk where the public cannot find them three months after this litigation began, Plaintiffs can no longer allege any injury.[12] Resp. at 19-22, 28; *compare* ECF No. 53 ("Second Milum Decl.") ¶ 4 (Milum stating her intention to add nine of the Banned Books to the in-house checkout program between July 23 and 27, 2022), *with* ECF No. 1 (Complaint dated April 25, 2022). Defendants do not claim Plaintiffs lacked such an injury at the time this case was filed; indeed, counsel for Defendants expressly conceded that Plaintiffs did—and continue to—suffer an injury in fact. Hr'g Tr. Vol. 2 at 82:11-15 (picking a library book out from the shelf "as opposed to having to go talk to the librarian and go to this inhouse checkout system . . . is a difference enough to create an injury in fact").

Instead, Defendants argue that the secret repository of Banned Books rendered Plaintiffs' claims moot. Defendants scrupulously avoid using the word "moot," but their argument is plain: even though Plaintiffs did not have access to the Banned Books when the case began, they now have access to them, so they are no longer suffering any impediment to accessing the books. Resp. at 19-22. *See Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000) (describing mootness as "the doctrine of standing set in a time frame: The requisite personal interest that must exist at the commencement of the litigation (standing) must continue throughout its existence (mootness)") (quoting *Arizonans for Official English v. Arizona*, 520 U.S. 43, 68, n. 22 (1997)).

---

[12] The cases Defendants cite for the personal injury requirement, Resp. at 20, merely stand for the unremarkable proposition that a plaintiff must allege a personal injury when bringing suit; they do not allow a defendant to evade suit by voluntarily removing the source of injury after litigation begins.

Defendants' reticence to call their mootness argument by its name is understandable: Defendants' lawyer previously represented to the Court that he would not argue that the existence of the secret repository moots Plaintiffs' claims. Hr'g Tr. Vol. 2 at 82:19-20. Defendants have thus waived any mootness argument. *See Caleb v. Grier*, 598 F. App'x 227, 235 (5th Cir. 2015) (waiver where argument "has been abandoned explicitly").

Even if this argument were allowed, Defendants' conduct has *not* mooted Plaintiffs' injury in this case. Having to directly request a book to which the County has attached such opprobrium is a burden Plaintiffs did not have to bear before the actions giving rise to this case.[13] *See Denver Area Educ. Telecomms. Consortium, Inc. v. F.C.C.*, 518 U.S. 727, 734, 754 (1996) (stigma of requesting access created burden on plaintiffs); *Counts v. Cedarville Sch. Dist.*, 295 F. Supp. 2d 996, 1002, 1005 (W.D. Ark. 2003) (stigma imposed unconstitutional burden). Defendants' lawyer (and secret book donor) admitted as much. Hr'g Tr. Vol. 2 at 82:11-15.

Finally, Defendants make no effort to meet the high standard required for voluntary cessation to effectively moot a case or to preclude a finding of irreparable injury. A defendant pressing a voluntary cessation argument "bears the formidable burden of showing that it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur." *Friends of the Earth*, 528 U.S. at 190. Defendants cannot "evade sanction by predictable protestations of repentance and reform after a lawsuit is filed." *Ctr. for Biological Diversity, Inc. v. BP Am. Prod. Co.*, 704 F.3d 413, 425 (5th Cir. 2013) (citation omitted). Courts thus routinely

[13] Plaintiffs uniformly attested to feeling such a stigma. *See* ECF No. 59-2 ("Moster Decl.") ¶ 5 ("offensive and impractical"); ECF No. 59-5 ("Kennedy Decl.") ¶ 5 ("offensive and impractical"); ECF No. 59-3 at 1-2 ("Day Decl.") ¶ 6 (inconvenient and draws unnecessary attention to the Plaintiffs and their reading choices); ECF No. 59-3 at 3-5 ("Waring Decl.") ¶ 7 ("exceedingly insulting"); ECF No. 59-4 ("Jones Decl.") ¶ 7 ("offensive, manipulative and absurd"); ECF No. 59-6 ("Puryear Decl.") ¶ 5 ("humiliating"); ECF No. 59-7 ("Little Decl.") ("disheartening").

