UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

**Leila Green Little**, et al.

    Plaintiffs,

v.

**Llano County**, et al.,

    Defendants.

Case No. 1:22-cv-00424-RP

**DEFENDANTS' SUR-REPLY**

  The plaintiffs' reply brief, like their initial post-hearing brief, contains falsehoods and misrepresentations of the evidence and testimony. We have asked the plaintiffs to correct these inaccuracies but they refuse to do so. *See* Letter from Ellen V. Leonida (Jan. 17, 2023) (attached as Exhibit 2). The defendants therefore wish to bring these false statements to the Court's attention so that it does not rely on them in any way.

  1. The plaintiffs' statement that "Milum . . . pulled the Banned Books off of the shelves for review because of their content and viewpoint"[1] is false in three respects: (a) The "fart" books and "*I Need a New Butt*" were never on the shelves,[2] so Ms. Milum could not have "pulled" them "off the shelves"; (b) There is no evidence that any of the 17 books was pulled off the shelves because of its "viewpoint"; and (c) Ms. Milum pulled books containing nudity (such as *It's Perfectly Normal* and *In the Night Kitchen*) from the shelves for review because of their content, per Judge Cunningham's directive,[3] but there is no evidence that Milum pulled any of the books on Bonnie Wallace's list for review because of their "content."

---

1. Pls.' Reply, ECF No. 98, at 2.
2. *See* Defs.' Br., ECF No. 100, at 11 n.22; Third Milum Decl., ECF No. 100-5, at ¶ 10 ("*I Need a New Butt* . . . and the four 'fart' books were never placed on the shelves and were never checked out by anyone.").
3. Hr'g Tr. Vol. 1 at 145:8–13.

2. The plaintiffs' statement that "The Banned Books were not eligible to be weeded under the CREW and MUSTIE criteria as those criteria had been previously applied by Milum and Tina Castelan"[4] is false. Castelan conceded that *Freakboy* was appropriately weeded under CREW and MUSTIE,[5] and she acknowledged that *Being Jazz* "could have been" weeded under CREW and MUSTIE but that she personally would have left it on the shelves.[6]

3. The plaintiffs' claim that there was "a statewide campaign to have the same books removed because of their expressed viewpoints"[7] is not supported by the citations from the hearing transcript or by any other evidence. The cited portions of the hearing transcript[8] reveal only the existence of the so-called Krause list, but there is nothing that indicates a "statewide campaign," or that Krause (or anyone else) objected to "viewpoints" in those books.

4. The plaintiffs' claim that "Plaintiffs only became aware of the existence of those books through this litigation"[9] is false. Leila Little testified that she also learned of the in-house checkout through the newspaper and from a librarian.[10] None of the other plaintiffs testified or provided evidence of how they learned about it.

The plaintiffs have refused our request to correct or withdraw these falsehoods and misrepresentations in their reply brief. *See* Letter from Ellen V. Leonida (Jan. 17, 2023) at 9–12

---

4. Pls.' Reply, ECF No. 98, at 3.
5. *See* Hr'g Tr. Vol. 1 at 38:25–39:7 ("Q. Was [*Freakboy*] appropriately removed pursuant to Llano County Library policies? A. Yes. Q. Tell me about that. A. Because its last circulation was in 2016. It was only checked out once. It was added in 2015, and so, for me, this book would have been one that I would have discovered and gotten rid of.").
6. *See* Hr'g Tr. Vol. 1 at 42:14–19 ("Q. Was [*Being Jazz*] appropriately weeded pursuant to library policy and CREW and MUSTIE criteria? A. So it could have been because it has—it was checked out in 2017. However, we only had one or two of the books that pertained to this subject and so, I would have left it.").
7. Pls.' Reply, ECF No. 98, at 3.
8. *See* Hr'g Tr. Vol. 1 at 30:24-32:4, 71:16-72:12.
9. Pls.' Reply, ECF No. 98, at 3.
10. Hr'g Tr. Vol. 2 at 42:18–22 ("I believe I first became aware of that through legal documents pertaining to this litigation. Following that, I did read about it. I believe it was in the Daily Trib newspaper that referred to the court filings referring to it. And following that, a librarian had told me about it.").

