# EXHIBIT 1

Page 1

1                     JONATHAN MITCHELL

2            IN THE UNITED STATES DISTRICT COURT
             FOR THE WESTERN DISTRICT OF TEXAS
3                   SAN ANTONIO DIVISION

4   LEILA GREEN LITTLE, JEANNE     )
    PURYEAR, KATHY KENNEDY,        )
5   REBECCA JONES, RICHARD DAY,    )
    CYNTHIA WARING, AND DIANE      )
6   MOSTER,                        )
                                   )      Civil Case No.
7             Plaintiffs,          )
                                   )      1:22-cv-00424-RP
8             -vs-                 )
                                   )
9   LLANO COUNTY, RON CUNNINGHAM,  )
    in his official capacity as    )
10  Llano County Judge, JERRY DON  )
    MOSS, in his official          )
11  capacity as Llano County       )
    Commissioner, PETER JONES, in  )
12  his official capacity as       )
    Llano County Commissioner,     )
13  MIKE SANDOVAL, in his          )
    official capacity as           )
14  Llano County Commissioner,     )
    LINDA RASCHKE, in her          )
15  official capacity as           )
    Llano County Commissioner,     )
16  AMBER MILUM, in her official   )
    capacity as Llano County       )
17  Library System Director,       )
    BONNIE WALLACE, in her         )
18  official capacity as Llano     )
    County Library Board Member,   )
19  ROCHELLE WELLS, in her         )  ORAL AND VIDEOTAPED DEPOSITION OF
    official capacity as Llano     )  DEPOSITION OF JONATHAN MITCHELL
20  County Library Board Member,   )    Friday, March 31, 2023
    RHONDA SCHNEIDER, in her       )
21  official capacity as Llano     )
    County Library Board Member,   )
22  and GAY BASKIN, in her         )
    official capacity as Llano     )
23  County Library Board Member,   )
                                   )
24            Defendants.          )
    _____/  Reported By: Darlene May
25  JOB NO. 224320                          Debra Isbell

1          JONATHAN MITCHELL

2               -   -   -

3     ORAL AND VIDEOTAPED DEPOSITION OF

4          JONATHAN MITCHELL

5          Friday, March 31, 2023

6               VOLUME I

7          (Reported Remotely)

8               -   -   -

9     The Videotaped Deposition of JONATHAN MITCHELL, taken

10 by a Zoom before me, Darlene K. May, CSR-9026 & Debra Amos Isbell,

11 CCR,RDR,CRR, NCRA #29238 in and for the State of Texas, reported

12 by stenographic method, appearing at the offices of Wittliff

13 Cutter, PLLC, 1209 Nueces Street, Austin, Texas, pursuant to the

14 Federal Rules of Civil Procedure.

15

16

17

18

19

20

21

22

23

24

25

```
 1                    JONATHAN MITCHELL

 2              A P P E A R A N C E S

 3  FOR THE PLAINTIFFS:

 4        ELLEN LEONIDA, ESQ.
          ELLIS HERINGTON, ESQ.
 5        BraunHagey & Borden LLP
          351 California Street
 6        San Francisco, California 94104

 7

 8

 9        RYAN BOTKIN, ESQ.
          KAYNA LEVY, ESQ.
10        Wittliff Cutter, PLLC
          1209 Nueces Street
11        Austin, Texas 78701

12

13

14  FOR THE DEFENDANTS, LLANO COUNTY; and THE WITNESS:

15        DWAIN ROGERS, JR., ESQ.
          Munsch Hardt Kopf & Harr, P.C.
16        1717 West 6th Street
          Austin, Texas 78703
17

18

19  ALSO PRESENT:

20        Brent Kirby, Legal Videographer

21

22

23

24

25
```

1                    JONATHAN MITCHELL

2                      I N D E X

3  WITNESSES:                              PAGE

4  JONATHAN MITCHELL

5       Examination by Ms. Leonida              12

6

7  EXHIBIT:               DESCRIPTION          MARKED

8  Number 102           E-mail                    90

9  Number 103           E-mail                    90

10  Number 106           Document                  46

11  Number 107           E-mail                    68

12  Number 112           Document                  80

13

14  OTHER MATTERS IN TRANSCRIPT:               PAGE

15  Preliminary Matters before Testimony          4

16  Pending Question Marked                       17

17  Change of Reporters                          103

18

19

20

21

22

23

24

25

1                     JONATHAN MITCHELL

2    the plaintiffs.

3                     MR. ROGERS:  And Dwain Rogers on behalf of Llano

4    County and Mr. Mitchell.

5                     Ellen, I wondered before we began, given the

6    unusual nature of this deposition, if we can have a discussion.

7    Obviously, we're concerned about getting into anything that

8    would be content of attorney/client discussion, et cetera.  Or

9    work product for that matter.

10                    I know in order to make this deposition useful

11   and productive and in order to approach it in good faith, we

12   recognize that, although we objected regarding the five -- I

13   believe six questions that were asked to Mr. Mitchell at the

14   preliminary injunction hearing.  What we would like to do is

15   enter a blanket objection so that we don't waive objections as

16   to just the deposition itself.

17                    But then, in order, again, to be productive and

18   proceed in good faith, with regard to, you know, basically, the

19   topic strictly of the in-house library system, I would like to

20   just kind of say "same objection" to each question in order to

21   preserve our objections.  And we would hope that you'd be

22   willing to state on the record that you agree we're not waiving

23   objections by participating in the deposition.  Because

24   otherwise, you know, we don't want to have to go seek relief

25   from the judge.  We don't want to have to do this again.  We'd

1                     JONATHAN MITCHELL

2  like to make it productive and useful, but we also have to do

3  something in order to protect our privilege and also to retain

4  the objections that we made at the PI hearing.

5                     I hope that made sense.  What is your response

6  to that?

7                     MS. LEONIDA:  If I understand you correctly,

8  you're saying that you want to object to the deposition

9  generally and to be able to say "same objection."  I have no

10 problem with that.  Our position is that the judge overruled

11 privileged objections regarding the donations to the in-house

12 checkout system.  He did so at the hearing and I believe he did

13 so again in the order that was issued yesterday.  I understand

14 that you can object, but it's a deposition.  So your objections

15 will be preserved in the event that we end up trying to

16 introduce any part of this deposition at trial.  But our

17 position is that the witness does have to answer.

18                     MR. ROGERS:  Okay.  And that's fine.  I think we

19 are on the same page on that.

20                     I guess the only other question would be do you

21 intend to get into any topics other than the in-house checkout

22 system today?

23                     MS. LEONIDA:  I do.  I intend to get into topics

24 that are relevant to the motivations of the donor to the

25 in-house checkout system.  So --

1                       JONATHAN MITCHELL

2             MR. ROGERS:  We'll have to take those as they

3    come.  But, yeah, why don't we -- why don't we proceed.

4             Let me --

5             THE WITNESS:  Well ...

6             MR. ROGERS:  I was going to say for the record I

7    was going to assert certain objections.

8             THE WITNESS:  I think when you're objecting on

9    privileged grounds --

10            MR. ROGERS:  Um-hmm.

11            THE WITNESS:  Ellen, can you hear me?

12            MS. LEONIDA:  I can hear you.

13            THE WITNESS:  Okay.  When you object on

14   privileged grounds, I think you should still instruct me not to

15   answer to make clear it's a privileged objection.

16            MR. ROGERS:  Um-hmm.

17            THE WITNESS:  Ellen, if you think -- if he's

18   objecting to something that Judge Pittman has already

19   overruled, we respect Judge Pittman's decision.  We may have

20   disagreements over just how far he went in overruling our

21   privileged objections, but we're willing to provide an answer

22   to the extent Judge Pittman already overruled our privileged

23   objections.  But we don't want you treating that as a waiver of

24   our privilege, because we still want to preserve our privileged

25   objections for appeal.  Does that make sense?

1              JONATHAN MITCHELL

2              MS. LEONIDA:  No.

3              THE WITNESS:  Okay.  Normally, if you answer a

4  question at a deposition that involves privileged material

5  you've waived your privileged objection; is that right?

6              MS. LEONIDA:  I don't know that it is.  If you

7  make the objection, I think any objections that you make at a

8  deposition are preserved for later.

9              THE WITNESS:  So even if you --

10             MS. LEONIDA:  But if I understand you -- if

11  I understand you correctly, you're saying that you're

12  not -- you'll answer the questions but want those answers to

13  not be considered a future waiver of your privilege objection?

14             THE WITNESS:  Correct.  You have stated it on

15  the record.

16             MS. LEONIDA:  Yes.  We are on the record.

17             THE WITNESS:  So by answering a question that

18  Mr. Rogers objects to on the ground of attorney/client

19  privilege, because Judge Pittman's already overruled our

20  objection, you're not going to treat the fact that I provided

21  you an answer as a permanent waiver of our privilege objections

22  on appeal?

23             MS. LEONIDA:  That's correct.  Our position is

24  that that's been ruled on, but I will not treat it as your

25  personal waiver.

1                    JONATHAN MITCHELL

2            THE WITNESS:  Right.

3            MS. LEONIDA:  Yeah.  That's fine.

4            THE WITNESS:  Thank you.  I just wanted to

5  clarify that before we started.  So I think ...

6            Is that okay?

7            MR. ROGERS:  I think that that's absolutely

8  fine.  That's where we're trying to get to.  And that, I think,

9  will allow us all to be productive today.

10            MS. LEONIDA:  Okay.  Anything else or are we

11  ready to start?

12            MR. ROGERS:  I guess what I will just state for

13  the record -- although we've already eluded to it -- is that

14  Defendant Llano County and Mr. Mitchell object to holding a

15  deposition of an attorney of record in this matter on the

16  grounds of attorney/client privilege, attorney work product.

17  And, again, pursuant to the stipulation, and pursuant to our

18  understanding of Judge Pittman's ruling at the preliminary

19  injunction hearing, we will be providing answers to certain

20  questions, but we are in agreement that that would not

21  constitute a personal waiver of the privilege for purposes of

22  this hearing.

23            And with that I am done with the monologue.

24            THE WITNESS:  Just one more thing.  When you

25  object on privilege grounds, are you still going to instruct me

1                    JONATHAN MITCHELL

2               MR. ROGERS:  Objection.  Privilege.

3               THE WITNESS:  I don't remember.

4  BY MS. LEONIDA (Continued):

5     Q.   When did you first become aware of this idea?

6               MR. ROGERS:  Objection.  Privilege.

7               THE WITNESS:  I would have to check my record to

8  make sure of the date, but it was shortly before the first set

9  of books was donated in August, I believe.  August of 2022.

10 BY MS. LEONIDA (Continued):

11    Q.   Was your first conversation about donating books to

12 the in-house checkout system in person?

13              MR. ROGERS:  Objection.  Privilege.

14              THE WITNESS:  Yes.  Subject to my counsel's

15 objection, it was not in person.

16 BY MS. LEONIDA (Continued):

17    Q.   Was your first conversation about donating books to

18 the in-house system on the telephone?

19              MR. ROGERS:  Objection. Privilege.

20              THE WITNESS:  Subject to the objection, yes.

21 BY MS. LEONIDA (Continued):

22    Q.   Who was on that call?

23              MR. ROGERS:  Objection.  Privilege.

24              THE WITNESS:  Did he overrule the objection on

25 that?

1                    JONATHAN MITCHELL

2                    MR. ROGERS:  The question is who was on the

3   call?