find that a defendant's voluntary cessation "does not preclude a finding of irreparable injury" or the entry of injunctive relief. *Doe v. Duncanville Indep. Sch. Dist.*, 994 F.2d 160, 166 (5th Cir. 1993); *see Prison Legal News v. Lindsey*, No. 3:07-CV-00367-P, 2007 WL 9717318, at *3 (N.D. Tex. June 18, 2007) ("It is well settled in the Fifth Circuit that a defendant's 'mere voluntary cessation' of a challenged practice does not preclude a finding of irreparable injury."); *Cisco Sys., Inc. v. Huawei Techs., Co.*, 266 F. Supp. 2d 551, 554 (E.D. Tex. 2003) (rejecting voluntary cessation argument, and adding that defendants' ability to cease the unlawful practice is evidence they will not be harmed by issuance of injunction).

The voluntary cessation here was driven by Defendants' counsel, who blithely inserted himself into the case as a fact witness by personally creating the secret repository, albeit behind a veil of anonymity. Hr'g Tr. Vol. 1 at 116:12-117-9; Hr'g Tr. Vol. 2 at 182:10-183:9. This fact alone demonstrates that Defendants' purported cessation is merely a litigation strategy, not an irrevocable act. And, given the overwhelming evidence of Defendants' viewpoint and content-based motivations, they are more likely than not going to relapse absent judicial intervention. The secret repository—and the circumstances of its creation—smack of "litigation posturing" rather than proof "the controversy is actually extinguished." *Yarls v. Bunton*, 905 F.3d 905, 910 (5th Cir. 2018); *see also 6th Cong. Dist. Republican Comm. v. Alcorn*, 913 F.3d 393, 407 (4th Cir. 2019) (rejecting mootness where defendant altered challenged election form during litigation because "such backpedaling will rarely serve to moot a case in federal court"). The secret repository of Banned Books does not cure the First Amendment violation.

### B. Strict Scrutiny Applies to Defendants' Content-Based Removal Decisions and They Have Not Even Attempted to Satisfy That Standard

Both the *Pico* plurality and the Fifth Circuit have held that, even in the context of school libraries, where the government is acting in a *parens patriae* capacity, removing library books

due to animus against the viewpoints expressed is categorically unconstitutional. In *Campbell*, the Fifth Circuit adopted the Supreme Court's *Pico* reasoning, stating that "school officials are prohibited from exercising their discretion to remove books from school library shelves 'simply because they dislike the ideas contained in those books and seek by their removal to 'prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion.'" *Campbell*, 64 F.3d at 188 (quoting *Pico*, 457 U.S. at 872). The *Campbell* court thus held that the constitutionality of library book removal depends on the removal authority's motives. *Id.* at 190. *Pico*'s reasoning—adopted by the Fifth Circuit—has "even greater force when applied to public libraries," which are "designed for freewheeling inquiry." *Sund v. City of Wichita Falls, Tex.*, 121 F. Supp. 2d 530, 548 (N.D. Tex. 2000) (quoting Pico, 457 U.S. at 915 (Rehnquist, J., dissenting)); *see also* Post-Hr'g Br. at 14-17.

Here, the contemporaneous evidence uniformly confirms Defendants' hostility to the Banned Books' contents and viewpoints, and shows Defendants' concerted action to remove those books from library shelves. Defendants suggest nonetheless that, if their viewpoint discrimination does not resolve the case, their content-based removal decisions do not merit strict scrutiny. Resp. at 21-22, 25. But, when making removal decisions, the County's library system, "like all other public libraries," is a First Amendment limited public forum. *Sund*, 121 F. Supp. 2d at 548 (citing *Kreimer v. Bureau of Police*, 958 F.2d 1242, 1261 (3d Cir. 1992) ("Library constitutes a limited public forum")); *see* ECF No. 22 at 14-15. Even if it were not, Defendants cite no case in which a court has applied rational-basis review to library removal decisions, much less to politically motivated or discriminatory removal decisions. Instead, they merely assert that, because removal of books that are "pervasively vulgar" or lacking "educational suitability" from *school* libraries might pass muster, anything goes in terms of content-based decisions in *public*

libraries. Resp. at 22-23 (citing *Pico* and *Campbell*). Of course, courts have held both protecting minors from obscenity and ensuring educational suitability to be compelling government interests under strict scrutiny, so the two *Pico* exceptions are hardly evidence *against* application of strict scrutiny to library removal decisions. *See, e.g.*, *Reno v. A.C.L.U.*, 521 U.S. 844, 875 (1997) ("we have repeatedly recognized the governmental interest in protecting children from harmful material"); *Murray v. W. Baton Rouge Par. Sch. Bd.*, 472 F.2d 438, 442 n.2 (5th Cir. 1973) ("The interest of the state in maintaining an educational system is a compelling one.").[14] Nor are those exceptions applicable with the same force in public libraries because "the Government may not 'reduc[e] the adult population . . . to . . . only what is fit for children.'" *Reno*, 521 U.S. at 875 (citation omitted) (alterations in original).