(attached as Exhibit 2). The plaintiffs are likewise unwilling to acknowledge the misstatements in their post-hearing brief of December 9, 2022, apart from their now-repudiated assertion that the in-house checkout system contained "only nine" of the 17 disputed books and their false claim that *It's Perfectly Normal* "was checked out within three years of its removal." *See id.* at 2–9. We have attached a letter from plaintiffs' counsel explaining their stance, and we believe that this letter, along with the prior correspondence that we have submitted to the Court,[11] will be sufficient to ensure that the Court will not misled by the plaintiffs' briefing.

We are also attaching to this sur-reply a copy of "the CREW Manual," which the plaintiffs continue to invoke in their briefs despite the fact that it was never introduced as evidence. *See* Pls.' Br., ECF No. 91 (asserting that "the CREW Manual states that books are to remain on shelves unless they do not circulate 'for 3-5 years,'" and falsely equating Exhibit 23 with "the CREW Manual"). This document is publicly available[12] and plaintiffs' counsel are fully aware of its existence and content. *See* Letter from Ellen V. Leonida (Jan. 17, 2023) at 8 (acknowledging that "[t]here is a document called 'CREW: A Weeding Manual for Modern Libraries' available online" and citing the URL). Plaintiffs' counsel are also aware that Exhibit 23 is not "the CREW Manual," but a mere slideshow produced by Dawn Vogler,[13] yet they continue to insist on equating the two while misrepresenting the contents of both the CREW Manual and the Vogler slideshow.

Because the plaintiffs continue to invoke "the CREW Manual" and refuse to withdraw their reliance on that document, the Court should be aware of what "the CREW Manual" actually says. To begin, the CREW Manual mandates not only content discrimination but also viewpoint discrimination in weeding decisions. *See* CREW Manual at 19 (attached as Exhibit 3) (listing "poor *content*" as grounds for weeding, including "[m]aterial that contains

---

11. *See* Notice to the Court, Ex. 1, ECF No. 102-1.
12. *See* https://bit.ly/3RjyQ6y (last visited on January 30, 2023).
13. *See* Letter from Ellen V. Leonida (Jan. 17, 2023) at 7–8.

biased, racist, or sexist terminology *or views*" (emphasis added)); *id*. at 21 (instructing librarians to consider "current interest in the subject matter"); *id*. at 33 ("[L]ook for books that contain stereotyping, including stereotypical images and views of people with disabilities and the elderly, or gender and racial biases."); *id*. at 65 ("Weed biased or unbalanced and inflammatory items."); *id*. ("Weed career guides with gender, racial, or ethnic bias."); *id*. at 68 ("Discard books that are MUSTIE or that reflect gender, family, ethnic, or racial bias."); *id*. ("Weed based on the quality of the retelling, especially if racial or ethnic bias is present."); *id*. at 73 ("While information may not become dated, watch for cultural, racial, and gender biases."); *id*. at 74 ("Discard books . . . that feature gender bias."); *id*. at 75 ("Watch for gender and racial bias in sports and athletics."); *id*. at 76 ("Watch for collections that feature gender or nationality bias and outdated interests and sensitivities."); *id*. at 77 ("Watch for outdated interests and collections that feature gender or race bias."); *id*. at 81 ("Weed books that reflect racial and gender bias."); *id*. at 82 ("Do not retain books that have erroneous and dangerous information simply because the book is still in great shape."). The plaintiffs need to explain how they can insist throughout their brief that content and viewpoint discrimination are constitutionally forbidden in weeding decisions while simultaneously invoking "the CREW Manual" as if it were an *ex cathedra* pronouncement.

The CREW Manual also flatly contradicts the plaintiffs' claim that books can never be weeded unless they have gone uncirculated "for 3–5 years." In many places, the CREW Manual endorses weeding after one or two years since last circulation, and explicitly states that fiction becomes eligible for weeding after *two* years of non-circulation. *See id*. at 33 ("Consider discarding older fiction especially when it has not circulated in the past two or three years."); *id*. at 77 ("F (Fiction) X/2/MUSTIE"); *id*. ("[C]onsider weeding any [graphic novel] that hasn't circulated in the past year."); *id*. at 81 ("Weed any [picture] book that has not circulated in the past two years."); *id*. ("[C]onsider weeding [juvenile fiction] that hasn't circulated in the past two years."); *id*. at 82 ("Any item [of young adult fiction] that has not

circulated within two years should be considered 'dead' and removed (and anything that hasn't circulated within the past year is suspect . . .)").