4            I don't believe so.  I'm thinking about the six

5   questions that were allowed to be asked at the hearing and

6   trying to give latitude for things that are similar subjects.

7            But I think in this regard, I don't believe that

8   he has overruled on objections regarding who the conversations

9   were with.  And in particular to the extent they were with

10  co-counsel, I'd really rather not invade that privilege.  So I

11  think I will object attorney/client and work product privilege

12  and instruct the witness not to answer.

13                   MS. LEONIDA:  And I'll ask that the court

14  reporter mark this portion of the transcript.

15  BY MS. LEONIDA (Continued):

16     Q.   How many people were on this call?

17                   MR. ROGERS:  I will have the same objection and

18  instruction.

19  BY MS. LEONIDA (Continued):

20     Q.   Were any of the defendants on that call?

21                   MR. ROGERS:  Same objection and instruction.

22  BY MS. LEONIDA (Continued):

23     Q.   Whose idea was it to put the books at issue in this

24  litigation in the in-house checkout system?

25                   MR. ROGERS:  Allow me to consider that one for a

1                          JONATHAN MITCHELL

2  moment, Ellen.  Again, I'm trying to proceed in good faith

3  regarding what overruled.

4                    THE WITNESS:  We've already answered that.

5                    MR. ROGERS:  I believe with regard to this, this

6  has already been answered.  I believe this was overruled.  So I

7  will revert to objection privilege as we discussed previously.

8                    THE WITNESS:  I've already answered that.  I

9  said I don't know.

10 BY MS. LEONIDA (Continued):

11     Q.   Did you take any notes during the conversation where

12 you were first thinking about donating books to the in-house

13 checkout system?

14                    MR. ROGERS:  Regarding that in particular,

15 because notes would obviously be attorney work product, I will

16 object to attorney/client privilege, attorney work product and

17 instruct the witness not to answer.

18 BY MS. LEONIDA (Continued):

19     Q.   Do you generally have difficulty remembering things,

20 Mr. Mitchell?

21                    MR. ROGERS:  Objection.  Privilege.  And -- but

22 I believe -- I believe he can answer that one.

23                    THE WITNESS:  I wouldn't say that I generally

24 have difficulty remembering things, but as I've gotten older,

25 I'm remembering fewer things than I did before.

1                    JONATHAN MITCHELL

2  BY MS. LEONIDA (Continued):

3     Q.   Is it fair to say that the idea of donating the books

4  that the county was being sued about to in-house checkout is a

5  significant development in this litigation?

6               MR. ROGERS:  Objection.  Privilege.

7               THE WITNESS:  I would agree that it's relevant

8  to this litigation.

9  BY MS. LEONIDA (Continued):

10    Q.   And you don't have the slightest idea whose idea it

11  was?

12              MR. ROGERS:  Objection.  Privileged and

13  objection to form.

14              THE WITNESS:  I didn't say that I didn't have

15  the slightest idea.  I said I don't remember whose idea it was.

16  BY MS. LEONIDA (Continued):

17    Q.   Okay.  So what ideas do you have about the genesis of

18  the idea of donating these books to the in-house checkout

19  system?

20              MR. ROGERS:  Objection.  Privileged.

21              THE WITNESS:  The genesis of the idea came from

22  the conversation I had with my client.

23  BY MS. LEONIDA (Continued):

24    Q.   So tell me about that conversation.

25              MR. ROGERS:  Objection.  Privilege.

1                    JONATHAN MITCHELL

2  Attorney/client privilege and work product privilege.

3                    And in that case, I would instruct the witness

4  not to answer.

5                    We do not believe that the Judge's ruling at the

6  preliminary injunction hearing would agree to divulge any

7  communications between co-counsel.

8                    MS. LEONIDA:  So regarding these objections, our

9  position is that the judge did overrule this.  The entire

10  reason that this witness is here is because of his choice to

11  participate in this litigation by donating the books to the

12  in-house checkout system.

13                    As we discussed at the preliminary injunction

14  hearing, and Judge Pittman has ruled, that makes his decision

15  to donate the books relevant and it makes the person whose idea

16  it was relevant.  And I -- you know, our position is that the

17  witness cannot hide behind a blanket privilege objection

18  regarding the genesis of the idea that in some ways became the

19  centerpiece of the defense in this case.

20                    We are going to ask if you're going to continue

21  to object based on privilege in this way that you provide

22  sufficient information that we can -- and the Court can.

23  Because, obviously, this is going to end up in front of Judge

24  Pittman at some point.  So that we can assess the applicability

25  of the privilege.

1                    JONATHAN MITCHELL

2              MR. ROGERS:  I would say that with respect to

3  the question that's currently on the table, it's specifically

4  seeking the content of communications with co-counsel and I did

5  not believe Judge Pittman's ruling at the hearing breached that

6  subject matter.

7  BY MS. LEONIDA (Continued):

8     Q.   How did you learn of the existence of an in-house

9  checkout system in the Llano County library?

10             MR. ROGERS:  Objection.  Privilege.

11             THE WITNESS:  Are you instructing me not to

12  answer?

13             MR. ROGERS:  How did you learn ...

14             THE WITNESS:  I'll answer it this way --

15             MR. ROGERS:  I think there are ways you could

16  answer that question without revealing communication.

17             THE WITNESS:  I don't have a way to answer that

18  question without divulging privilege.  Attorney/client

19  communication.

20  BY MS. LEONIDA (Continued):

21     Q.   When you donated the books that you bought to the

22  in-house checkout system, did you know that they would not be

23  available on the shelves the library?

24             MR. ROGERS:  Objection.  Privilege.

25             THE WITNESS:  I think I understood that at the

1                      JONATHAN MITCHELL

2  arguments in our brief, I would have thought it would help our

3  client.

4  BY MS. LEONIDA (Continued):

5      Q.   Did you speak with Amber Milum about donating books

6  to the in-house checkout system?

7              MR. ROGERS:  Objection.  Privilege.  And, again,

8  the content of communications with Ms. Milum, I think, is

9  beyond the Judge's ruling and I'll instruct you not to answer

10 regarding communications you had with the client.

11 BY MS. LEONIDA (Continued):

12     Q.   Did you speak with Ms. Milum on the phone about

13 donating books to the in-house checkout system?

14             MR. ROGERS:  Same objection and instruction.

15 BY MS. LEONIDA (Continued):

16     Q.   Did you communication with Ms. Milum via E-mail

17 regarding donating books to the in-house checkout system?

18             MR. ROGERS:  Same objection and instruction.

19 BY MS. LEONIDA (Continued):

20     Q.   Did you communicate with Ms. Milum via text regarding

21 books to the in-house checkout system?

22             MR. ROGERS:  Same objection and instruction.

23 BY MS. LEONIDA (Continued):

24     Q.   Did you communicate with Ron Cunningham in person

25 about donating books to the in-house checkout system?

1                    JONATHAN MITCHELL

2              MR. ROGERS:  The same objection and instruction.

3              And, counsel, if it would be helpful, I can

4   stipulate that if the same series of questions is asked

5   regarding Judge Cunningham as it was regarding Amber Milum,

6   again, I don't think the Judge's ruling reaches content if

7   there are any communications with clients or co-counsel.  So I

8   would just advise you that I would have the same objection and

9   instruction if the same series of questions was asked with

10  respect to Judge Cunningham as it was to Ms. Milum.

11             MS. LEONIDA:  We believe that the Judge did

12  overrule privilege objections regarding the contents of

13  communications as they relate to the in-house checkout system.

14             So I'm going to go ahead and ask.  You can put

15  your objections on the record and we'll see if we end up back

16  here answering these questions in a different way.

17             MR. ROGERS:  Fair enough.

18  BY MS. LEONIDA (Continued):

19    Q.   Did you communicate with Ron Cunningham via phone

20  regarding donating books to the in-house checkout system?

21             MR. ROGERS:  Same objection and instruction.

22  BY MS. LEONIDA (Continued):

23             Did you communicate with Ron Cunningham via

24  E-mail regarding books to the in-house checkout system?

25             MR. ROGERS:  Same objection and instruction.

1                    JONATHAN MITCHELL

2  BY MS. LEONIDA (Continued):

3      Q.   Did you communicate with Ron Cunningham via text

4  regarding books to the in-house checkout system?

5             MR. ROGERS:  Same objection and instruction.

6  BY MS. LEONIDA (Continued):

7      Q.   Did you communicate with Jerry Don Moss in person

8  regarding donating books to the in-house checkout system?

9             MR. ROGERS:  Same objection and instruction.

10 BY MS. LEONIDA (Continued):

11     Q.   Did you communicate with Jerry Don Moss on the phone

12 regarding donating books to the in-house checkout system?

13            MR. ROGERS:  Same objection and instruction.

14 BY MS. LEONIDA (Continued):

15     Q.   Did you communicate with Jerry Don Moss via E-mail

16 regarding books to the in-house checkout system?

17            MR. ROGERS:  Same objection and instruction.

18 BY MS. LEONIDA (Continued):

19     Q.   Did you communicate with Jerry Don Moss via text

20 message regarding donating books to the in-house checkout

21 system?

22            MR. ROGERS:  Same objection and instruction.

23 BY MS. LEONIDA (Continued):

24     Q.   Did you communicate with Bonnie Wallace via in-person

25 regarding donating books to the in-house checkout system?

1                      JONATHAN MITCHELL

2                 MR. ROGERS:  Same objection and instruction.

3   BY MS. LEONIDA (Continued):

4       Q.    Did you communicate with Bonnie Wallace on the phone

5   regarding donating books the in-house checkout system?

6                 MR. ROGERS:  Same objection and instruction.

7   BY MS. LEONIDA (Continued):

8       Q.    Did you communicate with Bonnie Wallace via E-mail

9   regarding donating books to the in-house checkout system?

10                MR. ROGERS:  Same objection and instruction.

11  BY MS. LEONIDA (Continued):

12      Q.    Did you communicate with Bonnie Wallace via text

13  regarding donating books to the in-house checkout system?

14                MR. ROGERS:  Same objection and instruction.

15  BY MS. LEONIDA (Continued):

16      Q.    Have you had conversations with Ms. Wallace

17  outside -- in the presence of people who are not parties or

18  lawyers in this lawsuit regarding the in-house checkout system?

19                MR. ROGERS:  Counsel, could you repeat the

20  question.  I want to make sure that I understand it.

21  BY MS. LEONIDA (Continued):

22      Q.    Sure.  Have you had conversations with Ms. Wallace

23  where people were present who are not parties to this lawsuit

24  or lawyers in this lawsuit regarding the in-house checkout

25  system?

```
 1                    JONATHAN MITCHELL

 2            MR. ROGERS:  I'm going to object to form.

 3            I mean, I guess if you were in a public forum, I

 4  guess you can answer that.

 5            Let me repeat because we've broken away for a

 6  moment.  Objection on attorney/client privilege grounds,

 7  attorney work product grounds and I will instruct the witness

 8  not to answer.

 9  BY MS. LEONIDA (Continued):

10    Q.   Have you had conversations with Rochelle Wells on the

11  phone about donating books to the in-house checkout system?

12            MR. ROGERS:  Same objection.  And instruction.

13  BY MS. LEONIDA (Continued):

14    Q.   Have you had conversations with Rochelle Wells via

15  E-mail regarding donating books to the in-house checkout

16  system?

17            MR. ROGERS:  Same objection and instruction.

18  BY MS. LEONIDA (Continued):

19    Q.   Have you had communications with Rochelle Wells via

20  text message regarding books to the in-house checkout system?

21            MR. ROGERS:  Same objection and instruction.

22  BY MS. LEONIDA (Continued):

23    Q.   Have you had conversations in person with Rhonda

24  Schneider regarding donating books to the in-house checkout

25  system?
```

1              JONATHAN MITCHELL

2              MR. ROGERS:  Same objection and instruction.

3 BY MS. LEONIDA (Continued):

4    Q.   Have you had conversations on the phone with Rhonda

5 Schneider regarding donating books to the in-house checkout

6 system?