Defendants cite two decisions in support of their position that this case falls outside the default position of strict scrutiny for content-based speech restrictions. Both involve ***selection***, and not ***removal***, of content, a distinction Defendants have consistently ignored. *See* Post-Hr'g Br. at 15 n.10; ECF No. 59 at 6-7. In *ALA*, a plurality approved a restriction requiring blocking software on federally funded internet stations, analogizing this to the library's decisions when selecting books for its shelves and advocating substantial leeway for such decisions. *United States v. Am. Libr. Ass'n, Inc.* ("*ALA*"), 539 U.S. 194, 204-05 (2003) (plurality op.). *Chiras*, which Defendants characterize as having "adopt[ed]" *ALA* instead of *Pico*, Resp. at 23, dealt with the acquisition of mandatory curriculum textbooks, an area where *Pico* also acknowledges wide government discretion. *Chiras v. Miller*, 432 F.3d 606, 611 (5th Cir. 2005); *see Pico*, 457 U.S. at 864. Far from rejecting *Pico*, *Chiras* distinguished textbook acquisition from "the

[14] Defendants have never argued that the Banned Books were removed because they met the legal definition of obscenity or that they were unfit in any way. They have thus waived any argument that they have satisfied strict scrutiny.

removal of an optional book from the school library." *Id.* at 619; *see ALA*, 539 U.S. at 242 (Souter, J., dissenting) ("The difference between choices to keep out and choices to throw out is . . . enormous, a perception that underlay the good sense of the plurality's conclusion in [*Pico*].")

Neither case suggests the sort of carte blanche Defendants advocate, where government officials can censor books already available to the public based on their personal preferences so long as they unilaterally declare that the books are "misleading," "trivial," or "irrelevant" to the public. Resp. at 24. Indeed, Llano County exercised its broad discretion under *Chiras* and *ALA* when it determined the Banned Books were of sufficient public interest to purchase and make available to patrons. Its authority to remove them due to county officials' antipathy to their messages is a different matter entirely, narrowly circumscribed by *Pico* and *Campbell*.

Defendants' "policy" argument in favor of rational-basis review lacks any constitutional basis and would eviscerate the marketplace of ideas. Resp. at 24-25. Under Defendants' theory, officials could remove books authored by their political rivals or that adopt a disfavored position on controversial issues such as racial or gender equality, abstinence-only education, abortion, or the proper role of patriotism in society. Such unbound removal decisions are not only anathema to libraries and their pursuit of open inquiry, study, and understanding, but they are an affront to the First Amendment and its guarantee of "the right to receive information and ideas." *Pico*, 457 U.S. at 867 (citing *Stanley v. Georgia*, 394 U.S. 557, 564 (1969). By contrast, despite Defendants' hypothetical concerns, there is little likelihood Llano County will find its libraries overrun with flat-earth books if its officials are not allowed to remove materials they personally dislike; in fact, it is unlikely the library ever acquired any.

At any rate, the question of whether to allow reduced scrutiny for routine decisions regarding library collections is not before this Court. In this case, the facts demonstrate (1) clear

political animus against the Banned Books' viewpoints and content, running afoul of the unequivocal prohibition in *Campbell* and *Pico*, (2) nothing about the decision or process to remove them was routine, and (3) the County's supposedly neutral system for evaluating retention decisions was not correctly applied in any case, *see infra*, Section C.2. On the facts of the case before the Court, Defendants' constitutional overreach is readily apparent.