Finally, the plaintiffs' reply falsely accuses the defendants of arguing that this case (and the motion for preliminary injunction) are moot. *See* Pls.' Reply Br., ECF No. 98, at 4–6. Neither the case nor the motion is moot, and it would be wrong for the Court to hold that they are moot. An Article III case or controversy continues to exist because the plaintiffs' inability to obtain or check out the disputed books from the shelves (as opposed to the in-house checkout system) supplies the "identifiable trifle" needed for injury in fact. *See United States v. Students Challenging Regulatory Agency Procedures (SCRAP)*, 412 U.S. 669, 689 n.14 (1973). The donation of the disputed books to the in-house checkout system does not moot anything, but it does eliminate any possibility of "irreparable harm" or violation of the plaintiffs' First Amendment rights that might otherwise occur between now and the end of trial. The plaintiffs have established an ongoing Article III injury, but they have *not* shown that they will suffer irreparable harm or a violation of their constitutional rights absent a preliminary injunction. The plaintiffs' "voluntary cessation" analysis is irrelevant because the defendants have not mooted the plaintiffs' Article III injury and are not attempting to moot the case by returning the books to the shelves. Voluntary cessation is an *exception* to mootness, and that exception cannot be implicated when the defendants have done nothing that could eliminate an Article III case or controversy.[14]

## CONCLUSION

The motion for preliminary injunction should be denied.

---

14. The plaintiffs falsely claim that mootness can be "waived." *See* Pls.' Reply Br., ECF No. 98, at 5 ("Defendants have thus waived any mootness argument."). Mootness can never be waived, as it goes to the subject-matter jurisdiction of the Court. *See Iron Arrow Honor Soc'y v. Heckler*, 464 U.S. 67, 70 (1983) ("Federal courts lack jurisdiction to decide moot cases").

|  |  |
|---|---|
|  | Respectfully submitted. |
|  | /s/ Jonathan F. Mitchell |
| Dwain K. Rogers | Jonathan F. Mitchell |
| Texas Bar No. 00788311 | Texas Bar No. 24075463 |
| County Attorney | Mitchell Law PLLC |
|  | 111 Congress Avenue, Suite 400 |
| Matthew L. Rienstra | Austin, Texas 78701 |
| Texas Bar No. 16908020 | (512) 686-3940 (phone) |
| First Assistant County Attorney | (512) 686-3941 (fax) |
|  | jonathan@mitchell.law |
| Llano County Attorney's Office |  |
| Llano County Courthouse |  |
| 801 Ford Street |  |
| Llano, Texas 78643 |  |
| (325) 247-7733 |  |
| dwain.rogers@co.llano.tx.us |  |
| matt.rienstra@co.llano.tx.us |  |
|  |  |
| Dated: January 30, 2023 | *Counsel for Defendants* |

## CERTIFICATE OF SERVICE

I certify that on January 30, 2023, I served this document through CM/ECF upon:

Ellen V. Leonida
Matthew Borden
J. Noah Hagey
Sarah Salomon
Pratik Ghosh
Amy Senia
BraunHagey & Borden LLP
351 California Street, 10th Floor
San Francisco, CA 94104
(415) 599-0210
leonida@braunhagey.com
borden@braunhagey.com
hagey@braunhagey.com
salomon@braunhagey.com
ghosh@braunhagey.com
senia@braunhagey.com

Ryan A. Botkin
Katherine P. Chiarello
María Amelia Calaf
Wittliff | Cutter PLLC
1209 Nueces Street
Austin, Texas 78701
(512) 960-4730 (phone)
(512) 960-4869 (fax)
ryan@wittliffcutter.com
katherine@wittliffcutter.com
mac@wittliffcutter.com

*Counsel for Plaintiffs*

                                                    /s/ Jonathan F. Mitchell
                                                    Jonathan F. Mitchell
                                                    *Counsel for Defendants*