7              MR. ROGERS:  Same objection and instructions.

8 BY MS. LEONIDA (Continued):

9    Q.   Have you had conversations over -- have you had

10 communications via E-mail with Rhonda Schneider about donating

11 books to the in-house checkout system?

12              MR. ROGERS:  Same objections and instructions.

13 BY MS. LEONIDA (Continued):

14    Q.   Have you had conversations/communications via text

15 message with Rhonda Schneider about donating books to the

16 in-house checkout system?

17              MR. ROGERS:  Same objections and instructions.

18 BY MS. LEONIDA (Continued):

19    Q.   Have you had conversations in person with Mike

20 Sandoval about donating books to the in-house checkout system?

21              MR. ROGERS:  Same objection and instruction.

22 BY MS. LEONIDA (Continued):

23    Q.   Have you had conversations on the phone with

24 Mike Sandoval about donating books to the in-house checkout

25 system?

1                    JONATHAN MITCHELL

2                MR. ROGERS:  Same objection and instruction.

3  BY MS. LEONIDA (Continued):

4     Q.   Have you had conversations or communications with

5  Mike Sandoval over E-mail about donating books to the in-house

6  checkout system?

7                MR. ROGERS:  Same objections and instructions.

8  BY MS. LEONIDA (Continued):

9     Q.   Have you communicated with Mike Sandoval via text

10 message about donating books to the in-house checkout system?

11               MR. ROGERS:  Same objections and instructions.

12 BY MS. LEONIDA (Continued):

13    Q.   Have you had conversations in person with Peter Jones

14 about donating books to the in-house checkout system?

15               MR. ROGERS:  Same objections and instructions.

16 BY MS. LEONIDA (Continued):

17    Q.   Have you had conversations on the phone with

18 Peter Jones about donating books to the in-house checkout

19 system?

20               MR. ROGERS:  Same objections and instructions.

21 BY MS. LEONIDA (Continued):

22    Q.   Have you communicated with Peter Jones via E-mail

23 regarding donating books to the in-house checkout system?

24               MR. ROGERS:  Same objections and instructions.

25

1                    JONATHAN MITCHELL

2  BY MS. LEONIDA (Continued):

3     Q.   Have you communicated with Peter Jones via text

4  message regarding donating books to the in-house checkout

5  system?

6              MR. ROGERS:  Same objections and instructions.

7  BY MS. LEONIDA (Continued):

8     Q.   Have you had any conservations in person with Linda

9  Raschke about donating books the in-house checkout system?

10             MR. ROGERS:  Same objections and instructions.

11 BY MS. LEONIDA (Continued):

12    Q.   Have you had conversations on the phone with Linda

13 Raschke about donating books to the in-house checkout system?

14             MR. ROGERS:  Same objections and instructions.

15 BY MS. LEONIDA (Continued):

16    Q.   Have you communicated with Linda Raschke over E-mail

17 about donating books to the in-house checkout system?

18             MR. ROGERS:  Same objections and instructions.

19 BY MS. LEONIDA (Continued):

20    Q.   Have you communicated with Linda Raschke via text

21 message regarding books to the in-house checkout system?

22             MR. ROGERS:  Same objections and instructions.

23 BY MS. LEONIDA (Continued):

24    Q.   Have you had in-person conversations with Gay Baskin

25 about donating books to the in-house checkout system?

1                      JONATHAN MITCHELL

2                  MR. ROGERS:  Same objections and instructions.

3  BY MS. LEONIDA (Continued):

4      Q.    Have you communicated with Ms. Baskin via telephone

5  regarding donating books to in-house checkout system?

6                  MR. ROGERS:  Same objections and instructions.

7  BY MS. LEONIDA (Continued):

8      Q.    Have you communicated with Gay Baskin via E-mail

9  regarding books to the in-house checkout system?

10                  MR. ROGERS:  Same objections and instructions.

11  BY MS. LEONIDA (Continued):

12      Q.    Have you communicated with Gay Baskin via text

13  message regarding books to the in-house checkout system?

14                  MR. ROGERS:  Same objections and instructions.

15  BY MS. LEONIDA (Continued):

16      Q.    Where did you buy the books that you donated to

17  in-house checkout system?

18                  MR. ROGERS:  Objection.  Privilege.

19                  THE WITNESS:  I think ...

20                  MR. ROGERS:  We could take a break.  I believe

21  that he did overrule that.

22                  THE WITNESS:  Yeah, I'll answer it.

23      A.    Amazon.

24  BY MS. LEONIDA (Continued):

25      Q.    I'm sorry?

1                    JONATHAN MITCHELL

2  attorney/client privilege and attorney work product privilege.

3  That shorthand is, basically, the signal when I say,

4  "Objection.  Privileged," that I will not instruct the client

5  not to answer.

6            Well, although, on the other hand, we didn't

7  talk about this local government section at all in the

8  preliminary injunction hearing.

9            MS. LEONIDA:  So is it your position that every

10 thought this witness has is subject to privilege?

11           MR. ROGERS:  No.  That's what I'm trying to work

12 out.  Of course, it's an unusual situation, but I believe -- I

13 believe that he can answer that question.  Subject to the

14 objections I've stated.

15           THE WITNESS:  No.

16 BY MS. LEONIDA (Continued):

17   Q.   Before donating books to the in-house checkout

18 system, did you make any effort to determine the legality of

19 donating books to the public library?

20           MR. ROGERS:  Objection.  Privilege.

21           And to the extent that that was legal research

22 related to the case, I would instruct you not to answer.  If

23 you can, answer outside of that.

24           THE WITNESS:  I don't see how I can answer that

25 without disclosing the extent of the legal research.

Page 52

                    JONATHAN MITCHELL

1 County have you attended?

3          MR. ROGERS:  I'll insert the same objections and

4 I believe the witness could answer to the extent you attended a

5 meeting in open court.

6          THE WITNESS:  I believe every meeting that I've

7 attended with the commissioners has been in executive session,

8 not open to the public.  I certainly understood that I was

9 having my conversations with the commissioners, county

10 commissioners of the court.

11 BY MS. LEONIDA (Continued):

12    Q.   Did you discuss donating books to the library at any

13 of the Commissioners' Court meetings that you attended?

14          MR. ROGERS:  I will object attorney/client and

15 work product and instruct him not to answer that because the

16 only interactions -- the witness has testified the only

17 interactions he had with the Court were in executive session.

18 BY MS. LEONIDA (Continued):

19    Q.   Are you aware of the Llano County requirement that if

20 a tangible item is being donated to a department, that the

21 department has to hold the item until final consideration and

22 approval by the Commissioners' Court before it's added to the

23 department's inventory?

24          MR. ROGERS:  I would object form.  I would

25 object privilege.  And I would specifically object to the

1                    JONATHAN MITCHELL

2  was such a policy?

3              MR. ROGERS:  Same objection.

4              THE WITNESS:  No.

5  BY MS. LEONIDA (Continued):

6      Q.   Why did you donate books anonymously.

7              MR. ROGERS:  I will object attorney/client

8  privilege and work product.

9              And instruct you to answer only to the extent it

10 would not reveal litigation strategy.

11             THE WITNESS:  I didn't donate them anonymously.

12 My clients knew or at least might have known.

13 BY MS. LEONIDA (Continued):

14     Q.   Why did Amber Milum then refer to you as an anonymous

15 donor in her declaration?

16             MR. ROGERS:  I will object regarding privilege

17 and work product and instruct you to answer only to the extent

18 it does not disclose attorney/client communications or

19 litigation strategy.

20             THE WITNESS:  That's not what the declaration

21 says.

22 BY MS. LEONIDA (Continued):

23     Q.   Why did Amber Milum not say in her declaration about

24 the books being donated to in-house checkout that she got them

25 from you?

1                      JONATHAN MITCHELL

2              MR. ROGERS:  I will assert the same objections

3  as the previous question with the same instructions.

4  Specifically, attorney/client privilege and work product and

5  instruct you only to answer to the extent it avoids revealing

6  client communications and avoids disclosing litigation

7  strategy.

8              THE WITNESS:  I don't see how I can answer that

9  without waiving privilege.

10              MR. ROGERS:  And that being the case, I'll

11  instruct you not to answer the question.

12              MS. LEONIDA:  And again, for the record, our

13  position is that your witness waived that privilege when he

14  made the decision to donate the books and insert himself as a

15  fact witness into this case.

16              MR. ROGERS:  Understood.  I don't think that the

17  Judge's ruling would have reached that and so we would want to

18  make that instruction and preserve that error.

19  BY MS. LEONIDA (Continued):

20      Q.   Mr. Mitchell, how do you define obscenity?

21              MR. ROGERS:  I will object to form and

22  privilege.

23              MS. LEONIDA:  Can you explain the privilege

24  objection there, counsel?

25              MR. ROGERS:  The purpose of the privilege

1                     JONATHAN MITCHELL

2     Q.   Mr. Mitchell, are you aware of Texas Penal Code

3 Section 43.24?

4              MR. ROGERS:  Objection.  To form.  And objection

5 privileged in the broader sense as previously done.  I believe

6 you can go ahead and answer.

7              THE WITNESS:  So if that's the statute that

8 contains the obscenity exemption, then, yes, I have some

9 passing familiarity with it.  I haven't studied it closely.

10             (Deposition Exhibit Number 107, E-mail, was

11              marked for identification.)

12 BY MS. LEONIDA (Continued):

13    Q.   Let me have you look at Exhibit 1 '07.

14    A.   (Witness complies.)

15    Q.   So we're looking at an E-mail that Bonnie Wallace

16 sent to Logan Harrison, Christian Mills and Andrew Murr.  Do

17 you represent Logan Harrison?

18             MR. ROGERS:  I will object to form.

19             THE WITNESS:  I have attorney/client

20 relationships with numerous members of the state legislature.

21 I couldn't tell you off the top of my head right now if   Logan

22 Harrison is one of them.  But he might be.

23 BY MS. LEONIDA (Continued):

24    Q.   Do you represent -- I'm sorry. Go ahead.

25             THE WITNESS:  But he might be.  I can't rule it

1                    JONATHAN MITCHELL

2  out.  Sorry.

3  BY MS. LEONIDA (Continued):

4      Q.    Do you represent Kirsten Mills?

5                  MR. ROGERS:  Objection to form.

6                  THE WITNESS:  Same answer, counsel.  I have

7  attorney/client relationships with numerous members of the

8  state legislature.  It is possible that Ms. Mills is one of

9  them, but I don't know that for sure.  I also have

10 attorney/client relationships with staff members in the state

11 legislature.

12 BY MS. LEONIDA (Continued):

13     Q.    But you don't know if any of the people on this

14 E-mail are people that you represent or have attorney/client

15 relationships with, right?