## C. Milum Did Not Follow MUSTIE Protocols

### 1. The Record Cannot Be Rewritten with Unauthorized Declarations

Defendants' new declarations cannot cure their First Amendment violations. Each of the declarants—Milum, Moss, and Cunningham—testified *twice* at the hearing. Defendants had ample opportunity to elicit all relevant testimony at that time. Defendants' latest, unauthorized declarations do not address new facts or arguments, and there is no justification for submitting them after the close of evidence, where witnesses are not subject to cross-examination.[15] The Court should ignore these new declarations—to do otherwise, particularly in light of Defendants' *continuing* withholding of contemporaneous evidence of their intent, *see* ECF No. 92 (describing Defendants' repeated violations of their discovery obligations), would deprive Plaintiffs of a fair opportunity to litigate this case.[16] But even if the Court considers them, the declarations are inconsistent with the declarants' prior depositions, declarations, and/or hearing testimony.

[15] Defendants submitted these declarations without either (1) seeking leave from the Court to do so or (2) providing Plaintiffs the opportunity via deposition to challenge the attestations contained therein.

[16] Notably, Defendants have still not produced emails between individual librarians during the relevant period. ECF No. 92 at 1. This contemporaneous evidence is the most salient of Defendants' intent and is central to Plaintiffs' Motion. Defendants only admitted they are withholding this critical evidence *after* the hearing on the Motion. Worse yet, Defendants were supposed to have responded to Plaintiffs' motion to compel this evidence on December 23, 2022, and even though the parties agreed to a two-week extension, Defendants *still* have not responded to Plaintiff's motion to compel or produced a single responsive document, and instead sought another extension from this Court. ECF No. 97.

Milum's unauthorized *third* declaration, for example, opines on certain text in Exhibit 23 detailing Llano Library's weeding policies. ECF No. 96 Ex. 5 ("Third Milum Decl.") ¶ 23. But Milum had a full and fair opportunity to discuss Exhibit 23 when it was admitted and considered at length during either of her two days of hearing testimony. Similarly, Moss and Cunningham newly discuss the accuracy of Rochelle Wells's emails, documents that were admitted and discussed during both days of the hearing, yet not disputed by either Moss or Cunningham.

The declarants' new assertions are inconsistent with the evidence already submitted to the Court—Milum and Cunningham now claim that Cunningham never directed Milum to remove any books from the library, but instead to only to temporarily pull certain books from shelves. ECF No. 96 Ex. 3 ("Second Cunningham Decl.") ¶ 3; Third Milum Decl. ¶ 14. This cannot be squared with the previously submitted evidence: (1) Milum's hearing testimony that Cunningham "told [her] to ***remove*** the Butt books from the ***library***," Hr'g Tr. Vol. 1 at 68:15-18; (2) her deposition testimony that "Cunningham directed [her] to remove [the Butt and Fart Books] ***from the library system***," Milum Dep. Tr. at 47:13-23; and (3) her contemporaneous August 5, 2021 communication to Cunningham confirming that she was going to "delete" the Butt and Fart Books from the library catalog, *id.* at 43:16-44:1. Milum also attests that her removal of *In the Night Kitchen* "had nothing whatsoever to do with the content of the book," Third Milum Decl. ¶ 35, despite her verified interrogatory response and sworn testimony that she "removed [*In the Night Kitchen*] from the library system based on inappropriate content," Hr'g Tr. Vol. 1 at 95:5-96:6; Ex. 87.

For his part, Moss now avers that he never instructed Milum to remove books from the library, but merely expressed his personal opinion that *he* would remove the books if he was the library administrator. ECF No. 96 Ex. 4 ("Second Moss Decl.") ¶ 4; *see also* Third Milum Decl.

¶ 12. Again, this claim cannot be reconciled the evidence properly in the record—it is refuted by Wells's multiple contemporaneous communications thanking Moss for removing books from the library, Ex. 8; Ex. 19, which Moss never refuted in his hearing testimony, despite being presented with one of the the emails at the hearing, Hr'g Tr. Vol. 2 at 175:12-176:15. Further the new Moss and Milum declarations are flatly contradicted by Milum's own August 2021 notes, memorializing her recollection that Moss "told me that I should take [the Butt Books] out of the system," and that if she did not, he said "the next step would be to take this to the [Commissioners Court]," which would "take them off the shelf and . . . would be bad publicity for the library." Ex. 2B. An assertion that Moss was merely giving his *personal* recommendation is hard to reconcile with the text of the contemporaneous note, particularly in light of the fact that he was (and remains) Milum's superior.[17]