16                 MR. ROGERS:  Objection to form.

17                 THE WITNESS:  I can't rule out the possibility.

18 Because, again, I have many attorney/client relationships with

19 legislature and their staff and I frequently give legal advice

20 and I don't have a list in front of me right now with every one

21 of those people.

22 BY MS. LEONIDA (Continued):

23     Q.    What would the nature of your attorney/client

24 relationship be if you didn't represent the person?

25                 MR. ROGERS:  Objection to form.

1                    JONATHAN MITCHELL

2                    THE WITNESS:  Providing legal counsel and legal

3    advice.

4    BY MS. LEONIDA (Continued):

5        Q.   And do you do that -- are you on retainer with the

6    members of the legislature that you're talking about?

7                    MR. ROGERS:  Objection to form.

8                    THE WITNESS:  That's privileged.

9    BY MS. LEONIDA (Continued):

10       Q.   The question is are you their general counsel in all

11   matters or do you give them advice about specific issues?

12                   MR. ROGERS:  Objection to form.  And objection

13   to the ext- -- again, only you can determine this.  I'm not

14   able to determine if it's attorney/client or not.  But to the

15   extent it is, I would ask that you would actually let that be

16   known.

17                   THE WITNESS:  Yeah, it's privileged I'm not

18   going to answer that.

19                   I'll acknowledge the existence of an attorney

20   client, but I'm not going to get into those details.

21   BY MS. LEONIDA (Continued):

22       Q.   You've drafted legislation in the past, correct?

23                   MR. ROGERS:  Objection to form.

24                   THE WITNESS:  That's privileged as well.  I have

25   an attorney/client relationship with legislatures who had

1              JONATHAN MITCHELL

2  service authors of senate bills and house bills.

3  BY MS. LEONIDA (Continued):

4      Q.   Have you yourself directed legislation in the past?

5              MR. ROGERS:  Objection to the form.

6              And, again, I'm relying on you to object

7  privilege or not because you are the only one aware of those

8  attorney/client relationships?

9              THE WITNESS:  Whether and to what extent I have

10 drafted legislation for a client of mine is protected by

11 attorney/client privilege.

12 BY MS. LEONIDA (Continued):

13     Q.   Is all of the legislation that you have drafted,

14 legislation that you've drafted on behalf of a client?

15             MR. ROGERS:  Objection to form.

16             THE WITNESS:  Probably.  I normally establish an

17 attorney/client relationship with a legislature before I

18 provide legal services for them.  I normally do that with

19 people outside the legislature who want me to advise on

20 legislation.

21 BY MS. LEONIDA (Continued):

22     Q.   And how do you establish that attorney/client

23 relationship?

24             MR. ROGERS:  Objection to form.

25             THE WITNESS:  The specifics about how I go about

1                    JONATHAN MITCHELL

2 establishing it are privileged, but an attorney/client

3 relationship inherently exists when I'm providing legal

4 services for someone.  Regardless of whether there's a signed

5 retainer.

6 BY MS. LEONIDA (Continued):

7     Q.   Can you describe to me the nature of your law

8 practice?

9               MR. ROGERS:  Objection to form.  Objection,

10 privileged to the extent it would reach.  With privileged

11 matters, I'm certain you can answer the question without doing

12 that.

13               THE WITNESS:  My law practice is a combination

14 of litigation related work and legislation related work.

15 BY MS. LEONIDA (Continued):

16     Q.   Can you tell me about approximately what percent is

17 which?

18               MR. ROGERS:  Objection to form.

19               THE WITNESS:  It varies throughout the year.

20 When legislatures are in session I spend more time working on

21 legislation then I do when the legislatures are out of session.

22 BY MS. LEONIDA (Continued):

23     Q.   How do you choose which legislation you work on?

24               MR. ROGERS:  Objection.  Form.

25               THE WITNESS:  That's really driven by my

1                    JONATHAN MITCHELL

2

3   BY MS. LEONIDA (Continued):

4       Q.   Is it your opinion that Penal Code Section 43.24 is

5   garbage?

6                    MR. ROGERS:  Objection to form.

7                    THE WITNESS:  No.  That's not my opinion.

8   BY MS. LEONIDA (Continued):

9       Q.   Are you working on crafting legislation meant to

10  replace Penal Code Section 43.24?

11                   MR. ROGERS:  I will object to form and allow the

12  witness to object to privilege regarding the other

13  attorney/client relationship.

14                   THE WITNESS:  That's privileged.

15  BY MS. LEONIDA (Continued):

16      Q.   You have drafted ordinances about libraries and

17  library boards, correct?

18                   MR. ROGERS:  I will object to form and

19  privilege.

20                   It will be left up to the witness to make others

21  that are there.

22                   THE WITNESS:  That's privileged.

23  BY MS. LEONIDA (Continued):

24      Q.   You drafted a resolution for the city of Abilene

25  about its library; is that correct?

1               JONATHAN MITCHELL

2               MR. ROGERS:  I will object to form.

3               THE WITNESS:  That's privileged.

4               MS. LEONIDA:  Counsel, are you instructing the

5    witness not to answer.

6               MR. ROGERS:  The way I'm handling this series of

7    questions, counsel, is that these privileges, if they exist,

8    would relate to relationships that would be with other parties

9    that are outside of my knowledge.  So I think the best way to

10   proceed regarding those relationships is for Mr. Mitchell to

11   indicate whether or not that would touch on some other

12   representation outside of the current case.

13   BY MS. LEONIDA (Continued):

14      Q.   Okay.  Then I guess I should say, so, Mr. Mitchell,

15   are you refusing to answer that question?

16      A.   I'm asserting attorney/client privilege.  So, yes,

17   I'm refusing to answer.

18      Q.   Is it true that you are working on writing an

19   ordinance for Llano County, but waiting until the lawsuit is

20   resolved or at least further down the pike.

21               MR. ROGERS:  Object to form and privilege.

22   That's obviously privilege.  I would instruct you not to answer

23   that.

24               MS. LEONIDA:  Has Llano County retained you to

25   write an ordinance.

1                    JONATHAN MITCHELL

2                    MR. ROGERS:  Same objections and the same

3  instruction, excuse me, regarding that question.

4  BY MS. LEONIDA (Continued):

5      Q.   Do you represent Llano County in any endeavor other

6  than this lawsuit?

7                    I'm sorry.  In any capacity other than this

8  lawsuit?

9                    MR. ROGERS:  I would object to form and

10  privilege.

11                    THE WITNESS:  I think it's okay.

12                    MR. ROGERS:  I think even the existence of

13  any -- which, by the way, we're not conceding or admitting that

14  those relationships exist.  I think even that would be

15  privileged.  I would object to form and privilege and instruct

16  you not to answer.

17                    MS. LEONIDA:  So you're instructing the witness

18  not to answer?

19                    MR. ROGERS:  Yes.

20  BY MS. LEONIDA (Continued):

21      Q.   Okay.  So are you claiming privilege on your

22  communications with legislature -- legislators about pending

23  bills and refusing to answer those questions?

24      A.   Yes.  With my clients.

25      Q.   And are you claiming privilege regarding your

1                        JONATHAN MITCHELL

2   communications with legislatures about contemplated legislation

3   and refusing to answer?

4        A.   Yes.

5        Q.   Is it your -- are you also claiming that your work

6   with cities or counties drafting city or county ordinances is

7   privileged?

8        A.   If they're my clients, yes.

9             MR. ROGERS:   I would also object to form on

10  that.

11  BY MS. LEONIDA (Continued):

12       Q.   Is it your position that even once a county makes an

13  ordinance that you've worked on public that you're refusing to

14  answer questions about that ordinance?

15            MR. ROGERS:   Objection to form.

16            THE WITNESS:   The county's enacting an ordinance

17  does not waive the attorney/client privilege over

18  communications that I've had with my clients.

19  BY MS. LEONIDA (Continued):

20       Q.   I understand that, Mr. Mitchell.   I'm not asking

21  specifically about communications.   Is it your position that

22  you will not answer any questions about ordinances that you

23  drafted even after those ordinances are public?

24            MR. ROGERS:   Objection to form.

25       A.   No, I wouldn't go that far.   I'm willing to answer

1                     JONATHAN MITCHELL

2  questions about the ordinances.  I'm not willing to disclose

3  attorney/client communications that I've had about those

4  ordinances.  So if you want to ask me a question that doesn't

5  disclose attorney/client communications, I'll answer it.

6  BY MS. LEONIDA (Continued):

7      Q.   Okay.  Are you registered as a lobbyist with the

8  Texas Ethics Commission?

9                MR. ROGERS:  Objection to form.

10                THE WITNESS:  No.  I'm not a lobbyist.  I'm not

11  registered as one.

12  BY MS. LEONIDA (Continued):

13     Q.   I'm sorry.  I couldn't hear the last part of that

14  answer.

15                THE WITNESS:  No, I'm not a lobbyist and I am

16  not registered as one. I've never lobbied anybody.

17                (Deposition Exhibit Number 112, Document, was

18                 marked for identification.)

19  BY MS. LEONIDA (Continued):

20     Q.   I'm going to ask you to take a look at Exhibit 112?

21     A.   (Witness complies.)

22     Q.   Do you recognize that?

23     A.   Do you see what it says at the top?

24                MR. ROGERS:  I'd object to form.

25                THE WITNESS:  What does it say on the top line?

1                     JONATHAN MITCHELL

2    "Privileged and confidential."

3    BY MS. LEONIDA (Continued):

4         Q.   Do you recognize the public document that is Exhibit

5    112?

6         A.   This document --

7                   MR. ROGERS:  Object to form.

8                   Go ahead.

9                   THE WITNESS:  This document is privileged and

10   confidential, as it says.

11   BY MS. LEONIDA (Continued):

12        Q.   Do you recognize the document?

13                  MR. ROGERS:  Objection to form.

14                  THE WITNESS:  The document is privileged and

15   confidential.

16   BY MS. LEONIDA (Continued):

17        Q.   I understand.  You've read that several times now,

18   Mr. Mitchell.  Do you recognize the document?

19                  MR. ROGERS:  Objection to form.

20        A.   I'm giving you the same answer.  The document is

21   privileged and confidential.  I'm not going to say whether I

22   recognize it.

23        Q.   Did you draft this document, Mr. Mitchell?

24                  MR. ROGERS:  Objection to form.

25                  THE WITNESS:  The document is privileged and

1                    JONATHAN MITCHELL

2  confidential.

3  BY MS. LEONIDA (Continued):

4      Q.    Did you draft it?

5             MR. ROGERS:  Objection to form.

6             THE WITNESS:  It's privileged and confidential.

7  I'm asserting attorney/client privilege.

8  BY MS. LEONIDA (Continued):

9      Q.    What are your feelings about Drag Queen Story Hour,

10  Mr. Mitchell?

11            MR. ROGERS:  Objection to form.

12            THE WITNESS:  I don't have any feelings about

13  it.  Some of my clients might.

14  BY MS. LEONIDA (Continued):

15     Q.    Do you think that Drag Queen Story Hour should be

16  allowed to happen in public libraries?

17            MR. ROGERS:  Objection to form.

18            THE WITNESS:  I don't have an opinion on that

19  question.  Public libraries make those decisions, not me.

20  BY MS. LEONIDA (Continued):

21     Q.    Do you think that libraries should contain material

22  intended to arouse allow sexual desire?

23            MR. ROGERS:  Objection to form.

24            THE WITNESS:  That's for the library to decide.

25  BY MS. LEONIDA (Continued):

1                    JONATHAN MITCHELL

2              MS. LEONIDA:  I'd like to show you Exhibit 102.

3              (Deposition Exhibit Number 102, E-mail, marked

4               for identification.)