**2. Milum's Weeding Testimony Is Implausible and Not Credible**

In their Response, Defendants claim that Plaintiffs have never challenged Milum's assertion that she merely weeded the Banned Books pursuant to County policies. *See, e.g.*, Resp. at 8. But Plaintiffs have repeatedly highlighted Milum's lack of credibility. At the hearing and in previous briefing, Plaintiffs impeached Milum with her contradictory contemporaneous statements and sworn testimony. *See* Post-Hr'g Br. at 8-11. Milum's contradictory and unbelievable testimony reveals the discriminatory intent underlying her actions. *See Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 147 (2000) ("Proof that the defendant's explanation is unworthy of credence is . . . circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive.").

[17] Moss Dep. Tr. at 77:2-7 (testifying that the Commissioner's Court has the authority to hire and fire the library director); Milum Dep. Tr. at 48:23-49:2 (stating that Moss and Cunningham were her "supervisors"); Hr'g Tr. Vol. 1 at 59:7-8 (Milum testifying that Moss is "one of [her] employers").

Milum first presented her current, MUSTIE-based justification for having "weeded" the Butt and Fart Books during her second round of testimony, on the second day of the hearing. Hr'g Tr. Vol. 2 at 108:6-9. However, in her two previous sworn statements, at her deposition, and during her first day of testimony—even while being questioned by her own lawyer—Milum never claimed that she weeded the Butt and Fart Books because they were "Trivial" or available "Elsewhere." *See* ECF No. 49-1 ("First Milum Decl.") ¶¶ 6-7; Second Milum Decl.; Milum Dep. Tr. at 39:10-15, 43:2-7; Hr'g Tr. Vol. 1 at 125:22-126:1. Indeed, at her deposition Milum flatly admitted that the real reason she "ultimately removed [the Butt and Fart Books] from the shelves is because certain individuals found these books offensive." Milum Dep. Tr. at 43:2-7. And in her verified Interrogatory response, Milum stated that the Butt and Fart Books were removed "on the basis of INAPPROPRIATE CONTENT." Ex. 87.

Milum's testimony that the balance of the Banned Books met any MUSTIE factor other than "Irrelevant" is similarly not credible in the face of her first declaration, deposition testimony, and testimony during the first day of the hearing (even when being questioned by her own lawyer). In each, Milum conveyed that she weeded the books because they had not been checked out enough, and specifically acknowledged, with regard to *Being Jazz* and *Freakboy*, that there was *no other reason* for their removal. *See* First Milum Decl. ¶¶ 8, 13-14;[18] Milum Dep. Tr. at 31:5-33:12, 86:22-90:10; Hr'g Tr. Vol. 1 at 123:18-126:13.[19] But even Milum agreed

[18] Milum did not address *Under the Moon: A Catwoman Tale* in that declaration.

[19] During her deposition and during the first day of the hearing, Milum could not recall why she weeded *Caste*, Milum Dep. Tr. at 31:3-4, 32:19-24, 90:11-25; Hr'g Tr. Vol. 1 at 126:6-13, so it is inexplicable how she was able to recall those details during the second day of the hearing, Hr'g Tr. Vol. 2 at 104-5-21, or in her unauthorized declaration, Third Milum Decl. ¶ 18 (attesting that she "permanently removed" *Caste* and the other Banned Books "in the fall of 2021 because in [her] judgment, these books met the criteria for weeding").

that "any one [MUSTIE] factor isn't enough to remove a book." *See* Milum Dep. Tr. at 24:5-10; 69:3-13.

The real reason that Milum removed the Banned Books from the shelves and then from the Llano County Library was because of the books' contents and viewpoints. Her testimony regarding her purported application of the weeding criteria is unpersuasive and immaterial: the critical decision to remove each of the Banned Books was based on her and/or her co-Defendants' discriminatory animus, amply demonstrated through the record evidence. *See Tompkins v. Vickers*, 26 F.3d 603, 609 (5th Cir. 1994) ("Circumstantial evidence is equally as probative as direct evidence in proving illegitimate intent," especially considering "direct evidence of an improper motive is usually difficult, if not impossible, to obtain.").