5   BY MS. LEONIDA (Continued):

6      Q.   Exhibit 102 is an E-mail from Gay Patek to

7   Bonnie Wallace that copied you, correct?

8              THE WITNESS:  Yes.

9              (Deposition Exhibit Number 103, E-mail, was

10              marked for identification.)

11  BY MS. LEONIDA (Continued):

12     Q.   I'd like you to take a look at Exhibit 103.

13     A.   (Witness complies.)

14     Q.   Exhibit 103 is an E-mail that you wrote in response

15  to Gay Patek's E-mail that was 102, right?

16             MR. ROGERS:  Objection to form.

17             THE WITNESS:  It's privileged.  It says so at

18  the bottom.

19             Look at the signature block on the bottom.

20  BY MS. LEONIDA (Continued):

21     Q.   So I'm referring to the E-mail sent on July 25th,

22  2022 at 3:07.  Subject, "Connecting you to."  The signature

23  appears to be dash Jonathan, correct?

24     A.   But at the very bottom of all of this there's a

25  signature block that automatically attaches to my

1                    JONATHAN MITCHELL

2  attorney/client communications.  And it says, "Privileged and

3  confidential attorney/client communication.  Attorney/client

4  work product."

5      Q.   Mr. Mitchell, in Exhibit 102, Gay Patek did not reach

6  out and ask you to craft an ordinance, did she?

7                MR. ROGERS:  Objection to form.

8                THE WITNESS:  That's a privileged communication

9  as well.  Both Gay Patek and Bonnie Wallace are clients of

10 mine.  Both of these exhibits are privileged.

11 BY MS. LEONIDA (Continued):

12     Q.   You do not represent Gay Patek and Bonnie Wallace in

13 the same matter, do you?

14                MR. ROGERS:  Objection to form.

15                THE WITNESS:  I have my an attorney/client

16 relationship with both of them.  My communications with them

17 and their communications with me about the material in these

18 E-mails is privileged.

19 BY MS. LEONIDA (Continued):

20     Q.   Is it your position that everybody you write to from

21 your Jonathan@MitchellLaw account, that every single

22 communication is privileged just because of the footer at the

23 bottom of it?

24                MR. ROGERS:  Objection to form.

25     A.   My position is if I'm sending an E-mail to a client,

1              JONATHAN MITCHELL

2  it's a privileged communication.

3  BY MS. LEONIDA (Continued):

4      Q.   I understand.  My question --

5      A.   I don't even need -- I don't even need to put that

6  footer in the E-mail.

7  BY MS. LEONIDA (Continued):

8      Q.   Okay.  Ms. Patek was not a client at the time you

9  sent her this E-mail, was she?

10     A.   Yes, she was.

11 BY MS. LEONIDA (Continued):

12     Q.   October 25th, 2022?

13          MR. ROGERS:  Objection to form.

14     A.   She was a client at the time.

15 BY MS. LEONIDA (Continued):

16     Q.   You had never met with her, correct?

17          MR. ROGERS:  Objection to form.

18     A.   I had an attorney/client relationship with her.  And

19 with Bonnie Wallace.

20 BY MS. LEONIDA (Continued):

21     Q.   And, in fact, what you write is, "Thanks for reaching

22 out.  I would like to draft an ordinance for the council to

23 enact."

24                    Right?

25          MR. ROGERS:  Objection to form.

1                      JONATHAN MITCHELL

2                 THE WITNESS:  It's a privileged communication.

3  BY MS. LEONIDA (Continued):

4      Q.   Had Gay Patek retained you to represent her prior to

5  you sending her this E-mail on July 25th at 3:07?

6                 MR. ROGERS:  Objection to form.

7                 THE WITNESS:  I had an attorney/client

8  relationship with her.

9  BY MS. LEONIDA (Continued):

10     Q.   When did you form that attorney/client relationship?

11                MR. ROGERS:  Objection to form.

12                THE WITNESS:  I don't recall when the exact

13 moment was, but if she reaches out to me seeking legal advice,

14 that's covered by the attorney/client privilege.  Regardless of

15 whether that's a signed retainer.

16 BY MS. LEONIDA (Continued):

17     Q.   Do you have an engagement agreement with Gay Patek?

18                MR. ROGERS:  Objection to form.

19                THE WITNESS:  That's privileged.  I have an

20 attorney/client relationship with her.

21 BY MS. LEONIDA (Continued):

22     Q.   You testified a little while ago that you never

23 drafted an ordinance unless somebody specifically asked you to;

24 is that right?

25                MR. ROGERS:  Objection to form.

1                    JONATHAN MITCHELL

2              THE WITNESS:  I don't think that's what you

3    asked or what I said.  But I'll have to go back and look at

4    exactly what the question was.

5    BY MS. LEONIDA (Continued):

6         Q.   Okay.  Then let me ask you the question again.

7         A.   Go ahead.

8         Q.   Isn't it true that you have drafted ordinances and

9    then asked people to enact them rather than having been asked

10   to draft an ordinance?

11             MR. ROGERS:  Objection to form.

12             THE WITNESS:  The ordinances that I have drafted

13   has been in the context of an attorney/client relationship.  So

14   I don't see a way to answer your question about disclosing

15   privilege material.

16   BY MS. LEONIDA (Continued):

17        Q.   Do you carry professional liability insurance?

18             MR. ROGERS:  Objection to form.

19             THE WITNESS:  No, I don't.

20   BY MS. LEONIDA (Continued):

21             Are you taking the position that every single

22   person that you talk to about legislation is somebody that you

23   thereby have an attorney/client relationship with.

24             MR. ROGERS:  Objection to form.

25             THE WITNESS:  I have an attorney/client

1                    JONATHAN MITCHELL

2  relationship with the people with whom I give legal advice and

3  with the people who seek legal advice or counsel from me.

4  BY MS. LEONIDA (Continued):

5      Q.   I think I might have asked you:  Do you have an

6  engagement letter with Gay Patek?

7                  MR. ROGERS:  Objection to form.

8      A.   It's privileged.  I'm not getting into my

9  attorney/client privileges with Gay Patek.

10 BY MS. LEONIDA (Continued):

11     Q.   Has Gay Patek paid you any money for legal services?

12                 MR. ROGERS:  Objection to form.

13                 THE WITNESS:  That's privileged as well.

14 BY MS. LEONIDA (Continued):

15     Q.   Are you refusing to answer?

16     A.   I'm asserting attorney/client privilege.  Yes, I'm

17 refusing to answer.

18     Q.   Are you taking the position that engagement letters

19 are privileged?

20                 MR. ROGERS:  Objection to form.

21                 THE WITNESS:  I'm taking the position that my

22 communications with Gay Patek are privileged.  And whether I

23 formed an attorney/client relationship with her through a

24 formal engagement letter or through some other means of

25 communication is attorney/client communication I'm not going to

1                      JONATHAN MITCHELL

2   disclose at the deposition.

3                 MS. LEONIDA:  I think I'm seeing from the court

4   reporter that we need a break.  So let's take 10 minutes.

5                 THE VIDEOGRAPHER:  Sure.  Go off the record at

6   4:57.

7                 (Momentarily off the record.)

8                 THE VIDEOGRAPHER:  This is segment number four.

9   We're back on the record, 5:03.

10  BY MS. LEONIDA (Continued):

11      Q.   Mr. Mitchell, have you ever read a book called

12  Jack (Not Jackie)?

13                MR. ROGERS:  Objection to form.

14                THE WITNESS:  No.

15  BY MS. LEONIDA (Continued):

16      Q.   Why would you say that this book should be removed

17  from public libraries to prevent children from accessing it?

18                MR. ROGERS:  Objection to form.

19                THE WITNESS:  That's a loaded question.  I never

20  even heard of this book.

21  BY MS. LEONIDA (Continued):

22      Q.   Isn't it true that Ms. Patek wrote you a letter

23  complaining about the book Jack (Not Jackie) and you responded

24  that you would like to draft an ordinance which will remove

25  this material from the public libraries and prevent children

1                    JONATHAN MITCHELL

2       Q.   Why would they be paying your legal fees?

3            MR. ROGERS:   Objection, form.

4       A.   Who said they were paying my legal fees?

5  You asked me if they were paying my legal fees in

6  this case, and I said no.

7       Q.   Are they paying your legal fees in any

8  case?

9            MR. ROGERS:   Objection, form.

10           THE WITNESS:   I need to discuss with

11 co-counsel.   Can we go off the record?

12           THE VIDEOGRAPHER:   5:14.

13           (A DISCUSSION WAS HELD OFF THE RECORD.)

14           THE VIDEOGRAPHER:   Segment number 6.

15 We're back on the record at 5:15.

16      A.   All right.   So to answer your question, I

17 perform legal services for America First Legal, so

18 I consider my relationship with them to be an

19 attorney/client relationship.   So I'm going to

20 assert privilege over your question.

21 BY MS. LEONIDA:

22      Q.   And are you refusing to answer it?

23      A.   Yes.   I'm asserting attorney/client

24 privilege.

25      Q.   Do you have any idea why Bonnie Wallace

1                    JONATHAN MITCHELL

2   would think that America First Legal is collecting

3   money to pay your legal fees in this case?

4            MR. ROGERS:  Objection, form.

5       A.   I don't know why Bonnie would think that.

6   It's not true.

7       Q.   Is it true that you are drafting an

8   omnibus legislation, omnibus anti-woke legislation?

9            MR. ROGERS:  Objection, form.

10      A.   Any legislation that I draft is on behalf

11  of a client and it's subject to attorney/client

12  privilege.

13      Q.   What does the word "woke" mean to you?

14           MR. ROGERS:  Objection, form.

15      A.   I've never tried to create a

16  comprehensive definition of that term.

17      Q.   Whether or not comprehensively, what do

18  you think the term means?

19           MR. ROGERS:  Objection, form.

20      A.   It's a shorthand that many people use.

21  Nothing more than that.

22      Q.   Shorthand for what?

23           MR. ROGERS:  Objection, form.

24      A.   Shorthand for an ideology that many

25  people oppose for different reasons.

1                    JONATHAN MITCHELL

2  not really thinking about new cases to bring.  I'm

3  more thinking about how I can reduce my workload.

4       Q.   So you're not looking for a white client

5  interested in buying a home and applying for a

6  mortgage from Wells Fargo as a plaintiff?

7            MR. ROGERS:  Objection, form.

8       A.   I'm going to assert attorney/client

9  privilege over that as well as work product

10 privilege.

11      Q.   Do you think it's important to dewoke the

12 judiciary?

13           MR. ROGERS:  Objection, form.

14      A.   I don't know what you mean by that.

15      Q.   Is that anything that you've ever said,

16 that you want to dewoke the judiciary?

17           MR. ROGERS:  Objection, form.

18      Q.   Sorry.  Dewokeify the judiciary.

19           MR. ROGERS:  Same objection.

20      A.   I've never used that phrase outside the

21 context of an attorney/client communication.  And

22 if I have used that phrase in the context of a

23 communication with a client, it's privileged.

24      Q.   Are you aware that Ron Cunningham told

25 Bonnie Wallace that he would shut the library if

                    JONATHAN MITCHELL

1

2 the plaintiffs won this case?