## II. Because County Commissioners Are Final Policymakers, the Preliminary Injunction Should Extend to All Defendants

County liability for a violation of First Amendment rights arises when the execution of an official policy causes the injury. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978). A "single action by a municipal official possessing final policymaking authority regarding the action in question constitutes the official policy of the municipality." *Brady v. Fort Bend County*, 145 F.3d 691, 698 (5th Cir. 1998); *accord Beattie v. Madison Cnty. Sch. Dist.*, 254 F.3d 595, 602 (5th Cir. 2001). Whether a municipal official possesses final policymaking authority is a question of state law. *McMillian v. Monroe Cnty.*, 520 U.S. 781, 786 (1997). Texas law expressly grants the commissioner's court final policymaking authority over county libraries. *See* Tex. Const. art. 5, § 18(b) ("[T]he County Commissioners Court . . . shall exercise such powers and jurisdiction over all county business, as is conferred by this Constitution and the laws of the State[.]"); Tex. Loc. Gov't Code. § 323.006 ("The county library is under the general supervision of the commissioners court."); *see also Doe AW v. Burleson Cnty.*, No. 1:20-CV-00126-SH,

2022 WL 875912, at *4 (W.D. Tex. Mar. 24, 2022) (holding county commissioners court has final policymaking authority over all areas entrusted to them by the state constitution and statutes); *K.D. Pool & Ven-Ken, Inc. v. Johnson Cnty.*, No. 3:00-CV-2246-R, 2002 WL 245973, at *5 (N.D. Tex. Feb. 15, 2002) (holding final policymaker for county was commissioners court).

The hearing evidence unequivocally demonstrates the Llano County Commissioners Court's direct involvement in purging the Banned Books. The county judge (Cunningham) and another commissioner (Moss) expressly drove efforts to remove the books from library shelves. *See, e.g.*, Hr'g Tr. Vol. 1 at 66:5-67:3, 68:15-25, 70:2-19; Exs. 2A, 2B, 5, 7, 8, 19, 60. The entire Commissioners Court participated, by closing the library system for three days so all "inappropriate" books could be purged from the shelves and then by replacing the previous library board with other individuals who had been driving efforts to remove the Banned Books. Ex. 11. The full Court's approval of the efforts of Cunningham and Moss amounted to ratification of their actions. *See Young v. Bd. of Supervisors*, 927 F.3d 898, 903 (5th Cir. 2019) ("If the authorized policymakers approve a subordinate's decision and the basis for it, their ratification would be chargeable to the municipality because their decision is final."); *Hatten v. Mathis*, No. 2:15-CV-601-RSP, 2016 WL 4572366, at *4 (E.D. Tex. Sept. 1, 2016) (holding individual commissioner could have final policymaking authority where commissioners court rubber stamps his actions). A preliminary injunction against the County, and against the Commissioners individually, is thus warranted. The library board members are also subject to injunction, having demonstrated their individual willingness to engage in similar activity in the future.[20]

[20] That the library board has supposedly agreed not to meet during the pendency of this litigation, Resp. at 29-30, merely ensures they face no injunctive burden; it does not absolve their liability.

Dated: January 6, 2023

Respectfully submitted,

/s/ Ellen Leonida

Ellen V. Leonida (CA Bar No. 184194)
Matthew Borden (CA Bar No. 214323
J. Noah Hagey (CA Bar No. 262331)
Max Bernstein (NY Bar No. 5609037)
**BraunHagey & Borden LLP**
351 California Street, 10th Floor
San Francisco, CA 94104
Tel: 415-599-0210
Fax: 415-276-1808
leonida@braunhagey.com
borden@braunhagey.com
hagey@braunhagey.com
bernstein@braunhagey.com

Ryan A. Botkin (TX Bar No. 00793366)
Katherine P. Chiarello (TX Bar No. 24006994)
María Amelia Calaf (TX Bar No. 24081915)
Kayna Stavast Levy (TX Bar No. 24079388)
**Wittliff | Cutter PLLC**
1209 Nueces Street
Austin, Texas 78701
Tel: 512-960-4730
Fax: 512-960-4869
ryan@wittliffcutter.com
katherine@wittliffcutter.com
mac@wittliffcutter.com
kayna@wittliffcutter.com

*Attorneys for Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that on January 6, 2023, a true and correct copy of the foregoing document was served on all counsel of record who have appeared in this case using the Court's CM/ECF system as a Filing User.

*/s/ Ellen Leonida*
Ellen V. Leonida