3          MR. ROGERS:  Objection, form.  And

4 objection, attorney/client and attorney work

5 product.  Privileged to the extent that it would

6 reach attorney/client communications beyond simple

7 communications between Ms. Wallace and

8 Mr. Cunningham.

9     A.   If I learned of that, it would have been

10 through a privileged attorney/client communication.

11 So there's no way to answer that without waiving

12 privilege.

13     Q.   Have you looked at any of the discovery

14 in this case?

15          MR. ROGERS:  Object, form and attorney

16 and work product privilege -- attorney/client and

17 work product privilege to the extent it would lead

18 to any discussion of conversations or litigation

19 strategy.

20     A.   Yeah.  I don't think there's a way to

21 answer that without waiving privilege.

22     Q.   So you're refusing to answer the question

23 have you looked at any discovery?

24          THE WITNESS:  What do you think?

25          MR. ROGERS:  I think you would answer

1                    JONATHAN MITCHELL

2      A.   My hourly rate varies depending on the

3   client, the case.  Sometimes it's -- there's a

4   range.  It all depends.

5      Q.   What is your hourly rate in this case?

6           THE WITNESS:  Privileged or not?

7           MR. ROGERS:  Have we asserted a claim for

8   attorneys' fees in any matter?

9           THE WITNESS:  We can't get fees.  We're

10  the defendants.

11          MR. ROGERS:  I don't believe that we have

12  and I don't believe that we can.  And to the extent

13  that we can't, I'm not sure that it's relevant.

14          Let me object to the form of that, and

15  you can go ahead and answer if you know.

16          THE WITNESS:  I think my rate is

17  privileged.  We haven't waived that.

18          MR. ROGERS:  Allow me a moment to think.

19  I apologize again.  This is an unusual

20  circumstance.  Let me put it through the computer a

21  bit.

22          We certainly aren't seeking attorneys'

23  fees, so I don't believe it would be relevant in

24  that regard.  The amount of the fee -- yeah, I

25  would be more concerned about a waiver, and I'm not

1                    JONATHAN MITCHELL

2  sure that the information would lead to anything

3  particularly relevant under the circumstances.

4           So I'm going to object to form and

5  privilege, attorney/client and work product, and

6  instruct you not to answer.

7           THE WITNESS:  Yeah, I think that's right.

8      Q.   How did you pay for the books that you

9  ordered on Amazon for the in-house checkout?

10          MR. ROGERS:  Objection, form -- pardon

11 me.  I've gotten so used to that.  I don't think

12 that one needs that.

13     A.   I paid with my own money.

14     Q.   Did you bill the County for that money?

15     A.   No.

16     Q.   Do you intend to ask the County to

17 reimburse you for that money?

18     A.   No.

19     Q.   Why not?

20          MR. ROGERS:  I'm going to actually -- I

21 know it's a bit ticky-tack, but I would object to

22 form and privilege to the extent that the answer to

23 that question could reach strategy.  I don't

24 believe that it does, however.

25          Go ahead and answer it if you can.

1                    JONATHAN MITCHELL

2   represented General Paxton in court.  I've never

3   given him legal advice directly.  I do speak

4   sometimes with people in his office in a manner

5   that I would regard as protected by the

6   attorney/client privilege.

7        Q.   How do you keep track of your clients?

8             MR. ROGERS:  Objection, form.

9        A.   I think that goes into attorney work

10  product.  I'm going to assert privilege over that.

11       Q.   And refuse to answer?

12       A.   Yes.

13            MS. LEONIDA:  Okay.  I don't have any

14  other questions.

15            MR. ROGERS:  I have no questions.

16            THE VIDEOGRAPHER:  Off the record at

17  5:42.

18            THE COURT REPORTER:  Mr. Rogers, do you

19  want a copy of this deposition?

20            MR. ROGERS:  The answer is yes, but --

21  I've been saying this all week.  The others are

22  probably tired of hearing it.

23            Our purchasing system requires a purchase

24  order that identifies the vendor ahead of time.

25  I'm not able to do that because I never know who

1                    JONATHAN MITCHELL

2                  C E R T I F I C A T E

3

4          I do hereby certify that the foregoing

5   proceedings were taken down by me and transcribed

6   using computer-aided transcription and that the

7   foregoing is a true and correct transcript of said

8   proceedings.

9          I further certify that I am neither of

10   counsel nor of kin to any of the parties, nor am I

11   in anywise interested in the result of said cause.

12

13

14   pgs 1-103

        _____
15                 DARLENE MAY, CSR
                   TEXAS CSR #9026
16

17

18

19   pgs 103-119

        _____
20                 DEBRA AMOS ISBELL, CCR,RDR,CRR
                   NCRA #29238
21

22   Dated: April 5, 2023

23

24

25

**To:**     Bonnie N. Wallace[mrs.bobwallace@gmail.com]
**Cc:**     jonathan@mitchell.law[jonathan@mitchell.law]
**From:**   Gay Patek[gpatek1@gmail.com]
**Sent:**   Mon 7/25/2022 3:02:42 PM (UTC-05:00)
**Subject:** Re: Connecting you two!
<u>VPL response to Citizen's Request 9.16.21.pdf</u>



7.25.22

Greetings Mr. Mitchell,

My name is Gay Patek and I live in Victoria, Texas. Bonnie Wallace and I became friends as we found ourselves fighting the same battle, but in different locations in Texas. Our desire is to protect the innocence of children with age and content appropriate books purchased for our public libraries with our taxpayer dollars or even donated to the library.

A little about me. I have been married to my husband, Gary, for 43 years. We have three grown children who are all married with families of their own, which include our 11 grandchildren.

Four of my grandchildren are homeschooled in Victoria. They often go to the library to look at and read books. They are 8 and under. My daughter in law saw several age and content inappropriate books in the picture book section of the library on transgenderism in April 2021. You can listen to her explain the issue she has with these books <u>here</u> at the June 21, 2022 City Council Meeting. This is basically how it all started. She contacted me and said she didn't think she could go to the library anymore with her children and she texted me pictures of two books from the Picture Book section that she found: <u>Jack, Not Jackie</u> by Erica Silverman and <u>I Am Not A Girl</u> by Maddix Lyons.

That had me wondering what other books were in the library of this nature. I began to search our Victoria Public Library online card catalog. I used the terminology of transgender, gender identity and LGBTQ because of the T in LGBTQ.

In the original list I compiled, I found 20 + books in the picture book section(Ages 4-8), 30+ plus books in the juvenile 8-12 year old section and 150 books in the Young Adult (YA) 12-18 year old, under the above search words. Mind you, I knew nothing of what was in these books other than from my word search. When we (22 women) started reading the books from this list to request the library to reevaluate these books, that was when we also found sexually explicit books that were on the list. We read 43 books for reevaluation. We turned in our Citizen's Request For Reevaluation Form to the Library Director in August of 2021.

Most of us asked the Library Director, Dayna Williams-Capone, to remove these age and content inappropriate books from the library. Some requested that the books be moved to a different section in the library. The Library Director replied to all of us that the library collection policy was used in selecting these books so she didn't see any need to remove them. (Please find the attached letter.) While the books were in the reevaluation process they were removed from the shelves and couldn't be checked out.

After we received the rejection letter 12 women appealed the Library Directors decision to the Library Advisory Board. There are 12 members on the board. There were 22 books that went before the Board. Some books didn't get appealed due to personal reasons. I asked God about that and I saw His hand in it. Our Library Advisory Board is making changes to the Library Collection Policy and they would like to put something in that states a book can only be appealed every three years. Our goal is to change the Library Advisory Board make up and the other 21 books can be appealed when a more favorable outcome can occur.

Back to the story: Twenty-two Books were appealed at the November regular Library Advisory Board meeting and they chose to take more time before they made their decision. At the specially called Library Advisory Board meeting in December there was an 8-1 decision on most of the books to follow the recommendation of the Library Director.

A small group of us continue to go to the Library Advisory Board meetings in February, May and June of 2022. We also began talking with all of our City Council members. We have the City's attention because at the past two Library Advisory Board meetings the City Manager, Jesus Garza and the City Attorney, Allison Lacey, have been present instead of just the Assistant City Manager, Darrek Ferrell.

The Library Advisory Board hasn't been listening to us. I requested that as they review their Collection Policy that they should craft a separate Children's Collection Policy. They act like that can't be done. The Library Director and City Attorney are afraid of a lawsuit. I even brought up that the new president elect for the American Library Association is an avowed Marxist. They didn't seem to bat an eye. That is when it was decided to take our concerns to the City Council meetings this summer.

We have attended 4 meetings this summer, two more to go. New acquisitions, or holdings as they are called, come in all the time to our library. We are asking the City Council to have our library write a Children's Collection Policy that reflect our community standards. This is not banning books. It is putting boundaries on books. This is no different than putting age restrictions on alcohol, tobacco, driving, etc. I'm sure you already understand this. I'm just giving you a quick overview of the situation.

Also, our Mayor, Jeff Bauknight, mentioned to me in passing that his plan was to freeze the library's acquisitions budget, which is projected to be 183K out of a 2.33 million dollar budget until the library can bring itself alongside our community. We vote 70% conservative in our primaries, but this is an issue everyone can support.

We have 6 City Council members, not including the Mayor. He needs to have the majority with him to withhold acquisitions and I believe he does.

This is not a battle God will lose. It is a battle we will lose because of the inaction of the body of Christ. We are working on getting pastors involved because we believe our future is at stake.

We have a core group that meets the 2nd and 4th Thursday of the month. We have a meeting this Thursday. I would love to tell them something about you, what you think you can do for our community and what our responsibilities are.

Serving Him,

Gay Patek
106 Oxford St
Victoria, Texas
361-649-7013

PS If you need more examples of books let me know.
On Thu, Jul 21, 2022 at 9:19 PM Bonnie N. Wallace <mrs.bobwallace@gmail.com> wrote:

Jonathan Mitchell, meet Gay Patek from Victoria.
Gay Patek, meet Jonathan Mitchell.

Jonathan & Gay,

After speaking with all the communities currently battling harmful content in their local libraries, I have decided that Victoria, Texas is the best shot at having a winning streak right out of the gate!

Jonathan's cell number (please don't share) is 703-314-9276

Gay's cell number is 361-649-7013

Please keep me posted as I battle along side you both! May God bless your endeavors to protect our children from harmful content and LGBT agendas being crammed down their throats.

Bonnie N. Wallace
(956) 330-8106 (cell)



**CITY OF VICTORIA**
Established 1824, Founded By Congress, Republic of Texas, 1839

**VICTORIA PUBLIC LIBRARY**
302 N. Main

September 16, 2021

Gay Patek
106 Oxford St.
Victoria, TX 77904

Dear Ms. Patek,

I have received your request for re-evaluation of materials at Victoria Public Library. In reviewing your request, I referred to our collection development policy, which is established by our volunteer Library Advisory Board. Our staff follows this policy when selecting resources for the library.

The policy is designed "to provide the community with a well-balanced collection of materials in a variety of formats, reflecting a wide range of views, opinions, and interests." I have included a copy of this policy along with this letter. After reviewing the items based upon the criteria set out in our policy, I recommend keeping these titles.

Additionally, I do not recommend moving these titles to an alternative location within the collection. Doing so would disrupt our system of organization and place an undue burden on library users who want to access these titles.

I want to thank you for submitting your concerns to us. We always appreciate any feedback that we receive from our community members. Thank you for your continued support of the Victoria Public Library.

Sincerely,

Dayna Williams-Capone

Dayna Williams-Capone
Director
Victoria Public Library

VICTORIA, TEXAS 77901-6592          (361) 485-3304          FAX (361) 485-3295

Cc:        Bonnie N. Wallace[mrs.bobwallace@gmail.com]
To:        Gay Patek[gpatek1@gmail.com]
From:      Jonathan Mitchell[jonathan@mitchell.law]
Sent:      Mon 7/25/2022 3:07:23 PM (UTC-05:00)
Subject:   Re: Connecting you two!

Gay:

Thanks for reaching out. I would like to draft an ordinance for the city council to enact, which will remove this material from the public libraries and prevent children from accessing it. It needs to be drafted carefully because it may provoke lawsuits.

Would the city council be willing to enact an ordinance along these lines? I'd be happy to call into one of your future group meetings on Thursday.

—Jonathan

**PLAINTIFF'S EXHIBIT**
**103**

On Jul 25, 2022, at 4:02 PM, Gay Patek <gpatek1@gmail.com> wrote:

7.25.22

Greetings Mr. Mitchell,

My name is Gay Patek and I live in Victoria, Texas.  Bonnie Wallace and I became friends as we found ourselves fighting the same battle, but in different locations in Texas. Our desire is to protect the innocence of children with age and content appropriate books purchased for our public libraries with our taxpayer dollars or even donated to the library.

A little about me. I have been married to my husband, Gary, for 43 years.  We have three grown children who are all married with families of their own, which include our 11 grandchildren.

Four of my grandchildren are homeschooled in Victoria. They often go to the library to look at and read books.  They are 8 and under.  My daughter in law saw several age and content inappropriate books in the picture book section of the library on transgenderism in April 2021.  You can listen to her explain the issue she has with these books here at the June 21, 2022 City Council Meeting. This is basically how it all started. She contacted me and said she didn't think she could go to the library anymore with her children and she texted me pictures of two books from the Picture Book section that she found: Jack, Not Jackie by Erica Silverman and I Am Not A Girl by Maddix Lyons.

That had me wondering what other books were in the library of this nature.  I began to search our Victoria Public Library online card catalog.  I used the terminology of transgender, gender identity and LGBTQ because of the T in LGBTQ.

In the original list I compiled, I found 20 + books in the picture book section(Ages 4-8), 30+ plus books in the juvenile 8-12 year old section and 150 books in the Young Adult (YA) 12-18 year old, under the above search words. Mind you, I knew nothing of what was in these books other than from my word search.  When we (22 women)  started reading the books from this list to request the library to reevaluate these books, that was when we also found sexually explicit books that were on the list. We read 43 books for reevaluation. We turned in our Citizen's Request For Reevaluation Form to the Library Director in August of 2021.

Most of us asked the Library Director, Dayna Williams-Capone, to remove these age and content inappropriate books from the library.  Some requested that the books be moved to a different section in the library.  The Library Director replied to all of us that the library collection policy was used in selecting these books so she didn't see any need to remove them. (Please find the attached letter.) While the books were in the reevaluation process they were removed from the shelves and couldn't be checked out.

After we received the rejection letter 12 women appealed the Library Directors decision to the Library Advisory Board.  There are 12 members on the board. There were 22 books that went before the Board.  Some books didn't

get appealed due to personal reasons. I asked God about that and I saw His hand in it.  Our Library Advisory Board is making changes to the Library Collection Policy and they would like to put something in that states a book can only be appealed every three years. Our goal is to change the Library Advisory Board make up and the other 21 books can be appealed when a more favorable outcome can occur.

Back to the story: Twenty-two Books were appealed at the November regular Library Advisory Board meeting and they chose to take more time before they made their decision.  At the specially called Library Advisory Board meeting in December there was an 8-1 decision on most of the books to follow the recommendation of the Library Director.

A small group of us continue to go to the Library Advisory Board meetings in February, May and June of 2022.  We also began talking with all of our City Council members. We have the City's attention because at the past two Library Advisory Board meetings the City Manager, Jesus Garza and the City Attorney, Allison Lacey, have been present instead of just the Assistant City Manager, Darrek Ferrell.

The Library Advisory Board hasn't been listening to us. I requested that as they review their Collection Policy that they should craft a separate Children's Collection Policy. They act like that can't be done.  The Library Director and City Attorney are afraid of a lawsuit.  I even brought up that the new president elect for the American Library Association is an avowed Marxist. They didn't seem to bat an eye.  That is when it was decided to take our concerns to the City Council meetings this summer.

We have attended 4 meetings this summer, two more to go. New acquisitions, or holdings as they are called,  come in all the time to our library. We are asking the City Council to have our library write a Children's Collection Policy that reflect our community standards.   This is not banning books.  It is putting boundaries on books.  This is no different than putting age restrictions on alcohol, tobacco, driving, etc. I'm sure you already understand this. I'm just giving you a quick overview of the situation.

Also, our Mayor, Jeff Bauknight, mentioned to me in passing that his plan was to freeze the library's acquisitions budget, which is projected to be 183K out of a 2.33 million dollar budget until the library can bring itself alongside our community.  We vote 70% conservative in our primaries, but this is an issue everyone can support.

We have 6 City Council members, not including the Mayor. He needs to have the majority with him to withhold acquisitions and I believe he does.

This is not a battle God will lose.  It is a battle we will lose because of the inaction of the body of Christ. We are working on getting pastors involved because we believe our future is at stake.

We have a core group that meets the 2nd and 4th Thursday of the month.  We have a meeting this Thursday.  I would love to tell them something about you, what you think you can do for our community and what our responsibilities are.

Serving Him,

Gay Patek
106 Oxford St
Victoria, Texas
361-649-7013

PS If you need more examples of books let me know.

On Thu, Jul 21, 2022 at 9:19 PM Bonnie N. Wallace <mrs.bobwallace@gmail.com> wrote:

Jonathan Mitchell, meet Gay Patek from Victoria.
Gay Patek, meet Jonathan Mitchell.

Jonathan & Gay,

After speaking with all the communities currently battling harmful content in their local libraries, I have decided that Victoria, Texas is the best shot at having a winning streak right out of the gate!

Jonathan's cell number (please don't share) is 703-314-9276

Gay's cell number is 361-649-7013

Please keep me posted as I battle along side you both!  May God bless your endeavors to protect our children from harmful content and LGBT agendas being crammed down their throats.

Bonnie N. Wallace
(956) 330-8106 (cell)

<VPL response to Citizen's Request 9.16.21.pdf>

----------------------------
Jonathan F. Mitchell
Mitchell Law PLLC
111 Congress Avenue, Suite 400
Austin, Texas 78701
(512) 686-3940 (phone)
(512) 686-3941 (fax)
jonathan@mitchell.law
 papers.ssrn.com/sol3/cf_dev/AbsByAuth.cfm?per_id=791842

**CONFIDENTIALITY NOTICE:**
This e-mail and any attachments are confidential and legally privileged. This information is intended only for the use of the individual or entity to whom it was sent as indicated above. If you are not the intended recipient, any disclosure, copying, distribution, or action taken in reliance on the contents of the information contained in this electronic mail message is strictly prohibited. If you have received this message in error, please delete it immediately, and call (512) 686-3940 to let me know that you received it. Thank you.

**PRIVILEGED AND CONFIDENTIAL — ATTORNEY–CLIENT COMMUNICATION / ATTORNEY WORK PRODUCT**



**DRAFT ORDINANCE—PRIVILEGED AND CONFIDENTIAL**

ORDINANCE ESTABLISHING RULES AND REGULATIONS FOR THE PUBLIC LIBRARY SYSTEM IN ABILENE, TEXAS.

BE IT ORDAINED BY THE CITY COUNCIL OF ABILENE THAT:

**Section 1.** This ordinance shall be known as the "Safe Library Patron Protection Act."

**Section 2.** The Abilene City Code is amended by adding Chapter 25.5 to read as follows:

## Chapter 25.5 — PUBLIC LIBRARIES

<u>**Sec. 25.5-1. — Definitions.**</u> As used in this chapter, the following terms shall have the respective meanings ascribed to them:

<u>*Book*</u>: Any type of book, including but not limited to e-books, audio books, and physical books.

<u>*Drag attire:*</u> Clothing or makeup meant to exaggerate a specific gender identity, usually (but not always) a gender identity that departs from an individual's biologically assigned sex.

<u>*Drag queen story hour:*</u> Any event in which an individual or individuals wearing drag attire read or perform to minors in a public library.

<u>*Electronic device*</u>: Any device with the capability to store, record, and/or transmit text, images, video, or audio data. Examples of such devices include, but are not limited to: computers, smart phones, laptops, tablets, and e-Readers.

<u>*Filth:*</u> Any depictions, descriptions, or representations intended to arouse or gratify the sexual desire of those who read, see, hear, or handle them.

<u>*Immoral content:*</u> Any instructions or guidance on how to obtain child pornography or obscenity.

<u>*Interactive computer service:*</u> Any information service, system, or access software provider that provides or enables computer access by multiple users to a computer server, including specifically a service or system that provides access to the Internet and such systems operated or services offered by libraries or educational institutions.

<u>*LGBTQ flag or emblem:*</u> Any flag or emblem intended to display support for lesbianism, homosexuality, bisexuality, transgenderism, gender non-conforming behavior, or the individuals who engage in such conduct. It includes, but is not necessarily limited to:

1

(1) The rainbow flag, which depicts the colors of the rainbow as horizontal stripes, and any variations on this design;

(2) The equality flag, which depicts a yellow equals sign against a blue background, and any variations on this design; and

(3) The transgender flag, which consists of five horizontal stripes: two light blue and two pink, with a white stripe in the center, and any variations on this design.

*LGBTQ Pride Month:* The designation of any month or other period of time for commemorating lesbianism, homosexuality, bisexuality, transgenderism, gender non-conforming behavior, or the individuals who engage in such conduct.

*Pornography:* Any visual depictions of nudity intended to arouse or gratify the sexual desire of the viewer.

*Public library:* The Abilene Public Library, and all of its branch libraries and mobile library units.

## Sec. 25.5-2  Drag Queen Story Hour Prohibited

(a) Notwithstanding any other law, the public library may not host drag queen story hour, nor permit any individual or individuals wearing drag attire to read or perform to minors in the public library.

(b) Notwithstanding any other law, no adverse action or threats of any sort may be taken or made by the city of Abilene, or by any officer, employee, or agent of this city, against any person in response to that person's violation or violations of Subsection (a), and the sole and exclusive consequence for violating Subsection (a) shall be exposure to private civil liability as set forth in Section 25.5-9. This section does not preclude or limit the enforcement of any other law or regulation against conduct that is independently prohibited by such other law or regulation, and that would remain prohibited by such other law or regulation in the absence of this section.

## Sec. 25.5-3  Filthy, Pornographic, or Immoral Books

(a) Notwithstanding any other law, the public library may not purchase or accept donations of any book, magazine, or publication containing filth, pornography, or immoral content, or place or maintain any such book on its shelves or in its catalogue.

(b) Any library patron who becomes aware of a book, magazine, or publication in the public library containing filth, pornography, or immoral content may ask an employee, volunteer, or agent of the public library to weed or remove the offending material.

2

## Sec. 25.5-4  Books In Sections Designated For Minors

(a) Notwithstanding any other law, the public library may not place or maintain in a section of the library designated for minors any book, magazine, or publication that contains depictions or descriptions of any of the following:

(1) Nudity that contains depictions or descriptions of buttocks, genitalia, female breasts, or breasts that have been artificially implanted or augmented on biological males;

(2) Sexual intercourse;

(3) Sodomy or buggery;

(4) Fellatio;

(5) Rape;

(6) Any type of sexual act between individuals;

(7) Pederasty;

(8) Pedophilia;

(9) Any type of romantic or sexual attraction between an adult and a minor;

(10) Masturbation, including mutual masturbation;

(11) Sadomasochism;

(12) Bestiality;

(13) Cross-dressing;

(14) Transvestism;

(15) Gender dysphoria;

(16) Transgenderism;

(17) The terms "cisgender," "pansexual," "genderqueer," "gender fluid," or "genderless";

(18) Gender identities inconsistent with biological sex;

(19) Suicide, self-harm, or self-mutilation;

(20) Excretory functions;

(21) Luring, directing, or referring minors to content, websites, or material that contains depictions or descriptions of any of the topics listed in this subsection.

3

(b) Any library patron who becomes aware of such a book, magazine, or publication in a section of the library designated for minors may ask an employee, volunteer, or agent of the public library to relocate it to a section of the library that is not designated for minors.

(c) No book described in subsection (a) may be read aloud, promoted, or displayed with the cover visible to minors at any location within the public library or on any property owned by the city of Abilene.

## Sec. 25.5-5  Internet or Network Filters

(a) The public library shall operate a technology protection measure with respect to each of its computers and electronic devices with Internet access that protects against access through such computers and electronic devices to any of the following:

(1) Child pornography as defined in 18 U.S.C. § 2256(8);

(2) Obscenity that falls outside the protections of First Amendment as interpreted by the Supreme Court of the United States; and

(3) Pornography.

(b) An administrator, supervisor, or other authority may disable a technology protection measure under Subsection (a) to enable access for bona fide research or other lawful purposes.

(c) Any person who becomes aware that information or material described in Subsection (a) is accessible through internet service provided by a public library or government-owned building in Abilene may notify an administrator, supervisor, or other authority and request that it block access to that information or material.

## Sec. 25.5-6  Prohibited Membership in Certain Library Associations

(a) The public library may not belong to or maintain membership in the American Library Association or the Texas Library Association.

## Sec. 25.5-7  LGBTQ Flags Or Emblems Prohibited

(a) Notwithstanding any other law, no LGBTQ flag or emblem may be displayed or maintained in the public library or on the building or grounds of any building owned by the city of Abilene by any employee, volunteer, or agent of the public library or the city of Abilene.

(b) Notwithstanding any other law, no adverse action or threats of any sort may be taken or made by the city of Abilene, or by any officer, employee, or agent of this city, against any person in response to that person's violation or violations of Subsection (a), and the sole and exclusive consequence for violating Subsection (a)

4

shall be exposure to private civil liability as set forth in Section 25.5-9. This section does not preclude or limit the enforcement of any other law or regulation against conduct that is independently prohibited by such other law or regulation, and that would remain prohibited by such other law or regulation in the absence of this section.

## Sec. 25.5-8 LGBTQ Pride Month Not Recognized

(a) Notwithstanding any other law, no employee, volunteer, or agent of the public library or the city of Abilene may take any action that recognizes or acknowledges the month of June or any other period of time as LGBTQ Pride Month during their working time in the public library or for the city of Abilene.

(b) Notwithstanding any other law, no adverse action or threats of any sort may be taken or made by the city of Abilene, or by any officer, employee, or agent of this city, against any person in response to that person's violation or violations of Subsection (a), and the sole and exclusive consequence for violating Subsection (a) shall be exposure to private civil liability as set forth in Section 25.5-9. This section does not preclude or limit the enforcement of any other law or regulation against conduct that is independently prohibited by such other law or regulation, and that would remain prohibited by such other law or regulation in the absence of this section.

## Sec. 25.5-9  Private Right of Action

(a) Any person, other than the city of Abilene, and any officer or employee of the city, has standing to bring and may bring a civil action against:

(1) Any person who violates Section 25.5-2(a) by allowing drag queen story hour in the public library, or by allowing any individual or individuals wearing drag attire to read or perform to minors in the public library;

(2) Any person who reads or performs to minors in the public library while wearing drag attire;

(3) Any person who violates Section 25.5-4(c);

(4) Any person who aids or abets the conduct prohibited by Sections 25.5-2(a) or 25.5-4(c);

(5) The public library if it:

(A) fails to weed or remove a book described in Section 25.5-3(a) after being asked to do so pursuant to Section 25.5-3(b);

(B) fails to relocate a book described in Section 25.5-4(a) after being asked to do so pursuant to Section 25.5-4(b);

5

(C) fails to block Internet access to information or material described in Section 25.5-5(a)(1)–(3) after being asked to do so pursuant to Section 25.5-5(c); or

(D) joins, belongs to, or maintains membership in the American Library Association or Texas Library Association in violation of Section 25.5-6, on or after January 1, 2023.

(b) If a claimant prevails in an action brought under Subsection (a), the court shall award:

(1) injunctive relief sufficient to prevent the defendant from violating this chapter;

(2) nominal and compensatory damages if the plaintiff has suffered injury or harm from the defendant's conduct, including but not limited to emotional distress;

(3) statutory damages in an amount of not less than $10,000 for each violation of this chapter; and

(4) costs and attorney's fees.

(c) Notwithstanding Subsection (b), a court may not award relief under Subsection (b)(3) or (b)(4) in response to a violation of this chapter if the defendant demonstrates that a court has already ordered the defendant to pay the full amount of statutory damages under Subsection (b)(3) in another action for that particular violation of this chapter.

(d) Notwithstanding any other law, a person may bring an action under this section not later than the sixth anniversary of the date the cause of action accrues.

(e) Notwithstanding any other law, the following are not a defense to an action brought under Subsection (a):

(1) ignorance or mistake of law;

(2) a defendant's belief that the requirements or provisions of this chapter are unconstitutional or were unconstitutional;

(3) a defendant's reliance on any court decision that has been vacated, reversed, or overruled on appeal or by a subsequent court, even if that court decision had not been vacated, reversed, or overruled when the cause of action accrued;

(4) a defendant's reliance on any state or federal court decision that is not binding on the court in which the action has been brought;

(5) a defendant's reliance on any federal statute, agency rule or action, or treaty that has been repealed, superseded, or declared invalid or unconstitutional.

even if that federal statute, agency rule or action, or treaty had not been repealed, superseded, or declared invalid or unconstitutional when the cause of action accrued;

(6) non-mutual issue preclusion or non-mutual claim preclusion;

(7) contributory or comparative negligence;

(8) assumption of risk; and

(9) governmental or official immunity, each of which is waived and abrogated in any action brought under Subsection (a).

(f) Notwithstanding any other law, neither the city of Abilene, nor any officer or employee of the city of Abilene may:

(1) act in concert or participation with anyone who brings suit under this section;

(2) establish or attempt to establish any type of agency or fiduciary relationship with a person who brings suit under this section;

(3) make any attempt to control or influence a person's decision to bring suit under this section or that person's conduct of the litigation; or

(4) intervene in any action brought under this section.

This subsection does not prohibit a person or entity described by this subsection from filing an amicus curiae brief in the action, so long as that person or entity does not act in concert or participation with the plaintiff or plaintiffs who sue under this section or violate any provision of Subsection (f)(1)–(4).

(g) Notwithstanding any other law, a court may not award costs or attorneys' fees to a litigant who is sued under this section.

(h) Notwithstanding any other law, a civil action under this section may be brought only in the district courts of the state of Texas and may not be considered by any municipal or county court.

(i) A defendant against whom an action is brought under Subsection (a) may assert an affirmative defense if:

(1) the imposition of civil liability on the defendant will violate rights, privileges, or immunities secured by the Constitution or laws of the United States or by the Constitution or laws of the state of Texas, that belong to the defendant personally; or

(2) the defendant

7

(A) has standing to assert the rights, privileges, or immunities of a third party under the tests for third-party standing established by the Supreme Court of the United States or the Supreme Court of Texas; and

(B) demonstrates that the imposition of civil liability on the defendant will violate rights, privileges, or immunities secured by the Constitution or laws of the United States, or by the Constitution or laws of the state of Texas, that belong to that third party.

(j) Nothing in this section or chapter shall limit or preclude a defendant from asserting the unconstitutionality of any provision or application of this ordinance as a defense to liability under Subsection (a), or from asserting any other defense that might be available under any other source of law.

## Sec. 25.5-10  Severability

(a) Mindful of *Leavitt v. Jane L.*, 518 U.S. 137 (1996), in which in the context of determining the severability of a state statute the Supreme Court of the United States held that an explicit statement of legislative intent is controlling, it is the intent of the city council that every provision, section, subsection, sentence, clause, phrase, or word in this chapter, and every application of the provisions in this chapter to every person, group of persons, or circumstances, are severable from each other.

(b)  If any application of any provision in this chapter to any person, group of persons, or circumstances is found by any court to be invalid, preempted, or unconstitutional, for any reason whatsoever, then the remaining applications of that provision to all other persons and circumstances shall be severed and preserved, and shall remain in effect. All constitutionally valid applications of the provisions in this chapter shall be severed from any applications that a court finds to be invalid, preempted, unconstitutional, because it is the city council's intent and priority that every single valid application of every provision in this chapter be allowed to stand alone.

(c) The city council further declares that it would have enacted this chapter, and each provision, section, subsection, sentence, clause, phrase, or word, and all constitutional applications of the provisions of this chapter, irrespective of the fact that any provision, section, subsection, sentence, clause, phrase, or word, or applications of this chapter were to be declared invalid, preempted, or unconstitutional.

(d) If any provision of this chapter is found by any court to be unconstitutionally vague, then the applications of that provision that do not present constitutional vagueness problems shall be severed and remain in force, consistent with the severability requirements of Subsections (a), (b), and (c).

8

(e) No court may decline to enforce the severability requirements of Subsections (a), (b), (c), and (d) on the grounds that severance would "rewrite" the provisions of this chapter or involve the court in legislative or lawmaking activity. A court that declines to enforce or enjoins a state or local official from enforcing a statute or ordinance is never rewriting the underlying law or engaging in legislative or lawmaking activity, as the statute or ordinance continues to contain the same words as before the court's decision. A judicial injunction or declaration of unconstitutionality:

(1)  is nothing more than an edict prohibiting enforcement that may subsequently be vacated by a later court if that court has a different understanding of the requirements of the Texas Constitution or United States Constitution;

(2)  is not a formal amendment of the language in a statute or ordinance; and

(3)  no more rewrites a statute or ordinance than a decision by the executive not to enforce a duly enacted statute in a limited and defined set of circumstances.

(f) If any court, including any state or federal court, disregards any of the severability requirements in Subsections (a), (b), (c), (d), or (e), and declares or finds any provision of this chapter facially invalid, preempted, or unconstitutional, when there are discrete applications of that provision which can be enforced against a person, group of persons, or circumstances without violating federal or state law or the federal or state constitutions, then that provision shall be interpreted, as a matter of city law, as if the city had enacted a provision limited to the persons, group of persons, or circumstances for which the provision's application will not violate federal or state law or the federal or state constitutions, and every court and every government official shall adopt this saving construction of that provision until the court ruling that pronounced the provision facially invalid, preempted, or unconstitutional is vacated or overruled.

## D. EFFECTIVE DATE

This ordinance shall go into immediate effect upon majority vote by the City Council.